**WHITE & CASE LLP**
Aaron Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

– and –

**WHITE & CASE LLP**
Jason Zakia (*pro hac vice* pending)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: jzakia@whitecase.com
           gregory.pesce@whitecase.com

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Kathryn J. Gundersen
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
           sam.hershey@whitecase.com
           kathryn.gundersen@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

*Counsel to Mohsin Y. Meghji, as Representative for the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Reorganized Debtors. | ) (Jointly Administered) |
| | ) |

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

|  | ) |
|---|---|
|  | ) |
| Mohsin Y. Meghji, as Representative for the Post-Effective Date Debtors, | ) ) |
|  | ) |
| Plaintiff, | ) Adv. Proc. No. __ - _____ |
|  | ) |
|  | ) |
| v. | ) |
|  | ) |
| ALEXANDER MASHINSKY, SHLOMI DANIEL LEON, HANOCH GOLDSTEIN, RONI COHEN-PAVON, HARUMI URATA-THOMPSON, JEREMIE BEAUDRY, JOHANNES TREUTLER, KRISTINE MEEHAN MASHINSKY, ALIZA LANDES, AM VENTURES HOLDING, INC., KOALA1 LLC, KOALA2 LLC, KOALA3 LLC, ALCHEMY CAPITAL PARTNERS, LP, BITS OF SUNSHINE LLC, AND FOUR THIRTEEN LLC. | ) ) ) ) ) ) ) ) ) ) |
|  | ) |
| Defendants. | ) |

## COMPLAINT

Mohsin Meghji (the "**Plaintiff**" or the "**Litigation Administrator**"), in his capacity as Litigation Administrator of the estates of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**," and together with their non-Debtor affiliates "**Celsius**" or the "**Company**") appointed pursuant to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Dkt. No. 4289] (the "**Plan**"), by and through his undersigned counsel, as Plaintiff in the above-captioned adversary proceeding, and based upon knowledge, information, belief, and the result of its investigation to date, alleges as follows:

## NATURE OF ACTION

1.      Celsius was founded on the idea that banks were broken.  Celsius promised to provide financial freedom to its account holders by paying them 80% of the gross revenue it

2

received from its investments.  Celsius's co-founders, Alexander Mashinsky, Daniel Leon, and Hanoch "Nuke" Goldstein, repeatedly assured Celsius's account holders that Celsius safeguarded their assets and advertised that Celsius only invested in safe, market-neutral and well-collateralized investments with reputable counterparties.  Unfortunately, none of this was true.

2.      From the beginning, Celsius operated a fraudulent business.  The company's initial capital raise occurred through an initial coin offering (or ICO) of its own cryptocurrency, the CEL token.  In the summer of 2018, Mr. Mashinsky announced that Celsius had raised $50 million through a fully funded ICO.  This was a lie.

3.      The claim that the ICO was fully funded relied on Mr. Mashinsky's agreement to backstop $18 million of unsold CEL tokens.  But when the time came to pay, Mr. Mashinsky refused.  Instead, Mr. Leon extended the time by which Mr. Mashinsky had to purchase the tokens and reduced the purchase price.  Mr. Mashinsky, Mr. Leon, Mr. Beaudry and Mr. Cohen-Pavon then orchestrated a series of deceptive corporate transactions and together with certain of the other Defendants, including Mr. Goldstein, colluded to hide the failure from the public.  Ultimately, two years later, Mr. Leon let Mr. Mashinsky off the hook, and the CEL tokens Mr. Mashinsky promised to purchase were added back to Celsius's balance sheet.

4.      Through a combination of relentless promotion, rising public interest in cryptocurrency, and top-of-the-market interest rates, the number of account holders who transferred assets to Celsius and the total value of those assets grew rapidly.  Mr. Mashinsky promoted Celsius's "success" each week on his live "Ask Mashinsky Anything" broadcasts ("**AMAs**") where he encouraged people to give Celsius their cryptocurrency, sit back, and earn

weekly rewards.  Mr. Mashinsky and other Defendants assured account holders that Celsius was responsibly investing in collateralized loans and other low risk investments.

5.     The truth was far different.  On the inside, Celsius was a mess and far more broken than any bank.  Celsius repeatedly failed to responsibly hold or invest the assets transferred to its platform by its account holders.   In 2020, investment decisions were primarily made by Mr. Mashinsky, Roni Cohen-Pavon (Celsius's Chief Revenue Officer), and Harumi Urata-Thompson (Celsius's Chief Investment and Financial Officer).  Those investment decisions were made in an ad hoc manner, with hundreds of millions of dollars' worth of cryptocurrency transmitted to counterparties with little to no diligence.  Celsius had hundreds of millions of uncollateralized loans and recklessly gambled on the price of cryptocurrency.

6.     By the spring of 2021, account holders had transferred over $10 billion of cryptocurrency to Celsius.  Celsius tasked two employees with overseeing risk and sorting through the ad hoc gambles placed by Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, and other Celsius employees.  To the extent Celsius tracked its billions of dollars of investments and various positions across the firm, it did so using a spreadsheet.

7.     Celsius's lack of basic investment controls led to disastrous results.  For example, in 2020, Mr. Mashinsky and Mr. Cohen-Pavon sent billions in assets to KeyFi, Inc. ("**KeyFi**")— an entity that was partially owned Mr. Mashinsky and Mr. Goldstein—to engage in staking and speculative investments.  These assets were sent to KeyFi before an agreement was finalized. Celsius never created proper controls or oversight mechanisms to ensure KeyFi was using its assets as directed.  KeyFi lost and absconded with more than $315 million.

8.     Celsius also provided hundreds of millions of dollars of Bitcoin ("**BTC**") and Ethereum ("**ETH**") collateral to a separate entity, Equities First Holdings ("**EFH**"), without receiving basic financial information from EFH.  EFH, ultimately, refused to return Celsius's cryptocurrency and now owes Celsius approximately $308 million and 3,765 BTC (with a current market value of over $231 million).

9.     During this same period, Celsius used BTC transferred by customers to strategically purchase CEL tokens and artificially inflate the token's price.  In late 2020 and early 2021, the Defendants realized that they had not accurately tracked Celsius's assets and liabilities and, because the Defendants were using BTC to purchase CEL tokens, Celsius had significantly more BTC obligations than it had assets to satisfy those obligations.  As BTC prices skyrocketed and everyone in the crypto industry was making money, Celsius lost *over $250 million*—a fact that the Defendants did not realize until it was too late.  After that incident, the Defendants knew that Celsius had to better track its assets and obligations—yet, the Defendants *again* failed to allocate proper resources to Celsius's financial operations. Instead, the Defendants turned to another ineffective, manually updated spreadsheet, which often misrepresented Celsius's position by hundreds of millions of dollars.

10.     The above-described losses were some of the many "poor asset deployment decisions" made by the Debtors in 2020 and 2021.[2]  During that time, Celsius operated at a multiple hundred-million-dollar loss.  The returns from its investments were not sufficient to meet the bloated operating expenses incurred by the Defendants, the staggering losses suffered due to the

_____

[2] *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, In Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 23] ¶ 10.

Defendants' reckless conduct, and the above-market interest rates the Defendants refused to reduce. ***In 2021 alone, the Defendants lost over $1.2 billion***.

11.     As the losses mounted, Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler directed Celsius to continue spending ***hundreds of millions of dollars*** to buy CEL tokens on the open market to inflate the token's price.  Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler coordinated the timing, price, and size of purchases, each specifically intended to inflate the price of the token.  As the largest holders of CEL tokens, Mr. Mashinsky, Mr. Leon, Mr. Goldstein and the other Defendants profited from the rising price.  All of the Defendants sold millions of dollars of CEL token directly back to the Company through its "over-the-counter" ("**OTC**") trading desk at prices that they knew were inflated.  Mr. Mashinsky, Mr. Leon, and Mr. Goldstein also directly profited by secretly selling CEL tokens from their private wallets, often around the time when Celsius was purchasing CEL tokens.  Between 2019 and 2022, Mr. Mashinsky sold more than $73.9 million of CEL tokens, Mr. Leon sold more than $21.6 million, and Mr. Goldstein sold more than $6 million.  Certain of those sales were in direct violation of Celsius's policy on trading CEL tokens.  Certain of those sales were in direct violation of Celsius's policy on trading CEL tokens.

12.     Also in 2021, Celsius became concerned by Mr. Mashinsky's pattern of misrepresentation when promoting Celsius on his live AMAs and other engagements.  Mr. Mashinsky's lies included statements about the risk of Celsius's investments, regulatory compliance, the strength of its financials, and the method by which Celsius set its rewards rates.  Each lie was intended to convince more retail investors to transfer their assets to Celsius.  Celsius's risk team raised concerns to Mr. Mashinsky about his repeated misrepresentations and informed

him of the specific inaccuracies and misrepresentations. They asked him to not film live and instead record the AMAs so that the risk, compliance, and other teams could review the videos and remove misstatements before the videos were released to the public. Mr. Mashinsky refused and continued to lie to the public. Each week, Celsius employees would watch Mr. Mashinsky's AMAs as they were broadcast live to thousands of account holders. Celsius would then post the video to the internet. The employees would then send a list of Mr. Mashinsky's and other employees' lies to the media team who would remove the statements, remove the version with the lies from the internet, and repost the edited video. Each Defendant was aware of the cover-up. Neither the Defendants nor Celsius ever retracted or corrected any of Mr. Mashinsky's misrepresentations. Mr. Mashinsky also lied on widely published news broadcasts and other live events, which could not be covered up by the Celsius team.

13.    It all came to a head in January 2022. The Defendants were operating a billion-dollar derivatives trading desk without tracking the positions they were holding. The desk was betting that markets would continue to go up. As the cryptocurrency market turned, and prices began to drop, the derivatives desk experienced significant losses. Mr. Mashinsky, Mr. Leon, and the other officers were informed of the issue after significant losses had been incurred, but they failed to take action for days. Finally, after days of additional losses, Mr. Mashinsky took matters into his own hands and recklessly bet the markets would continue to drop, ordering Celsius's traders to sell ***hundreds of millions of dollars in cryptocurrency***. But Mr. Mashinsky was wrong again. The market turned positive while Celsius had a large short position and this caused Celsius to incur staggering losses.

14.     In May 2022, the Terra Luna crisis and resulting drain on Celsius's liquidity crippled Celsius.  After Mr. Mashinsky and Mr. Leon became aware that Celsius would likely not survive, they and their relatives withdrew substantially all of their non-CEL token cryptocurrency from the Celsius platform.  In total, the Defendants **withdrew nearly $20 million** between April 1, 2022 and July 13, 2022 (the "**Petition Date**").

15.     Mr. Mashinsky would often preach that if account holders had questions about whether they should trust Celsius, they only had to look at him—the largest account holder and CEL token holder—who was putting his money where his mouth was and standing alongside them. Like many other things Mr. Mashinsky said to entice customers to transfer their hard-earned assets to Celsius, those statements were not true.  Mr. Mashinsky refused to invest at the beginning after telling customers the money was in the bank, skimmed millions off the top through his secret sales of CEL tokens, and was the first one to jump as the Celsius ship began to sink.

16.     From the outset, Mr. Mashinsky and the other Defendants placed themselves ahead of Celsius and its account holders.  Their reckless and self-interested conduct has caused more than $3 billion of damage to the hundreds of thousands of account holders who believed the Defendants and trusted them to safeguard their cryptocurrency.  This lawsuit seeks damages for, among other things, (1) breaches of the Defendants' fiduciary duties to Celsius and aiding and abetting those breaches, (2) fraudulent misrepresentation, conspiracy to fraudulently misrepresent, and violations of applicable state consumer fraud statutes, (3) avoidance of actual, preferential, and constructive transfers, and (4) equitable subordination and/or disallowance of Defendants' claims.

## JURISDICTION

17.     This adversary proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

18.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Federal subject matter jurisdiction also exists under 28 U.S.C. § 1331 and under 28 U.S.C. § 1332(a), based on complete diversity of citizenship of the parties and because the amount in controversy, exclusive of interests and costs, exceeds $75,000.

19.     This Court has personal jurisdiction over each of the Defendants pursuant to Bankruptcy Rule 7004.  Each of the Defendants has maintained minimum contacts with the United States in connection with the claims asserted herein.

20.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.

21.     The Litigation Administrator consents to the entry of final orders or judgements by the Bankruptcy Court.

## PARTIES

22.     Plaintiff is the Litigation Administrator appointed by the Debtors to pursue estate causes of action pursuant to the Plan, which became effective on January 31, 2024.

23.     The Litigation Administrator brings this action on behalf of the Post-Effective Date Debtors' (the "**Debtors**") estates.[3]  The Debtors are: Celsius Network LLC; Celsius KeyFi LLC; Celsius Lending LLC; Celsius Mining LLC; Celsius Network, Inc.; Celsius Network Limited; Celsius Networks Lending LLC; Celsius US Holding LLC; GK8 Ltd; GK8 UK Limited; and GK8 USA LLC.  On July 13, 2022, the Debtors, other than GK8 Ltd, GK8 UK Limited, and GK8 USA LLC (collectively, the "**GK8 Debtors**"), filed voluntary petitions for relief in this Court under Chapter 11 of the Bankruptcy Code.[4]  On December 7, 2022, the GK8 Debtors filed voluntary petitions in this Court under Chapter 11 of the Bankruptcy Code.  The Plan became effective on January 31, 2024.

24.     Defendant Alexander Mashinsky is one of the founders of Celsius.  Mr. Mashinsky was a director of Celsius Network Limited and Celsius Network, Inc.  He served as the Chief Executive Officer ("**CEO**") of Celsius Network LLC and Celsius Network Limited on or around the time of their inceptions until September 27, 2022.  Mr. Mashinsky also served as CEO of Celsius US Holding LLC, Celsius Lending LLC, Celsius Networks Lending LLC, and Celsius Network, Inc., in addition to serving as Executive Chairman of the Board for Celsius Mining LLC and Secretary of Celsius Network, Inc.  Mr. Mashinsky was a director of Celsius KeyFi LLC, Celsius Mining LLC, Celsius Network LLC, Celsius Lending LLC, Celsius US Holding LLC, and Celsius Networks Lending LLC from their inception to September 27, 2022.  Upon information

---

[3] References to the "Debtors" with respect to conduct that occurred prior to the effective date of the Plan are to the pre-effective date Debtors.  References to the "Debtors" with respect to conduct that occurred following the effective date of the Plan are to the post-effective date Debtors.

[4] The claims asserted herein also include certain creditors' claims which were assigned to the Debtors' estates under the Plan.

and belief, Mr. Mashinsky served on Celsius's (1) New Business Committee from its inception until it was disbanded in July 2021,[5] (2) Executive Committee ("**ExCO**") from its inception until the end of his tenure at Celsius, (3) Assets and Liabilities Committee ("**ALCO**") from its inception in July 2021 until the end of his tenure at Celsius, (4) Risk Committee from its inception in December 20, 2020 until on or around August 2021, (5) Assets & Obligations Committee ("**A&O Committee**") from its inception on April 7, 2020, until it was disbanded, (6) Deployment Committee as its chair from its inception on April 7, 2020 until it was disbanded, and (7) Investment Committee in or around 2020.  Mr. Mashinsky regularly attended, participated in, and received materials from the New Business Committee, ExCO, ALCO, Risk Committee, A&O Committee, Deployment Committee, and Investment Committee meetings during his time at Celsius, even if he was not a member of the applicable committee at the time.  At all times relevant to this Complaint, Mr. Mashinsky controlled the Debtors through his 83.7% equity stake in Debtor Celsius Network Inc., a Delaware corporation, which is a majority owner of Celsius Network Limited, which wholly owns Celsius US Holding LLC, which is the sole owner of Celsius Network LLC.  Upon information and belief, Mr. Mashinsky maintains a residence and conducts or conducted business in or directed at New York for the time period relevant to this Complaint.

25.    Defendant Shlomi Daniel Leon is one of the founders of Celsius.  He was a director of Celsius Network, Inc. and Celsius Network Limited.  He served as the Chief Strategy Officer ("**CSO**") of Celsius Network Limited and Celsius Network LLC on or around the time of each of their inception until September 27, 2022.  He served as Chief Operating Officer ("**COO**") of

---

[5] The New Business Committee functioned as Celsius's investment and business development committee from around 2018 to July 2021. The New Business Committee replaced the Investment Committee in 2020.

Celsius Network Limited and Celsius Network LLC from, on, or around each of their inception until January 3, 2022.  Mr. Leon was the CSO of Celsius Lending LLC, President of Celsius Mining LLC, and COO of Celsius Network, Inc. and of Celsius Networks Lending LLC.  He was a director of Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network LLC, Celsius Networks Lending LLC, Celsius US Holding LLC, and GK8 USA LLC.  Upon information and belief, Mr. Leon served on (1) the ExCO from its inception until the end of his tenure at Celsius, (2) the ALCO from its inception in July 2021 until the end of his tenure at Celsius, (3) the Risk Committee from December 20, 2020 until on or around December 2021, (4) the A&O Committee from its inception on April 7, 2020 until it was disbanded, the (5) the New Business Committee from its inception until it was disbanded in July 2021, and (6) the Investment Committee in or around 2020.  Upon information and belief, Mr. Leon regularly attended, participated in, and received materials from the ExCO, ALCO, Investment Committee, Risk Committee, New Business Committee, and A&O Committee meetings during his time at Celsius, even if he was not a member of that committee at the time.  Upon information and belief, Mr. Leon maintains a residence in New Hampshire and conducts or conducted business in or directed at New York.

26.     Defendant Hanoch "Nuke" Goldstein is one of the founders of Celsius.  Mr. Goldstein served as the Chief Technology Officer ("**CTO**") of Celsius Network LLC, Celsius Lending LLC, and Celsius Network Limited from on or around the time of their inceptions until March 21, 2022.  Mr. Goldstein served as the President of Labs at Celsius Network LLC and Celsius Network Limited until he was terminated during the Chapter 11 Cases.  Mr. Goldstein served on the ExCO from its inception until the end of his tenure at Celsius, and the Risk

Committee from on or around September 2021 until March 2022.  Upon information and belief, Mr. Goldstein regularly attended, participated in, and received materials from the ExCO and Risk Committee meetings during his time at Celsius, even if he was not a member of that committee at the time.  Mr. Goldstein maintains a residence in Florida and conducts or conducted business in or directed at New York.

27.     Defendant Roni Cohen-Pavon was initially outside counsel to Celsius.   He later was hired as the Chief Revenue Officer ("**CRO**") of Celsius Network Limited, Celsius Network LLC, and Celsius Mining LLC from on or about September 16, 2020.  As part of his duties, Mr. Cohen-Pavon was responsible for leading and overseeing Celsius's regulatory compliance.  On September 13, 2023, Mr. Cohen-Pavon pled guilty to securities fraud, wire fraud, and market manipulation related to the conduct alleged in this Complaint.  His employment with Celsius was terminated following his indictment in July 2023.  Upon information and belief, Mr. Cohen-Pavon served on (1) the ExCO from the beginning of his employment until the termination of his employment, (2) the ALCO from its inception in July 2021 until the termination of his employment, (3) the Risk Committee from its inception on December 20, 2020 until the termination of his employment, (4) the A&O Committee from its inception on April 7, 2020 until such committee was disbanded,[6] and (5) the Regulatory Committee from its inception on April 7, 2020 until such committee was disbanded.  Upon information and belief, Mr. Cohen-Pavon regularly attended, participated in, and received materials from the ExCO, ALCO, A&O Committee, Regulatory Committee, and Risk Committee meetings during his time at Celsius, even

---

[6] Mr. Cohen-Pavon was appointed to the Assets & Obligations Committee notwithstanding that he was not an employee or officer of Celsius at the time.

if he was not a member of that committee at the time.  On information and belief, Mr. Cohen-Pavon maintains a residence in Tel Aviv, Israel and conducts and conducted business in or directed at New York, including regular business travel to New York.

28.    Defendant Harumi Urata-Thompson served as the Chief Financial Officer ("**CFO**") of Celsius Network Limited and Celsius Network, Inc. from April 2020 to November 2021 and Chief Investments Officer ("**CIO**") of the same entities from February 2020 to September 2021. Upon information and belief, Ms. Urata-Thompson served on (1) the ALCO from its inception in July 2021 until the end of her tenure at Celsius, (2) the New Business Committee from the beginning of her employment with Celsius until it was disbanded in July 2021, (3) the Risk Committee from its inception on December 20, 2020 until the end of her tenure at Celsius, (4) the Deployment Committee as its chair from its inception on April 7, 2020 until it was disbanded, (5) the A&O Committee from its inception on April 7, 2020 until it was disbanded, (6) the Investment Committee in or around 2020, and (7) the ExCO from the beginning of her employment with Celsius until the end of her tenure at Celsius.  Upon information and belief, Ms. Harumi Urata-Thompson regularly attended, participated in, and received materials from the ExCO, ALCO, New Business Committee, Investment Committee, Deployment Committee, A&O Committee, and Risk Committee meetings during her time at Celsius, even if she was not a member of the applicable committee at the time.  Upon information and belief, Ms. Urata-Thompson maintains a residence and conducts or conducted business in or directed at New York.

29.    Defendant Jeremie Beaudry served as General Counsel, Chief Compliance Officer ("**CCO**"), Secretary to the Board, and head of the anti-money laundering compliance department of Celsius Network Limited from April 7, 2020 to September 2021.  Mr. Beaudry was CCO of

Celsius Lending LLC and Celsius Networks Lending LLC from its inception until September 2021. Upon information and belief, Mr. Beaudry served on the (1) Risk Committee from April 2021 to July 2021, (2) the A&O Committee as its chair from its inception on April 7, 2020 until it was disbanded, (3) the Regulatory Committee from its inception on April 7, 2020 until the end of his tenure at Celsius, and (4) the ExCO from the beginning of his employment with Celsius until February 2021. Upon information and belief, Mr. Beaudry regularly attended, participated in, and received materials from the A&O Committee, ExCO, Regulatory Committee, and Risk Committee meetings during his time at Celsius, even if he was not a member of that committee at the time. Upon information and belief, Mr. Beaudry maintains a residence in Georgia and conducts or conducted business in or directed at New York.

30.    Defendant Johannes Treutler was the Head of CeFi Trading of Celsius Network Limited from October 2019 to January 2022. During that time, among other things, Mr. Treutler directed the purchase of CEL tokens on public markets and exchanges and oversaw the execution of Celsius's exchange traded strategies. Upon information and belief, Mr. Treutler regularly attended, participated in, received materials from, and prepared information for the Investment Committee and ExCO during his time at Celsius, even if he was not a member of the applicable committee at the time. Upon information and belief, Mr. Treutler lives in Berlin, Germany and conducted business in or directed at New York.

31.    Defendant Aliza Landes served as the Head of Business Development for EMEA at Celsius Network Limited from January 2018 to March 2019. Ms. Landes served as the Vice President of Lending at Celsius Network Limited, Celsius Lending LLC, and Celsius Network LLC from its inception until January 2022. Ms. Landes served on the Risk Committee from on or

around September 2021 until November 2021.  Upon information and belief, Ms. Landes regularly

attended, participated in, and received materials from Risk Committee meetings during her time

at Celsius, even if she was not a member of that committee at the time.  Ms. Landes is the spouse

of Defendant Shlomi Daniel Leon.  Upon information and belief, Ms. Landes maintains a residence

in New Hampshire and conducts or conducted business in or directed at New York.

32.     Defendant Kristine Meehan Mashinsky is the spouse of Defendant Alexander

Mashinsky.  Upon information and belief, Mrs. Mashinsky maintains a residence and conducts or

conducted business in or directed at New York.

33.     Defendant AM Ventures Holding, Inc. ("**AMV**") is a corporation incorporated

under the laws of the State of Delaware.  Upon information and belief, AMV is wholly owned by

Defendant Alexander Mashinsky.  AMV agreed to purchase CEL tokens in connection with the

ICO of Celsius Network Limited.

34.     Defendant Koala1 LLC is a limited liability company incorporated under the laws

of the State of Delaware.  Upon information and belief, Koala1 LLC is owned and controlled by

Defendant Alexander Mashinsky.  Koala1 LLC maintained an account with Celsius.

35.     Defendant Koala2 LLC is a limited liability company incorporated under the laws

of the State of Delaware.  Upon information and belief, Koala2 LLC is controlled by Defendant

Alexander Mashinsky.

36.     Defendant Koala3 LLC is a limited liability company incorporated under the laws

of the State of Delaware.  Upon information and belief, Koala3 LLC is controlled by Defendant

Alexander Mashinsky.

37.     Defendant Alchemy Capital Partners, LP ("**Alchemy**") is a limited partnership incorporated under the laws of the State of Delaware.  Upon information and belief, Alchemy is controlled by Defendant Shlomi Daniel Leon.

38.     Defendant Bits of Sunshine LLC is a limited liability company incorporated under the laws of the State of Delaware.  Upon information and belief, Bits of Sunshine LLC is controlled by Defendant Hanoch Goldstein.

39.     Defendant Four Thirteen LLC is a limited liability company incorporated under the laws of the State of Delaware.  Upon information and belief, Four Thirteen LLC is controlled by Defendant Hanoch Goldstein.

40.     Collectively, Defendants Alexander Mashinsky, Leon, Goldstein, Cohen-Pavon, Urata-Thompson, and Beaudry are referred to as the "**D&O Defendants**" throughout this Complaint.

## STATEMENT OF FACTS

### I.     The Launch of Celsius and Initial Coin Offering

41.     Celsius was started by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein in 2017.  The business idea was described in a "Whitepaper," which Celsius used to solicit capital through the public initial coin offering of the CEL token (the "**ICO**").[7]  The Whitepaper explained that the CEL token was necessary because Celsius's "lending and borrowing model requires a blockchain and open ledger," which would be key to transparency on the platform.

---

[7] The CEL token uses the ERC-20 standard.  The ERC-20 standard defines a common list of rules that ERC-20 tokens must adhere to, including how the tokens can be transferred, how transactions are approved, and the total supply of tokens.  Transactions of ERC-20 tokens are processed and documented on the Ethereum blockchain.

42.     Celsius planned to offer two primary products.  First, customers could transfer their cryptocurrency assets to Celsius in exchange for weekly interest—the Earn program.  Celsius said it would lend those cryptocurrency assets to hedge funds, family offices, and crypto funds to "make the most of their greed" and generate yield.  Second, Celsius would "allow its members to use their crypto holdings as collateral in order to secure low interest loans in dollars"—the Borrow program.

43.     Mr. Mashinsky, Mr. Leon, and Mr. Goldstein advertised that "Banking is Broken" and that Celsius's product would be for "[t]he 99% not the 1%."  They decried that banks take depositors' money to make large profits for their shareholders while only paying a fraction of interest to their depositors.  By contrast, Celsius promised to pay 80% of its gross revenue to customers in the form of rewards on their cryptocurrency deposits in the Earn program.

44.     The late 2010s were known as the "ICO boom."  Coins (and scams) were common, and a successful ICO was perceived as the key to a project's successful start.  Celsius said it would mint 650,000,000 CEL tokens.  It offered half of those tokens (325,000,000) to the public for sale at $0.20-0.30 per token.  Celsius employees were scheduled to receive 123,500,000 CEL tokens (19%) and partners and advisors would receive 26,000,000 CEL tokens (4%).  The balance of the tokens would be allocated to Celsius's treasury.

45.     If all 325,000,000 CEL tokens were sold, Celsius would raise approximately $50,000,000.  The Whitepaper provided that any of the 325,000,000 CEL tokens offered that went unsold would be "burned" or destroyed.  It explained how Celsius would use that $50,000,000 to fund its operations, loan reserves, research and development, sales and marketing, and an insurance pool.

46.     On March 28, 2018, Mr. Mashinsky executed a token sale agreement with Celsius Network Limited on behalf of his corporation AMV (the "**Token Sale Agreement**").  Mr. Leon signed the Token Sale Agreement on behalf of Celsius Network Limited.  Under the Token Sale Agreement, Mr. Mashinsky agreed to purchase the CEL tokens not sold in the ICO, up to a maximum amount of 90,000,000, for $18 million.  Mr. Mashinsky would receive a bonus of 30% more CEL tokens (*i.e.*, a total of 117,000,000 CEL tokens or 36% of the total amount of CEL tokens to be sold).  The purchase was to be settled 90 days after March 28, 2018.  The Token Sale Agreement provided that the purchase was "final, and there are no refunds or cancellations . . ."

47.     On April 30, 2018, Celsius filed a Notice of Exempt Offering of Securities (Form D) with the United States Securities and Exchange Commission, disclosing that it had sold $24,527,033 of the $50,000,000 of CEL tokens offered, including to 1,343 unaccredited investors.  Celsius later filed an Amended Form D which indicated that the "Total Offering Amount," and "Total Remaining to be Sold" was "Indefinite" because Celsius was "[u]nable to determine [the] exchange rate."  Celsius's records reflect that it ultimately sold only $32 million, or 203 million CEL tokens.

48.     Notwithstanding the fact that Celsius had failed to sell the entire amount of CEL tokens offered in the ICO, Mr. Mashinsky, aware that a successful ICO was a key barometer of success, told several media outlets that the ICO of the CEL token was fully funded.  For instance, at the World Blockchain Forum held in New York from June 11-13, 2018, Mr. Mashinsky stated: "Celsius completed a fifty two million dollar ICO two months ago."[8]  During a July 25, 2018 Coin

---

[8] Events, Alex Mashinsky – Crossing the Chasm – The Next 100 Million Crypto Users, YouTube (Jun. 24, 2018), at [1:41], https://www.youtube.com/watch?v=m5W7vNUfguM.

Central Interview, Mr. Mashinsky repeated this claim, stating, "[i]t's funny because our ICO raised over $50 million."[9]  And on October 2, 2018 in Las Vegas, Mr. Mashinsky stated again that "[w]e did a $52 million ICO four months ago."[10]

49.     Each of these statements was false, as Mr. Mashinsky refused to purchase the 117,000,000 CEL tokens that he had promised to buy and Celsius's ICO only raised approximately $32 million.  Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Mr. Goldstein, and Mr. Beaudry all knew that the ICO was underfunded, that all of the representations that Celsius made to the contrary were false, and that customers would react negatively if the truth were revealed.  None of them corrected any of Mr. Mashinsky's many false statements.  To the contrary, they actively conspired to hide the truth.

50.     Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, and Mr. Beaudry hatched a series of convoluted corporate transactions that were designed to hide the fact that the ICO had not been fully funded.  In early September 2018, Mr. Mashinsky instructed Mr. Leon to extend the Token Sale Agreement by 12 months and to change the price of the purchase obligation to the current market price ($0.06 vs. the $0.20 previously agreed sale price) to avoid a "tax hit."

51.     More than a year later, Mr. Mashinsky continued to refuse to purchase the CEL tokens AMV was obligated to buy.  To settle the unfulfilled obligations in the Token Sale Agreement, AMV entered into a loan agreement, in which Celsius Network Limited "lent" AMV $7,020,000 collateralized with the 117,000,000 CEL tokens (which AMV had not purchased) and

---

[9] Steven Buchko, Celsius Network CEO Alex Mashinsky Is Moving from VoIP to MoIP, Coin Central (Jul. 17, 2022), https://coincentral.com/alex-mashinsky-voip-to-moip-2/.

[10] BlockShow, Alex Mashinsky. Power vs. People: The War of Decentralization. BlockShow Americas 2018, YouTube (Oct. 2, 2018), at [16:19], https://www.youtube.com/watch?v=HTENY4DlIqc.

common shares of Celsius (the "**AMV Loan**").  Mr. Mashinsky signed for AMV and Mr. Leon signed for Celsius.  Celsius employees, including Celsius's then CFO, struggled to understand how Mr. Mashinsky could take a loan collateralized by assets he did not own.  Celsius even paid Mr. Mashinsky's personal legal bill for the AMV loan.  It is unclear whether any fiat currency changed hands under the AMV Loan.

52.    At Celsius's April 7, 2020 board meeting, the board discussed issues regarding AMV's agreement to buy CEL tokens and noted that Celsius Network Limited and AMV had terminated the Token Sale Agreement at some point before the meeting.  The board resolved to keep the 117,000,000 CEL tokens that Mr. Mashinsky refused to purchase in a segregated account.  The board resolution was approved by Mr. Leon and Patrick Martin (whose company had been appointed to the board that day), both large holders of CEL tokens.  Despite Celsius's promise in the Whitepaper to burn any of the 325,000,000 CEL tokens that were not sold, the 117,000,000 CEL tokens were not burned.  Instead, those CEL tokens were deposited in a segregated wallet at the direction of Mr. Leon and Mr. Martin to obscure their return from the public.

53.    The board eventually resolved to move the 117,000,000 CEL tokens to Celsius's treasury.  In June 2020, Celsius employees, including Ms. Urata-Thompson and Mr. Goldstein, discussed whether Celsius's customers would react negatively to the return of the 117,000,000 CEL tokens to Celsius's treasury more than two years after the ICO.  Ms. Urata-Thompson determined that they would need to "find a good story" and "well-crafted information" to explain why the 117,000,000 CEL tokens were not purchased.  Defendant Johannes Treutler, who was in charge of the Company's purchases of CEL tokens, informed Ms. Urata-Thompson that he had told Mr. Leon about similar concerns.  Other employees warned that "not burning the tokens would

be a concern" as the Whitepaper promised that all CEL tokens that were designated to be sold in the ICO, but were not ultimately sold, would be destroyed. But Mr. Leon and Mr. Mashinsky ordered the 117,000,000 CEL tokens to be sent to Celsius's treasury.

54.    The 117,000,000 CEL tokens were classified on the Celsius website as loan collateral. Mr. Beaudry acknowledged this classification was misleading and worked with Ms. Urata-Thompson on how to categorize the tokens on the Celsius website in a way that would not raise suspicion. Mr. Cohen-Pavon assisted in drafting statements to justify Celsius's appropriation of these tokens, explaining that the company acted in the best interests of its clients by contributing the tokens to its balance sheet and thereby strengthening its financial position. Additionally, he prepared a response to Coin Market's inquiries about the 117,000,000 CEL tokens, asserting that the tokens were held by the company as collateral for a loan and were considered part of the total circulating supply of CEL tokens.

55.    The Company continued to misrepresent how it handled the tokens that were not purchased in the ICO until its bankruptcy filing. In an April 1, 2022 AMA, Mr. Goldstein again told the public that "initially after the ICO we burned a few tokens that were not sold like we promised in the Whitepaper . . . we just followed exactly to the "T" of what we wrote in the Whitepaper, it was our commitment and building the trust."[11] Mr. Goldstein did not mention the 117,000,000 CEL token that were not sold in the ICO and not burned in accordance with the Whitepaper, as had been promised.

---

[11] Celsius Network, Celsius AMA April 1st 2022, YouTube (Apr. 1, 2022), at [32:53], https://www.youtube.com/watch?v=ELjw52R6BzY.

## II.   The CEL Token

56.     Mr. Mashinsky described the CEL token as the "backbone of Celsius" and often equated the market price of the CEL token with the strength of Celsius business.[12]  Celsius account holders could elect to receive weekly rewards payments (or interest) in CEL tokens. Interest in CEL tokens was most often paid at a higher rate than if the account holder elected to receive interest in-kind (*i.e.*, interest paid in the deposited cryptocurrency).

57.     As set forth in the table below, Mr. Mashinsky and other Celsius insiders were among the largest holders of CEL tokens.

| CEL Tokens Owned by Defendants | 7/12/2022 |
|---|---|
| Alexander Mashinsky | 57,180,878 |
| Shlomi Daniel Leon | 15,934,635 |
| Hanoch "Nuke" Goldstein | 9,705,806 |
| Kristine Meehan Mashinsky | 2,117,023 |
| Johannes Treutler | 535,928 |
| Jeremie Beaudry | 274,249 |
| Roni Cohen-Pavon | 85,678 |
| Harumi Urata-Thompson | 315,487 |
| **Total Defendants CEL Balance** | **86,149,684** |
| **Treasury CEL Balance** | **284,568,835** |
| **Available CEL Supply** | **692,753,441** |

---

[12] Celsius Network, Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon – Friday, July 17, 2020, YouTube (July 17, 2020), at [5:27], https://www.youtube.com/watch?v=csFrn4XtwL0; Celsius Network, Celsius Network Team AMA – Thursday, July 2, 2020, YouTube (July 2, 2020), at [38:35], https://youtube.com/watch?v=Ym1EjbThjVk; Ozi_Crypto, Celsius Network Twitter Spaces AMA 1-12-2021, YouTube (Jan. 12, 2021), at [1:43:33], https://www.youtube.com/watch?v=1v9zDkWbZJc&list=PL91_dMxDmGklKGDKCX_YFDLeRk0ag2Koj&index=28.

On the Petition Date, the eight Defendants listed above, their affiliated entities, and Celsius's treasury owned approximately 54% of all CEL tokens.

58.    Celsius used a flywheel diagram to demonstrate the benefits the CEL token was purported to provide to token holders and Celsius.



The flywheel evolved over time, but the point was that customers would deposit digital assets onto the Celsius platform.  Celsius would lend those digital assets to third parties to earn yield.  Celsius would use the return from its investments to buy CEL tokens on the market.  Celsius would pay interest in CEL token to electing holders, whose balances would increase.  Celsius would earn yield on the increased balances and pay its users more interest in CEL tokens.

1.      *CEL Token Utility*

59.      The CEL token had limited utility.[13]  Celsius provided that users could use CEL

tokens to pay interest on their retail loans at a lower interest rate than if interest was paid in dollars

or stablecoins.[14]  Celsius also created membership tiers, where users who held more CEL tokens

would receive early access to future Celsius products.  CEL tokens were also provided to

employees as part of their compensation.

60.      The Defendants hoped that Celsius could use CEL tokens as collateral to borrow

other currency and generate yield from third parties.  That never happened.  In fact, Celsius was

virtually the only entity that would accept CEL tokens as collateral.  Celsius offered fiat and

stablecoin margin loans to employees and certain retail customers collateralized by their CEL

tokens.

61.      Mr. Leon and Mr. Goldstein both monetized their CEL token holdings by taking

multi-million-dollar loans from Celsius collateralized by CEL tokens.  Specifically, Mr. Goldstein

received a $4.2 million loan from Celsius on April 1, 2021.  Alchemy Capital Partners, LP (which,

upon information and belief, is wholly owned and controlled by Mr. Leon) received a $4 million

loan on April 13, 2022.  The interest rates on Mr. Leon's and Mr. Goldstein's loans were 0.1% and

---

[13] The CEL token was easily gamed by certain Celsius customers.  Certain account holders who elected to earn interest
in CEL tokens would immediately sell the tokens (or swap it on Celsius) for BTC, ETH, or stablecoins.  The Company
frequently bought those CEL tokens on the open market as part of its buybacks using BTC, ETH, and stablecoins.  In
essence, the Company was paying the increased interest rate with in-kind assets (or stablecoins, which it borrowed at
an additional cost to the Company).  The Defendants were aware that Celsius's customers were taking advantage of
the Company and the resulting losses to the Company, but did not take any action to stop the bleeding.  Rather, they
encouraged it by reducing the amount of CEL tokens account holders had to hold to swap CEL tokens for BTC, ETH,
and stablecoins.

[14] Stablecoin is a term used to describe a cryptocurrency, such as USDC or USDT, whose value is tied or pegged to
fiat currency through an algorithm or reserves.

1%, respectively.  Mr. Leon and Mr. Goldstein did not execute loan agreements in connection with their multi-million-dollar loans from Celsius.  Celsius asserts that the loans are governed by the relevant Terms of Use that were in place at the time the loans were issued.

62.    Mr. Goldstein's loan matured on April 1, 2024.  The Litigation Administrator called Mr. Leon's loan on May 7, 2024.  That loan matured on June 7, 2024.  As Celsius's Global Treasury Director put it, the loans allowed the insiders to "us[e] the company" as a "piggybank." As of the date of this Complaint, neither Mr. Goldstein nor Alchemy have repaid the amounts owed to Celsius.

### 2.   *Defendants Caused Celsius to Spend Hundreds of Millions of Dollars to Inflate the Price of the CEL Token*

63.    From 2018 through June 2022, Celsius used BTC, ETH, and stablecoins worth hundreds of millions of dollars to purchase CEL tokens on public markets through third-party exchanges (such as FTX and Liquid Exchange) or its OTC trading desk.  Together Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, Mr. Treutler, and other Defendants orchestrated a scheme to manipulate the price of CEL token by causing Celsius to purchase massive amounts of CEL token to artificially inflate the price of the token.  At the direction of Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler, Celsius strategically sized and timed its purchases of CEL tokens to prop-up the market price of the CEL token.

64.    Celsius advertised that it would purchase the amount of CEL token it owed customers who elected to "Earn in CEL," rather than using CEL token in its treasury.[15]  Beginning

---

[15] Celsius Network, Celsius Network Team AMA – Friday, December 31, 2021, YouTube (Dec. 31, 2021), at [3:70], https://www.youtube.com/watch?v=miXgxNqwFag.

in the summer of June 2020, Mr. Mashinsky committed that Celsius would "stop using the treasury to pay interest to our community" and would start "buying almost everything . . . almost 100 percent from the markets."[16]

65.     The amount of CEL tokens purchased was determined in an ad hoc manner by Mr. Mashinsky, Ms. Urata-Thompson, Mr. Cohen-Pavon, and Mr. Treutler, who provided specific price targets to support (including resting buy orders at set prices) and amounts to be purchased. On certain occasions, Ms. Urata-Thompson and Mr. Treutler directed CEL tokens to be purchased during Mr. Mashinsky's live AMAs to encourage retail investors to purchase CEL tokens.

66.     Celsius frequently purchased CEL tokens in amounts that were significantly greater than the amount needed to meet reward obligations.  For example, on November 10, 2020, Mr. Treutler proposed and directed the purchase of 100,000 CEL tokens per day for that week, even though Celsius only needed 65,000 CEL tokens per day to satisfy its reward obligations.  On November 26, 2020, Mr. Mashinsky assured the public that Celsius's purchases were transparent and calculated based on those who elected to receive interest (or "Earn in") CEL token: "[Celsius] just published our total assets, do the math how much $CEL we will need to buy next week all time record users, deposits and Celsius earning in CEL."  Similarly, in late December 2020, Celsius's trading desk bought a total of $3.8 million in CEL tokens despite needing only $1.5 million to cover its reward obligations.  From July 2020 to the end of 2020, Celsius purchased more than 17 million CEL tokens more than it paid its customers.  Those purchases artificially

---

[16] Celsius Network, Ask Mashinsky Anything – Friday, June 19, 2020, YouTube (June 19, 2020), at [00:11:41], https://www.youtube.com/watch?v=YrGcsAID3cM.

increased the price of CEL token from approximately $0.40 in late July 2020 to approximately $5.50 by the end of 2020.

67.     On occasion, Celsius also bought CEL tokens to improve its position in business deals.  In one case, Mr. Treutler noted that "[w]e bought a lot [of CEL] . . . to support price for this deal" and contended that the purchases resulted in Celsius securing a better deal in the transaction than it otherwise would have secured.

68.     As described in further detail below, Ms. Urata-Thompson and Mr. Treutler also monitored large CEL token sales by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein on centralized and decentralized exchanges and directed Celsius to purchase CEL tokens to support the falling price due to the increase in supply resulting from the directors' and officers' sales.  While Ms. Urata-Thompson and Mr. Treutler complained to one another about Mr. Mashinsky's large sales of his CEL tokens at times when Celsius was purchasing CEL tokens, both continued to facilitate the purchases, spending company assets to inflate the price of the CEL token after such sales.

69.     In July 2020, Celsius implemented a policy that restricted sales of CEL tokens by executive officers and directors of Celsius.  The policy specifically prohibited officers and directors from buying and selling CEL tokens if they knew material non-public information, as well as any sale or purchases in an amount more than $20,000 per day or $50,000 per week.  Mr. Beaudry was in charge of enforcing the CEL token trading policy.  Mr. Beaudry was repeatedly informed that executives, including Mr. Mashinsky and Mr. Leon, were breaching the policy, but did not take actions to enforce the policy or stop the executives from selling amounts in excess of the policy.

70.     Between December 25, 2020 and January 8, 2021, the CEL token increased in value from $3.80 to $5.50.  Mr. Mashinsky, Mr. Leon, and Mr. Goldstein each sold significant amounts of CEL tokens on each day during that period through third party exchanges.  In total, during that period, Mr. Mashinsky sold 1,231,486 CEL tokens (with a market value of $6,161,533.53), Mr. Leon sold 529,013 CEL tokens (with a market value of $2,540,508), and Mr. Goldstein sold 200,000 CEL tokens (with a market value of $1,053,253).  Each sale violated Celsius's trading policy.  Many of the CEL tokens sold by the Defendants were purchased by Celsius through resting buy orders that Mr. Treutler had placed at specific price targets.

71.     Ms. Urata-Thompson and Mr. Treutler were aware of the Defendants' sales and their downward effect on the price of the CEL token.   Ms. Urata-Thompson specifically acknowledged that Mr. Mashinsky's sales violated Celsius's newly enacted policy on CEL token trading, but, nevertheless, she directed Mr. Treutler to "breach it back" and "support the market" by purchasing more CEL tokens.  Each of the D&O Defendants was aware that insiders were selling CEL tokens in violation of the CEL token trading policy.

72.     During this period Celsius paid its officers and employees bonuses when the market price of CEL token reached $1.50 and $5.00.  These bonuses were calculated as a total amount of CEL tokens.  However, a portion of each employee's CEL token bonus was paid in CEL tokens that would vest over time and the remaining portion of each employee's CEL token bonus allocation was paid in cash.  The cash portions of the Defendants' bonuses were significant, with some more than $1 million.  These bonuses were paid as a result of the Defendants' manipulation of the price of CEL token.

73.     At the beginning of 2021, the price of CEL had increased to over $6.00 per token. The rising price required Celsius to spend more dollars each week if it was to do as it promised and purchase the amount of CEL token required to pay the rewards it owed its customers. To avoid that cash burn, Mr. Mashinsky instructed Mr. Treutler to stop purchasing CEL token in the market until the price dropped. In March 2021, Mr. Mashinsky and the Defendants found a "hole" in Celsius's balance sheet, which was created in part through its purchase of CEL tokens using BTC and ETH that had been transferred by customers. On March 21, 2021, Mr. Mashinsky directed Ms. Urata-Thompson to change course and only purchase half of the CEL tokens required to pay interest to account holders who elected to receive interest in CEL token on the public market and take half from treasury. Ms. Urata-Thompson relayed the message to Mr. Treutler and asked him to make sure "to keep a low profile for now."

74.     Throughout this time, Mr. Mashinsky continued to represent that the amount of CEL token purchased by the Company was determined by the number of users who elected to Earn in CEL. For instance, in an AMA released on March 19, 2021, Mr. Mashinsky told the public: "We obviously want CEL token to go higher in price, but we don't control it. It's not like we are the invisible hand that control the pricing here or anything like that."[17] In that AMA Mr. Mashinsky further stated that: "56.5% of [account holders] are earning in CEL. Those are the drivers. That's what's driving adoption and demand—creates demand for the CEL token. Those are the biggest drivers compared to buyers and sellers."[18]

---

[17] Celsius Network, Celsius March Madness – Business Development AMA (March 19, 2021), YouTube (Mar. 19, 2021), at [1:04:41], https://www.youtube.com/watch?v=JlELwjvdYcc.

[18] Celsius Network, Celsius March Madness – Business Development AMA (March 19, 2021), YouTube (Mar. 19, 2021), at [1:07:25], https://www.youtube.com/watch?v=JlELwjvdYcc.

75.     In April 2021, Celsius resumed purchasing more CEL token than it needed to pay rewards in CEL token to artificially inflate the price of the token.  In total for 2021, Celsius purchased approximately $243 million more of CEL tokens than it paid to its customers as rewards.

76.     The Defendants were aware that Celsius was artificially inflating the CEL token's market price.  On October 30, 2021, in a WhatsApp discussion, Mr. Cohen-Pavon told Mr. Mashinsky that:

> We're not just sitting and watching the price.  We're on it all week and even now [another Celsius executive] and I are live with the market maker.  The issue is that people are selling and no one is buying except for us.  The main problem was that the value was fake and was based on us spending millions (~8M a week and even more until February 2020) just to keep it where it is.  This week we spent 'only' $4M (on top of the rewards) and the price is still going down.

77.     On December 11, 2021, Mr. Cohen-Pavon told Mr. Mashinsky "[a]s of now, no one is buying in the market except for us.  We spent $20M in the last 36 hours (16M to buy out [a known large CEL token holder] and 4M to support in the market).  And this is after we're going up and the entire market is going down, people are still selling."

78.     In December 2021, Mr. Cohen-Pavon provided Mr. Mashinsky with a chart of CEL token purchased in 2021 and stated that "we bought 23 [million] extra tokens."  Even when accounting for the activities of Celsius's OTC desk, Celsius had been a net purchaser of 47.8 million CEL tokens that year, according to Mr. Cohen-Pavon's chart.

79.     Mr. Mashinsky, however, continued to misrepresent the amount of CEL tokens Celsius purchased.  On January 7, 2022, Mashinsky again told the public that "[t]he piece of how much we buy CEL has nothing to do with Celsius – Celsius doesn't decide how many CEL tokens

to buy and then how many of them to burn . . . the more you earn in CEL the more you can direct

how much we buy and how much we burn."[19]

80.     Celsius has accepted and acknowledged as true that its executives manipulated the

price of the CEL token, stating in a sworn stipulation with the Department of Justice that:

> Mashinsky touted the CEL token and the rise in CEL token's price
> as an indicator of Celsius's own financial health, and encouraged the
> public to purchase and hold CEL token. These claims were false and
> misleading. The rise in the value of the CEL token was not the
> product of market forces but was instead attributable to the fact that
> Celsius executives, including Mashinsky, had orchestrated a scheme
> to manipulate the CEL token by taking steps to artificially support
> the price of CEL. For example, although Mashinsky publicly
> disclosed that Celsius was purchasing CEL as part of a weekly
> "buyback" program to pay customer rewards, Celsius did not
> disclose that, in many weeks, Celsius was secretly purchasing far
> more CEL token than was necessary to pay those rewards. Those
> excess CEL purchases were not made for the purpose of paying
> customer rewards or for carrying out any legitimate business
> activity. Rather, their acknowledged purpose was to artificially
> support the price of CEL token.

81.     Likewise, on September 13, 2023, Mr. Cohen-Pavon pled guilty to four counts of

(1) engaging in a scheme to defraud investors in CEL token by artificially manipulating the market

for CEL token and by making false and misleading statements about Mr. Mashinksy's own sales

of CEL token, (2) conspiring to manipulate the price of CEL token, (3) market manipulation of the

CEL token, and (4) wire fraud in connection with the manipulation of the CEL token.  As part of

that plea, Mr. Cohen-Pavon testified under oath that:

> Beginning in 2019, [Celsius] told [CEL token] market participants
> that . . . the company was purchasing [the] amount of [CEL tokens]
> in the market to fund the interest payments that is owed to [Celsius]

---

[19] Celsius Network, Celsius AMA January 7th 2022, YouTube (Jan. 7, 2022), at [42:11],
https://www.youtube.com/watch?v=6631ORa2v4M.

clients. From October 2021 through December 31, 2021, I oversaw and at time directly ordered a pattern of [CEL token] purchases in excess of what the company needed to buy to meet its interest obligation. I knew and understood that the purpose of these excess purchases was at least in part to increase the price of [CEL token], prevent the price of [CEL token] from dropping and all to create [an] appearance of a more liquid market in [CEL token] trading all of which were intended to at least in part to induce additional [CEL token] purchases by the public, at prices that likely did not reflect the true market price.

82.     From its inception to the Petition Date, Celsius spent hundreds of millions of dollars to purchase CEL tokens on the open market to inflate the price of the token at the direction of Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler.

83.     In May 2022, hoping to halt the enormous expense of supporting the CEL token, concerned Celsius employees attempted to calculate the cost to the Company. They estimated that Celsius had already spent more than $50 million that year purchasing CEL tokens. The total amount of CEL tokens purchased by Celsius at the direction of Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, Mr. Treutler and others from 2019 to 2022 exceeds $500 million.

84.     Celsius took assets from its general omnibus wallets (where all customer funds were accepted and commingled) to fund its purchases of CEL tokens. Celsius operated at a multiple hundred-million-dollar loss in each of 2020, 2021, and 2022. Even if Celsius's intent was to use its profits to purchase CEL tokens, it simply did not have the profits to do so. Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler caused Celsius to use digital assets (such as BTC, ETH, and stablecoin) deposited by account holders to purchase CEL tokens. Those purchases directly benefited Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, the other Defendants, and other Celsius employees who held the majority of the CEL token at the expense of Celsius's account holders.

85.     Between 2019 to 2022, Mr. Mashinsky, Mr. Leon, and Mr. Goldstein sold the following net amounts of CEL tokens through centralized and decentralized exchanges:[20]

| Year | Net Sales From Known Mashinsky Wallets | | Net Sales From Known Leon Wallets | | Net Sales From Known Goldstein Wallets | |
|---|---|---|---|---|---|---|
| | Total USD Value | Number of CEL Tokens | Total USD Value | Number of CEL Tokens | Total USD Value | Number of CEL Tokens |
| 2019 | 204,760 | 2,631,204.69 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2020 | 10,770,301 | 10,710,169 | 2,532,404 | 746,541 | 1,393,858 | 2,272,926 |
| 2021 | 58,966,480 | 9,836,528 | 7,221,691 | 1,278,987 | 686,479 | 104,076 |
| 2022 | 3,492,360 | 1,495,627 | 395,719.00 | 140,924 | 632,689 | 233,530 |
| TOTAL | 73,433,901 | 24,673,529 | 10,149,814 | 2,166,452 | 2,713,026 | 2,610,531 |

86.     Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, Mr. Beaudry, Mr. Treutler, and Ms. Landes also sold their personal CEL token holdings back to Celsius via the Company's OTC desk.  They did so knowing that the price of CEL token was artificially inflated because of their actions and that their CEL token was worth significantly less than the cash value they were receiving for it.  Between 2019 to 2022, the Defendants also sold the following net amounts of CEL tokens through the OTC desk:

| Defendant | Number of CEL Token Sold To Celsius Through the OTC Desk | USD Value Received From OTC Sales |
|---|---|---|
| Daniel Leon | 2,345,790 | $11,521,250.00 |
| Johannes Treutler | 1,553,278 | $8,872,941.07 |
| Jeremie Beaudry | 620,103 | $3,965,348.00 |

---

[20] The amounts in the table above are based on public blockchain data from cryptocurrency wallets which have been identified as being owned by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein.  The report by the Examiner appointed in the Debtors' Chapter 11 cases also identified sales of CEL tokens from private wallets associated with Mr. Mashinsky, Mr. Leon, and Mr. Goldstein.  While the amounts identified by the Examiner and the Committee are slightly different, the Committee and the Examiner have come to the same conclusion; Mr. Mashinsky, Mr. Leon, and Mr. Goldstein each sold millions of dollars' worth of CEL tokens from 2019 through 2022.

| Hanoch Goldstein | 700,000 | $2,362,500.00 |
| Four Thirteen LLC | 325,000 | $1,775,000.00 |
| Aliza Landes | 340,000 | $1,767,000.00 |
| Harumi Urata-Thompson | 201,343 | $1,343,859.27 |
| Roni Cohen-Pavon | 256,000 | $1,074,600.00 |
| Alexander Mashinsky | 416,667 | $500,000.00 |
| **TOTAL** | **6,758,181** | **$33,182,498.30** |

87.     The sales through the OTC desk were done to hide the fact that Celsius executives were selling millions of dollars of CEL token from the public.[21]

### III.   Ask Mashinsky Anything

88.     From the beginning, Mr. Mashinsky was the face of Celsius.  Celsius relied heavily on social media to market its platform, with Mr. Mashinsky at the forefront of weekly "Ask Mashinsky Anything" ("**AMA**") videos.   Mr. Mashinsky recorded many AMAs from his apartment in New York and the Company's New Jersey offices.  During the videos, Mr. Mashinsky answered questions submitted directly by the public.  The AMAs frequently featured guests, including many of the Defendants.  Mr. Mashinsky recorded 179 AMAs in total, which were broadcast live to the public every Friday and live-streamed on social media.

---

[21] Mr. Mashinsky repeatedly and falsely claimed in AMAs and on Twitter that he was not a seller of CEL token.  For example, in a November 5, 2021 AMA, Mr. Mashinsky addressed "rumors" that he had sold CEL tokens in recent weeks, stating that he had actually bought "something like 30,000 CEL token last few days.  If you think I'm selling, I'm not selling, I'm buying" but that it did not matter as "you have to make your own decisions."  In the month before that AMA, Mr. Mashinsky had sold a significant amount of CEL tokens.  He continued to sell CEL tokens after that AMA as well.  Examiners Report at 322 (citing Celsius, Celsius AMA November 5th 2021, YouTube (Nov. 5, 2021) https://www.youtube.com/watch?v=t-4DzujwruI.).  On December 9, 2021, Mr. Mashinsky posted to Twitter, "All @CelsiusNetwork founders have made purchases of #CEL and are not sellers of the token." *Id*. (citing @Mashinsky, Twitter (Dec. 9, 2021)).

89.     The AMAs were among Celsius's most important marketing tools and were regularly viewed by tens of thousands of people.  To entice consumers to deposit coins, Mr. Mashinsky promised account holders some of the highest returns in the market.  Mr. Mashinsky regularly assured customers that Celsius funded its above-market rates through low-risk, market-neutral investment strategies.[22]  He repeatedly stressed the strength of Celsius's balance sheet as compared to those of Celsius's competitors.  Mr. Mashinsky cast traditional banks as villains and championed that, unlike banks, Celsius's priority was making money for its account holders.

### 1.     Mr. Mashinsky and other Defendants Repeatedly Made False and Misleading Public Statements

90.     Throughout the AMAs, Mr. Mashinsky and the other Defendants who participated in the broadcasts failed to disclose material facts and Celsius's massive losses.  They repeatedly lied to account holders and the public about the legal status of their deposits, the risk of Celsius's investments, and Celsius's financial condition.  For example, on June 24, 2020, Mr. Mashinsky, accompanied by Mr. Cohen-Pavon, told the public that "when you give us Bitcoin it is not like it is ours, right, it is yours.  Legally it is still your Bitcoin, the only thing we do is when you lend us your Bitcoin, we lend them to people who pay us interest, when they return them it goes back to the wallet and it is still yours from that wallet."[23]  The Company took the opposite position in its Chapter 11 Cases.

---

[22] A market-neutral investment strategy uses hedges and other investments to avoid exposure to the wider financial market.  One way to accomplish market neutrality it to balance long positions and short positions. A long position is the purchase of an asset with an expectation that it will increase in value. A short position is the sale of an asset with the expectation to repurchase it later at a lower price.  A properly executed market-neutral strategy will result in a positive return if the market value of an asset or index increases or decreases.

[23] Celsius Network, AMA July 24, 2020 with Mashinsky and Cohen Pavon, YouTube (July 24, 2020), at [1:16:38], https://www.youtube.com/watch?app=desktop&v=kC-89USzxaM.

**a. Celsius Never Calculated the Interest It Paid to Account Holders Based on its Revenue**

91.    Mr. Mashinsky used the AMAs and other public interviews to repeat Celsius's motto that it would pay 80% of its gross revenue to customers.  Mr. Mashinsky made this promise as early as March 7, 2019, in a New York-based interview with NASDAQ, stating that "Celsius network enables you to deposit your coins, enables you to lend them to someone else, and you get to keep 80%."[24]   Mr. Mashinsky made the same promise in AMAs on, among other occasions,

---

[24] Celsius Network, Alex Mashinsky, Celsius CEO, interview at NASDAQ, YouTube (Mar. 7, 2019), at [3:26], https://www.youtube.com/watch?v=8cIdPpA-pyk.

December 19, 2019,[25] March 20, 2020,[26] April 10, 2020,[27] May 15, 2020,[28] December 6, 2020,[29]

December 18, 2020,[30] March 7, 2021,[31] and February 10, 2022.[32]

---

[25] AMA: "So what Celsius has done is really put this whole model on its head by returning eighty or ninety percent to our depositors. No one has ever done that before. No one has ever done that in seven hundred years of banking giving so much back to the depositors right . . . Celsius gives you eighty to ninety percent [of] the revenues we collect. Revenue, not net profit." (Mr. Mashinsky, New York); Celsius Network, AMA with Celsius Network CEO Alex Mashinsky, YouTube (Dec. 19, 2019), at [49:52, 53:12], https://www.youtube.com/watch?v=el62VDzt_ww&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=50.

[26] "[W]e [are] finding more and more ways to earn more and more yield for customers, and again, no one can compete with this model. No one who pays less than 80% to their community can compete with the Celsius model. If you want to beat us, you're going to have to pay more than 80 percent." Celsius Network, Fireside Finance with Alex Mashinsky, YouTube (Mar. 20, 2020), at [31:18], https://www.youtube.com/watch?v=4_a9QWuXMF0&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=47.

[27] "And again 80%, we're the only guys that take 80% of what we earn and give it to the community as Bitcoin, Ethereum, or CEL tokens." Celsius Network, AMA with Celsius Network and Saga!, YouTube (Apr. 10, 2020), at [46:25], https://www.youtube.com/watch?v=HAuolsYA9EQ.

[28] "We have to earn the money, give you 80%, and use the 20% to deliver everything you're asking from us every day." Celsius Network, Ask Mashinsky Anything – Friday, May 15, YouTube (May 15, 2020), at [30:48], https://www.youtube.com/watch?v=am5CXWgj-Vk.

[29] "We are structured almost like a hedge fund, even though we're not. But we are like a 80-20 LP-GP relationship, meaning our users are LP's. They lend us their coins. We deploy the coins. We earn yield, and we give 80% of it back to the depositors." Celsius Network: Regulations & Yield on Crypto Assets, RealVision (Dec. 7, 2020), at [19:57], https://www.realvision.com/shows/cryptoverse/videos/celsius-network-regulations-yield-on-crypto-assets-2QXo?tab=details.

[30] "Right, so if you continue to earn interest, then Celsius would be basically a scam or something. We couldn't sit there and explain how we make money. Celsius makes money, we don't charge you any fees, we pay your withdrawal fees, and we are doing everything because we do make money when you take a loan. How do we make money? We've got your collateral effectively for free, you've got the loan. We've got the collateral and we make income off that collateral. So we can't make income and pay you at the same time, right? So that's why it's one or the other. We basically don't make any money when you just deposit with us and we pay you that 80%, right? Because the cost of running Celsius is more than 20% of our income, all of the revenues, right? So the rest of the money comes from us using your collateral and re-hypothecating the collateral." Celsius Network, Celsius AMA December 18th, YouTube (Dec. 18, 2020), at [47:53] https://www.youtube.com/watch?v=8s3_X3VOq4k.

[31] "Celsius lends funds to institutions and returns up to 80% of earnings to users." Alex Mashinsky, How Celsius creates prosperity for retail and institutional investors alike, Medium (Mar. 7, 2021), https://medium.datadriveninvestor.com/how-celsius-creates-prosperity-for-retail-and-institutionalinvestors-alike-cc086084c6bd.

[32] Just Get Started with Brian Ondrako, Alex Mashinsky on Why People Should be Unbanking Themselves, iHeart Radio (Feb. 10, 2022), https://www.iheart.com/podcast/269-just-get-started-podcast-61217509/episode/211-alex-mashinsky-on-why-people-92736422/ (last visited Apr. 26, 2023) (Mr. Mashinsky highlighted that the Celsius wallets "charge no fees yet pay 80% of interest income revenues back to the depositors and the underserved global population.").

92.    Other Defendants promised investors that Celsius returned 80% of its revenues to customers as well.  Mr. Leon made this promise in a February 10, 2021 Twitter video, claiming that unlike other companies, Celsius spent its money on its customers, and telling viewers "that's why we share up to 80% of our revenues with you."[33]  Mr. Goldstein made this promise in the December 10, 2019 AMA, stating that "at the end of the day the interest that you see is 80% of our revenue, right . . . this is not something Alex [Mashinsky] just makes up this is on the spot every week we have an ExCo we see the numbers and we make sure that were 80% of revenue, not profit, is going back to you guys."[34]

93.    On August 19, 2020, Ms. Urata-Thompson made this promise in a Medium blog post, in which she stated that "Celsius returns up to 80% of what we earn (and that's before we deduct any expenses), and that enables us to offer a very high reward rate on the assets we support."[35]  Ms. Urata-Thompson reiterated this promise in a since-deleted January 22, 2021 blog post, in which she stated that "we make money by deploying the coins transferred to Celsius and return up to 80% of our revenue to the community before we take out any for expenses."[36]

94.    All of these statements were false.  Celsius never calculated its rewards based on revenue—a fact it admitted when arguing to state, federal, and foreign regulators that the Earn

---

[33] @sdanielleon, Twitter (Feb. 10, 2021, 2:35 PM), https://x.com/sdanielleon/status/1359601845770059778.

[34] Celsius Network, Celsius Network AMA with CTO Nuke Goldstein, YouTube (Dec. 10, 2019), at [29:20], https://www.youtube.com/watch?v=gxf2XgPKdzI&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=50.

[35] Celsius Network, What We Do & How We Do It, Medium (Aug. 19, 2020), https://blog.celsius.network/what-we-do-howwe-do-it-9a82124f7159.

[36] Celsius Network, What are stablecoins? How to earn more on your dollars with Celsius, Medium (Jan. 18, 2021), https://web.archive.org/web/20210118043446/https://celsiusnetwork.medium.com/what-are-stablecoins-how-to-earn-more-on-your-dollars-with-celsius-42b4d9c9630a.

program was not a security.  For instance, on July 2, 2021, Celsius told the Financial Conduct Authority of the United Kingdom (the "**FCA**") that rewards paid to customers "do not represent a share in the income or capital appreciation derived from Celsius's[s] use of such cryptoassets," and are rather paid weekly according to a fixed reward schedule.[37]  The letter went on to explain how rewards were calculated, emphasized that rewards were in no way linked to Celsius's revenue and confirmed that customers did not receive 80% of revenue as rewards.

95.     For the majority of the time Celsius operated, Celsius did not even perform a calculation when setting its rewards rates or know what 80% of its revenue was.  Instead, Celsius's rates were primarily based on marketing concerns and that the Company would lose customers if it offered lower rates.  In reality, Celsius paid out far more in rewards than it even earned in revenue.  By portraying its top of the market rates as a percentage of its revenue, and moving those rates to create the appearance of adjusting for profitability, Celsius was able to project the appearance of a profitable business when the truth was that Celsius was incurring unsustainable losses.

96.     The Defendants were all aware that Celsius was not profitable when repeating their mantra, but they nevertheless persisted in telling the public otherwise.

### b.  Celsius Issued Billions of Unsecured Loans

97.     Mr. Mashinsky also repeatedly told investors on AMAs that Celsius only issued collateralized loans to well-capitalized institutions.  Those statements were never true.  For example, on July 17, 2020, Mr. Mashinsky, accompanied by Mr. Leon, stated that "Celsius does

---

[37] Defendants Mashinsky, Leon, Goldstein, Beaudry, and Cohen-Pavon were all aware of the FCA's June 18, 2021 letter to CNL.  Defendants Mashinsky, Beaudry, and Cohen-Pavon were aware of CNL's July 2, 2021 response.

not do non-collateralized loans" because "that would be taking too much risk on [customers']
behalf."[38]   Mr. Leon did not correct Mr. Mashinsky.[39]   Mr. Mashinsky reiterated this promise
multiple times, including, on April 14, 2020, April 17, 2020,[40] May 15, 2020,[41] May 18, 2020,[42]

---

[38] Celsius Network, Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon, YouTube (July 17, 2020), at [53:21], https://www.youtube.com/watch?v=csFrn4XtwL0.

[39] Celsius Network, Revealing the NEW WORLD of Crypto Lending, YouTube (Apr. 14, 2020), at [14:53], https://www.youtube.com/watch?v=QqWl9Qbh5to.

[40] Celsius Network, Ask Mashinsky Anything - Friday, April 17 2020, YouTube (Apr. 17, 2020), at [21:35], https://www.youtube.com/watch?v=zC1jIOwdhK0. ("[W]e only do asset backed lending.   I know some of our competitors lend coins with no collateral, we don't do that.").

[41] Celsius Network, Ask Mashinsky Anything - Friday, May 15, YouTube (May 15, 2020), at [14:08], https://www.youtube.com/watch?v=am5CXWgj-Vk ("I can tell you that our competitors are lending coins unsecured, meaning they not take any collateral.   Right, we don't do anything like that we always require collateral we always have something that we hold to make sure that the institution on the other side we don't mean are just relying on their goodwill.   We have an asset that they want to come back and claim. So we get our coins back -- or your coins back, actually.").

[42] Celsius Network, Coronavirus and Market Crash won't stop DeFi Interview with Alex Mashinsky, YouTube (May 19, 2020), at [12:44], https://www.youtube.com/watch?v=6kWqRsRXAt8. ("Celsius basically has zero leverage at any time. We don't use leverage at all, right. We collect coins and assets from 80,000 retail users and we only lend them to institutions, and we always have collateral from the institutions, there's no leverage in the system. So, we expand the net-work this way, meaning we don't create any leverage in the system, you don't want to create leverage and copy what Wall Street does.").

May 19, 2020,[43] July 17, 2020,[44] September 11, 2020,[45] November 6, 2020,[46] November 9, 2020,[47]

May 14, 2021,[48] January 7, 2022,[49] March 11, 2022,[50] and April 13, 2022.[51]  Other Defendants

also falsely represented that Celsius only made collateralized loans; for example, in the December

---

[43] Celsius Network, Crypto for the Masses Celsius Network w The Godfather of VOIP Alex Mashinsky – Crypto Arnie, YouTube (May 19, 2020), at [18:39], https://www.youtube.com/watch?v=vmqMPL51v_4 ("Crypto for the Masses, Celsius Network with the Godfather of VOIP Alex Mashinsky – Crypto Arnie" Video: "So we are only doing asset backed lending unlike the banks, and the credit card companies, and all the other guys who lend you money.").

[44] Celsius Network, Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon, YouTube (July 17, 2020), at [53:18], https://www.youtube.com/watch?v=csFrn4XtwL0 ("Celsius does not do non-collateralized loans" because "that would be taking too much risk on [customers'] behalf.").

[45] Celsius Network, CHAINLINK Keynote & AMA Alex Mashinsky (Smart Contract Summit 2020), YouTube (Sept. 11, 2020), at [42:11], https://www.youtube.com/watch?v=DWd2AE-g694 ("We don't believe in fractional reserve or taking loans with fractional collaterals. All of our loans are effectively over-collateralized or they are given to institutions that have billion dollar balance sheets.").

[46] Celsius Network, Celsius AMA - Ask Mashinsky Anything - Friday, November 6, YouTube (Nov. 6, 2020), at [32:25], https://www.youtube.com/watch?v=apWkwq8uscU ("We do not do all kinds of unsecured lending like a lot of people are talking about or saying Celsius does unsecured. We do not do unsecured lending.").

[47] Celsius Network, Why Celsius makes all loans collateralized, YouTube (Nov. 9, 2020), at [1:20], https://www.youtube.com/watch?v=NgA5t2RUcWI. ("I'm asking you right now, anyone who received an uncollateralized loan from Celsius go on twitter, give us the loan number that you got, and I will give you a thousand dollars just to prove that Celsius does not do non collateralized loans.").

[48] Celsius Network, Crypto Volatility and Elon Musk - Celsius AMA May 14th 2021, YouTube (May 14, 2021), https://www.youtube.com/watch?v=4r4jnEgeWl8 (The loans Celsius makes to "vetted financial institutions . . . are collateralized" as the institutions "give Celsius assets or dollars to hold on to[.]").  This statement was removed from the AMA during the censorship process, which is described in Section III herein.

[49] Real Vision Finance, Everything You Need to Know About Yield in Crypto, YouTube (Jan. 7, 2022), at [18:50], https://www.youtube.com/watch?v=-paNUHyLWlk. ("So, Celsius, is, uh, lending, uh, basically most of our loans are fully collateralized. Some of them are partially collateralized. It really depends on the size of the counterparty . . . And we have, uh, tier 1 institutions with billions of dollars on their balance sheet borrowing from us.").

[50] Celsius Network, Celsius AMA March 11th 2022, YouTube (Mar. 11, 2022), https://www.youtube.com/watch?v=JCMuY2FbKJQ. This statement was removed from the AMA during the censorship process, which is described in Section III hereof. ("So we are squeezing the lots of the largest guys on Wall Street.").

[51] CNBC International TV, Celsius CEO on best practices for retail investing in cryptocurrencies, YouTube (Apr. 13, 2022), at [1:43], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=7s ("[W]e do not offer any noncollateralized loans.").

10, 2019 AMA, Mr. Goldstein said "We don't leverage.  We don't do all these manipulations banks do.  We are fully collateralized with whatever we do."[52]

98.     These statements were false.  In December 2019, 72% of Celsius's aggregate institutional loans outstanding were unsecured.   A significant portion of Celsius's loans outstanding in 2020 were unsecured.   As of July 30, 2021, Celsius had uncollateralized and undercollateralized loans outstanding with numerous non-traditional financial institutions, including Genesis Global Capital, LLC, Alameda Research Ltd., and Three Arrows Capital Ltd., each of which has now undergone a chapter 11 or liquidation proceeding.   The amount of unsecured loans was documented in Risk Committee meeting materials that were presented to Mr. Mashinsky and Mr. Goldstein on or about the time of those statements.

99.     In an August 19, 2021 letter to the New Jersey Office of the Attorney General, Celsius admitted that 30% of Celsius's institutional lending book, or the equivalent of $747,948,734, was uncollateralized.

100.     But Mr. Mashinsky never changed his tune, even when directly warned by Celsius employees.  For instance, in November 2021 an article quoted Mr. Mashinsky as reiterating his promise that borrowers were always required to "put up more than 100 percent of the value of their loan in collateral in another asset."  An executive had that statement removed and again informed Mr. Mashinsky, "this is not true, and we cannot say that."  Mr. Mashinsky did not stop.  For instance, on April 13, 2022, a CNBC reporter asked Mr. Mashinsky if Celsius offered

---

[52] Celsius Network, Celsius Network AMA with CTO Nuke Goldstein, YouTube (Dec. 10, 2019), at [14:11] https://www.youtube.com/watch?v=gxf2XgPKdzI&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=50.

uncollateralized loans.   Mr. Mashinsky explicitly stated that Celsius's institutional lending business had "undercollateralized [loans], but we do not offer any non-collateralized loans."[53]  On or about that time, Celsius had more than $1.3 billion in outstanding uncollateralized loans.

### c.   Celsius Placed Risky Directional Bets on Cryptocurrency

101.    Mr. Mashinsky also repeatedly advertised that Celsius only undertook low risk, delta neutral investing strategies and did not "bet the market." For instance, on September 29, 2020, Mr. Mashinsky tweeted that "Celsius does not trade or take long or short positions with customer coins."

102.    An internal Celsius presentation from February 2022 noted that "[d]irectional trading was a widespread practice before September 2021 and was known and accepted by senior management, including risk.  It was presented and discussed in ExCo, ALCO, and [the Risk Committee] and there is extensive supporting evidence."  Mr. Mashinsky also directed Celsius to take large directional bets.  As described in more detail in Section VII, *infra*, in January 2022, the price of BTC significantly dropped.  At the bottom of the market, Mr. Mashinsky directed traders to sell ***hundreds of millions of dollars of BTC***, betting the price would continue to plummet.  It did not, and Celsius incurred massive losses as a result.

103.    That did not stop Mr. Mashinsky's misrepresentations and in an April 13, 2022 CNBC interview, in response to allegations that Celsius pursued risky trading strategies, Mr.

---

[53] CNBC International TV, Celsius CEO on best practices for retail investing in cryptocurrencies, YouTube (Apr. 13, 2022), at [1:43], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=7s.

Mashinsky again told the public that "Celsius is a delta neutral strategy [and] doesn't bet on the market going up and down."[54]

104.    Mr. Mashinsky has also subsequently admitted that Celsius operated a swing trading strategy, including in his sworn testimony to this Court.[55]  Swing trading is not market neutral, as it attempts to profit by predicting market movement.

### d. Celsius Had Many Defaulted Loans

105.    On November 12, 2021, Mr. Mashinsky boasted that, "[i]n four years we have not had a single institution default, either not pay the interest or not return the collateral, or the [] coins that we lend to them."[56]  That statement was false.  By July of 2021, EFH had informed Celsius that it could not return over $500 million worth of BTC and ETH collateral that had been posted by Celsius.  In an August 19, 2021 letter to the New Jersey Office of the Attorney General Celsius admitted that two counterparties to uncollateralized loans "failed to pay it back" and that Celsius "accounts for the disputed amounts on its books as 'bad debt.'"

### e. The Defendants Misrepresented Celsius's Regulatory Compliance

106.    Throughout the life of the Company, Mr. Mashinsky repeatedly misrepresented Celsius's regulatory issues to the public.  During a December 19, 2019 AMA, Mr. Mashinsky stated: "we are fully compliant, everything we do is compliant . . . we will not do anything that is

---

[54] CNBC International TV, Celsius CEO on best practices for retail investing in cryptocurrencies, YouTube (Apr. 13, 2022), at [2:50], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=148s.

[55] *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, In Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 23] ¶ 81.

[56]   Celsius   Network,   Celsius   AMA   November   12th,   2021,   YouTube   (Nov.   12,   2021), https://www.youtube.com/watch?v=bTrByn1DAFo.

not 100% compliant."[57]  In July of 2020, Mr. Mashinsky told customers: "[t]here's no way we're doing this bypassing all the rules like FinCEN and the SEC."[58]  And on July 21, 2021, notwithstanding his knowledge of multiple investigations by federal and state regulatory agencies, Mr. Mashinsky appeared on CNBC's show "The Exchange" and stated that "we also work closely with regulators all over the world . . . we are fully compliant. We do everything that we need to do to stay compliant in all the jurisdictions we operate."[59]  Mr. Mashinsky made similar misrepresentations on November 26, 2021,[60]  December 3, 2021,[61] March 11, 2022,[62]  and April 13, 2022.[63]  These statements were all false as many regulatory agencies were investigating Celsius

---

[57] Celsius Network, AMA with Celsius Network CEO Alex Mashinsky, YouTube (Dec. 19, 2019), at [58:36; 1:01:02], https://www.youtube.com/watch?v=el62VDzt_ww.

[58] On the Chain LIVE, Celsius Network with Alex Mashinsky – On the Chain, YouTube (July 19, 2020), at [8:04], https://www.youtube.com/watch?v=h5yzyx9Z6uk.

[59] "The Exchange" (@CNBCTheExchange), Twitter (July 21, 2021, 1:59 PM), at [2:02], https://twitter.com/CNBCTheExchange/status/1417907168678920192.

[60] White Crypto, Celsius network (CEL) $26B TVL Interview with CEO Alex Mashinsky WebSummit. Bitcoin, YouTube (Nov. 26, 2021), at [12:30], https://www.youtube.com/watch?v=LkZ8XJ-2n1c. (During this public interview broadcast from Lisbon, Portugal, Mr. Mashinsky stated, "[w]e have followed regulations since day one. We did KYC AML FinCen SEC everything. We followed all the rules as needed and we will continue to do that.").

[61] Kitco NEWS, This is when Bitcoin will hit $140k according to Alex Mashinsky, CEO of Celsius, YouTube (Dec. 3, 2021), at [7:10], https://www.youtube.com/watch?v=DJPogJVkQUE. (During this interview with KITCO News in Florida, Mr. Mashinsky represented that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything . . .").

[62] Celsius Network, *Celsius AMA March 11th 2022,* YouTube (Mar. 11, 2022), at [16:35], https://www.youtube.com/watch?v=JCMuY2FbKJQ. (During this AMA broadcast from Texas, Mr. Mashinsky stated that Celsius had not been "do[ing] the things that get you in trouble" and had been complying with regulations "since day one.").

[63] CNBC International TV, Celsius CEO on best practices for retail investing in cryptocurrencies, YouTube (Apr. 13, 2022), at [6:41], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=7s. (During this CNBC interview in Paris, when asked about regulatory compliance, Mr. Mashinsky stated: "We are following all the rules A to Z. Seven days a week.").  He doubled down on this statement in an April 15, 2022 AMA, during which he said: "There's not—no legal issues at least with the services that Celsius provides."  This statement was removed from the AMA during the censorship process, which is described in Section III hereof.

at that time.  Mr. Mashinsky and the other Defendants were aware of those investigations when those statements were made.

### f.    The Defendants Sold Millions of Dollars of CEL Tokens

107.    Finally, Mr. Mashinsky repeatedly and falsely claimed in AMAs and on Twitter that he and the other directors and officers were not selling CEL tokens.  For example, in a November 5, 2021 AMA, Mr. Mashinsky addressed "rumors" that he had sold CEL tokens in recent weeks, stating that he had actually bought "something like 30,000 CEL token last few days. If you think I'm selling, I'm not selling, I'm buying."[64]  On December 9, 2021, Mr. Mashinsky posted to Twitter, "All @CelsiusNetwork founders have made purchases of #CEL and are not sellers of the token."  As noted in Section II, above, this was false, and he and the other Defendants were selling their personal CEL tokens in large quantities on or about the time of those statements.

### 2.    Defendants Hid the Misrepresentations After They Were Made

108.    Mr. Mashinsky and the other Defendants' misrepresentations and lies were well-known within the company.[65]  On May 1, 2021, Celsius's Chief Risk Officer, Rodney Sunada-Wong, noted inaccuracies in the April 20, 2021 AMA regarding the risk of the Company's investments.  Mr. Sunada-Wong recommended that AMAs be taped rather than proceeding live so that false or misleading statements could be removed before the AMA was broadcast to the public "[t]o protect Celsius."  Mr. Mashinsky resisted and directed the Celsius team to broadcast the videos to the public "ASAP and then make the changes necessary."

---

[64] Celsius AMA November 5th 2021 (November 5, 2021) https://www. youtube.com/watch?v=t-4DzujwruI.

[65] Prior to the Petition Date, Celsius hired a third-party risk management and investigation firm to review Mr. Mashinsky's media statements and assess the damage that had been caused.

109.    From that time forward, Celsius executives from its risk, regulatory, compliance, and legal teams watched the AMAs live, along with thousands of current and prospective customers, and documented inaccurate or materially misleading statements made by Mr. Mashinsky, co-hosts, and guests.  The video would be immediately posted to YouTube.  The executives would then send a list of false or misleading statements to the marketing department, which edited the videos, removed the live recording from YouTube, and then reposted the scrubbed version.

110.    The statements by Mr. Mashinsky that were deleted from the AMAs ranged from distasteful comments and exaggerations to material misstatements about Celsius's balance sheet and the risk undertaken by the Company.  For example, Mr. Sunada-Wong called it "crucial" to delete a statement from the May 14, 2021 AMA that said,

> When you transfer your assets to your Celsius wallet you've instantly start[ed] generating rewards that are paid out every Monday.  These rewards compound causing your returns to stack and snowball over time.  Celsius is able to achieve this by lending out the community's assets to vetted financial institutions.  These loans are collateralized.  This means the institutions give Celsius assets or dollars to hold onto before we give out the digital assets.  This protects the community and keeps them whole.

This statement was misleading, given that many of Celsius's institutional loans were uncollateralized, and was removed after it was seen by thousands of customers and potential customers.  As of the filing of this Complaint, the statement is not present in the version of the May 14, 2021 AMA posted on YouTube.[66]

---

[66] Crypto Volatility and Elon Musk – Celsius AMA May 14th 2021, YouTube (May 14, 2021), https://www.youtube.com/watch?v=4r4jnEgeWl8.

111.    The YouTube editing process occurred every week from May 2021 until around June 12, 2022, when Celsius paused all withdrawals from the platform.  Mr. Mashinsky, Mr. Goldstein, Mr. Leon, Mr. Cohen-Pavon, and Mr. Beaudry were each included on the emails noting the inaccuracies and were aware that Celsius was editing and removing false and misleading statements from the AMA videos.  Instead of correcting the misrepresentations to the public, the Defendants and other Celsius employees covered them up.  At no time did Mr. Mashinsky or the Defendants involved in the editing of AMAs retract or correct any of these misrepresentations.

**IV.    Celsius's Inability to Accurately Track its Assets and Liabilities Resulted in Massive Losses**

112.    Since its inception, Mr. Mashinsky and Celsius focused on growing the number of Celsius customers and amount of assets those customers transferred to Celsius above all else.  To that end, Mr. Mashinsky and Celsius aggressively promoted Celsius's above-market interest rates.  The D&O Defendants, including Mr. Goldstein, the Chief Technology Officer, also directed that Celsius devote almost all of its technological and development resources to its customer-facing application with the goal of attracting more users and assets.  But Celsius's revenue could not support its rewards rates.  Celsius also did not appropriately invest in its financial technology or operations, or in developing the necessary processes and procedures to invest the billions of dollars of assets entrusted to it by its account holders in a remotely responsible manner.

113.    During most of 2020, Mr. Mashinsky and Ms. Urata-Thompson made the ultimate decisions regarding Celsius's investment, growth, and deployment strategies.  To the extent the Company tracked its investments, it was done in an ad hoc manner using spreadsheets that were manually updated.  There were no clear or documented investment policies or decision-making processes or procedures.  In February 2020, a single employee was hired as a consultant to evaluate

risk.  That consultant developed a rudimentary database to track Celsius's loan positions and set basic credit limits.  But those limits were not followed.  As of December 2020, Celsius's exposure exceeded its credit limits for a number of Celsius's significant institutional loans, including with Alameda Research (twice its credit limit), Tether (twice its credit limit), and Three Arrows Capital (three times its credit limit).

114.    Celsius's official Risk Committee was not created until December 2020, and only then, primarily because the FCA required Celsius to do so.  The Risk Committee lacked any real rigor.  Up until the spring of 2021, Celsius's risk team was composed of **two employees** who were tasked with attempting to oversee the Company's efforts to deploy **over $10 billion** of digital assets.

115.    Sometime around the end of 2020, Celsius realized that the Company was not accurately tracking its positions and that Celsius had significantly more BTC obligations than BTC assets, and thus had a short position on the rapidly appreciating asset.  A substantial factor contributing to Celsius's short position was the Defendants' use of BTC transferred by account holders to purchase CEL tokens to inflate the price of the token.  When Celsius finally realized it was short BTC, it was too late.  While others in the cryptocurrency industry were making money hand-over-fist as BTC rose from approximately $10,000 to $60,000, **Celsius lost approximately $250 million.**

116.    In response to that loss, Mr. Mashinsky and other Celsius executives instructed several of Celsius's employees to "turn over the couch cushions" and locate all of its assets to assess the damage done.  Those employees found millions of dollars of investments largely unknown to anyone at Celsius.  To remedy these issues, Celsius began using a Google sheet it

called the "Freeze Report" to track its billions of dollars in assets and investments. Unsurprisingly, another manual spreadsheet did not fix the problem.

117.    The Google sheet was updated periodically with apparently no set schedule. Many different Celsius employees across different departments had to check their positions and often manually input them into the Google sheet. That meant that many employees had access to, and could alter, the Google sheet at any given time.

118.    The Google sheet was not closely monitored and was often incorrect by hundreds of millions of dollars on any given day. As a result, Celsius's officers and financial team had difficulties tracking the Company's exposure and implementing coherent investment strategies. One coin deployment specialist noted that "Celsius [had] lost money selling coins that management believes to be long, only to buy them back shortly afterward when it realized Celsius needed to cover its short exposure." According to Celsius's Head of Model Risk and Quantitative Analytics, the Google sheet was "one analyst's lonely guess of the firm's position," and it was a result of leadership not diverting the "proper resources and care" to its accounting procedures.

119.    Celsius's leadership, including many of the D&O Defendants, were acutely aware of the Company's inability to track its positions and inadequate technological infrastructure. An internal report that was issued in 2022—over a year after Celsius had experienced the quarter of a billion dollar loss due to its unexpected short position—noted that Celsius lacked fundamental technology and controls with respect to its financial positions. The internal report was circulated to the D&O Defendants. The report explained that Celsius had no order management systems, portfolio management system, pre-trade mandate or compliance controls, institutional grade trading systems, risk systems, or systems to generate profit and loss statements.

120.    Ms. Aslihan Denizkurdu, who joined Celsius in 2022 after over 10 years at Citibank, noted that the technology "we [*i.e.*, Celsius] have is worse than what we had in 1993." Mr. Rod Bolger, who was formerly the CFO of the Royal Bank of Canada, noted that when he joined as the CFO in the spring of 2022, Celsius's leadership was using an incomplete profit and loss statement to assess its positions.

V.    **2020 - 2021 – Explosive User Growth and Exorbitant Losses**

121.    Between 2019 and 2021, Celsius experienced rapid growth in both its registered users and assets under management.  By December 2021, Celsius claimed that it had over one million registered users.  Only a portion of those users had transferred assets to the Celsius platform.

122.    At all times relevant to this Complaint, Celsius operated at a loss and was insolvent. The D&O Defendants were aware of those facts.  But they continued to pay out astronomical rewards rates and pursue a "growth at all costs" strategy chosen by the D&O Defendants.  Mr. Mashinsky, Ms. Urata-Thompson, Mr. Cohen-Pavon, and other officers and directors took on riskier investments in their attempts to support their unsustainable business strategy.

1.    *The Self-Interested and Reckless KeyFi Transaction*

123.    Mr. Mashinsky and Mr. Goldstein were partial owners of an entity called KeyFi. In the summer of 2020, Mr. Mashinsky, Mr. Goldstein, and Mr. Cohen-Pavon wanted Celsius to begin investing in staking and decentralized finance ("**DeFi**") protocols.  Mr. Mashinsky, Mr. Goldstein, and Mr. Cohen-Pavon chose to work with KeyFi, who would deploy Celsius's assets.

124.    On August 19, 2020, Mr. Mashinsky and Mr. Cohen-Pavon reached an "agreement in principal" with KeyFi and its principal, Jason Stone, whereby KeyFi would deploy assets

transferred by Celsius account holders.  Upon information and belief, before a written agreement was signed, and over the objection of other Celsius employees, Mr. Mashinsky and Mr. Cohen-Pavon directed the transfer of cryptocurrency from Celsius to KeyFi.  Notwithstanding his equity interest in KeyFi, Mr. Mashinsky executed on Celsius's behalf the final Asset Purchase Agreement between Celsius Network Limited and KeyFi on January 11, 2021.  Mr. Goldstein was the primary person at Celsius in charge of closing the KeyFi deal.

125.    In February 2021, KeyFi held $1.4 billion of digital assets that had been transferred to it by Celsius.  Upon information and belief, Celsius's decision to invest in KeyFi was never approved by an independent decision-maker.  Instead, Mr. Mashinsky and Mr. Cohen-Pavon directed that Celsius send more than $1 billion in assets to an entity in which Mr. Mashinsky and Mr. Goldstein owned equity, before a contract was signed, and without the ability to police those assets. Other Defendants, including Harumi Urata-Thompson and Jeremie Beaudry, were aware that KeyFi was in financial distress and believed that entering into a deal with them was unwise, but did not do anything to stop the transaction.  As a result of Mr. Mashinsky's and Mr. Goldstein's conflicted and reckless conduct, Celsius lost more than $315 million.

## 2.    *Mr. Mashinsky Dictated Unsustainable Interest Rates to Attract More Customers*

126.    Until July 2021, Celsius did not have a formal method or policy to determine the interest rates it offered and paid to its customers.  Rates were chosen on an ad hoc basis, largely based on Mr. Mashinsky's and other executives' fears that Celsius would lose customers if its rates were lower than those set by Celsius's competitors.  Celsius employees expressed that "[t]here is no evidence that has ever supported the rates we pay."  Mr. Mashinsky consistently resisted efforts to reduce the rewards rates that Celsius offered on BTC.  For instance, in January 2022, the ALCO

was informed that even if Celsius was able to maximize BTC deployment across every available investment strategy, it would still lose money at its current rewards rates. Nevertheless, Mr. Mashinsky vetoed any suggestion to lower interest rates on BTC at that time.

127.    In February 2022, Celsius's Treasury department prepared an analysis for the Company's new CFO showing $100 million in potential cost savings to Celsius by reducing interest rates paid out on BTC and ETH deposits. The presentation also pointed out that at that time, Celsius's liabilities exceeded its assets by $1 billion and that Celsius was incurring financing costs of approximately $100 million per year. The presentation recommended that Celsius "should begin to shift its strategic direction to profitability rather than being a 'loss leader' for the sake of customer acquisition." Those suggestions were again refused by Mr. Mashinsky and Celsius's other executives.

### 3.    *Celsius Incurs Staggering (and Unsustainable) Losses*

128.    In a presentation that was given to the Board of Directors in May 2022, Celsius reported an $811 million pre-tax loss on its management profit and loss statement for the year ending 2021. Following the Petition Date, the Debtors informed the Official Committee of Unsecured Creditors that the figure was much higher and identified approximately $1.2 billion of losses in 2021. Mr. Mashinsky has admitted that Celsius's staggering losses were the result of "poor asset deployment decisions."[67] Those large losses, which were never disclosed to Celsius's account holders until the Company's Chapter 11 cases, include:

---

[67] *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, In Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 23] ¶ 10.

129.    **Equities First Holdings ($308 million and 3,765 BTC defaulted unsecured obligation (current market value of approximately $230 million))**:   In 2019, Mr. Mashinsky decided to enter into the first of a series of loan agreements with EFH under which EFH would loan Celsius U.S. dollars collateralized by BTC and ETH, which would be held by EFH.   When Ms. Urata-Thompson joined the Company, she was in charge of Celsius's relationship with EFH, including subsequent multi-million dollar loans.   Celsius did not require (and EFH did not provide Celsius with) financial statements in connection with entering into any of the loans.[68]   Upon information and belief, Celsius did not conduct a public records search before it executed the first loan agreement.   If it had, it would have known that at that time, EFH had been sued at least four times in the United States for failing to return borrowers' collateral.[69]   Celsius's risk officer was not told about the loan until months after it had been executed.   That risk officer immediately identified that Celsius was over-exposed to EFH.

130.    During the course of the EFH loan, Celsius's collateral appreciated significantly in value.   But because Celsius had not negotiated for a reverse margin feature common in similar loans, Celsius had no recourse to recoup its collateral.   When certain of Celsius's loans with EFH came due in July 2021, EFH informed Celsius that it would be unable to return Celsius's BTC and ETH collateral which was then valued to be worth approximately $509 million.   It was only after EFH refused to return Celsius's collateral that the Risk Committee did background checks on EFH

---

[68] EFH has never provided Celsius with financial statements.

[69] *See HNA Sweden Hospitality Management AB et al v. Equities First Holdings, LLC et al.*, No. 1:19-cv-02452-JRS-MPB (S.D. Ind. June 17, 2019); *Roossien et al v. Equities First Holdings LLC*, No. 3:12-cv-02649 (N.D. Tex. July 10, 2012); *Morris et al v. Equities First Holdings LLC et al.*, No. 3:08-cv-05126 (W.D. Wash. Mar. 3, 2008); *Segovia v. Equities First Holdings, LLC*, No. 06C-09-149-JRS, 2008 Del. Super. LEXIS 197 (Del. Super. Ct. May 30, 2008).

and its principals.  Prior to the Petition Date, Celsius agreed to a long dated unsecured payment plan with EFH.  EFH defaulted and stopped making any payments to Celsius on or around June 13, 2023.  It currently owes Celsius approximately $308 million and 3,765 BTC which have a market value of approximately $230 million.

131.  **Grayscale BTC Trust (~$120 million loss)**:  In 2021, Celsius contributed BTC to the Grayscale BTC Trust in exchange for shares in the Trust, which were trading at a premium to the Trust's Net Asset Value at the time.  Celsius was required to hold the shares for six months before they could be sold.  Once the lock-up period expired, the shares were trading at a discount to the BTC that Celsius had contributed.  Mr. Mashinsky elected to hold the shares over the advice of other Celsius employees, betting that the share price would rebound and trade at a premium again.  Instead, the discount increased, resulting in an approximately $120 million loss when the shares were sold.

132.  **Stakehound Loss (~$110 million loss)**: Stakehound is an ETH staking service provider that was utilized by Celsius.  In 2021, Stakehound announced that both it and its custody provider had deleted the private key for the wallet that held 35,000 ETH that had been transferred by Celsius.  Celsius did not disclose that loss to its customers until June 2022 and only after various news outlets published stories on the loss.

133.  **BadgerDAO Hack (~$49 million loss)**:  On December 2, 2021, a phishing incident occurred on BadgerDAO, a DeFi protocol where Celsius had stored 906 BTC.  BadgerDAO issued a recovery token, remBadger, which guaranteed a full pay-out over two years if the tokens remained deposited at BadgerDAO.  BadgerDAO made clear that the condition for receiving the restitution pay-out was keeping the remBadger token deposited and that the holder of the

remBadger token could not re-deposit the token after its withdrawal. A Celsius employee withdrew the tokens, forfeiting the payment. The mistake could have easily been avoided had Celsius implemented proper corporate controls, including a multi-signature approval protocol.

134.    **Defaults on Under-Collateralized and Uncollateralized Loans (~$35 million loss)**: Between 2020 and the end of 2021, Celsius began to increase its exposure to under-collateralized and wholly uncollateralized loans which provided a higher interest rate, but also significantly more risk. By June 2021, it was routine for one-third or more of Celsius's institutional loan portfolio to consist of unsecured loans. In 2021, two counterparties defaulted on significant uncollateralized and under-collateralized loans resulting in approximately $35 million losses.[70]

135.    **Acquisition of GK8 and Subsequent Sale (~$71 million loss)**: In October 2021, Celsius Network Limited purchased the GK8 Debtors, a digital asset custody business, for $115 million. After the acquisition of GK8, Celsius made limited effort, and was never able, to integrate the GK8 Debtors' technology in the broader Celsius business. On top of that, Mr. Mashinsky repeatedly promised consumers that GK8 had a "$750 million insurance policy" which would offer "$750 million insurance per client." Neither Celsius nor GK8 had ever owned such an insurance policy. On December 13, 2022, the Bankruptcy Court approved the Debtors' sale of the GK8 Debtors for approximately $44 million—a realized loss of approximately $71 million.

136.    ***In all, Celsius suffered realized losses that exceeded $1.2 billion due to the reckless conduct and actions taken in 2021 by the D&O Defendants. The Company also spent over $388 million buying back CEL token in 2021.***

---

[70] The Reliz LTD loan was under-collateralized. The Iterative OTC LLC loan was uncollateralized.

## VI.    <u>Increased Regulatory Pressure</u>

137.    At the same time that Celsius was experiencing billions of dollars in losses, the Company faced increasing regulatory pressure from authorities in the United Kingdom and the United States.  In July 2021, the Debtors determined to "migrate" their retail business from Celsius Network Limited (a U.K. entity) to Celsius Network LLC (a Delaware entity) in an effort to avoid the FCA prosecuting Celsius for running an unlicensed investment scheme.  Celsius moved all of its customer obligations to Celsius Network LLC, but did not move many, if any, crypto assets as part of the migration.  Celsius also did not tell its customers that Celsius had been accused of offering unlicensed investments or that Celsius was moving their obligations to a massively insolvent entity.  Rather, Mr. Mashinsky told Celsius's account holders that Celsius was moving because it liked the U.S. markets.

138.    Around that time, U.S. state regulators also began cracking down on Celsius.  On May 14, 2021, the Texas State Securities Board notified Celsius that it may have offered securities in Texas in violation of securities law.   Shortly thereafter, several state regulatory agencies, including  those in New Jersey, Vermont, California, Alabama, Kentucky, and New York, took action against Celsius.

139.    Celsius's Chief Compliance Officer and General Counsel, Jeremie Beaudry, left Celsius around that time, in the summer and early fall of 2021.  Mr. Cohen-Pavon, who was already in charge of regulatory matters, handled all regulatory issues for Celsius thereafter.

140.    On September 17, 2021, the New Jersey Bureau of Securities found that Celsius was offering unregistered securities in violation of New Jersey law.  New Jersey ordered that

Celsius cease and desist from offering its Earn investment account to unaccredited investors in the United States (the "**New Jersey Order**").

VII.   **January 2022 – The Jig Is Up**

141.   In December 2021, certain affiliates of the WestCap Group ("**Westcap**") and Caisse de dépôt et placement du Québec ("**CDPQ**") converted certain convertible promissory notes to Series B preferred shares of Celsius Network Limited (the "**Series B Preferred Shares**"). Celsius received approximately $536 million from the Series B raise.  Mr. Mashinsky cited the Series B equity raise to customers as legitimizing Celsius.  But the investment did not solve Celsius's problems, or even make it solvent.  The capital raised in the Series B offering was more than offset by Celsius's staggering losses.

142.   Celsius's derivatives (or CeFi) desk was led by Mr. Treutler and composed of approximately six traders who were dispersed between New York, Berlin, and Australia.  Celsius told the Oklahoma Department of Securities that in October 2021 the total USD value in accounts used to support its trading strategies was approximately $1.3 billion.  Celsius did not establish risk limits for its traders until sometime on or about December 2021.  When those risk limits were finally imposed, they were not monitored or enforced.  Indeed, the only information the investment and risk teams received on the status of Celsius's CeFi deployments was a weekly email that contained a basic profit and loss statement that was manually generated.  Celsius's risk and finance teams had no way to tell the positions of each strategy or whether the traders were within their limits.

143.   After the New Year, members of Celsius's risk and finance teams raised concerns regarding substantial losses incurred by the CeFi trading desk.  A subsequent investigation found

that the traders were intentionally placing only one side of the transaction and not properly hedging their trades by placing a second derivative. Mr. Treutler was informed that the desk was over its limits on January 9, 2022. Because Celsius and the D&O Defendants had not instituted proper oversight procedures for the trading desk, the issue was not identified until Celsius had already realized significant losses.

144.    On January 11, 2022, the limit breach was not remedied and was raised in an Executive Committee meeting that Mr. Mashinsky, Mr. Goldstein, Mr. Cohen-Pavon, and Mr. Leon attended. On January 11, 2022, Celsius's Chief Investment Officer ("**CIO**") directed the traders to get under the risk limit within 48 hours. The traders did not listen and, upon information and belief, other than asking nicely, neither the CIO nor the D&O Defendants took any actions to bring the traders within their limits. The limits were still breached when the price of BTC plummeted on January 20, 2022—***nine days after the CIO instructed the traders to get back within their limits***. Between January 20 to January 23, the price of BTC dropped precipitously from approximately $42,500 to $33,500.

145.    On January 21, 2022, the CEO of Celsius Mining, Amir Ayalon, also informed the risk department that he had been relying on January 1, 2022 Bitcoin prices and Celsius's future Bitcoin production was unhedged. Mr. Mashinsky was aware of the growing imbalance in the Company's BTC position, but told the finance department to not bring the position level and instead wait for Bitcoin prices to rebound. The price continued to go down.

146.    On the evening of Sunday, January 24, 2022, Mr. Mashinsky held a chaotic call with Celsius's finance, risk, and trading teams in which he instructed traders to sell 2,785 BTC with a market value of approximately $100 million. Celsius now had a large short position with

60

respect to BTC.  Upon information and belief, the next day Mr. Mashinsky again instructed the traders to sell BTC and other coins worth more than $100 million.  The market turned against Celsius and began to rebound.  Certain Celsius executives pleaded with Mr. Mashinsky to bring the position even.  Mr. Mashinsky eventually relented and agreed to purchase half of the position back.  As BTC prices continued to rise, he purchased the second half of the position on January 26, 2022.  Upon information and belief, Celsius ultimately lost more than $60 million as a result of Mr. Mashinsky's, Mr. Treutler's, and the other executives' and traders' reckless conduct.

147.    Both the risk and audit departments conducted "post-mortem" analyses of the events.  Their reports included other recent, similar reckless and irresponsible events, including (1) delays implementing hedging strategies, (2) issues at Celsius Mining concerning a lack of communication and project plan, which led to rushed decisions on large rig purchases and power agreements, and (3) special situation investments made at the direction of Mr. Mashinsky that were unknown to the rest of the finance team or could not be hedged.  The post-mortem noted:

- The failure of existing controls (*e.g.*, trading limits) or a lack of controls;

- The failure of multiple communications channels to enable decision making; and

- The lack of governance and unclear roles and responsibilities.

148.    In March 2022, Celsius was reeling and acknowledged in a presentation to the ALCO that it was not producing enough revenue to cover liabilities or additional operating expenses.  Subsequent presentations show that Celsius had net capital of approximately negative $60 million at this time (that negative figure included the CEL tokens held in treasury which Celsius valued at more than $700 million).  If the value of Celsius's CEL token treasury is removed, Celsius was insolvent by nearly $800 million.

149.    On April 4, 2022, Celsius did not have enough liquid assets (*i.e.*, assets that Celsius could retrieve within seven days or less) to meet its expected obligations.

150.    On April 10, 2022, Mrs. Mashinsky withdrew approximately 1 million CEL tokens with a market value of $2,946,336.[71]  On April 13, Mr. Leon withdrew $2,200,000 of USDC.[72] Mr. Leon also transferred 8,000,000 CEL tokens to an account owned by Alchemy, a limited partnership that he controlled.  That same day, Alchemy posted 7,373,272 CEL tokens as collateral and received a $4 million loan.

151.    On April 15, 2022, Celsius only had liquid assets sufficient to meet 54.5% of its total liabilities.  Also on April 15, 2022, the New Jersey Order became effective, and Celsius was forced to close its Earn program to unaccredited investors.  In an attempt to keep customers on the platform, Celsius launched its "Custody" product for customers in certain U.S. states.  Funds that were already held in Celsius's Earn accounts were grandfathered into the Earn program regardless of accreditation status.  But unaccredited users could not invest more digital assets into the Earn program.  A major source of assets and liquidity—incoming deposits from U.S. unaccredited customers—was closed.

152.    On April 26, 2022, Rod Bolger, Celsius's new CFO, informed Mr. Mashinsky that Celsius was "hemorrhaging $7.5mm pre-tax losses each week" and if they did not correct their deployments, Celsius ran "a real risk of not returning to profitability quickly enough."

---

[71] Mrs. Mashinsky then sold those tokens in a series of smaller, regular transactions that appear designed to conceal the sales and minimize their effect on the price of the CEL token.

[72] USDC is a stablecoin whose value is intended to be pegged to the U.S. dollar.

153.    On May 2 and 3, 2022, Celsius Network Limited held a two-day board meeting to discuss the Company's future.  The presentation to the board stated that, notwithstanding the Series B investment, Celsius's capital sat near zero.  It disclosed that Celsius had already lost approximately $159 million in 2022.

154.    On May 7, 2022, the cryptocurrency token, TerraUSD ("**UST**"), suffered a significant loss of value that sent shockwaves through the entire cryptocurrency market.  The UST token was a stablecoin whose value was pegged to USD through an algorithm and use of another cryptocurrency called Luna.  The UST coin value "de-pegged" and plummeted.  Celsius had approximately $940 million deployed on the Terra Chain.  It realized an approximately $30 million loss on its assets deployed on the Terra Chain.  Celsius also had lent $41 million to Three Arrows Capital, which entered liquidation as a result of the collapse of Terraform Labs.

155.    Rumors swirled around Celsius and its stability.  Users withdrew over $1.4 billion worth of digital assets from the Celsius platform the week after the collapse of Terraform Labs.  Mr. Mashinsky and Celsius desperately tried to hold the line.  In response to a May 11, 2022 inquiry from a CoinTelegraph reporter, Mr. Mashinsky responded that "we have ample liquidity and continue to issue loans . . . [we] have had no significant issues as we were ready for this downturn since end of 2021."  Mr. Mashinsky reiterated that comment to the public on May 11 when he tweeted "[a]ll funds are safe and we have robust risk management."  *That same day*, in response to the dramatic drop in liquidity, instead of restricting deployments, as was required by its liquidity risk policy, Celsius dramatically decreased its liquidity thresholds.  If it had not, it would have failed its liquidity test.  On May 12, 2022, Mr. Mashinsky lied to Celsius employees, assuring them in an internal email that "our liquidity position remains very strong and all client

funds remain secure." On May 13, 2022, Mr. Mashinsky told AMA viewers that "Celsius is stronger than ever, we have billions of dollars in liquidity . . . and we continue to do what Celsius does best – serve the community, protect the community, make sure your assets are there when you need them." On May 27, 2022, Mr. Mashinsky told AMA viewers that it was "business as usual" at Celsius. The next day, Mr. Goldstein tweeted that "the Celsius community, company, and staff are strong as always . . ."

156.    Celsius faced a liquidity crisis. It had billions of dollars invested in illiquid investments, including approximately $800 million[73] in staked ETH (which was locked until an uncertain date in the future) and approximately $600 million invested in its fledgling and ill-planned BTC mining operation, but insufficient assets to address customer withdrawal requests. Celsius experienced an issue that has been faced by banks with on demand deposits for centuries, but the D&O Defendants had not taken any meaningful (let alone sufficient) steps to protect against the liquidity crisis it was facing. Instead, Celsius had more than $1 billion in loans that were collateralized by cryptocurrency that was dramatically decreasing in value and required additional collateral to avoid margin calls.

157.    On May 9, 2022, the price of the CEL token dropped precipitously. On May 12, 2022, with the price of CEL token crossing $1.00 and Celsius desperately trying to preserve liquidity, Mr. Mashinsky ordered the purchase of $5 million of CEL tokens to inflate the value of the CEL token. Only a portion was purchased. On May 13, 2022, Mr. Mashinsky also instructed

---

[73] On the Petition Date, Celsius had 410,516 ETH staked with the Lido Finance DeFi protocol and 371,149 ETH staked directly on the Beacon Chain. The Beacon Chain is the original proof-of-stake blockchain that was launched in 2020. The Beacon Chain introduced proof-of-stake to Ethereum and formalized proof-of-stake as Ethereum's consensus mechanism with The Merge upgrade on September 15, 2022.

Tal Bentov, the head of loans, to stop issuing CEL token-backed loans.  He further instructed Ms. Bentov not to announce the change as he "did not want negative press."

158.    On May 14, 2022, members of the risk team described the liquidity crisis facing Celsius as "existential" and the measures they were taking to increase liquidity as "only buying [Celsius] time."

159.    On May 15, 2022, Mr. Mashinsky withdrew BTC, ETH, and USDC worth $1,089,137.

160.    On May 16, 2022, Celsius's liquidity had dropped by 40% due to customer withdrawals and steep price declines in BTC and ETH.  That day, Ms. Denizkurdu asked Mr. Bolger, "why aren't we talking about the elephant in the room.  Survival?  Liquidity.  How many days we have left.  at what price do we go bust . . ."  Also on that day, Mr. Mashinsky withdrew $1,792,255 in stablecoins.

161.    On May 19, 2022, Mr. Bolger sent a presentation to Mr. Mashinsky which included projections that were dramatically different than the projections presented to the board of directors 17 days earlier.  Mr. Bolger now projected that Celsius's capital position sat at approximately negative $800 million and Celsius would be approximately $1.1 billion in the red by the end of the year.  Mr. Bolger concluded that "[t]he current business model is not financially sustainable" and that "[n]o business unit or coin is currently profitable at the current level of rewards rates and OpEx."  Mr. Bolger warned Mr. Mashinsky that "profitability is not achieved even at 2x growth."  Mr. Mashinsky responded that he understood "the current business model is not sustainable and that our capital position is making things worse."

162.    On May 27, 2022, Celsius triggered the reduced liquidity stress test introduced weeks before.  On that same day, Mr. Mashinsky instructed a Celsius employee to withdraw substantially all of the non-CEL token cryptocurrency held by Koala1 LLC—worth $5,120,317.

163.    On May 29, 2022, Mr. Leon withdrew $2,370,634 of stablecoins.

164.    On May 31, 2022, Mrs. Mashinsky withdrew CEL tokens with a purported value of $2,027,339.  The same day, Mr. Leon withdrew BTC with a value of $423,376 and Ms. Landes, who was the Vice President of Lending at Celsius and is the wife of Mr. Leon, withdrew $333,548 of stablecoins.

165.    In a June 1, 2022 interview, Mr. Mashinsky was asked whether account holders' funds were safe at Celsius.  Mr. Mashinsky responded, "not just that they are safe but we provided anyone who wanted to withdraw partially or fully, there were no problems . . . I know people are concerned about the whole market . . . about the TerraLuna situation.  That's the service, you can withdraw at any time . . . We have billions of dollars of liquidity."[74]  On June 3, 2022, Mr. Mashinsky urged consumers to leave their assets on the platform and "HODL," meaning "hold on for dear life."  He promised that Celsius had "figured out how to make money for all of us while you HODL."[75]

166.    On June 7, 2022, at the direction of Mr. Leon, Celsius published a blog titled "Damn the Torpedoes, Full Speed Ahead."[76]  Celsius sought to reassure the community, stating that it was

---

[74] Id. (citing Crypto Archives, InvestAnswers interviews Alex Mashinsky, CEO of Celsius Live streamed June 1, 2022 (Dec. 13, 2022), https://m.youtube.com/watch?v=lPXHwWyJhTo.)

[75]   Celsius Network, Celsius AMA June 3, 2022, YouTube (Jun. 3, 2022), at [48:13], https://www.youtube.com/watch?v=9zAVFmiyDhE.

[76] Celsius, Damn the Torpedoes, Full Speed Ahead, (June 7, 2022), https://celsiusnetwork.medium.com/damn-the-torpedoes-full-speed-ahead-4123847832af.  This blog post has since been deleted.

prepared for the crypto downturn, that it will "continue to process withdrawal[] without delay," and that "Celsius has the reserves (and more than enough ETH) to meet obligations" under its "comprehensive liquidity risk management framework."[77]  These statements were false, but Mr. Leon and Mr. Goldstein retweeted the June 7, 2022 blog post from their personal Twitter accounts.

167.    On June 10, 2022, Mr. Mashinsky stated that "Celsius has billions in liquidity" and "anyone who wants to withdraw has no problem."[78]

## VIII.    **The Pause**

168.    On June 12, 2022, Celsius paused all withdrawals from the platform to prevent further erosion of liquidity and value (the "**Pause**").

169.    On June 13, 2022, Tether applied BTC that it was holding as collateral for a loan to Celsius.  Tether purported to apply the collateral for a total amount of $816,822,948.

170.    Thereafter, certain of the D&O Defendants instructed Celsius employees to continue liquidating retail loans as cryptocurrency prices dropped to avoid making Celsius's asset to liability gap larger.

## IX.    **Chapter 11 Bankruptcy and Government Actions**

171.    On July 13, 2022, the Debtors other than the GK8 Debtors filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  On December 7, 2022, the GK8 Debtors filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

---

[77] *Id.*

[78] Celsius Network, Celsius AMA June 10, 2022, YouTube (Jun. 10, 2022), at [9:06; 45:48], https://www.youtube.com/watch?v=GyRO_W-utXs.

172.    On July 13, 2023, the U.S. Attorney for the Southern District of New York indicted Mr. Mashinsky on counts of securities fraud, commodities fraud, wire fraud relating to his false statements inducing customers to invest their assets in Celsius, conspiracy to manipulate the price of CEL token, fraudulent scheme to manipulate the price of CEL token, market manipulation, and wire fraud related to CEL token manipulation.  The Southern District of New York also indicted Mr. Cohen-Pavon for securities fraud, wire fraud, and market manipulation related to the CEL token manipulation scheme.  On September 13, 2023, Mr. Cohen-Pavon pled guilty to the charges against him, admitting under oath that the Company manipulated the price of CEL token.

173.    Also on July 13, 2023, the Securities and Exchange Commission filed a complaint against Mr. Mashinsky alleging securities fraud; the Federal Trade Commission filed a complaint against Mr. Mashinsky, Mr. Leon, and Mr. Goldstein alleging deceptive business practices; and the Commodity Futures Trading Commission filed a complaint against Mr. Mashinsky alleging fraud under the Commodity Exchange Act.

## COUNT I

**(Breach of Fiduciary Duty — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Harumi Urata-Thompson, and Jeremie Beaudry)**

174.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

175.    At all times relevant to this Complaint, Celsius was insolvent.  Celsius's debts and liabilities exceeded the value of its assets, especially when the artificially inflated value of its CEL token treasury was taken into account.  Because a substantial portion of the Company's assets were illiquid, Celsius did not have the ability to meet its on demand and other obligations.

176.    The Defendants were directors and officers of Celsius Network, Inc., Celsius Network Limited, Celsius Network LLC, and certain other of their affiliates.  While not explicitly named as directors of these entities, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were officers that made major decisions for these entities that would normally be carried out by directors.  Additionally, each of the D&O Defendants were senior level employees enjoying significant trust and independence within these entities.

177.    The D&O Defendants therefore owed Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors a fiduciary duty to exercise the care, skill, and diligence that an ordinarily careful and prudent person would use when carrying out the functions exercised by the directors and officers in relation to the companies they serve.  This duty included, among other things, the obligations to acquire and maintain sufficient knowledge to enable them to discharge their duties as directors and officers, and to act on an informed basis after considering relevant and reasonably available information.

178.    The D&O Defendants breached their fiduciary duty to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors, as well as their creditors, by acting in bad faith, without exercising the care, skill, and diligence that an ordinarily careful and prudent person would exercise in similar circumstances; by not acquiring and maintaining sufficient knowledge and considering relevant and reasonably available material information; by disregarding knowledge they did possess; and by acting with negligence, gross negligence, and reckless and irrational indifference to the interests of Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors.

179.    The Defendants' conduct was arbitrary and unreasonable, frustrating the overarching purpose of Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors' governing documents, and breaching the implied contractual covenant of good faith and fair dealing.

180.    Celsius was a financial services company that catered to retail investors.  Mr. Mashinsky marketed Celsius through online "Ask Mashinsky Anything" videos that were broadcast to the public.  During those videos, Mr. Mashinsky repeatedly and persistently made fraudulent, false, and misleading statements to the public.  Mr. Mashinsky was aware his statements were false when he made them.  Mr. Mashinsky intentionally made those false and misleading statements to encourage more individuals to transfer cryptocurrency to Celsius.  The other D&O Defendants, including Mr. Goldstein, Mr. Leon, and Ms. Urata-Thompson, made similar misrepresentations to the public.

181.    The D&O Defendants and other employees of Celsius collectively and knowingly engaged in a scheme to cover up Mr. Mashinsky's and other employees' misrepresentations and false statements.  Members of the risk, legal, compliance, regulatory, and media teams would flag problematic and false statements to be deleted from the AMAs after such videos had been broadcast live and many had already been posted to YouTube.  Mr. Mashinsky and the other D&O Defendants were warned about the fraudulent, false, and misleading statements Mr. Mashinsky and certain of the other D&O Defendants were making and the claims and liability that the Company would incur as a result of those statements.  Despite that knowledge, Mr. Mashinsky and the D&O Defendants continued to intentionally publish false and misleading statements to the public to entice individuals to transfer cryptocurrency to Celsius.

182.    Celsius received billions of dollars of assets from retail investors and had a fiduciary duty to handle and invest those assets in a responsible manner.  Celsius and the D&O Defendants stressed the safety of its investments and systems repeatedly in public communications targeted at current and prospective account holders, specifically retail investors.  The D&O Defendants engaged in directional investments and uncollateralized loans that were significantly riskier than the investment strategies Celsius told its customers it was pursuing.

183.    The D&O Defendants also failed to establish adequate controls, systems, technology, infrastructure, and decision-making processes to responsibly invest or protect the assets that they were trusted to invest.

184.    Celsius managed its assets and investments on spreadsheets in which positions were required to be manually inputted and updated.  Those spreadsheets were not accurate and did not adequately track Celsius's relative positions in certain cryptocurrencies.  This and other failures, directed by the D&O Defendants, caused Celsius to incur over $250 million of losses in late 2020 and early 2021, when, unbeknownst to the Company, its BTC and other coin obligations greatly exceeded its BTC assets as the market price of BTC (and cryptocurrency prices generally) increased rapidly.  Celsius's losses could have been avoided or mitigated if proper systems were in place.

185.    In response to that exorbitant loss, the D&O Defendants again failed to implement a system that could accurately track Celsius's assets and liabilities.  Rather, they relied on another Google spreadsheet.  The sheet required many different employees to manually input investments and positions.  The updates were done in an unorganized, ad hoc manner.  As a result, the Google sheet regularly misreported the Company's positions by hundreds of millions of dollars.  The D&O

Defendants were repeatedly informed of the inadequacy of the Company's systems, but failed to take adequate measures to remedy the situation. Instead, the D&O Defendants directed that more technological resources be invested in new products and the customer facing side of the business, to attract more assets from retail investors, rather than investing in the necessary systems to protect the Company and its customers' assets.

186.   The D&O Defendants also failed to implement proper risk management procedures. Up until spring of 2021, Celsius employed two risk management professionals. In March of 2021, those two risk management professionals were overseeing more than $10 billion of assets and investments. Many of the investments that led to the large losses described in Section V, *supra*, were incurred while those two individuals oversaw Celsius's risk exposure. Such investment decisions included posting collateral with EFH without conducting proper diligence or receiving financial statements and transferring money to KeyFi, an entity in which Mr. Mashinsky and Mr. Goldstein owned equity, before executing a written contract or ensuring proper oversight mechanisms were in place.

187.   Even after the Company brought in additional risk management professionals, the problems continued. For instance, the D&O Defendants did not implement any risk limits for its $1.3 billion CeFi trading desk until the end of 2021. The D&O Defendants also did not establish any mechanism, policy, or procedure to monitor and oversee the traders' positions and ensure that such traders were following Celsius's investment policy and properly hedging their positions. The D&O Defendants also did not utilize any method to effectively police the risk limits.

188.   The lack of effective risk limits and risk monitoring led to significant losses in January 2022, when traders refused to reduce positions that were outside of their delta neutral

mandates and risk limits for more than 15 days while the cryptocurrency market plummeted.  Mr. Mashinsky then took a reckless gamble on BTC continuing to drop, betting over $200 million on the volatile cryptocurrency.  The Company lacked appropriate controls or the delegation of responsibility to stop that reckless decision.  The other D&O Defendants failed to take appropriate action to stop Mr. Mashinsky's reckless gamble.

189.    The D&O Defendants also failed to take appropriate actions to manage their business.  From at least as early as 2021 through 2022, the D&O Defendants were repeatedly informed that Celsius had a negative net interest margin and was not making enough money from its investments to fund the rewards rates it promised to pay to account holders.  Members of the Finance and Treasury departments made multiple proposals to reduce the rewards rates.  With full knowledge of Celsius's financial condition, including an extreme shortfall in assets compared to liabilities, the D&O Defendants refused to lower rewards rates and continued to offer rates that were regularly higher than their competitors.  The failure to reduce rewards rates caused Celsius to incur hundreds of millions in operating losses in 2021 and 2022.

190.    The D&O Defendants' breach of their fiduciary duties caused substantial damage to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, the other Debtors, and their account holders and other creditors in an amount to be proven at trial.  But for such breaches of fiduciary duty, Celsius and its creditors would not have suffered such damage.

## COUNT II

**(Breach of Fiduciary Duty of Loyalty — Purchase and Manipulation of CEL token — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Jeremie Beaudry, Harumi Urata-Thompson, and Johannes Treutler)**

191.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

192.     At all times relevant to this Complaint, Celsius was insolvent.  Celsius's debts and liabilities exceeded the value of its assets, especially when the artificially inflated value of its CEL token treasury was taken into account.  Because a substantial portion of the Company's assets were illiquid, Celsius did not have the ability to meet its on demand and other obligations.

193.     Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Mr. Beaudry, Ms. Urata-Thompson, and Mr. Treutler, as well as their family, friends, and affiliated entities, all owned large quantities of CEL tokens.

194.     Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Mr. Beaudry, and Ms. Urata-Thompson were directors and officers of Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and certain other of their affiliates.  While not explicitly named as directors, Mr. Goldstein, Mr. Cohen-Pavon, Mr. Beaudry, and Ms. Urata-Thompson were officers that made high-level decisions for these entities that would normally be carried out by directors. Additionally, Mr. Goldstein, Mr. Cohen-Pavon, Mr. Beaudry, and Ms. Urata-Thompson were senior level employees enjoying significant trust and independence within these entities.

195.     Mr. Treutler was the Head of the CeFi trading desk and in charge of implementing and directing Celsius's purchase of CEL tokens from public markets in late 2019 through the fall of 2021.  Although not a director or officer of Celsius Network Inc., Celsius Network Limited, or

Celsius Network LLC, Mr. Treutler was a key, senior employee within these entities, who made material decisions with respect to these entities' strategy, operations, and the use of significant assets of the Company. Mr. Treutler ran the CeFi division of the Company, participated in financial decisions of the Company, had input into and knowledge of the financial welfare of the Company, and advised Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Mr. Beaudry, and Ms. Urata-Thompson, who were Celsius Network Inc., Celsius Network Limited, and Celsius Network LLC's Directors, CEO, COO, CTO, CRO, CCO, and CFO at all times relevant to this Count II. Together with Mr. Mashinsky, Mr. Cohen-Pavon, and Ms. Urata-Thompson, Mr. Treutler would establish price targets for Celsius's purchase of CEL tokens. Mr. Treutler would determine the specific quantities of CEL tokens purchased, the prices to purchase CEL tokens, and when the purchases would occur to inflate the price of the CEL token. As a key managerial employee, Mr. Treutler owed Celsius Network Limited the same fiduciary duties as its officers and directors. Additionally, Mr. Treutler owed an implied fiduciary duty to Celsius Network Limited because Mr. Treutler and Celsius Network Limited had a relationship of trust on which Celsius Network Limited relied, Mr. Treutler and Celsius Network Limited's interests were aligned, and Mr. Treutler exercised control and dominion over a substantial amount of Celsius Network Limited's property, instructing the purchase of hundreds of millions of dollars of CEL tokens, and oversaw and directing Celsius Network Limited's CeFi trading activities, which at times exceeded $1 billion.

196.    Each of the D&O Defendants and Mr. Treutler therefore owed Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors a fiduciary duty of loyalty, including the duty to act in good faith and in the best interest of Celsius, promote the

success of the Company, and, at all times, to subordinate their personal interests to the interests of Celsius.

197.    The D&O Defendants and Mr. Treutler breached their fiduciary duty of loyalty to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors by acting in bad faith, failing to act in the best interest of the Company as a whole, failing to act in a way that promoted the success of the Company, and failing to subordinate their personal interests to the interests of the Company.  The D&O Defendants' and Mr. Treutler's conduct was arbitrary, unreasonable, and done in bad faith, which frustrated the overarching purpose of Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors' governing documents and breached the implied contractual covenant of good faith and fair dealing.

198.    Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler repeatedly directed Celsius to purchase CEL tokens on the open market in a manner designed to artificially increase the price of the token, including directing the timing, amount, and price of such purchases and setting resting purchase orders to purchase CEL token at set prices to absorb demand from larger sellers.  Contrary to Mr. Mashinsky's and Celsius's public statements, the amount of these purchases was determined in an *ad hoc* manner and often exceeded the amount of weekly rewards in CEL tokens to be paid to account holders.

199.    On certain occasions, the Defendants directed CEL tokens to be purchased during Mr. Mashinsky's public AMA segments to encourage retail investors to purchase CEL tokens.

200.    Celsius's strategic purchases were designed and intended to artificially increase the price of the CEL token above a fair market price.  The manipulation of the price of the CEL token benefited insiders, including, but not limited to, the D&O Defendants, Mr. Treutler, their families,

and affiliates, who held substantial amounts of CEL tokens, at the expense of the Company and its account holders and other creditors. The manipulation of the CEL token also resulted in the Company paying the Defendants and employees millions of dollars in bonuses when CEL token reached $1.50 and $5.00.

201.    Mr. Mashinsky, Mr. Leon, and Mr. Goldstein all sold large amounts of CEL tokens on public exchanges on or around the time Celsius was buying CEL tokens.

202.    Certain of those sales violated Celsius's corporate policy regarding the sale of CEL tokens by insiders and employees.  Ms. Urata-Thompson, Mr. Cohen-Pavon, Mr. Beaudry, and Mr. Treutler were aware of those sales and that such sales violated Celsius policies.  Nevertheless, Ms. Urata-Thompson, Mr. Cohen-Pavon, and Mr. Treutler specifically directed the purchase of CEL tokens to support its price around the times of certain of the large sales by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein to avoid those sales depressing the price of CEL token.

203.    Mr. Beaudry was the primary individual responsible for managing the Company's CEL token trading policy.  He was aware of certain of the large sales of CEL tokens by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein, which were reported to him.  He took no measures to stop these breaches, and instead amended the policy to authorize larger sales.

204.    The D&O Defendants and Mr. Treutler used wallets with commingled customer deposits and other undeployed assets to make the above-mentioned CEL token purchases.

205.    At the direction of Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler, Celsius spent hundreds of millions of dollars purchasing CEL tokens on public markets to manipulate and support the token's price.  These purchases were not conducted at a fair market value, and the strategic timing and pricing of the transactions caused

Celsius to overpay for the CEL tokens it purchased.  Celsius did not keep track of the amount of these purchases, and to this day the Company does not know the total amount it spent to purchase CEL tokens.  The total amount Celsius spent buying CEL tokens on the open market from 2019 to 2022 exceeds $500 million.

206.    Additionally, Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Ms. Urata-Thompson, Mr. Beaudry, Ms. Landes, Mr. Treutler, and certain of their affiliates sold their personal CEL token holdings back to the Company via its OTC desk, receiving tens of millions of dollars in return. They did so knowing that the price of CEL token was artificially inflated because of their actions, that their CEL token was worth significantly less than the value they were receiving for it, and that they were profiting through the Company's payment of cash and other cryptocurrency for the artificially inflated CEL token.

207.    Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler spent hundreds of millions of dollars' worth of assets of Celsius Network Limited and Celsius Network LLC that had been deposited by account holders to inflate the value of CEL token, and to enrich themselves, their friends, families, and affiliated entities.  The D&O Defendants' and Mr. Treutler's conduct with respect to the CEL token breached the Defendants' fiduciary duty of loyalty to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors because the Defendants acted in bad faith, failed to act in the best interest of Celsius as a whole, failed to act in a way that promoted the success of Celsius, and failed to subordinate their personal interests to the interests of Celsius.  The D&O Defendants' and Mr. Treutler's conduct also put Celsius Network Inc., Celsius Network Limited, Celsius Network LLC,

and the other Debtors at substantial risk of insolvency and additional claims to the detriment of Celsius, its account holders, and creditors.

208.    The Defendants' breach of the fiduciary duty of loyalty caused substantial damage to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, their affiliates, and their creditors in an amount to be proven at trial.  But for such breaches of fiduciary duty, Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, their affiliates, and their creditors would not have suffered such damage.

## COUNT III

**(Aiding and Abetting Breach of Fiduciary Duty of Loyalty — Purchase and Manipulation of CEL token — Defendant Johannes Treutler)**

209.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

210.    As set forth in detail above, at all times relevant, Mr. Treutler was Head of CeFi Trading at Celsius and responsible for directing Celsius's purchase of CEL tokens from public markets.  Mr. Treutler was a senior managerial employee within Celsius whose contributions to Company strategy were essential to operations and the use of the Company's assets.

211.    Mr. Treutler wielded significant influence over Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors' officers and directors and understood his role in the Company and the effects that his actions could have on the Company and its creditors.  Mr. Treutler also understood the roles and duties of the Company's officers and directors.

212.    As also set forth in detail in this Complaint, Defendants Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler each participated in the

scheme to artificially inflate the price of CEL token by directing the Company to buy back large quantities of CEL token in public markets and on certain occasions timing these purchases to avoid decreases in the token price that otherwise would have occurred due to large sales by Mr. Mashinsky, Mr. Goldstein, and Mr. Leon.

213.    Celsius represented that it only purchased the amount of CEL token needed to pay interest owed to Celsius account holders who elected to Earn in CEL token.  However, the purchases directed and made by Mr. Treutler often exceeded the amount of CEL tokens that were required to be purchased to pay the interest owed to Celsius account holders who elected to Earn in CEL token.

214.    Mr. Treutler knew that his conduct and that of the other Defendants constituted breaches of the fiduciary duties they owed to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and their affiliates.

215.    To the extent this Court determines that Mr. Treutler does not owe any fiduciary duties of his own, Mr. Treutler is liable for aiding and abetting other Defendants' breaches of fiduciary duty.

216.    Mr. Treutler substantially assisted and supported the other Defendants in these breaches of fiduciary duty by encouraging and implementing the Defendants' strategy to artificially inflate the price of CEL token.

217.    Mr. Treutler understood that Mr. Mashinsky's and other Defendants' sales of their personal CEL tokens were enriching Defendants while diminishing CEL token's value, but continued to covertly conspire to deceive the public and benefit insiders by artificially inflating the price of CEL token.

218.    As a result of Mr. Treutler's aiding and abetting other Defendants' breaches of fiduciary duty, Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, their affiliates, and their creditors suffered significant damages in an amount to be determined at trial. But for such breaches of fiduciary duty, Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, their affiliates, and their creditors would not have suffered such damage.

## COUNT IV

### (Breach of Fiduciary Duty of Loyalty — KeyFi Purchase and Asset Deployment — Defendants Alexander Mashinsky and Hanoch Goldstein)

219.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

220.    At all times relevant to this Complaint, Celsius was insolvent.  Celsius's debts and liabilities exceeded the value of its assets, especially when the artificially inflated value of its CEL token treasury was taken into account.  Because a substantial portion of the Company's assets were illiquid, Celsius did not have the ability to meet its on demand and other obligations.

221.    Mr. Mashinsky was a co-founder, director and officer of Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and certain of their affiliates.  Mr. Goldstein was a co-founder and officer that made decisions for Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors that would normally be carried out by a director.  Mr. Goldstein was a senior-level officer enjoying significant trust and independence within Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors.

222.    Mr. Mashinsky and Mr. Goldstein therefore owed Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors a fiduciary duty of loyalty,

including the duty to act in good faith and in the best interest of Celsius, promote the success of the Company, and, at all times, to subordinate their personal interests to the interests of Celsius.

223.    Mr. Mashinsky and Mr. Goldstein breached their fiduciary duty of loyalty to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors by acting in bad faith, failing to act in the best interest of the Company as a whole, failing to act in a way that promotes the success of the Company, and failing to subordinate their personal interests to the interests of the Company.

224.    Mr. Mashinsky and Mr. Goldstein owned equity in KeyFi.

225.    Mr. Mashinsky and Mr. Goldstein, together with Mr. Cohen-Pavon, caused Celsius to transfer hundreds of millions of dollars' worth of customer assets to KeyFi.

226.    Mr. Mashinsky and Mr. Goldstein would profit from Celsius's assets that were transferred to KeyFi if it was successful in investing those funds due to their equity interests.

227.    Mr. Mashinsky and Mr. Cohen-Pavon directed certain of these transfers to be made before a formal agreement between KeyFi and Celsius was executed so that Mr. Mashinsky and Mr. Goldstein could begin to profit from KeyFi's deployment of Celsius assets through their equity ownership of KeyFi.

228.    Mr. Goldstein was one of the primary people at Celsius in charge of closing the KeyFi deal.

229.    When the contract was ultimately signed, the terms were extremely favorable to KeyFi.

230.    Mr. Mashinksy and Mr. Goldstein were aware of the risks of the KeyFi investment but directed it nonetheless in bad faith, for the benefit of Mr. Mashinsky and Mr. Goldstein, and

failed to subordinate their personal interests to the interests of the Company. As a result, Celsius lost more than $315 million.

231.    Mr. Mashinsky and Mr. Goldstein, by such aforementioned actions, breached their fiduciary duties of loyalty and acted to favor their own interests over the interests of the Company. They did not act to maximize the value or the long-term wealth-creating capacity of the Company.

232.    Mr. Mashinsky and Mr. Goldstein's breach of the fiduciary duty of loyalty caused substantial damage to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, the other Debtors, and their creditors in an amount to be proven at trial. But for such breaches of fiduciary duty, the Company and its creditors would not have suffered such damage.

## <u>COUNT V</u>

**(Breach of Fiduciary Duty of Loyalty — Execution of AMV Loan — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Jeremie Beaudry, Harumi Urata-Thompson, and Roni Cohen-Pavon)**

233.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

234.    At all times relevant to this Complaint, Celsius was insolvent. Celsius's debts and liabilities exceeded the value of its assets, especially when the artificially inflated value of its CEL token treasury was taken into account. Because a substantial portion of the Company's assets were illiquid, Celsius did not have the ability to meet its on demand and other obligations.

235.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were directors and officers of Celsius Network, Inc., Celsius Network Limited, Celsius Network LLC, and certain other of their affiliates. While not explicitly named as directors, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were officers that made

high-level decisions for Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors that would normally be carried out by directors. Additionally, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were senior-level employees enjoying significant trust and independence within Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors.

236.   Each of the Defendants therefore owed Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors a fiduciary duty of loyalty, including the duty to act in good faith and in the best interest of Celsius, promote the success of the Company, and, at all times, to subordinate their personal interests to the interests of Celsius.

237.   The Defendants breached their fiduciary duty of loyalty to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors by acting in bad faith, failing to act in the best interest of the Company as a whole, failing to act in a way that promoted the success of the Company, and failing to subordinate their personal interests to the interests of the Company. The Defendants' conduct was arbitrary and unreasonable, which frustrated the overarching purpose of Celsius's governing documents and breached the implied contractual covenant of good faith and fair dealing.

238.   Mr. Mashinsky and Mr. Leon, who both signed the Token Sale Agreement, did not abide by the agreement that obligated Mr. Mashinsky to purchase the 117,000,000 CEL tokens not sold in the ICO. Instead, they extended the agreement and ultimately cancelled the Token Sale Agreement to the detriment of Celsius and the benefit of Mr. Mashinsky.

239.   Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Mr. Goldstein, and Mr. Beaudry worked together to hide the fact that the CEL token ICO was not fully funded and that 117,000,000

CEL tokens were not sold. Mr. Mashinsky, despite knowing otherwise, continued to make public statements that the ICO was fully funded.

240.    Mr. Mashinsky and Mr. Leon entered into the AMV Loan to cover up the fact that the CEL tokens which should have been purchased by Mr. Mashinsky were not actually purchased. Mr. Beaudry facilitated the AMV loan by drafting the agreement. Mr. Leon approved Celsius entering into the AMV Loan and depositing the CEL tokens into a segregated wallet to obscure their return from the public.

241.    Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Mr. Goldstein, and Mr. Beaudry were aware that Celsius had represented in its Whitepaper that all CEL tokens not offered to be sold, but not sold in the ICO would be burned. Nevertheless, Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Mr. Goldstein, and Mr. Beaudry covered up the fact that the CEL tokens were not destroyed or paid off by Mr. Mashinsky, and both directed and enabled Celsius to retain the ICO CEL tokens in its treasury. Mr. Goldstein made false statements to the public that all CEL tokens not sold had been burned.

242.    The decision to enter into the AMV Loan and retain the ICO CEL tokens in Celsius's treasury primarily benefited Mr. Mashinsky, allowing him to eschew his obligation to purchase the leftover ICO CEL tokens at the expense of the Company and its account holders and other creditors.

243.    Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Mr. Goldstein, Ms. Urata-Thompson, and Mr. Beaudry all owned a substantial amount of CEL token and were entitled to receive more CEL token in the future and, thus, benefited from obscuring the return of the unsold CEL tokens to the treasury.

244.     The Defendants' breach of the fiduciary duty of loyalty caused substantial damage to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, their affiliates, and their creditors in an amount to be proven at trial.  But for such breaches of fiduciary duty, Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, their affiliates, and their creditors would not have suffered such damage.

## COUNT VI

**(Breach of Director's Duties — Duty to Exercise Independent Judgment (English Law) — Defendants Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Harumi Urata-Thompson, and Jeremie Beaudry)**

245.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

246.     Mr. Leon was a director and officer of Celsius Network Limited, and Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were officers of Celsius Network Limited.  While not explicitly named as directors, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were all officers who made high-level decisions for Celsius Network Limited that would normally be carried out by directors.

247.     Each of the D&O Defendants owed a duty to exercise independent judgment, to take responsibility for all decisions reached, consider issues for themselves, and regard themselves as the ultimate decision-maker.

248.     Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry breached their duty to exercise independent judgment by failing to consider issues for themselves and take responsibility for all decisions reached.

249.    Specifically, among other failures to exercise independent judgment, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry repeatedly deferred to Mr. Mashinsky on numerous consequential management decisions notwithstanding their own roles within Celsius and despite relevant and reasonably available information indicating such decisions were not in the best interests of the Company.

250.    For example, despite being warned about the fraudulent, false, and misleading statements Mr. Mashinsky was making in his AMA videos and the liability that the Company would incur as a result, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry failed to exercise independent judgment and stop these fraudulent statements. Instead, they participated in a scheme to cover up Mr. Mashinsky's misrepresentations. The Defendants were aware of the scheme to edit the AMAs after they were recorded live to remove the live misrepresentations that Mr. Mashinsky had made, and to not explicitly correct those misstatements. The Defendants actively participated in the editing process. None of the Defendants ever corrected or retracted any of Mr. Mashinsky's statements.

251.    Mr. Leon and Mr. Beaudry failed to exercise independent judgment with respect to the Token Sale Agreement between AMV and Celsius Network Limited. Mr. Leon extended the deadline and reduced the price for AMV's purchase in 2018 at Mr. Mashinsky's direction, so that Mr. Mashinsky could avoid tax consequences. Ultimately, rather than holding Mr. Mashinsky to his agreement to purchase 117,000,000 CEL tokens under the Token Sale Agreement, Mr. Leon agreed to release Mr. Mashinsky from his purchase obligation in exchange for no consideration. Mr. Leon subsequently authorized and approved the AMV Loan arrangement in an attempt to cover up the issue. Mr. Beaudry facilitated the cover-up by drafting the AMV Loan agreement.

Ultimately, Mr. Leon authorized the termination of each agreement and the return of the 117,000,000 CEL tokens to Celsius's treasury instead of being burned as the Whitepaper promised. Mr. Leon's and Mr. Beaudry's decisions and actions demonstrated that they were being influenced by Mr. Mashinsky rather than exercising independent judgment to make decisions in the best interest of Celsius.

252.    Ms. Urata-Thompson and Mr. Cohen-Pavon were key members of various Celsius committees, including the Executive Committee, the Risk Committee, the Assets and Liabilities Committee, the New Business Committee, and the Investment Committee, and had significant input into Celsius's investment decisions. Ms. Urata-Thompson and Mr. Cohen-Pavon failed to exercise independent judgment with respect to many significant investment decisions, including, but not limited to: (1) posting significant cryptocurrency collateral with EFH without conducting proper diligence, (2) failing to sell shares in the Grayscale Bitcoin Trust when Celsius was able to do so, (3) transferring significant assets to KeyFi before an agreement had been executed, (4) making unsecured loans to risky counterparties that exceeded the Company's risk limits, and (5) not reducing the unsustainable interest rate that Celsius paid to its customers. These poor investment decisions were influenced by Mr. Mashinsky, and had Ms. Urata-Thompson and Mr. Cohen-Pavon exercised independent judgment and considered all relevant issues for themselves, they would not have made these decisions.

253.    Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, and Ms. Urata-Thompson failed to prioritize, develop, and authorize proper systems to track and monitor Celsius's assets, obligations, and trading positions. The Defendants' initial failure led to an approximate $250 million loss that was discovered in late 2020 and early 2021. In response, the Defendants attempted to implement

a system to better track Celsius's assets and obligations.  However, the ultimate system Google sheet that the Defendants created or oversaw creating to remedy the issue was obviously and woefully inadequate to track the billions of dollars of assets that had been entrusted to Celsius by retail investors and the investments that Celsius made for the benefit of the Company and its account holders.  The Defendants never implemented a system to track Celsius's trading positions.

254.    The Defendants also failed to take appropriate actions to manage their business. From at least as early as 2021, through 2022, the Defendants were repeatedly informed that Celsius had a negative net interest margin and was not making enough money from its investments to fund the rewards rates it promised to pay to account holders.  Members of the Finance and Treasury departments made multiple proposals to reduce the rewards rates.  With full knowledge of Celsius's financial condition, including an extreme shortfall in assets compared to liabilities, the Defendants buckled to Mr. Mashinsky's insistence that rewards rates remain competitive, refused to lower rewards rates, and continued to offer rates that were regularly higher than their competitors'.  The failure to reduce rewards rates caused Celsius to incur hundreds of millions in operating losses in 2021 and 2022.

255.    The Defendants failed to take immediate action in January 2022 to block Mr. Mashinsky from betting that the cryptocurrency market would drop further during a period of extreme market volatility and selling hundreds of millions of dollars' worth of BTC and other cryptocurrency assets.  Following that incident, Defendants failed to remove Mr. Mashinsky's ability to make similar decisions.

256.    In breaching their duty to exercise independent judgment, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry caused substantial damage to Celsius

Network Limited and its creditors in an amount to be proven at trial.  But for such breaches of duty, Celsius Network Limited and its creditors would not have suffered such damage.

## COUNT VII

**(Breach of Fiduciary Duty — Duty to Avoid Conflicts of Interest (English Law) — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Jeremie Beaudry, Harumi Urata-Thompson, and Johannes Treutler)**

257.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

258.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Mr. Beaudry, and Ms. Urata-Thompson were all directors and officers of various Celsius entities from 2018 to present, including Celsius Network Limited.  While not explicitly named as directors of Celsius Network Limited, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were officers that made high-level decisions for Celsius Network Limited that would normally be carried out by directors.  Additionally, the Defendants were senior level officers enjoying significant trust and independence within Celsius Network Limited.

259.    Mr. Treutler was the Head of the CeFi trading desk and in charge of implementing and directing Celsius's purchases of CEL tokens from public markets.  Although not a director or officer of Celsius Network Limited, Mr. Treutler was a key senior employee within Celsius Network Limited, who made material decisions with respect to Celsius Network Limited's strategy, operations, and the use of significant assets of Celsius Network Limited.  Mr. Treutler ran the CeFi division of Celsius, participated in financial decisions of the Company, had input into and knowledge of the financial welfare of the Company, and advised Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, and Ms. Urata-Thompson, who were the Company's Directors, CEO, COO,

CRO, and CFO at times relevant to this Count VII.  Together with Mr. Mashinsky, Mr. Cohen-Pavon, and Ms. Urata-Thompson, Mr. Treutler would establish price targets for Celsius's purchases of CEL tokens and set resting purchase orders at specific prices.  Mr. Treutler would determine the specific quantities of CEL tokens to be purchased, the prices at which to purchase the CEL tokens, and when the purchases would occur, to inflate the price of the CEL token.

260.    Accordingly, each of the aforementioned Defendants owed a duty to avoid conflicts of interest, or situations in which they have, or can have, a direct or indirect interest that conflicts, or possibly may conflict, with the interests of Celsius Network Limited.

261.    Mr. Mashinsky and Mr. Goldstein owned equity interests in KeyFi when, on behalf of Celsius, they transferred coins to KeyFi prior to entering into a written agreement with KeyFi and ultimately agreed to purchase KeyFi for more than fair-market value.

262.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Ms. Urata-Thompson, Mr. Treutler, and their family, friends, and related entities each owned significant amounts of CEL tokens.  They directed and engaged in strategic purchases of CEL tokens on public markets using Celsius assets to manipulate and support the price of CEL token.  Mr. Mashinsky, Mr. Leon, and Mr. Goldstein sold substantial amounts of CEL tokens when they knew Celsius was purchasing CEL tokens on the open market.

263.    As set forth *infra*, each of the aforementioned Defendants withdrew their assets from the Celsius platform or sold CEL token to Celsius through the OTC desk with the actual intent to hinder, delay, and defraud Celsius and its creditors.

264.    The Defendants breached their duty to avoid conflicts of interest by engaging in fraudulent actions with respect to the CEL token for their own personal benefit and withdrawing

their assets from the Celsius platform at a time when the Company was suffering financial distress, harming the Company and its creditors to the benefit of themselves.

265.    The Defendants possessed and were able to obtain non-public information regarding Celsius's financial condition due to their positions within Celsius, deliberately concealed this information from the public and account holders, misrepresented Celsius's financial condition and the risks that it was taking with its investments, and/or were aware of public misrepresentations of Celsius and its financial condition, and used this information for their own personal advantage.

266.    In breaching their duty to avoid conflicts of interest, the Defendants caused substantial damage to Celsius Network Limited and its creditors, in an amount to be proven at trial. But for such breaches of duty, Celsius Network Limited and its creditors would not have suffered such damage.

## <u>COUNT VIII</u>

### (Fraudulent Misrepresentation – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, and Harumi Urata-Thompson)

267.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

268.    On the date the Plan became effective, customers' claims for fraudulent misrepresentation described herein were irrevocably contributed to the post-effective date Debtor for the Litigation Administrator to prosecute pursuant to Article IV.U of the Plan.

269.    Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson made false statements concerning several matters, including (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius's loans to third parties; (5) Celsius's

trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius.   These false statements are described with particularity *supra* in Section III.

270.   The specific misrepresentations and omissions made by Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson in this Complaint:

**a.** Were factually incorrect;

**b.** Were made by Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson in their official capacities through, among others, media, interviews, AMA broadcasts, tweets, blog posts on the Celsius website and podcast interviews;

**c.** Were known to be false by Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson at the time such statements were made;

**d.** Were never retracted or corrected by Defendants Mashinsky, Leon, Goldstein, or Urata-Thompson;

**e.** Created a materially false impression with respect to Celsius's financial health, leverage, risk strategy, regulatory compliance, and business model;

**f.** Presented the kind of information that customers regularly research, investigate, diligence and rely upon when making investment decisions;

**g.** Were intended to and did induce customers to transfer digital assets to and/or not withdraw digital assets from the Celsius platform;

**h.** Were likely to mislead a reasonable consumer acting reasonably under the circumstances; and

**i.** Were reasonably and justifiably relied on by the customers in deciding whether to transfer assets to and/or withdraw assets from the Celsius platform.

271.   Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson knew or should have known that customers would rely on the misrepresentations and/or omissions they made because they insisted that customers rely on them for accurate information.

272.    The customers' reliance on Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson's representations about, among other things, (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius's loans to third parties; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above, was both reasonable and justifiable because:

a. The customers, taken as a whole, are retail investors;

b. Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson are sophisticated parties in the cryptocurrency industry relative to the customers, taken as a whole;

c. The misrepresentations and omissions were made by sophisticated parties with personal and specific knowledge about the subject matter relating thereto;

d. The communications were primarily advertisements. Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson intended for customers to rely on their statements and send digital assets to Celsius or keep digital assets on Celsius' platform;

e. Celsius established and carried out a systematic censorship process (see Section III *infra*), which Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson were aware of, in that process they were informed of their misrepresentation. Celsius, at the direction of the Defendants, removed any evidence of such misrepresentations and omissions from the public record after the fact and did not take any action to retract or correct the misrepresentations and omissions;

f. The customers watched AMAs and interviews with Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson, read blog posts on the Celsius website authored by Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson, and read tweets by Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson to learn information about Celsius; and

94

    **g.** The customers had no reason to doubt the truthfulness of Defendants Mashinsky, Leon, Goldstein, or Urata-Thompson's representations made in their official capacities.

273. Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson willfully, knowingly and recklessly engaged in the conduct alleged herein, including a coordinated effort to remove misstatements from Celsius's marketing materials and public statements.

274. Had customers known the truth about (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans to third parties; (5) Celsius's risky trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform, and therefore would not have sustained such damages but for Defendants Mashinsky, Leon, Goldstein, or Urata-Thompson's fraudulent conduct.

275. As a direct and proximate result of relying on Defendants Mashinsky, Leon, Goldstein, or Urata-Thompson's intentional misrepresentations and/or omissions, which induced customers to transfer digital assets to and/or not withdraw digital assets from the Celsius platform, customers have suffered the loss of the digital assets they transferred to the Celsius platform in an amount to be determined at trial.

276. In addition to state laws including, but not limited to, the laws of New York, New Jersey, and Delaware, the facts asserted in this Count VIII also constitute common law fraudulent misrepresentation under English law, which is rooted in the tort of deceit and requires:

    **a.** Defendants making a false representation to Celsius's customers;

    **b.** Defendants' knowledge that the representation is false, or recklessness as to whether it is true or false;

    **c.** Defendants' intention that customers act in reliance on the representation; and

    **d.** The Class members acting in reliance on the representation and suffering loss as a result.

277.    As set out above, the specific misrepresentations and omissions made by Defendants to customers as to: (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius's loans to third parties; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above were, among other things:

    **a.** Factually incorrect;

    **b.** Known to be false by Defendants at the time such statements were made;

    **c.** Intended to and did induce customers to transfer digital assets to and/or not withdraw digital assets from the Celsius platform; and

    **d.** Reasonably and justifiably relied upon by customers, causing them to suffer the loss of the digital assets they transferred to the Celsius platform in an amount to be determined at trial.

## <u>COUNT IX</u>

**(Conspiracy to Fraudulently Misrepresent – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Harumi Urata-Thompson, Jeremie Beaudry, Roni Cohen-Pavon, Johannes Treutler)**

278.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

96

279.     Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, Beaudry, Cohen-Pavon, and Treutler knew of the other Defendants' misrepresentations regarding (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius's loans to third parties; (5) the different collateralization requirements for retail borrowers and institutional borrowers; (6) Celsius's trading strategies; (7) regulatory issues that Celsius was facing, and (8) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above (the "**Fraudulent Misrepresentations**").

280.     Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, Beaudry, Cohen-Pavon, and Treutler did not correct the statements and engaged in a scheme to cover up the misstatements by erasing the content from the internet.

281.     Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, Beaudry, Cohen-Pavon, and Treutler also willfully, knowingly and recklessly engaged in a coordinated effort to (1) remove misstatements from Celsius's marketing materials and public statements, but without correcting these misstatements publicly, because they knew these constituted fraudulent misrepresentations, ¶¶ 108-111; (2) obscure the fact that the ICO had not been fully funded, by segregating the CEL tokens that Mr. Mashinsky refused to purchase and moving the tokens to Celsius's treasury, ¶¶ 50-55; and (3) support (*i.e.*, inflate) the market by purchasing CEL tokens in a manner that was contrary to what Celsius told the public.  ¶¶ 63-87.

282.     Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, Beaudry, Cohen-Pavon, and Treutler's conduct described herein was intentional, as demonstrated by their communications, including communications described in the aforementioned paragraphs.

283.    Had customers known the truth about the Fraudulent Misrepresentations, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform, and therefore would not have sustained damages but for Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, Beaudry, Cohen-Pavon, and Treutler's failure to correct the Fraudulent Misrepresentations and coordinated efforts to obscure the Fraudulent Misrepresentations.

284.    As a direct and proximate result of relying on the Fraudulent Misrepresentations, which Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, Beaudry, Cohen-Pavon, and Treutler willfully, knowingly and recklessly failed to correct and attempted to obscure, customers transferred digital assets to and/or failed to withdraw digital assets from the Celsius platform, thus suffering losses in an amount to be determined at trial.

### COUNT X

**(Violation of New York Deceptive Practices Act (N.Y. Gen. Bus. Law § 349(a) – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Jeremie Beaudry, and Harumi Urata-Thompson)**

285.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

286.    New York General Business Law ("**GBL**") § 349 prohibits any business or person from engaging in deceptive business practices in the conduct of any business, trade or commerce, or in the furnishing of any service, in New York state.  GBL § 349(a).

287.    As consumers of Celsius's services as described herein, account holders who contributed their claims to the Litigation Administrator are "person[s]" within the meaning of GBL § 349.

288.    These account holders, and, by assignment, the Litigation Administrator, are authorized to bring a private action for the conduct described herein under GBL § 349(h).

289.    At all times relevant herein, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson conducted business in the State of New York or directed their business at the State of New York and are therefore subject to New York law for the incidents described in this Count.

290.    Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry and Urata-Thompson's actions alleged herein constitute unlawful, unfair, deceptive and fraudulent business practices in the State of New York.

291.    Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson's conduct constitutes acts, uses and/or employment by these Defendants of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations and/or the knowing concealment, suppression and/or omission of material facts with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of services, and with the subsequent performance of services and transactions, in violation of GBL § 349.

292.    At all times relevant herein, Celsius offered and sold its services to a robust consumer base and did not tailor such offer or sale to a specific buyer.

293.    Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson made repeated, specific misrepresentations and omissions to Celsius customers in public broadcasts and interviews as to: (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack

thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was

facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as

detailed with particularity in Section III above:

a.  Were factually incorrect;

b.  Were made by Defendants in their official capacities through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website and podcast interviews;

c.  Were known to be false by Defendants at the time such misrepresentations or omissions were made;

d.  Were never retracted or corrected by Defendants;

e.  Presented the kind of information that investors regularly research, investigate, diligence and rely upon when making investment decisions;

f.  Were intended to and did induce customers to transfer digital assets to and/or not withdraw digital assets from the Celsius platform;

g.  Were likely to mislead a reasonable consumer acting reasonably under the circumstances; and

h.  Constituted materially misleading and, therefore, deceptive conduct in violation of GBL § 349.

294.    In addition to making specific misrepresentations and omissions, Defendants

Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson conspired to conceal

these misrepresentations from Celsius customers by editing the misrepresentations out of AMA

videos after they had been broadcast live, but before they were posted on YouTube.  Defendants

made these changes surreptitiously and did not inform customers that the information they had

heard on the live AMA broadcasts was incorrect.  This practice is described with particularity in

Section III above.

295.    Defendants systematically engaged in these deceptive, misleading and unlawful

acts and practices to the detriment of customers.

296.    Had customers known the truth about (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform.

297.    Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson knowingly and/or recklessly engaged in the conduct alleged herein, including the coordinated effort to remove misstatements from Celsius's marketing materials and public statements.

298.    Customers relied on Defendants' misrepresentations when they transferred their assets to Celsius, and customers have been harmed by Defendants' deceptive conduct in that they have suffered the loss of the digital assets they transferred to the Celsius platform.  As a result of Defendants' violation of GBL § 349, customers have suffered a loss in an amount to be determined at trial.

299.    Plaintiff, on behalf of account holders, seeks all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

## COUNT XI

**(Violation of New York False Advertising Law (N.Y. Gen. Bus. Law § 350 – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Jeremie Beaudry, and Harumi Urata-Thompson)**

300.    Plaintiff repeats and realleges each and every allegation and factual statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully herein.

301.    GBL § 350-a(1) prohibits false advertising in the conduct of any business, trade or commerce, or in the furnishing of any service, in New York state.

302.    GBL § 350-A defines the term "false advertising" as advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.

303.    At all times relevant herein, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson conducted business in the State of New York or directed their business at the State of New York and are therefore subject to New York law for the incidents described in this Count.

304.    As alleged herein, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson have engaged in material deceptive, misleading or false advertising that was directed at and affected consumers who transferred digital assets to and/or did not withdraw digital assets from Celsius platform as a result of such deceptive, misleading or false advertising, in violation of GBL §§ 350 and 350-a.

305.    At all times relevant herein, Celsius offered and sold its services to a robust consumer base and did not tailor such offer or sale to a specific buyer.

306.    Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson made repeated,

specific misrepresentations and omissions to Celsius customers in public broadcasts and interviews as to: (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above:

      **a.**  Were factually incorrect;

      **b.**  Were made by Defendants in their official capacities, through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website, podcast interviews;

      **c.**  Were known to be false by Defendants at the time such misrepresentations or omissions were made;

      **d.**  Were never retracted or corrected by Defendants;

      **e.**  Presented the kind of information that consumers regularly research, investigate, diligence and rely upon when determining whether to purchase or use a product or service;

      **f.**  Were intended to and did induce customers to transfer digital assets to and/or not withdraw digital assets from the Celsius platform;

      **g.**  Were likely to mislead a reasonable consumer acting reasonably under the circumstances; and

      **h.**  Constituted affirmative misrepresentation and omissions in connection with the marking, advertising, promotion and sale of the products and services offered by Celsius in violation of GBL § 350 and 350-a.

307.    In addition to making specific misrepresentations and omissions, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson conspired to conceal these misrepresentations from Celsius customers by editing the misrepresentations out of AMA videos after they had been broadcast live, but before they were posted on YouTube. Defendants

made these changes surreptitiously and did not inform customers that the information they had heard on the live AMA broadcasts was incorrect. This practice is described with particularity in Section III above.

308.    Had customers known the truth about (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform.

309.    Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson willfully, knowingly and/or recklessly engaged in the conduct alleged herein, including the coordinated effort to remove misstatements from Celsius's marketing materials and public statements.

310.    Customers have been harmed by Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson's deceptive conduct in that they have suffered the loss of the digital assets they transferred to the Celsius platform. As a result of Defendants' violation of GBL §§ 350 and 350-a, customers have suffered a loss in an amount to be determined at trial.

311.    Plaintiff, on behalf of account holders, accordingly seeks all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

## COUNT XII

**(Violation of New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1, et seq.) – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Jeremie Beaudry, and Harumi Urata-Thompson)**

312.    Plaintiff repeats and realleges each and every allegation and factual statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully herein.

313.    The New Jersey Consumer Fraud Act (the "**NJCFA**") prohibits unconscionable practices, misrepresentations and omissions, including:

> the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

N.J. Stat. Ann. 56:8-2.

314.    At all times relevant herein, Celsius had an office or offices in the State of New Jersey.

315.    At all times relevant herein, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson conducted business in the State of New Jersey or directed its business at the State of New Jersey and are therefore subject to New Jersey law for the incidents described in this Count.

316.    Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, and Urata-Thompson have engaged in unconscionable commercial practices under the NJCFA.

317.    Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson made repeated, specific misrepresentations and omissions to Celsius customers in public broadcasts and interviews

as to: (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Sections III above:

    **a.** Were factually incorrect;

    **b.** Were made in connection with the sale or advertisement of merchandise, being the Celsius services;

    **c.** Were made by Defendants in their official capacities, through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website, podcast interviews;

    **d.** Were known to be false by Defendants at the time such misrepresentations or omissions were made;

    **e.** Were never retracted or corrected by Defendants;

    **f.** Were intended to and did induce customers to use the Celsius service by transferring digital assets to and/or not withdrawing digital assets from the Celsius platform; and

    **g.** Constituted, in the aggregate, an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation and/or the knowing, concealment, suppression and/or omission of material facts in connection with the sale and advertisement of the Celsius services, in violation of N.J. Stat. Ann. § 56:8-2.

318.   In addition to making specific misrepresentations and omissions, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson conspired to conceal these misrepresentations from Celsius customers by editing the misrepresentations out of AMA videos after they had been broadcast live, but before they were posted on YouTube. Defendants made these changes surreptitiously and did not inform customers that the information they had heard on the live AMA broadcasts was incorrect. This practice is described with particularity in

Section III above.

319.    Had customers known the truth about (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform.

320.    Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson willfully, knowingly and/or recklessly engaged in the conduct alleged herein, including the coordinated effort to remove misstatements from Celsius's marketing materials and public statements.

321.    Customers have been harmed by Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, and Urata-Thompson's deceptive conduct in that they have suffered the quantifiable and measurable loss of the digital assets they transferred to the Celsius platform.  As a result of Defendants' violations of N.J. Stat. Ann. § 56:8-2, customers have suffered a loss in an amount to be determined at trial.

322.    Plaintiff, on behalf of account holders, accordingly seeks all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

## COUNT XIII

**(Avoidance and Recovery of Preferential Transfers — 11 U.S.C §§ 547(b); 550 — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Jeremie Beaudry, Roni Cohen-Pavon, Harumi Urata-Thompson, Aliza Landes, Kristine Meehan Mashinsky, AM Ventures Holding LLC, Koala1 LLC, Bits of Sunshine LLC, and Four Thirteen LLC)**

323.   Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

324.   Prior to the Pause, the Defendants withdrew cryptocurrency from the Celsius platform, and each withdrawal constituted a transfer of an interest of the Debtors in the property.

325.   A complete list of the Defendants' withdrawals is included as **Exhibit A** to this Complaint (the "**Preferential Transfers**").[79]

326.   The Defendants were creditors of Celsius at the time of the Preferential Transfers.

327.   The Preferential Transfers were to, or for the benefit of, the Defendants within the meaning of section 547(b)(1) of the Bankruptcy Code.

328.   The Preferential Transfers were made for, or on account of, an antecedent debt or debts owed by the Debtors to each of the Defendants before such transfers were made.

329.   The Preferential Transfers each occurred within one year of the Petition Date.

330.   The Preferential Transfers were made while the Debtors were insolvent.

---

[79] As part of this due diligence evaluation, Plaintiff reviewed the Debtors' books and records and identified that Defendants potentially deposited assets on the Celsius platform during the applicable period that would qualify as new value under section 547(c)(4) of the Bankruptcy Code. However, the subsequent new value defense is an affirmative defense, for which Defendants bear the burden of proof under section 547(g) of the Bankruptcy Code. Factors such as the appropriate valuation date of such new value may affect the ultimate net of new value amount, if any. Accordingly, Defendants bear the burden of proof to establish they are entitled to this new value.

331.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Beaudry, Mr. Cohen-Pavon, Ms. Urata-Thompson, Ms. Landes, and Mrs. Mashinsky qualify as statutory insiders under section 101(31) of the Bankruptcy Code as the Defendants were all directors, officers, or persons in control of the Debtors, or relatives of directors, officers, or persons in control of the Debtors. These Defendants are also non-statutory insiders because they shared close relationships with the Debtors, had material non-public information regarding the Debtors, and had positions of significant authority and decision-making with the Debtors leading up to the Preferential Transfers.

332.    AMV, Koala1 LLC, Bits of Sunshine LLC, and Four Thirteen LLC are non-statutory insiders because they shared close relationships with the Debtors, are owned and controlled by the Defendants, and negotiated at less than arm's length with the Debtors leading up to the Preferential Transfers.  Specifically, AMV and Koala1 LLC are entities that, upon information and belief, are wholly owned by Mr. Mashinsky, the founder, director, and former CEO of Celsius.  Bits of Sunshine LLC and Four Thirteen LLC are entities that, upon information and belief, are wholly owned by Mr. Goldstein.

333.    As a result of the Preferential Transfers, each of the Defendants received more than they would be entitled to receive (i) under a hypothetical Chapter 7 case; (ii) if the transfers had not been made; and (iii) if such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

334.    As of the date hereof, the Defendants have not repaid all or a part of the value of the Preferential Transfers or returned the Preferential Transfers.

335.    The Preferential Transfers are avoidable under section 547(b) of the Bankruptcy Code.

336.     Under Section 550 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred and avoided under section 547 of the Bankruptcy Code from any immediate or mediate transferee of the initial transferee of such property.

337.     The Defendants are the recipients of the Preferential Transfers and are liable as initial transferees.  In the alternative, the Defendants are liable as subsequent or mediate transferees.

338.     Therefore, the Preferential Transfers or the value of the property transferred in Preferential Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XIV

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Alexander Mashinsky)**

339.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

340.     Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

341.     Between May 14, 2022 and the Petition Date, Mr. Mashinsky transferred the following amounts from the Celsius platform to his personal cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Alexander Mashinsky Transfers**"):

*Alex Mashinsky*

| Date | Asset | USD Amount |
|------|-------|-----------|
| May 14, 2022 | SOL | $121,935 |
| May 14, 2022 | MATIC | 30,178 |
| May 14, 2022 | BTC | 334,407 |
| May 14, 2022 | LINK | 35,663 |
| May 14, 2022 | CEL | 10,000 |
| May 15, 2022 | ETH | 204,472 |
| May 15, 2022 | ETH | 803,764 |
| May 15, 2022 | USDC | 1,299,827 |
| **Total** | | **$2,840,246** |

342.    The Alexander Mashinsky Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

343.    Mr. Mashinsky caused the Alexander Mashinsky Transfers to be made by the Debtors.

344.    Mr. Mashinsky caused Debtors to make the Alexander Mashinsky Transfers with the actual intent to hinder, delay, or defraud creditors.  Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Mr. Mashinsky.

345.    Mr. Mashinsky's actual intent to hinder, delay, or defraud creditors is established by, among other things, the following badges of fraud:

   **a.**   The close relationship between the Debtors and Mr. Mashinsky, who was a director and the CEO of the Debtors at the time of the transfers;

   **b.**   Mr. Mashinsky's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn;

   **c.**   The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

   **d.**   Contemporaneous communications that establish Mr. Mashinsky knew Celsius was insolvent and in dire financial condition;

111

**e.** The fact that Mr. Mashinsky withdrew substantially all of his BTC, ETH, and stablecoins on deposit with Celsius;

**f.** Mr. Mashinsky had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

**g.** That Mr. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

**h.** That notwithstanding the Alexander Mashinsky Transfers, Mr. Mashinsky continued to represent publicly that he was fully invested in Celsius and was not withdrawing his assets in order to persuade others to keep their digital assets on the platform;

**i.** The Alexander Mashinsky Transfers were to an insider; and

**j.** Mr. Mashinsky, through initiating the Alexander Mashinsky Transfers and other transfers described herein, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors.

346.    The Alexander Mashinsky Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  To the extent the Alexander Mashinsky Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

347.    Plaintiff is entitled to avoid the Alexander Mashinsky Transfers.

348.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

349.   Mr. Mashinsky is the initial transferee for whose benefit the Alexander Mashinsky Transfers were made.  Upon information and belief, Mr. Mashinsky may have transferred the funds comprising the Alexander Mashinsky Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

350.   Therefore, the Alexander Mashinsky Transfers, or the value of the property transferred in the Alexander Mashinsky Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XV

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Shlomi Daniel Leon)**

351.   Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

352.   Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

353.   Between July 15, 2021 and the Petition Date, Mr. Leon transferred the following amounts from the Celsius platform to his personal cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Leon Transfers**"):

### *Shlomi Daniel Leon*

| Date | Asset | USD Amount |
|------|-------|-----------|
| July 15, 2021 | BTC | $31,447 |
| July 18, 2021 | ETH | 1,916 |
| July 18, 2021 | CEL | 11 |

| July 19, 2021 | ETH | 69,320 |
|---|---|---|
| August 8, 2021 | CEL | 636,462 |
| September 14, 2021 | CEL | 5 |
| September 14, 2021 | CEL | 104,200 |
| September 21, 2021 | CEL | 102,616 |
| September 22, 2021 | BTC | 1,355,123 |
| September 27, 2021 | CEL | 177,575 |
| October 6, 2021 | CEL | 113,800 |
| October 21, 2021 | CEL | 184,800 |
| December 2, 2021 | CEL | 206,208 |
| March 29, 2022 | CEL | 64,030 |
| April 4, 2022 | CEL | 69,280 |
| April 11, 2022 | CEL | 265,576 |
| April 13, 2022 | USDC | 2 |
| April 13, 2022 | USDC | 50 |
| April 14, 2022 | USDC | 2,200,000 |
| April 20, 2022 | CEL | 100 |
| April 26, 2022 | CEL | 81,000 |
| May 29, 2022 | USDC | 2,370,634 |
| May 31, 2022 | BTC | 420,805 |
| May 31, 2022 | ETH | 110,179 |
| May 31, 2022 | DOT | 52,575 |
| May 31, 2022 | ADA | 30,978 |
| May 31, 2022 | SNX | 35,975 |
| May 31, 2022 | USDC | 3,127 |
| **Total** | | **$8,687,793** |

354.     The Leon Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

355.     Mr. Leon caused the Leon Transfers to be made by the Debtors.

356.     Mr. Leon caused Debtors to make the Leon Transfers with the actual intent to hinder, delay, or defraud creditors.  Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Mr. Leon.

357.     Mr. Leon's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.** The close relationship between the Debtors and Mr. Leon, who was a director, the COO, or the CSO of the Debtors at the time of the transfers;

    **b.** Mr. Leon's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Leon Transfers;

    **c.** The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

    **d.** Contemporaneous communications that establish Mr. Leon knew Celsius was insolvent and in dire financial condition;

    **e.** The fact that Mr. Leon withdrew all of his BTC, ETH, and a majority of his stablecoins on deposit with Celsius;

    **f.** The fact that Mr. Leon moved nearly all of his CEL tokens between associated entities;

    **g.** Mr. Leon had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

    **h.** Mr. Leon, through initiating the Leon Transfers, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors;

    **i.** That Mr. Leon's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

    **j.** The Leon Transfers were to an insider; and

    **k.** The Debtors were insolvent or became insolvent shortly after the Leon Transfers were made.

358. By virtue of the foregoing, the Leon Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Leon Transfers.

359. To the extent the Leon Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

360.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

361.    Mr. Leon is the initial transferee for whose benefit the Leon Transfers were made. Upon information and belief, Mr. Leon may have transferred the funds comprising the Leon Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

362.    Therefore, the Leon Transfers, or the value of the property transferred in the Leon Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XVI

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Hanoch Goldstein)**

363.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

364.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

365.    Between August 12, 2021 and the Petition Date, Mr. Goldstein transferred the following amounts from the Celsius platform to his personal cryptocurrency wallet (collectively, the "**Goldstein Transfers**"):

### *Hanoch Goldstein*

| Date | Asset | USD Amount |
|---|---|---|
| August 12, 2021 | ETH | $4,269 |
| October 27, 2021 | USDC | 100,000 |
| October 28, 2021 | USDT ERC20 | 2,828 |
| December 4, 2021 | USDC | 250,000 |
| March 4, 2022 | CEL | 152,000 |
| March 4, 2022 | ETH | 682,381 |
| April 17, 2022 | CEL | 44,259 |
| May 6, 2022 | ETH | 540,921 |
| May 11, 2022 | ETH | 694,989 |
| May 27, 2022 | CEL | 72,146 |
| **Total** | | **$2,543,793** |

366.     The Goldstein Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

367.     Mr. Goldstein caused the Goldstein Transfers to be made by the Debtors.

368.     Mr. Goldstein caused Debtors to make the Goldstein Transfers with the actual intent to hinder, delay, or defraud creditors.  Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Mr. Goldstein.

369.     Mr. Goldstein's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

   a.  The close relationship between the Debtors and Mr. Goldstein, who was the CTO or President of Labs of the Debtors at the time of the transfers;

   b.  Mr. Goldstein's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Goldstein Transfers;

   c.  The timing of the transactions as Celsius was experiencing financial distress;

   d.  Contemporaneous communications that establish Mr. Goldstein knew Celsius was insolvent and in dire financial condition;

e.  That Mr. Goldstein's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

f.  The Goldstein Transfers were to an insider;

g.  The Debtors were insolvent or became insolvent shortly after the Goldstein Transfers were made;

h.  Mr. Goldstein, through initiating the Goldstein Transfers, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors; and

i.  The fact that Mr. Goldstein moved nearly all of his CEL tokens and a substantial majority of stablecoins between associated entities.

370.  By virtue of the foregoing, the Goldstein Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Goldstein Transfers.

371.  To the extent the Goldstein Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

372.  Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

373.  Mr. Goldstein is the initial transferee for whose benefit the Goldstein Transfers were made.  Upon information and belief, Mr. Goldstein may have transferred the funds

comprising the Goldstein Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

374.    Therefore, the Goldstein Transfers, or the value of the property transferred in the Goldstein Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## <u>COUNT XVII</u>

**(Avoidance and Recovery of Constructive Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(B); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Hanoch Goldstein)**

375.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

376.    Plaintiff brings this claim under sections 544(b), 548(a)(1)(B), and 550 of the Bankruptcy Code.

377.    On April 1, 2021, Mr. Goldstein received a loan of $4,200,000 collateralized by 9,628,852 CEL tokens, which constitutes a transfer of interest in the Debtors' property and was made to and for the benefit of Mr. Goldstein (the "**Goldstein Loan**").

378.    The Goldstein Loan was made within two years prior to the Petition Date.

379.    The Debtors received less than reasonably equivalent value or did not receive fair consideration in exchange for the Goldstein Loan.  At the time of the transfer, the 9,628,852 CEL tokens received as collateral were worth significantly less than the $4,200,000 received by Mr. Goldstein, particularly when the manipulation of the CEL token's value is considered.

380.    The interest rate on the Goldstein Loan is 1%.  Upon information and belief, Mr. Goldstein did not execute a loan agreement in connection with the Goldstein Loan.

381.    The Debtors were insolvent on the date of the Goldstein Loan; were left with unreasonably small capital on the date of the Goldstein Loan or as a result of the Goldstein Loan; or intended to incur or believed they would incur debts beyond its ability to pay as such debts matured.

382.    Moreover, the Debtors made the Goldstein Loan to, or for the benefit of, an insider, or incurred such obligation to or for the benefit of an insider and not in the ordinary course of business.

383.    By virtue of the foregoing, the Goldstein Loan was a constructive fraudulent transfer avoidable under sections 544(b) and 548(a)(1)(B) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Goldstein Loan.

384.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

385.    Mr. Goldstein is the initial transferee for whose benefit the Goldstein Loan was made. Upon information and belief, Mr. Goldstein may have transferred the funds comprising the Goldstein Loan to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

386.    Therefore, the Goldstein Loan, or the value of the property transferred in the Goldstein Loan, is recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XVIII

**(Breach of Contract — Failure to Repay Loan — Defendant Hanoch Goldstein)**

387.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

388.    As set out in Count XVII, Mr. Goldstein entered into the Goldstein Loan, which constituted a valid and binding agreement between Mr. Goldstein and Celsius.

389.    The Goldstein Loan was subject to the Celsius Loan Terms and Conditions, which stated that a failure to make timely payments would constitute a default.

390.    Mr. Goldstein defaulted on the Goldstein Loan by failing to repay it by the maturity date of April 1, 2024.

391.    The total amount currently owed by Mr. Goldstein to Celsius is $4,280,778, which includes the principal amount of $4,200,000 plus accrued and unpaid interest of $76,521 and late fees of $4,257, plus additional interest and fees accruing daily.

392.    Mr. Goldstein was sent a notice on behalf of Celsius on May 8, 2024 informing him of his default on the Goldstein Loan and requesting full repayment.  Mr. Goldstein did not repay his loan in response to this notice.

393.    As a result of this breach of contract, Celsius and its creditors suffered damage.

## <u>COUNT XIX</u>

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b);
548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform
Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware)
— Defendant Jeremie Beaudry)**

394.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs,
which are incorporated by reference as if set forth fully herein.

395.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section
548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law
including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New
York, New Jersey, and Delaware.

396.    Between July 16, 2021 and the Petition Date, Mr. Beaudry transferred the following
amounts of cryptocurrency from the Celsius platform to his personal cryptocurrency wallet
(collectively, the "**Beaudry Transfers**"):

*Jeremie Beaudry*

| Date | Asset | USD Amount |
|------|-------|-----------|
| July 16, 2021 | BTC | $100 |
| July 16, 2021 | BTC | 147,929 |
| July 19, 2021 | USDC | 15,000 |
| August 4, 2021 | USDC | 850,000 |
| August 9, 2021 | USDC | 35,000 |
| August 13, 2021 | USDC | 41,000 |
| August 20, 2021 | USDC | 400,000 |
| October 16, 2021 | ETH | 453,879 |
| November 17, 2021 | USDC | 30,000 |
| December 1, 2021 | USDC | 42,000 |
| December 1, 2021 | BAT | 61 |
| December 2, 2021 | BCH | 16,615 |
| December 2, 2021 | BTC | 37,702 |
| December 2, 2021 | DASH | 8 |
| December 2, 2021 | UNI | 9,352 |
| December 2, 2021 | USDC | 100,000 |

122

| | | |
|---|---|---|
| December 3, 2021 | USDT ERC20 | 28 |
| December 3, 2021 | BTC | 13,987 |
| December 3, 2021 | USDC | 6,000 |
| December 3, 2021 | USDC | 21,000 |
| December 4, 2021 | USDC | 40,000 |
| December 4, 2021 | USDC | 400,000 |
| December 5, 2021 | USDC | 30,000 |
| December 6, 2021 | BTC | 31 |
| December 6, 2021 | BCH | 10 |
| December 6, 2021 | USDC | 37,000 |
| December 9, 2021 | UNI | 3 |
| December 9, 2021 | USDC | 40,000 |
| December 10, 2021 | USDC | 50,000 |
| December 12, 2021 | USDC | 50,000 |
| December 13, 2021 | USDC | 20,000 |
| December 15, 2021 | USDC | 42,000 |
| December 17, 2021 | USDC | 25,050 |
| December 20, 2021 | USDC | 50,000 |
| December 20, 2021 | USDC | 10,000 |
| December 22, 2021 | USDC | 30,000 |
| December 23, 2021 | USDC | 13,000 |
| December 28, 2021 | USDC | 20,000 |
| December 29, 2021 | USDC | 25,000 |
| January 1, 2022 | CEL | 150,289 |
| January 1, 2022 | ETH | 500 |
| January 2, 2022 | USDC | 16,607 |
| January 3, 2022 | USDC | 76 |
| January 5, 2022 | CEL | 149,838 |
| January 5, 2022 | CEL | 140,059 |
| January 6, 2022 | USDC | 245,000 |
| January 7, 2022 | CEL | 149,236 |
| January 7, 2022 | ETH | 321,528 |
| January 7, 2022 | ETH | 480,847 |
| January 7, 2022 | USDC | 866 |
| January 10, 2022 | USDC | 79 |
| January 10, 2022 | ETH | 87 |
| January 17, 2022 | BTC | 49 |
| March 2, 2022 | USDC | 100,000 |
| March 4, 2022 | USDC | 50,000 |
| March 5, 2022 | USDC | 50,001 |
| May 11, 2022 | USDC | 25 |
| **Total** | | **4,956,843** |

397. The Beaudry Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

398. Mr. Beaudry caused the Beaudry Transfers to be made by the Debtors.

399. Mr. Beaudry caused Debtors to make the Beaudry Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Mr. Beaudry.

400. Mr. Beaudry's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.** The close relationship between the Debtors and Mr. Beaudry, who was the Debtors' current or former General Counsel and Chief Compliance Officer at the time of the transfers;

    **b.** Mr. Beaudry's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Beaudry Transfers;

    **c.** The Debtors' financial condition before and after each of the Beaudry Transfers;

    **d.** The Beaudry Transfers occurred on or about the time that significant regulatory action was taken against Celsius that had a material negative effect on its business. As the Chief Compliance Officer, Mr. Beaudry was uniquely positioned to know the negative effect those regulatory actions would have on Celsius's ability to continue to operate as a going concern;

    **e.** Mr. Beaudry, through initiating the Beaudry Transfers, engaged in a pattern, or series of transactions, or course of conduct after the significant regulatory actions were taken against the Debtors and the Debtors suffered significant losses;

    **f.** The fact that Mr. Beaudry withdrew the majority of his CEL tokens, all of his BTC, all of his ETH, and substantially all of his stablecoins, on deposit with Celsius;

    **g.** The general chronology of the events and the Beaudry Transfers;

    **h.** The Beaudry Transfers were questionable and not in the usual course of business;

    **i.** The Beaudry Transfers were made to an insider;

    **j.** The secrecy, haste, or unusualness of the Beaudry Transfers; and

    **k.** In early 2022, Mr. Beaudry engaged in a series of large CEL token withdrawals and then immediately swapped the withdrawn CEL tokens in exchange for ETH and stablecoins.

401.    By virtue of the foregoing, the Beaudry Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Beaudry Transfers.

402.    To the extent the Beaudry Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

403.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

404.    Mr. Beaudry is the initial transferee for whose benefit the Beaudry Transfers were made.  Upon information and belief, Mr. Beaudry may have transferred the funds comprising the Beaudry Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

405.    Therefore, the Beaudry Transfers, or the value of the property transferred in the Beaudry Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XX

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Roni Cohen-Pavon)**

406.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

407.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

408.    Between July 18, 2021 and the Petition Date, Mr. Cohen-Pavon transferred the following amounts of cryptocurrency from the Celsius platform to his personal cryptocurrency wallet (collectively, the "**Cohen-Pavon Transfers**"):

*Roni Cohen-Pavon*

| Date | Asset | USD Amount |
|---|---|---|
| July 18, 2021 | CEL | $137,850 |
| July 22, 2021 | CEL | 105,588 |
| July 26, 2021 | USDT ERC20 | 150,000 |
| August 6, 2021 | USDT ERC20 | 140,000 |
| September 1, 2021 | ETH | 147,975 |
| September 1, 2021 | ETH | 148,383 |
| September 1, 2021 | ETH | 110,387 |
| September 7, 2021 | USDT ERC20 | 148,000 |
| September 7, 2021 | USDT ERC20 | 62,020 |
| September 20, 2021 | CEL | 144,194 |
| May 31, 2022 | USDC | 9,500 |
| May 31, 2022 | ETH | 501 |
| **Total** | | **$1,304,398** |

409.     The Cohen-Pavon Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

410.     Mr. Cohen-Pavon caused the Cohen-Pavon Transfers to be made by the Debtors.

411.     Mr. Cohen-Pavon caused Debtors to make the Cohen-Pavon Transfers with the actual intent to hinder, delay, or defraud creditors.  Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Mr. Cohen-Pavon.

412.     Mr. Cohen-Pavon's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

> **a.** The close relationship between the Debtors and Mr. Cohen-Pavon, who was the Debtors' current or former Chief Revenue Officer at the time of the transfers;
>
> **b.** Mr. Cohen-Pavon's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Cohen-Pavon Transfers;
>
> **c.** The Debtors' financial condition before and after each of the Cohen-Pavon Transfers;
>
> **d.** The Cohen-Pavon Transfers occurred on or about the time that significant regulatory action was taken against Celsius that had a material negative effect on its business.  As one of the primary individuals responsible for Celsius's legal affairs, Mr. Cohen-Pavon was uniquely positioned to know the negative effect those regulatory actions would have on Celsius's ability to continue to operate as a going concern;
>
> **e.** Mr. Cohen-Pavon, through initiating the Cohen-Pavon Transfers, engaged in a pattern, or series of transactions, or course of conduct after the significant regulatory actions were taken against the Debtors and the Debtors suffered significant losses;
>
> **f.** The fact that Mr. Cohen-Pavon withdrew the majority of his CEL tokens, all of his BTC, all of his ETH, and substantially all of his stablecoins, on deposit with Celsius;
>
> **g.** The general chronology of the events and the Cohen-Pavon Transfers;

**h.** The Cohen-Pavon Transfers were questionable and not in the usual course of business;

**i.** The Cohen-Pavon Transfers were made to an insider; and

**j.** The secrecy, haste, or unusualness of the Cohen-Pavon Transfers.

413.   By virtue of the foregoing, the Cohen-Pavon Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Cohen-Pavon Transfers.

414.   To the extent the Cohen-Pavon Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

415.   Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

416.   Mr. Cohen-Pavon is the initial transferee for whose benefit the Cohen-Pavon Transfers were made.  Upon information and belief, Mr. Cohen-Pavon may have transferred the funds comprising the Cohen-Pavon Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

417.   Therefore, the Cohen-Pavon Transfers, or the value of the property transferred in the Cohen-Pavon Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## <u>COUNT XXI</u>

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform**

Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware)
— Defendant Harumi Urata-Thompson)

418.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

419.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

420.    Between May 12, 2022 and the Petition Date, Ms. Urata-Thompson transferred the following cryptocurrency from the Celsius platform to her personal cryptocurrency wallet (collectively, the "**Urata-Thompson Transfers**"):

### Harumi Urata-Thompson

| Date | Asset | USD Amount |
|---|---|---|
| May 11, 2022 | CEL | $50 |
| June 11, 2022 | CEL | 7,819 |
| June 12, 2022 | CEL | 9,780 |
| **Total** | | **$17,650** |

421.    The Urata-Thompson Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

422.    Ms. Urata-Thompson caused the Urata-Thompson Transfers to be made by the Debtors.

423.    Ms. Urata-Thompson caused Debtors to make the Urata-Thompson Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Ms. Urata-Thompson.

424.     Ms. Urata-Thompson's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.**  The close relationship between the Debtors and Ms. Urata-Thompson, who was the Debtors' former CFO and CIO at the time of the transfers;

    **b.**  Ms. Urata-Thompson's knowledge of Celsius's financial condition;

    **c.**  Ms. Urata-Thompson's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Urata-Thompson Transfers;

    **d.**  The general chronology of the events and the Urata-Thompson Transfers;

    **e.**  The Urata-Thompson Transfers were questionable and not in the usual course of business;

    **f.**  The secrecy, haste, or unusualness of the Urata-Thompson Transfers; and

    **g.**  The Urata-Thompson Transfers were made to an insider.

425.     By virtue of the foregoing, the Urata-Thompson Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Urata-Thompson Transfers.

426.     To the extent the Urata-Thompson Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

427.     Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

428.     Ms. Urata-Thompson is the initial transferee for whose benefit the Urata-Thompson Transfers were made.

429.     Therefore, the Urata-Thompson Transfers, or the value of the property transferred in the Urata-Thompson Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXII

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Aliza Landes)**

430.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

431.     Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

432.     Between August 17, 2021 and the Petition Date, Ms. Landes transferred the following cryptocurrency from the Celsius platform to her personal cryptocurrency wallet (collectively, the "**Landes Transfers**"):

### *Aliza Landes*

| Date | Asset | USD Amount |
|------|-------|-----------:|
| August 17, 2021 | USDC | $50 |
| August 17, 2021 | USDC | 100 |
| August 23, 2021 | USDC | 100 |
| August 31, 2021 | USDC | 690,000 |
| October 20, 2021 | USDC | 370,000 |
| January 24, 2022 | USDC | 20 |
| January 24, 2022 | USDC | 400,000 |

| | | |
|---|---|---|
| February 15, 2022 | USDC | 125,600 |
| May 31, 2022 | USDC | 333,548 |
| **Total** | | **$1,919,418** |

433.     The Landes Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

434.     Ms. Landes caused the Landes Transfers to be made by the Debtors.

435.     Ms. Landes caused Debtors to make the Landes Transfers with the actual intent to hinder, delay, or defraud creditors.  Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Ms. Landes.

436.     Ms. Landes' actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

> a.  Ms. Landes' spousal relationship with Mr. Leon;
>
> b.  The close relationship between the Debtors, Ms. Landes, who was the current or former VP of Lending of the Debtors at the time of the transfers, and Mr. Leon, who was a director, the COO or the CSO of the Debtors at the time of the transfers;
>
> c.  Ms. Landes' continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Landes Transfers;
>
> d.  The timing of the transactions shortly before the Pause when the Debtors were experiencing extreme financial distress;
>
> e.  That Ms. Landes' transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;
>
> f.  The Landes Transfers were to an insider;
>
> g.  The Debtors were insolvent or became insolvent shortly after the Landes Transfers were made;
>
> h.  Contemporaneous communications that establish that Ms. Landes' spouse, Mr. Leon, knew Celsius was insolvent and in dire financial condition;

    **i.**  Ms. Landes withdrew substantially all of her stablecoins on deposit with Celsius;

    **j.**  Ms. Landes had not previously conducted a large-scale withdrawal of substantially all of her stablecoins on the Celsius platform; and

    **k.**  The Landes Transfers were questionable and not in the usual course of business.

437.    By virtue of the foregoing, the Landes Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Landes Transfers.

438.    To the extent the Landes Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

439.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

440.    Ms. Landes is the initial transferee for whose benefit the Landes Transfers were made.  Upon information and belief, Ms. Landes may have transferred the funds comprising the Landes Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

441.    Therefore, the Landes Transfers, or the value of the property transferred in the Landes Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXIII

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Kristine Meehan Mashinsky)**

442.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

443.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

444.    Between April 6, 2022 and the Petition Date, Mrs. Mashinsky transferred the following cryptocurrency from the Celsius platform to her personal cryptocurrency wallet (collectively, the "**Kristine Mashinsky Transfers**"):

### Kristine M Meehan

| Date | Asset | USD Amount |
|------|-------|-----------:|
| April 6, 2022 | CEL | $20 |
| April 10, 2022 | CEL | 2,946,336 |
| May 31, 2022 | CEL | 8 |
| May 31, 2022 | CEL | 2,027,331 |
| **Total** | | **$4,973,695** |

445.    The Kristine Mashinsky Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

446.    Mrs. Mashinsky caused the Kristine Mashinsky Transfers to be made by the Debtors.

447.    Mrs. Mashinsky caused Debtors to make the Kristine Mashinsky Transfers with the actual intent to hinder, delay, or defraud creditors.  Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Mrs. Mashinsky.

448.    Mrs. Mashinsky's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.**  The close relationship between the Debtors and Mrs. Mashinsky, who is the spouse of Alexander Mashinsky, a director and the CEO of the Debtors at the time of the transfers;

    **b.**  Mrs. Mashinsky's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Kristine Mashinsky Transfers;

    **c.**  The financial condition of the Debtors before and after each of the Kristine Mashinsky Transfers and Mrs. Mashinsky's knowledge of the Debtors' financial condition;

    **d.**  Contemporaneous communications that establish that Mrs. Mashinsky's spouse, Alexander Mashinsky, knew Celsius was insolvent and in dire financial condition;

    **e.**  Mrs. Mashinsky, through initiating the Kristine Mashinsky Transfers, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors;

    **f.**  The general chronology of the events and the Kristine Mashinsky Transfers;

    **g.**  The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

    **h.**  The Kristine Mashinsky Transfers were questionable and not in the usual course of business;

    **i.**  The secrecy, haste, and unusualness of the Kristine Mashinsky Transfers;

    **j.**  Mrs. Mashinsky had not previously conducted large-scale withdrawal of her CEL token holdings on the Celsius platform;

135

  **k.** The Kristine Mashinsky Transfers were made to an insider; and

  **l.** Mrs. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11.

449. Following each large withdrawal of CEL token, Mrs. Mashinsky sold CEL tokens in small batches regularly for the month after the withdrawal. The sales appear coordinated to not draw scrutiny or affect the price of the CEL token.

450. By virtue of the foregoing, the Kristine Mashinsky Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Kristine Mashinsky Transfers.

451. To the extent the Kristine Mashinsky Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

452. Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

453. Mrs. Mashinsky is the initial transferee for whose benefit the Kristine Mashinsky Transfers were made. Upon information and belief, Mrs. Mashinsky may have transferred the funds comprising the Kristine Mashinsky Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

454.    Therefore, the Kristine Mashinsky Transfers, or the value of the property transferred in the Kristine Mashinsky Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXIV

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant AM Ventures Holding Inc.)**

455.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

456.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

457.    Between July 28, 2021 to the Petition Date, AMV transferred the following cryptocurrency from the Celsius platform to its cryptocurrency wallet (collectively, the "**AMV Transfers**"):

### *AM Ventures Holding Inc.*

| Date | Asset | USD Amount |
|---|---|---|
| July 28, 2021 | CEL | $584 |
| July 28, 2021 | CEL | 6,592,283 |
| October 7, 2021 | CEL | 5,591,165 |
| **Total** | | **$12,184,031** |

458.    The AMV Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

459.    AMV caused the AMV Transfers to be made by the Debtors.

460.    AMV caused Debtors to make the AMV Transfers with the actual intent to hinder, delay, or defraud creditors.  Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against AMV.

461.    AMV's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

**a.** Mr. Mashinsky's ownership and control of AMV;

**b.** The close relationship between the Debtors and Mr. Mashinsky, who was a director and the CEO of the Debtors at the time of the transfers;

**c.** Mr. Mashinsky's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the AMV Transfers;

**d.** The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

**e.** Contemporaneous communications that establish Mr. Mashinsky knew Celsius was insolvent and in dire financial condition;

**f.** The fact that Mr. Mashinsky withdrew substantially all non-CEL token cryptocurrency in accounts held by himself or his affiliated entities on deposit with Celsius;

**g.** Neither Mr. Mashinsky nor his affiliated entities had previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

**h.** That AMV and Mr. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

**i.** The AMV Transfers were to an insider;

**j.** The Debtors were insolvent or became insolvent shortly after the AMV Transfers were made;

**k.** Alexander Mashinsky knowingly caused the withdrawals of cryptocurrencies in the AMV Transfers; and

       **l.**  The AMV Transfers were questionable and not in the usual course of business.

462.    Following each large withdrawal of CEL token, Mr. Mashinsky sold CEL tokens in small consistent batches regularly after the withdrawal.  The sales appear coordinated to not draw scrutiny or affect the price of the CEL token.

463.    By virtue of the foregoing, the AMV Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the AMV Transfers.

464.    To the extent the AMV Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

465.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

466.    AMV is the initial transferee for whose benefit the AMV Transfers were made. Upon information and belief, AMV may have transferred the funds comprising the AMV Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

467.    Therefore, the AMV Transfers, or the value of the property transferred in the AMV Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

<u>**COUNT XXV**</u>

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b);
548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform
Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware)
— Defendant Koala1 LLC)**

468.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

469.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

470.    Upon information and belief, Koala1 LLC is owned and controlled by Mr. Mashinsky.

471.    On May 27, 2022, Koala1 LLC transferred the following cryptocurrency from the Celsius platform to its cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Koala Transfers**"):

*KOALA 1 LLC*

| Date | Asset | USD Amount |
|------|-------|------------|
| May 27, 2022 | USDC | $1,638,303 |
| May 27, 2022 | ETH | 1,174,716 |
| May 27, 2022 | BTC | 1,589,025 |
| **Total** | | **$4,402,044** |

472.    The Koala Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

473.    Koala1 LLC caused the Koala Transfers to be made by the Debtors.

474.     Koala1 LLC caused Debtors to make the Koala Transfers with the actual intent to hinder, delay, or defraud creditors.  Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Koala1 LLC.

475.     Koala1 LLC's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

  **a.** Mr. Mashinsky's ownership and control of Koala1 LLC;

  **b.** The close relationship between the Debtors and Mr. Mashinsky, who was a director and the CEO of the Debtors at the time of the transfers;

  **c.** Mr. Mashinsky's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Koala Transfers;

  **d.** The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

  **e.** Contemporaneous communications that establish Mr. Mashinsky knew Celsius was insolvent and in dire financial condition;

  **f.** The fact that Mr. Mashinsky withdrew substantially all non-CEL token cryptocurrency in accounts held by himself or his affiliated entities on deposit with Celsius;

  **g.** Mr. Mashinsky had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

  **h.** That Koala1 LLC and Mr. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

  **i.** The Koala Transfers were to an insider;

  **j.** The Debtors were insolvent or became insolvent shortly after the Koala Transfers were made;

  **k.** Mr. Mashinsky knowingly caused the Koala Transfers;

  **l.** The fact that all or substantially all of Koala1 LLC's stablecoin holdings on deposit with Celsius were withdrawn;

**m.** The fact that Koala1 LLC had not previously conducted a largescale withdrawal of its stablecoin holdings on the Celsius platform; and

**n.** The Koala Transfers were questionable and not in the usual course of business.

476.    By virtue of the foregoing, the Koala Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Koala Transfers.

477.    To the extent the Koala Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

478.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

479.    Koala1 LLC is the initial transferee for whose benefit the Koala Transfers were made.  Upon information and belief, Koala1 LLC may have transferred the funds comprising the Koala Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

480.    Therefore, the Koala Transfers, or the value of the property transferred in the Koala Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXVI

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Alchemy Capital Partners, LP)**

481.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

482.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

483.    On April 13, 2022, Mr. Leon transferred 8,000,002 CEL tokens to Alchemy.  That same day, Alchemy entered into a loan agreement with the Debtors and, on April 14, 2022, received $4,000,000 in exchange for posting 7,373,272 CEL tokens as collateral.  On May 27, 2022, Mr. Leon transferred 7,023,636 CEL tokens to Alchemy.  That same day, Alchemy posted additional collateral of 7,654,644 CEL tokens.  In total, Alchemy posted 15,027,916 CEL tokens as collateral in exchange for the $4 million USD loan from the Debtors (the "**Alchemy Loan**").

484.    The Alchemy Loan constitutes a transfer of interest in the Debtors' property and was made within two years prior to the Petition Date.

485.    Alchemy caused the Alchemy Loan to be made by the Debtors.

486.    The interest rate on the Alchemy Loan is 0.1%.  Upon information and belief, Alchemy did not execute a loan agreement in connection with the Alchemy Loan.

487.    Alchemy caused Debtors to make the Alchemy Loan with the actual intent to hinder, delay, or defraud creditors.  Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Alchemy.

488.    Alchemy's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.** Mr. Leon's ownership and control of Alchemy;

    **b.** The close relationship between the Debtors and Mr. Leon, who was a director, the COO or the CSO of the Debtors at the time of the transfers;

    **c.** Mr. Leon's continued retention of possession, benefit, or use of the money received from the Alchemy Loan;

    **d.** The timing of the transactions shortly before the effective date of the New Jersey Order and as Celsius was experiencing financial distress;

    **e.** Contemporaneous communications that establish Mr. Leon knew Celsius was insolvent and in dire financial condition;

    **f.** Mr. Leon had not previously entered into a loan collateralized by CEL tokens;

    **g.** The Alchemy Loan was conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

    **h.** Alchemy, and by extension, Mr. Leon, was able to receive USD value for the CEL token collateral, which was worth significantly less than the USD value received. Therefore, reasonably equivalent value was not received;

    **i.** Alchemy, and by extension, Mr. Leon, was able to receive USD value for the CEL token collateral without having to sell his CEL token positions, guaranteeing a USD value in exchange for the CEL tokens as Debtors faced the consequences of the New Jersey Order and insolvency;

    **j.** The Alchemy Loan was to an insider;

    **k.** The Alchemy Loan was unusual and not in the regular course of business; and

     **l.**    The Debtors were insolvent or became insolvent shortly after the Alchemy Loan was made.

489.    By virtue of the foregoing, the Alchemy Loan was a fraudulent transfer avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Alchemy Loan.

490.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

491.    Alchemy is the initial transferee for whose benefit the Alchemy Loan was made. Upon information and belief, Alchemy may have transferred the funds comprising the Alchemy Loan to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

492.    Therefore, the Alchemy Loan, or the value of the property transferred in the Alchemy Loan, is recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXVII

**(Avoidance and Recovery of Constructive Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(B); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Alchemy Capital Partners, LP)**

493.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

494.    Plaintiff brings this claim under sections 544(b), 548(a)(1)(B), and 550 of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware

495.    As set out in Count XXVI, Alchemy caused the Alchemy Loan to be made by the Debtors, which constitutes a transfer of interest in the Debtors' property made to and for the benefit of Alchemy.

496.    The Alchemy Loan was made within two years prior to the Petition Date.

497.    The Debtors received less than reasonably equivalent value or did not receive fair consideration in exchange for the Alchemy Loan.  At the time of the transfer, the 15,027,916 CEL tokens posted by Alchemy as collateral were worth significantly less than the $4,000,000 received by Alchemy, particularly when the manipulation of the CEL token's value is considered.

498.    The interest rate on the Alchemy Loan is 0.1%.  Upon information and belief, Alchemy did not execute a loan agreement in connection with the Alchemy Loan.

499.    The Debtors were insolvent on the date of the Alchemy Loan; were left with unreasonably small capital on the date of the Alchemy Loan; or intended to incur or believed it would incur debts beyond its ability to pay as such debts matured.

500.    Moreover, the Debtors made the Alchemy Loan to, or for the benefit of, an insider, or incurred such obligation to or for the benefit of an insider and not in the ordinary course of business.

501.    By virtue of the foregoing, the Alchemy Loan was a constructive fraudulent transfer avoidable under sections 544(b) and 548(a)(1)(B) of the Bankruptcy Code, as well as applicable

state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Alchemy Loan.

502.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

503.    Alchemy is the initial transferee for whose benefit the Alchemy Loan was made. Upon information and belief, Alchemy may have transferred the funds comprising the Alchemy Loan to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

504.    Therefore, the Alchemy Transfers, or the value of the property transferred in the Alchemy Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXVIII

**(Breach of Contract — Failure to Repay Loan — Defendants Daniel Leon and Alchemy Capital Partners, LP)**

505.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

506.    As set out in Count XXVI, Alchemy entered into the Alchemy Loan, which constituted a valid and binding agreement between Alchemy and Celsius.  On April 14, 2022 and May 27, 2022 Mr. Leon transferred 8,000,002 and 7,023,636 CEL tokens respectively to Alchemy, which Alchemy then used as collateral for the Alchemy Loan with Celsius.

507.     Mr. Leon also took out three loans from Celsius in the principal amounts of $1,000, $2,000, and $2,000 respectively (the "**Leon Loans**"), each of which constituted a valid and binding agreement.

508.     Mr. Leon and Alchemy were sent a notice on behalf of Celsius on May 8, 2024 informing them that Mr. Leon and Alchemy were in default (and if not, Celsius thereby terminated the loans).  The notice also informed them that the Alchemy Loan and the Leon Loans were due and payable; such loans were required to be repaid; the accrued and unpaid interest on the Alchemy Loan currently amounted to $7,288; and the combined accrued and unpaid interest on the Leon Loans amounted to $90.  Neither Mr. Leon nor Alchemy paid back any of their outstanding loan balances in response to the notice.

509.     The Alchemy Loan and Leon Loans were subject to the Celsius Loan Terms and Conditions, which stated that a failure "to pay any amount whatsoever (principal, interest or other) to Celsius in respect of the loan" constituted a default.

510.     The Celsius Loan Terms and Conditions also state that a failure to respond to Celsius's communications constitutes a default.

511.     Mr. Leon and Alchemy failed to repay the accrued and unpaid interest on the loans. Mr. Leon and Alchemy also failed to respond to Celsius's default notice sent on May 8, 2024. Therefore, Mr. Leon and Alchemy have defaulted on the Alchemy Loan and Leon Loans and breached the terms of the Celsius Loan Terms and Conditions.

512.     As a result of these breaches of contract, the Company suffered damages.

## COUNT XXIX

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Bits of Sunshine LLC)**

513.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

514.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

515.    Bits of Sunshine LLC is owned and controlled by Mr. Goldstein.

516.    Between February 7, 2022 and the Petition Date, Bits of Sunshine LLC transferred the following cryptocurrency from the Celsius platform to its cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Bits of Sunshine Transfers**"):

### *Bits of Sunshine LLC*

| Date | Asset | USD Amount |
|------|-------|-----------|
| February 7, 2022 | CEL | $150,000 |
| February 23, 2022 | CEL | 154,500 |
| April 27, 2022 | CEL | 105,703 |
| May 9, 2022 | CEL | 162,000 |
| **Total** | | **$572,203** |

517.    The Bits of Sunshine Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

518.    Bits of Sunshine LLC caused the Bits of Sunshine Transfers to be made by the Debtors.

519.    Bits of Sunshine LLC caused Debtors to make the Bits of Sunshine Transfers with the actual intent to hinder, delay, or defraud creditors.  Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Bits of Sunshine LLC.

520.    Bits of Sunshine LLC's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.** Mr. Goldstein's ownership and control of Bits of Sunshine LLC;

    **b.** The close relationship between the Debtors and Mr. Goldstein, who was Chief Technology Officer of the Debtors at the time of the transfers;

    **c.** Mr. Goldstein's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Bits of Sunshine Transfers;

    **d.** The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

    **e.** Contemporaneous communications that establish Mr. Goldstein knew Celsius was insolvent and in dire financial condition;

    **f.** The fact that Mr. Goldstein withdrew substantially all non-CEL token cryptocurrency in accounts held by himself or his affiliated entities on deposit with Celsius;

    **g.** Mr. Goldstein had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

    **h.** That Bits of Sunshine LLC and Mr. Goldstein's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

    **i.** The Bits of Sunshine Transfers were to an insider;

    **j.** The Debtors were insolvent or became insolvent shortly after the Bits of Sunshine Transfers were made;

**k.** Mr. Goldstein knowingly caused the withdrawals of cryptocurrencies in the Bits of Sunshine Transfers;

**l.** The fact that all or substantially all of Bits of Sunshine LLC's stablecoin holdings on deposit with Celsius were withdrawn;

**m.** The fact that Bits of Sunshine LLC had not previously conducted a largescale withdrawal of its stablecoin holdings on the Celsius platform; and

**n.** The Bits of Sunshine Transfers were questionable and not in the usual course of business.

521.   By virtue of the foregoing, the Bits of Sunshine Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Bits of Sunshine Transfers.

522.   To the extent the Bits of Sunshine Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

523.   Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

524.   Bits of Sunshine LLC is the initial transferee for whose benefit the Bits of Sunshine Transfers were made. Upon information and belief, Bits of Sunshine LLC may have transferred the funds comprising the Bits of Sunshine Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

525.    Therefore, the Bits of Sunshine Transfers, or the value of the property transferred in the Bits of Sunshine Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXX

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Four Thirteen LLC)**

526.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

527.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

528.    Four Thirteen LLC is owned and controlled by Mr. Goldstein.

529.    Between May 30, 2022 and the Petition Date, Four Thirteen LLC transferred the following cryptocurrency from the Celsius platform to its cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Four Thirteen Transfers**"):

*Four Thirteen LLC*

| Date | Asset | USD Amount |
|------|-------|-----------|
| May 30, 2022 | CEL | $11,039 |
| June 1, 2022 | USDT ERC20 | $821 |
| **Total** | | **$11,860** |

530.     The Four Thirteen Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

531.     Four Thirteen LLC caused the Four Thirteen Transfers to be made by the Debtors.

532.     Four Thirteen LLC caused Debtors to make the Four Thirteen Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Four Thirteen LLC.

533.     Four Thirteen LLC's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.** Mr. Goldstein's ownership and control of Four Thirteen LLC;

    **b.** The close relationship between the Debtors and Mr. Goldstein, who was Chief Technology Officer of the Debtors at the time of the transfers;

    **c.** Mr. Goldstein's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Four Thirteen Transfers;

    **d.** The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

    **e.** Contemporaneous communications that establish Mr. Goldstein knew Celsius was insolvent and in dire financial condition;

    **f.** The fact that Mr. Goldstein withdrew substantially all non-CEL token cryptocurrency in accounts held by himself or his affiliated entities on deposit with Celsius;

    **g.** Mr. Goldstein had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

    **h.** That Four Thirteen LLC and Mr. Goldstein's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

    **i.** The Four Thirteen Transfers were to an insider;

**j.** The Debtors were insolvent or became insolvent shortly after the Four Thirteen Transfers were made;

**k.** Mr. Goldstein knowingly caused the withdrawals of cryptocurrencies in the Four Thirteen Transfers;

**l.** The fact that all or substantially all of Four Thirteen LLC's stablecoin holdings on deposit with Celsius were withdrawn;

**m.** The fact that Four Thirteen LLC had not previously conducted a largescale withdrawal of its stablecoin holdings on the Celsius platform; and

**n.** The Four Thirteen Transfers were questionable and not in the usual course of business.

534.    By virtue of the foregoing, the Four Thirteen Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Four Thirteen Transfers.

535.    To the extent the Four Thirteen Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

536.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

537.    Four Thirteen LLC is the initial transferee for whose benefit the Bits of Sunshine Transfers were made. Upon information and belief, Four Thirteen LLC may have transferred the funds comprising the Four Thirteen Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

538.     Therefore, the Four Thirteen Transfers, or the value of the property transferred in the Bits of Sunshine Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXXI

**(Avoidance and Recovery of Actual Fraudulent Transfers — OTC Sales — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Aliza Landes, Johannes Treutler, Harumi Urata-Thompson, Jeremie Beaudry, Roni Cohen-Pavon,  and Four Thirteen LLC)**

539.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

540.     Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

541.     Between October 18, 2020 and the Petition Date, Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC sold CEL tokens to the company via the OTC desk (collectively, the "**OTC Sales**").  A list of the OTC Sales is attached as **Exhibit B** to this Complaint.

542.     Defendants received cash, stablecoins, or other more valuable cryptocurrency such as BTC and ETH in exchange for these sales.

543.     The OTC Sales constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

544.    Defendants directed and caused Celsius to make the OTC Sales and Celsius entered into the OTC Sales with the actual intent to hinder, delay, or defraud Celsius and its creditors by obscuring the sales from the market to avoid the negative affect they would have on the price of CEL token.  The Defendants profited from the CEL token's artificially inflated value at the company's and customers' expense through the OTC Sales.

545.    The OTC Sales were an integral part of Defendants' fraudulent scheme to artificially inflate the price of CEL token.  At the direction of Defendants, Celsius promoted employees' use of the OTC desk to sell back their CEL token to the Company rather than using third-party cryptocurrency exchanges for these sales.  The Defendants directed Celsius to do so to conceal the fact that employees were selling CEL token and prevent large sales by employees from negatively impacting the market price of CEL token.  By keeping the CEL token's price artificially high through the use of the OTC desk and strategically purchasing CEL token in manners that were contrary to what Celsius and the Defendants told the public, Defendants were able to profit.

546.    Celsius' actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

> **a.** The close relationship between the Debtors and Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC, who were insiders at the time of the OTC Sales;
>
> **b.** The timing of the OTC Sales as Celsius was experiencing financial distress;
>
> **c.** Contemporaneous communications that establish Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon and Beaudry knew Celsius was insolvent and in dire financial condition at the time of the OTC Sales;
>
> **d.** The Debtors were insolvent or became insolvent shortly after the OTC Sales were made;

156

e.  The Debtors received less than reasonably equivalent value in exchange for the cash, stablecoins, and other cryptocurrencies they transferred to Defendants through the OTC sales;

f.  Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC made the OTC sales knowing that the CEL token was subject to significant manipulation and its value was artificially inflated; and

g.  Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC, through initiating the OTC Sales, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors.

547.    By virtue of the foregoing, the OTC Sales were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

548.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

549.    Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC are initial transferees for whose benefit the OTC Sales were made.

550.    Therefore, the OTC Sales, or the value of the property transferred in the OTC Sales, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXXII

**(Avoidance and Recovery of Constructive Fraudulent Transfers — OTC Sales — 11 U.S.C. §§ 544(b); 548(a)(1)(B); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Aliza Landes, Johannes Treutler, Harumi Urata-Thompson, Jeremie Beaudry, Roni Cohen-Pavon, and Four Thirteen LLC)**

551.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

552.    Plaintiff brings this claim under sections 544(b), 548(a)(1)(B), and 550 of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

553.    Between October 18, 2020 and the Petition Date, Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC sold CEL token to the company via the OTC desk (the OTC Sales, attached hereto as **Exhibit B**), which constitute transfers of interest in the Debtors' property made within two years prior to the Petition Date, and made to and for the benefit of Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC.

554.    The Debtors received less than reasonably equivalent value or did not receive fair consideration in exchange for the cash, stablecoins, or more valuable cryptocurrency such as BTC and ETH that Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC received through the OTC Sales.  At the time of the transfers, the CEL tokens received by the Debtors were worth significantly less than the cash, stablecoins, or more valuable cryptocurrency such as BTC and ETH received by Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and

Four Thirteen LLC, particularly considering the manipulation of the CEL token, which rendered its value nearly non-existent, and the company being insolvent at the time of the sales.

555.   The Debtors were insolvent on the dates of the OTC Sales; were engaged or about to engage in a business or transaction for which the remaining assets of the Debtors were unreasonably small on the date of the OTC Sales or as a result of the OTC Sales; or intended to incur, believed, or reasonably should have believed they would incur debts beyond their ability to pay as such debts came due.

556.   Moreover, the Debtors participated in the OTC Sales for the benefit of insiders, not in the ordinary course of business.

557.   By virtue of the foregoing, the OTC Sales were constructive fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(B) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the OTC Sales.

558.   Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

559.   Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC are the initial transferees for whose benefit the OTC Sales were made.  Upon information and belief, Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC may have

transferred the funds received through the OTC Sales to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

560.    Therefore, the OTC Sales, or the value of the property transferred in the OTC Sales, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXXIII

**(Avoidance and Recovery of Actual Fraudulent Transfers — CEL Token Bonus Cash Payments — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law, including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Jeremie Beaudry, Harumi Urata-Thompson, Roni Cohen-Pavon, Aliza Landes, and Johannes Treutler)**

561.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

562.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

563.    Celsius paid its officers and employees bonuses when the market price of CEL token reached $1.50 and $5.00 (the "**$1.50 CEL Token Bonus**" and "**$5.00 CEL Token Bonus**", respectively, and together, the "**CEL Token Bonuses**").  The CEL Token Bonuses consisted of allocations of a total quantity of CEL token.  A portion of each employee's CEL Token Bonus allocation was paid in CEL tokens that would vest over time.  The remaining portion of each employee's CEL token bonus allocation was paid in cash.

564.    On or about November 17, 2020, Defendant Mashinsky received a cash payment in the amount of $1,081,193.16 as a portion of his $1.50 CEL Token Bonus.

565.    On or about February 16, 2021, Defendant Mashinsky received a cash payment in the amount of $1,302,353.26 as a portion of his $5.00 CEL Token Bonus.

566.    On or about November 17, 2020, Defendant Leon received a cash payment in the amount of $915,452.20 as a portion of his $1.50 CEL Token Bonus.

567.    On or about November 17, 2020, Defendant Goldstein received a cash payment in the amount of $1,080,410.84 as a portion of his $1.50 CEL Token Bonus.

568.    On or about February 16, 2021, Defendant Goldstein received a cash payment in the amount of $1,302,353.26 as a portion of his $5.00 CEL Token Bonus.

569.    On or about November 17, 2020, Defendant Beaudry received a cash payment in the amount of $386,078.79 as a portion of his $1.50 CEL Token Bonus.

570.    On or about February 16, 2021, Defendant Beaudry received a cash payment in the amount of $703.362.71 as a portion of his $5.00 CEL Token Bonus.

571.    On or about November 17, 2020, Defendant Urata-Thompson received a cash payment in the amount of $298,142.80 as a portion of her $1.50 CEL Token Bonus.

572.    On or about February 16, 2021, Defendant Urata-Thompson received a cash payment in the amount of $485,546.91 as a portion of her $5.00 CEL Token Bonus.

573.    On or about November 17, 2020, Defendant Cohen-Pavon received a cash payment in the amount of $36,003.27 as a portion of his $1.50 CEL Token Bonus.

574.    On or about November 17, 2020, Defendant Landes received a cash payment in the amount of $167,311.77 as a portion of her $1.50 CEL Token Bonus.

575.    On or about November 17, 2020, Defendant Treutler received a cash payment in the amount of $58,770.48 as a portion of his $1.50 CEL Token Bonus (together with the cash

payments referenced in paragraphs 564 through 574 above, the "**CEL Token Bonus Cash Transfers**").

576.    The CEL Token Bonus Cash Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

577.    CEL Token Bonuses were paid out as part of the CEL token manipulation scheme directed by Defendants.  The payment of CEL Token Bonuses furthered Defendants' manipulation scheme by reinforcing artificially inflated CEL token prices through the payment of cash bonuses at amounts in excess of the true value of CEL token.  CEL token would not have reached the $1.50 and $5.00 price thresholds if its market price had not been artificially inflated by Defendants' manipulation scheme, discussed *supra* in paragraphs 63 through 87.  Celsius, directed by Defendants, paid the CEL Token Bonuses in order to allow its insiders to profit as a result of the CEL token manipulation scheme at the expense of creditors.

578.    The CEL Token Bonus Cash Transfers were intended to be the cash equivalent of a portion of Defendants' CEL token allocation provided for by the CEL Token Bonuses.  However, due to CEL token's artificially inflated price resulting from Defendants' manipulation, the CEL tokens intended to be represented by the CEL Token Bonus Cash Transfers and kept by the Debtors as consideration for the CEL Token Bonus Cash Transfers were actually worth far less than the dollar amounts Defendants received.

579.    Celsius's actual intent to hinder, delay, or defraud creditors is established by, among other things, the following badges of fraud:

      **a.** The close relationship between the Debtors and Defendants Mashinsky, Leon, Goldstein, Beaudry, Urata-Thompson, Cohen-Pavon, Landes, and Treutler, who were insiders at the time of the CEL Token Bonus Cash Transfers;

      **b.** The timing of the CEL Token Bonus Cash Transfers as Celsius was experiencing financial distress;

      **c.** Contemporaneous communications that establish Defendants Mashinsky, Leon, Goldstein, Beaudry, Urata-Thompson, Cohen-Pavon, Landes, and Treutler knew Celsius was insolvent and in declining financial condition at the time of the CEL Token Bonus Cash Transfers,

      **d.** The Debtors were insolvent or became insolvent shortly after the CEL Token Bonus Cash Transfers made;

      **e.** The Debtors received less than reasonably equivalent value in exchange for the CEL Token Bonus Cash Transfers;

      **f.** Defendants Mashinsky, Leon, Goldstein, Beaudry, Urata-Thompson, Cohen-Pavon, Landes, and Treutler directed the Debtors to make the CEL Token Bonus Cash Transfers knowing that the CEL token was subject to significant manipulation and its value was artificially inflated; and

      **g.** The CEL Token Bonus Cash Transfers were a part of the scheme to allow insiders and employees to monetize the artificially inflated CEL token.

580.     The CEL Token Bonus Cash Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

581.     Plaintiff is entitled to avoid the CEL Token Bonus Cash Transfers.

582.     Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

583.     Defendants Mashinsky, Leon, Goldstein, Beaudry, Urata-Thompson, Cohen-Pavon, Landes, and Treutler are the initial transferees for whose benefit the CEL Token Bonus Cash Transfers were made.  Upon information and belief, Defendants may have transferred the

funds comprising the CEL Token Bonus Cash Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

584.    Therefore, the CEL Token Bonus Cash Transfers, or the value of the property transferred in the CEL Token Bonus Cash Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXXIV

**(Avoidance and Recovery of Constructive Fraudulent Transfers — CEL Token Bonus Cash Payments — 11 U.S.C. §§ 544(b)(1); 548(a)(1)(B); 550; and Applicable Law including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Jeremie Beaudry, Harumi Urata-Thompson, Roni Cohen-Pavon, Aliza Landes, and Johannes Treutler)**

585.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

586.    Plaintiff brings this claim under sections 544(b)(1), 548(a)(1)(B), and 550 of the Bankruptcy Code.

587.    Defendants received the CEL Token Bonus Cash Transfers described in Count XXXIII above.

588.    The CEL Token Bonus Cash Transfers were intended to be the cash equivalent of a portion of Defendants' CEL token allocation provided for by the CEL Token Bonuses. However, due to CEL token's artificially inflated price resulting from the manipulation directed by Defendants, the CEL tokens intended to be represented by the CEL Token Bonus Cash Transfers and kept by the Debtors as consideration for the CEL Token Bonus Cash Transfers were actually worth far less than the dollar amounts Defendants received.

589.    The Debtors received less than reasonably equivalent value or did not receive fair consideration as part of these CEL Token Bonus Cash Transfers.

590.    The Debtors were insolvent at all times relevant to this Complaint, and when each of the CEL Token Bonus Cash Transfers was completed.  The Debtors also had unreasonably small capital on the date of each CEL Token Bonus Cash Transfer or intended to incur or believed they would incur debts beyond their ability to pay as such debts matured.

591.    The Debtors, directed by Defendants, conducted the CEL Token Bonus Cash Transfers or incurred such obligation to, or for the benefit, of insiders like Defendants, and not in the ordinary course of business.

592.    By virtue of the foregoing, the CEL Token Bonus Cash Transfers were constructive fraudulent transfers avoidable under sections 544(b)(1) and 548(a)(1)(B) of the Bankruptcy Code, and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

593.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 or 548 of the Bankruptcy Code, the Litigation Administrator may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

594.    Defendants Mashinsky, Leon, Goldstein, Beaudry, Urata-Thompson, Cohen-Pavon, Landes, and Treutler are the initial transferees for whose benefit the CEL Token Bonus Cash Transfers were made.  Upon information and belief, Defendants may have transferred the funds comprising the CEL Token Bonus Cash Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

595.     Therefore, the CEL Token Bonus Cash Transfers, or the value of the property transferred in the CEL Token Bonus Cash Transfers, is recoverable by the Litigation Administrator under section 550 of the Bankruptcy Code.

## COUNT XXXV

**(Equitable Subordination – 11 U.S.C. § 510 – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Harumi Urata-Thompson, Jeremie Beaudry, Johannes Treutler, Kristine Meehan Mashinsky, Aliza Landes, AM Ventures Holding, Inc., Koala1 LLC, Koala2 LLC, Koala3 LLC, Bits of Sunshine LLC, Four Thirteen LLC, and Alchemy Capital Partners, LP)**

596.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

597.     Defendants used their power as statutory and/or non-statutory insiders to their own advantage and to the other creditors' detriment.

598.     All named Defendants engaged in wrongful and inequitable conduct by orchestrating the fraudulent transactions referred to in Counts XIV through XXX herein, at a time when Celsius was experiencing financial distress, and with the actual intent to hinder, delay, or defraud creditors and Celsius.  Prior to the Pause, within one year of the Petition Date and while the Debtors were insolvent, all Defendants withdrew cryptocurrency from the Celsius platform. Each withdrawal constituted a fraudulent transaction and an illegal preferential transfer of the Debtors' interest in the property.

599.     Defendants A. Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Beaudry, Cohen-Pavon, and Four Thirteen LLC also orchestrated the fraudulent transactions referred to in Counts XXXI through XXXIV herein, whereby they engaged in sales of their personal CEL token holdings back to the Company via the OTC desk at prices which were

artificially inflated as a result of Defendants' CEL token manipulation scheme, and directed Celsius to pay them cash bonuses when CEL token reached particular (artificially inflated) market prices.

600.    Moreover, Defendants A. Mashinsky, Leon, Goldstein, Cohen-Pavon, Urata-Thompson, and Treutler also used their power as insiders to control Celsius to the detriment of the other creditors, breaching their fiduciary duties of care and loyalty to the Company.  As discussed in detail in Counts I through VII herein, these breaches of duty included approving and overseeing risky investments that resulted in enormous losses of customer assets; failing to implement proper controls or adequate means of tracking the Company's assets; approving self-interested transactions such as the AMV loan; participating in a scheme to edit fraudulent statements out of AMAs after they had already been broadcast live; and manipulating the price of the CEL token to benefit themselves, their families, and their affiliates at the expense of the Company and its creditors.

601.    Additionally, as described in Counts VIII and IX herein, Defendants fraudulently misrepresented and conspired to fraudulently misrepresent (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) the legal nature of deposits in Celsius.  These fraudulent misrepresentations were reasonably relied upon by Celsius customers, inducing them to invest their cryptocurrency assets in Celsius and ultimately suffer massive losses.

602.    These fraudulent misrepresentations, along with the scheme defendants engaged in to cover them up by editing AMA videos after they had been broadcast live, also constitute

deceptive business practices, false advertising, and consumer fraud in violation of applicable state statutes as described in Counts X through XII.

603.    Defendants' conduct as alleged above, including but not limited to the fraudulent transfers, preferential transfers, breaches of fiduciary duty, fraudulent misrepresentation, deceptive business practices, false advertising, and consumer fraud, constitutes inequitable conduct.

604.    By reason of this inequitable conduct, Defendants received an unfair advantage in the form of excess value that otherwise would have been available to all of the Celsius stakeholders.  Celsius's unsecured creditors were injured because their credit exposure was increased and their potential for recovery was reduced due to Defendants' actions.

605.    Allowing Defendants to receive payment on their claims would be unfair and inequitable.

606.    Equitable subordination of the Defendants' claims is consistent with the Bankruptcy Code and with the Code's overarching purpose to protect creditors and guarantee similar treatment for all similarly situated claims.

607.    Because of the transactions and actions described herein, Defendants' claims, including any and all current and future claims they have for indemnification against the Company, should be equitably subordinated to all general unsecured claims pursuant to 11 U.S.C. § 510.

## COUNT XXXVI

**(Disallowance of Defendants' Claims — 11 U.S.C. § 502(d) — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Harumi Urata-Thompson, Jeremie Beaudry, Johannes Treutler, Kristine Meehan Mashinsky, Aliza Landes, AM Ventures Holding, Inc., Koala1 LLC, Koala2 LLC, Koala3 LLC, Bits of Sunshine LLC, Four Thirteen LLC, and Alchemy Capital Partners, LP)**

608.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

609.    The Defendants are all persons or entities from which property is recoverable under section 550 of the Bankruptcy Code or is a transferee of transfers avoidable under sections 544, 547, and 548 of the Bankruptcy Code.

610.    The Defendants have not paid the amount or turned over any property transferred for which the Defendants are liable under section 550 of the Bankruptcy Code.

611.    Any filed or scheduled claims held by the Defendants are disallowed until the Defendants pay in full or return the property for which they are liable under section 550 of the Bankruptcy Code.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor against the Defendants as follows:

(a)  Damages in an amount to be proven at trial;

(b)  Punitive damages in an amount to be proven at trial;

(c)  Compensatory damages reflecting Mr. Goldstein, Mr. Leon, and Alchemy Capital Partners, LP's breaches of contract;

(d)  Determining that each of the Preferential and Fraudulent Transfers[80] is avoidable as a preferential transfer or fraudulent transfers pursuant to the applicable provisions of the Bankruptcy Code and applicable state law, including, without limitation, sections 544, 547, 548, and 550 of the Bankruptcy Code;

(e)  Ordering that Plaintiff may recover and the Defendants or any mediate transferee must turn over, for the benefit of the estate, the transferred cryptocurrency or, in the alternative, if

---

[80] The "**Fraudulent Transfers**" are those transfers identified in Counts XIV through XVII, XIX through XXVII, and XXIX through XXXIV.

greater, the U.S. dollars in an amount equal to the price of the transferred cryptocurrency on the day of the transfer, with interest;

(f) Ordering that pursuant to the applicable provisions of the Bankruptcy Code, including, without limitation, section 502(d) of the Bankruptcy Code, each claim asserted by the Defendants is disallowed;

(g) Ordering that pursuant to the applicable provisions of the Bankruptcy Code, including, without limitation, section 510 of the Bankruptcy Code, each claim asserted by the Defendants is equitably subordinated, including any and all current and future claims for indemnification by the Company;

(h) Granting Plaintiff costs of suit incurred herein, including, without limitation, attorneys' fees, costs, and other expenses incurred in this action;

(i) Granting Plaintiff pre- and post-judgment interest on the judgment amount to the fullest extent allowed by applicable law; and

(j) Ordering such other and further relief as the Court may deem just and proper.


*[Remainder of Page Intentionally Left Blank]*

Dated:  July 10, 2024
        New York, New York

*/s/ Aaron Colodny*

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Kathryn J. Gundersen
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email:  david.turetsky@whitecase.com
        sam.hershey@whitecase.com
        kathryn.gundersen@whitecase.com

– and –

**WHITE & CASE LLP**
Jason Zakia (*pro hac vice* pending)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email:  jzakia@whitecase.com
        gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700

Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

*Counsel to the Litigation Administrator*

# Exhibit A
**Preferential Transfers**

### AM Ventures Holding Inc.

| Date | Entity / Individual | Associated Party | Asset | Transaction Type | Coin Amount | USD Amount |
|---|---|---|---|---|---|---|
| July 28, 2021 | AM Ventures Holding Inc. | Alex Mashinsky | CEL | Withdrawal | 100 | $584 |
| July 28, 2021 | AM Ventures Holding Inc. | Alex Mashinsky | CEL | Withdrawal | 1,130,000 | 6,592,283 |
| October 7, 2021 | AM Ventures Holding Inc. | Alex Mashinsky | CEL | Withdrawal | 966,000 | 5,591,165 |
| **Total** | | | | | | **$12,184,031** |

### Shlomi Daniel Leon

| Date | Entity / Individual | Associated Party | Asset | Transaction Type | Coin Amount | USD Amount |
|---|---|---|---|---|---|---|
| July 15, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | BTC | Withdrawal | 1 | $31,447 |
| July 18, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | ETH | Withdrawal | 1 | 1,916 |
| July 18, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Withdrawal | 2 | 11 |
| July 19, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | ETH | Withdrawal | 38 | 69,320 |
| August 8, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Withdrawal | 100,000 | 636,462 |
| September 14, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Withdrawal | 1 | 5 |
| September 14, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Withdrawal | 20,000 | 104,200 |
| September 21, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Withdrawal | 20,000 | 102,616 |
| September 22, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | BTC | Withdrawal | 32 | 1,355,123 |
| September 27, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Withdrawal | 35,000 | 177,575 |
| October 6, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Withdrawal | 20,000 | 113,800 |
| October 21, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Withdrawal | 35,000 | 184,800 |
| December 2, 2021 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Withdrawal | 50,000 | 206,208 |
| March 29, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Withdrawal | 19,000 | 64,030 |
| April 4, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Withdrawal | 21,924 | 69,280 |
| April 11, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Withdrawal | 100,000 | 265,576 |
| April 13, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | USDC | Withdrawal | 2 | 2 |
| April 13, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | USDC | Withdrawal | 50 | 50 |
| April 14, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | USDC | Withdrawal | 2,200,000 | 2,200,000 |
| April 20, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Internal Account Transfer: Yield to Custody | 45 | 100 |
| April 26, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | CEL | Internal Account Transfer: Yield to Custody | 39,134 | 81,000 |
| May 29, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | USDC | Internal Account Transfer: Yield to Custody | 2,370,634 | 2,370,634 |
| May 31, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | BTC | Internal Account Transfer: Yield to Custody | 13 | 420,805 |
| May 31, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | ETH | Internal Account Transfer: Yield to Custody | 56 | 110,179 |
| May 31, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | DOT | Internal Account Transfer: Yield to Custody | 5,128 | 52,575 |
| May 31, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | ADA | Internal Account Transfer: Yield to Custody | 47,421 | 30,978 |
| May 31, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | SNX | Internal Account Transfer: Yield to Custody | 11,313 | 35,975 |
| May 31, 2022 | Shlomi Daniel Leon | Shlomi Daniel Leon | USDC | Internal Account Transfer: Yield to Custody | 3,127 | 3,127 |
| **Total** | | | | | | **$8,687,793** |

### Kristine Meehan Mashinsky

| Date | Entity / Individual | Associated Party | Asset | Transaction Type | Coin Amount | USD Amount |
|---|---|---|---|---|---|---|
| April 6, 2022 | Kristine Meehan Mashinsky | Alex Mashinsky | CEL | Withdrawal | 6 | $20 |
| April 10, 2022 | Kristine Meehan Mashinsky | Alex Mashinsky | CEL | Withdrawal | 1,000,000 | 2,946,336 |
| May 31, 2022 | Kristine Meehan Mashinsky | Alex Mashinsky | CEL | Withdrawal | 10 | 8 |
| May 31, 2022 | Kristine Meehan Mashinsky | Alex Mashinsky | CEL | Withdrawal | 2,452,820 | 2,027,331 |
| **Total** | | | | | | **$4,973,695** |

### Jeremie Beaudry

| Date | Entity / Individual | Associated Party | Asset | Transaction Type | Coin Amount | USD Amount |
|---|---|---|---|---|---|---|
| July 16, 2021 | Jeremie Beaudry | Jeremie Beaudry | BTC | Withdrawal | 0 | $100 |
| July 16, 2021 | Jeremie Beaudry | Jeremie Beaudry | BTC | Withdrawal | 5 | 147,929 |
| July 19, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 15,000 | 15,000 |
| August 4, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 850,000 | 850,000 |
| August 9, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 35,000 | 35,000 |
| August 13, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 41,000 | 41,000 |
| August 20, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 400,000 | 400,000 |
| October 16, 2021 | Jeremie Beaudry | Jeremie Beaudry | ETH | Withdrawal | 115 | 453,879 |
| November 17, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 30,000 | 30,000 |
| December 1, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 42,000 | 42,000 |
| December 1, 2021 | Jeremie Beaudry | Jeremie Beaudry | BAT | Withdrawal | 40 | 61 |
| December 2, 2021 | Jeremie Beaudry | Jeremie Beaudry | BCH | Withdrawal | 30 | 16,615 |
| December 2, 2021 | Jeremie Beaudry | Jeremie Beaudry | BTC | Withdrawal | 1 | 37,702 |
| December 2, 2021 | Jeremie Beaudry | Jeremie Beaudry | DASH | Withdrawal | 0 | 8 |
| December 2, 2021 | Jeremie Beaudry | Jeremie Beaudry | UNI | Withdrawal | 413 | 9,352 |
| December 2, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 100,000 | 100,000 |
| December 3, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDT ERC20 | Withdrawal | 28 | 28 |
| December 3, 2021 | Jeremie Beaudry | Jeremie Beaudry | BTC | Withdrawal | 0 | 13,987 |
| December 3, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 6,000 | 6,000 |
| December 3, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 21,000 | 21,000 |
| December 4, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 40,000 | 40,000 |
| December 4, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 400,000 | 400,000 |
| December 5, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 30,000 | 30,000 |
| December 6, 2021 | Jeremie Beaudry | Jeremie Beaudry | BTC | Withdrawal | 0 | 31 |
| December 6, 2021 | Jeremie Beaudry | Jeremie Beaudry | BCH | Withdrawal | 0 | 10 |
| December 6, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 37,000 | 37,000 |
| December 9, 2021 | Jeremie Beaudry | Jeremie Beaudry | UNI | Withdrawal | 0 | 3 |
| December 9, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 40,000 | 40,000 |
| December 10, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 50,000 | 50,000 |
| December 12, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 50,000 | 50,000 |
| December 13, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 20,000 | 20,000 |
| December 15, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 42,000 | 42,000 |

| December 17, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 25,050 | 25,050 |
| December 20, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 50,000 | 50,000 |
| December 20, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 10,000 | 10,000 |
| December 22, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 30,000 | 30,000 |
| December 23, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 13,000 | 13,000 |
| December 28, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 20,000 | 20,000 |
| December 29, 2021 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 25,000 | 25,000 |
| January 1, 2022 | Jeremie Beaudry | Jeremie Beaudry | CEL | Withdrawal | 35,032 | 150,289 |
| January 1, 2022 | Jeremie Beaudry | Jeremie Beaudry | ETH | Withdrawal | 0 | 500 |
| January 2, 2022 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 16,607 | 16,607 |
| January 3, 2022 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 76 | 76 |
| January 5, 2022 | Jeremie Beaudry | Jeremie Beaudry | CEL | Withdrawal | 37,095 | 149,838 |
| January 5, 2022 | Jeremie Beaudry | Jeremie Beaudry | CEL | Withdrawal | 35,133 | 140,059 |
| January 6, 2022 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 245,000 | 245,000 |
| January 7, 2022 | Jeremie Beaudry | Jeremie Beaudry | CEL | Withdrawal | 46,203 | 149,236 |
| January 7, 2022 | Jeremie Beaudry | Jeremie Beaudry | ETH | Withdrawal | 100 | 321,528 |
| January 7, 2022 | Jeremie Beaudry | Jeremie Beaudry | ETH | Withdrawal | 151 | 480,847 |
| January 7, 2022 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 866 | 866 |
| January 10, 2022 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 79 | 79 |
| January 10, 2022 | Jeremie Beaudry | Jeremie Beaudry | ETH | Withdrawal | 0 | 87 |
| January 17, 2022 | Jeremie Beaudry | Jeremie Beaudry | BTC | Withdrawal | 0 | 49 |
| March 2, 2022 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 100,000 | 100,000 |
| March 4, 2022 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 50,000 | 50,000 |
| March 5, 2022 | Jeremie Beaudry | Jeremie Beaudry | USDC | Withdrawal | 50,001 | 50,001 |
| May 11, 2022 | Jeremie Beaudry | Jeremie Beaudry | USDC | Internal Account Transfer: Yield to Custody | 25 | 25 |
| **Total** | | | | | | **$4,956,843** |

### KOALA 1 LLC

| Date | Entity / Individual | Associated Party | Asset | Transaction Type | Coin Amount | USD Amount |
|---|---|---|---|---|---|---|
| May 27, 2022 | KOALA 1 LLC | Alex Mashinsky | USDC | Internal Account Transfer: Yield to Custody | 1,638,303 | $1,638,303 |
| May 27, 2022 | KOALA 1 LLC | Alex Mashinsky | ETH | Internal Account Transfer: Yield to Custody | 671 | 1,174,716 |
| May 27, 2022 | KOALA 1 LLC | Alex Mashinsky | BTC | Internal Account Transfer: Yield to Custody | 55 | 1,589,025 |
| **Total** | | | | | | **$4,402,044** |

### Alex Mashinsky

| Date | Entity / Individual | Associated Party | Asset | Transaction Type | Coin Amount | USD Amount |
|---|---|---|---|---|---|---|
| May 14, 2022 | Alex Mashinsky | Alex Mashinsky | SOL | Internal Account Transfer: Yield to Custody | 2,612 | $121,935 |
| May 14, 2022 | Alex Mashinsky | Alex Mashinsky | MATIC | Internal Account Transfer: Yield to Custody | 48,275 | 30,178 |
| May 14, 2022 | Alex Mashinsky | Alex Mashinsky | BTC | Internal Account Transfer: Yield to Custody | 11 | 334,407 |
| May 14, 2022 | Alex Mashinsky | Alex Mashinsky | LINK | Internal Account Transfer: Yield to Custody | 5,066 | 35,663 |
| May 14, 2022 | Alex Mashinsky | Alex Mashinsky | CEL | Internal Account Transfer: Yield to Custody | 13,114 | 10,000 |
| May 15, 2022 | Alex Mashinsky | Alex Mashinsky | ETH | Internal Account Transfer: Yield to Custody | 100 | 204,472 |
| May 15, 2022 | Alex Mashinsky | Alex Mashinsky | ETH | Internal Account Transfer: Yield to Custody | 386 | 803,764 |
| May 15, 2022 | Alex Mashinsky | Alex Mashinsky | USDC | Internal Account Transfer: Yield to Custody | 1,299,827 | 1,299,827 |
| **Total** | | | | | | **$2,840,246** |

### Hanoch Goldstein

| Date | Entity / Individual | Associated Party | Asset | Transaction Type | Coin Amount | USD Amount |
|---|---|---|---|---|---|---|
| August 12, 2021 | Hanoch Goldstein | Hanoch Goldstein | ETH | Withdrawal | 1 | $4,269 |
| October 27, 2021 | Hanoch Goldstein | Hanoch Goldstein | USDC | Withdrawal | 100,000 | 100,000 |
| October 28, 2021 | Hanoch Goldstein | Hanoch Goldstein | USDT ERC20 | Withdrawal | 2,828 | 2,828 |
| December 4, 2021 | Hanoch Goldstein | Hanoch Goldstein | USDC | Withdrawal | 250,000 | 250,000 |
| March 4, 2022 | Hanoch Goldstein | Hanoch Goldstein | CEL | Withdrawal | 50,000 | 152,000 |
| March 4, 2022 | Hanoch Goldstein | Hanoch Goldstein | ETH | Withdrawal | 250 | 682,381 |
| April 17, 2022 | Hanoch Goldstein | Hanoch Goldstein | CEL | Internal Account Transfer: Yield to Custody | 20,000 | 44,259 |
| May 6, 2022 | Hanoch Goldstein | Hanoch Goldstein | ETH | Internal Account Transfer: Yield to Custody | 200 | 540,921 |
| May 11, 2022 | Hanoch Goldstein | Hanoch Goldstein | ETH | Internal Account Transfer: Yield to Custody | 300 | 694,989 |
| May 27, 2022 | Hanoch Goldstein | Hanoch Goldstein | CEL | Internal Account Transfer: Yield to Custody | 138,308 | 72,146 |
| **Total** | | | | | | **$2,543,793** |

### Aliza Landes

| Date | Entity / Individual | Associated Party | Asset | Transaction Type | Coin Amount | USD Amount |
|---|---|---|---|---|---|---|
| August 17, 2021 | Aliza Landes | Daniel Leon | USDC | Withdrawal | 50 | $50 |
| August 17, 2021 | Aliza Landes | Daniel Leon | USDC | Withdrawal | 100 | 100 |
| August 23, 2021 | Aliza Landes | Daniel Leon | USDC | Withdrawal | 100 | 100 |
| August 31, 2021 | Aliza Landes | Daniel Leon | USDC | Withdrawal | 690,000 | 690,000 |
| October 20, 2021 | Aliza Landes | Daniel Leon | USDC | Withdrawal | 370,000 | 370,000 |
| January 24, 2022 | Aliza Landes | Daniel Leon | USDC | Withdrawal | 20 | 20 |
| January 24, 2022 | Aliza Landes | Daniel Leon | USDC | Withdrawal | 400,000 | 400,000 |
| February 15, 2022 | Aliza Landes | Daniel Leon | USDC | Withdrawal | 125,600 | 125,600 |
| May 31, 2022 | Aliza Landes | Daniel Leon | USDC | Internal Account Transfer: Yield to Custody | 333,548 | 333,548 |
| **Total** | | | | | | **$1,919,418** |

### Roni Cohen-Pavon

| Date | Entity / Individual | Associated Party | Asset | Transaction Type | Coin Amount | USD Amount |
|---|---|---|---|---|---|---|
| July 18, 2021 | Roni Cohen-Pavon | Roni Cohen-Pavon | CEL | Withdrawal | 25,000 | $137,850 |
| July 22, 2021 | Roni Cohen-Pavon | Roni Cohen-Pavon | CEL | Withdrawal | 20,000 | 105,588 |
| July 26, 2021 | Roni Cohen-Pavon | Roni Cohen-Pavon | USDT ERC20 | Withdrawal | 150,000 | 150,000 |
| August 6, 2021 | Roni Cohen-Pavon | Roni Cohen-Pavon | USDT ERC20 | Withdrawal | 140,000 | 140,000 |
| September 1, 2021 | Roni Cohen-Pavon | Roni Cohen-Pavon | ETH | Withdrawal | 42 | 147,975 |
| September 1, 2021 | Roni Cohen-Pavon | Roni Cohen-Pavon | ETH | Withdrawal | 42 | 148,383 |
| September 1, 2021 | Roni Cohen-Pavon | Roni Cohen-Pavon | ETH | Withdrawal | 31 | 110,387 |

| September 7, 2021 | Roni Cohen-Pavon | Roni Cohen-Pavon | USDT ERC20 | Withdrawal | 148,000 | 148,000 |
| September 7, 2021 | Roni Cohen-Pavon | Roni Cohen-Pavon | USDT ERC20 | Withdrawal | 62,020 | 62,020 |
| September 20, 2021 | Roni Cohen-Pavon | Roni Cohen-Pavon | CEL | Withdrawal | 28,000 | 144,194 |
| May 31, 2022 | Roni Cohen-Pavon | Roni Cohen-Pavon | USDC | Withdrawal | 9,500 | 9,500 |
| May 31, 2022 | Roni Cohen-Pavon | Roni Cohen-Pavon | ETH | Withdrawal | 0 | 501 |
| **Total** | | | | | | **$1,304,398** |

### Bits of Sunshine LLC

| Date | Entity / Individual | Associated Party | Asset | Transaction Type | Coin Amount | USD Amount |
|---|---|---|---|---|---|---|
| February 7, 2022 | Bits of Sunshine LLC | Nuke Goldstein | CEL | Withdrawal | 50,000 | $150,000 |
| February 23, 2022 | Bits of Sunshine LLC | Nuke Goldstein | CEL | Withdrawal | 50,000 | 154,500 |
| April 27, 2022 | Bits of Sunshine LLC | Nuke Goldstein | CEL | Internal Account Transfer: Yield to Custody | 50,000 | 105,703 |
| May 9, 2022 | Bits of Sunshine LLC | Nuke Goldstein | CEL | Internal Account Transfer: Yield to Custody | 100,000 | 162,000 |
| **Total** | | | | | | **$572,203** |

### Harumi Urata-Thompson

| Date | Entity / Individual | Associated Party | Asset | Transaction Type | Coin Amount | USD Amount |
|---|---|---|---|---|---|---|
| May 11, 2022 | Harumi Urata-Thompson | Harumi Urata-Thompson | CEL | Internal Account Transfer: Yield to Custody | 48 | $50 |
| June 11, 2022 | Harumi Urata-Thompson | Harumi Urata-Thompson | CEL | Internal Account Transfer: Yield to Custody | 20,000 | 7,819 |
| June 12, 2022 | Harumi Urata-Thompson | Harumi Urata-Thompson | CEL | Internal Account Transfer: Yield to Custody | 26,000 | 9,780 |
| **Total** | | | | | | **$17,650** |

### Four Thirteen LLC

| Date | Entity / Individual | Associated Party | Asset | Transaction Type | Coin Amount | USD Amount |
|---|---|---|---|---|---|---|
| May 30, 2022 | Four Thirteen LLC | Nuke Goldstein | CEL | Internal Account Transfer: Yield to Custody | 17,000 | $11,039 |
| June 1, 2022 | Four Thirteen LLC | Nuke Goldstein | USDT ERC20 | Internal Account Transfer: Yield to Custody | 821 | 821 |
| **Total** | | | | | | **$11,860** |

# **Exhibit B**
## **OTC Sales**

| Name | Date | Number of CEL Token Sold | $USD / CEL | $USD Total |
|------|------|------|------|------|
| Shlomi Daniel Leon | 10/29/2020 | 100,000 | $1.25 | $125,000 |
| Shlomi Daniel Leon | 11/1/2020 | 150,000 | $1.35 | 202,500 |
| Shlomi Daniel Leon | 11/8/2020 | 150,000 | $1.80 | 270,000 |
| Shlomi Daniel Leon | 11/29/2020 | 150,000 | $2.40 | 360,000 |
| Shlomi Daniel Leon | 1/4/2021 | 300,000 | $6.00 | 1,800,000 |
| Shlomi Daniel Leon | 1/21/2021 | 200,000 | $3.90 | 780,000 |
| Shlomi Daniel Leon | 2/22/2021 | 315,790 | $4.75 | 1,500,000 |
| Shlomi Daniel Leon | 4/7/2021 | 150,000 | $7.25 | 1,087,500 |
| Shlomi Daniel Leon | 4/16/2021 | 75,000 | $7.00 | 525,000 |
| Shlomi Daniel Leon | 5/19/2021 | 130,000 | $6.25 | 812,500 |
| Shlomi Daniel Leon | 5/27/2021 | 50,000 | $6.80 | 340,000 |
| Shlomi Daniel Leon | 6/3/2021 | 75,000 | $7.85 | 588,750 |
| Shlomi Daniel Leon | 6/10/2021 | 100,000 | $7.35 | 735,000 |
| Shlomi Daniel Leon | 6/28/2021 | 200,000 | $6.00 | 1,200,000 |
| Shlomi Daniel Leon | 7/15/2021 | 100,000 | $5.60 | 560,000 |
| Shlomi Daniel Leon | 8/12/2021 | 100,000 | $6.35 | 635,000 |
| **Total** | | **2,345,790** | | **$11,521,250** |

| Name | Date | Number of CEL | $USD / CEL | $USD Total |
|------|------|------|------|------|
| Johannes Treutler | 11/23/2020 | 200,000 | $2.50 | $500,000 |
| Johannes Treutler | 12/28/2020 | 100,000 | $4.50 | 450,000 |
| Johannes Treutler | 1/3/2021 | 100,000 | $6.50 | 650,000 |
| Johannes Treutler | 4/9/2021 | 65,000 | $7.80 | 507,000 |
| Johannes Treutler | 5/10/2021 | 40,000 | $7.40 | 296,000 |
| Johannes Treutler | 5/13/2021 | 35,088 | $7.10 | 249,125 |
| Johannes Treutler | 5/17/2021 | 31,487 | $6.69 | 210,648 |
| Johannes Treutler | 5/18/2021 | 90,654 | $6.77 | 613,728 |
| Johannes Treutler | 5/23/2021 | 57,340 | $5.85 | 335,439 |
| Johannes Treutler | 5/29/2021 | 50,000 | $6.85 | 342,500 |
| Johannes Treutler | 6/21/2021 | 215,082 | $6.10 | 1,312,000 |
| Johannes Treutler | 6/26/2021 | 226,642 | $5.63 | 1,275,994 |
| Johannes Treutler | 7/5/2021 | 122,495 | $7.00 | 857,465 |
| Johannes Treutler | 7/14/2021 | 219,490 | $5.80 | 1,273,042 |
| **Total** | | **1,553,278** | | **$8,872,941** |

| Name | Date | Number of CEL | $USD / CEL | $USD Total |
|------|------|------|------|------|
| Hanoch Goldstein | 11/11/2020 | 100,000 | $1.80 | $180,000 |
| Hanoch Goldstein | 11/29/2020 | 150,000 | $2.40 | 360,000 |
| Hanoch Goldstein | 12/6/2020 | 100,000 | $2.40 | 240,000 |
| Hanoch Goldstein | 12/16/2020 | 100,000 | $2.55 | 255,000 |
| Hanoch Goldstein | 12/21/2020 | 100,000 | $2.85 | 285,000 |
| Hanoch Goldstein | 5/9/2021 | 75,000 | $7.05 | 528,750 |
| Hanoch Goldstein | 5/29/2021 | 75,000 | $6.85 | 513,750 |
| **Total** | | **700,000** | | **$2,362,500** |

| Name | Date | Number of CEL | $USD / CEL | $USD Total |
|------|------|------|------|------|
| Jeremie Beaudry | 1/3/2021 | 46,154 | $6.50 | $300,001 |

| Name | Date | Number of CEL | $USD / CEL | $USD Total |
|---|---|---|---|---|
| Jeremie Beaudry | 2/8/2021 | 70,000 | $5.00 | 350,000 |
| Jeremie Beaudry | 4/7/2021 | 42,000 | $7.20 | 302,400 |
| Jeremie Beaudry | 5/10/2021 | 56,000 | $7.20 | 403,200 |
| Jeremie Beaudry | 6/4/2021 | 51,000 | $7.93 | 404,430 |
| Jeremie Beaudry | 6/10/2021 | 37,978 | $7.35 | 279,138 |
| Jeremie Beaudry | 7/2/2021 | 68,625 | $6.20 | 425,475 |
| Jeremie Beaudry | 7/23/2021 | 87,720 | $5.70 | 500,004 |
| Jeremie Beaudry | 7/31/2021 | 160,626 | $6.23 | 1,000,700 |
| **Total** | | **620,103** | | **$3,965,348** |

| Name | Date | Number of CEL | $USD / CEL | $USD Total |
|---|---|---|---|---|
| Alex Mashinsky | 10/18/2020 | 416,667 | $1.20 | $500,000 |
| **Total** | | **416,667** | | **$500,000** |

| Name | Date | Number of CEL | $USD / CEL | $USD Total |
|---|---|---|---|---|
| Aliza Landes | 1/7/2021 | 150,000 | $5.70 | $855,000 |
| Aliza Landes | 1/10/2021 | 190,000 | $4.80 | 912,000 |
| **Total** | | **340,000** | | **$1,767,000** |

| Name | Date | Number of CEL | $USD / CEL | $USD Total |
|---|---|---|---|---|
| Four Thirteen LLC | 1/3/2021 | 100,000 | $6.50 | $650,000 |
| Four Thirteen LLC | 2/3/2021 | 150,000 | $4.80 | 750,000 |
| Four Thirteen LLC | 3/14/2021 | 75,000 | $5.00 | 375,000 |
| **Total** | | **325,000** | | **$1,775,000** |

| Name | Date | Number of CEL | $USD / CEL | $USD Total |
|---|---|---|---|---|
| Roni Cohen-Pavon | 10/12/2021 | 35,000 | $5.81 | $203,350 |
| Roni Cohen-Pavon | 10/27/2021 | 17,000 | $4.79 | 81,430 |
| Roni Cohen-Pavon | 11/3/2021 | 17,000 | $4.01 | 68,170 |
| Roni Cohen-Pavon | 11/9/2021 | 17,000 | $4.50 | 76,500 |
| Roni Cohen-Pavon | 11/16/2021 | 17,000 | $4.41 | 74,970 |
| Roni Cohen-Pavon | 11/23/2021 | 17,000 | $4.01 | 68,170 |
| Roni Cohen-Pavon | 11/30/2021 | 17,000 | $3.96 | 67,320 |
| Roni Cohen-Pavon | 12/7/2021 | 17,000 | $3.68 | 62,560 |
| Roni Cohen-Pavon | 12/14/2021 | 17,000 | $3.79 | 64,430 |
| Roni Cohen-Pavon | 12/21/2021 | 17,000 | $3.80 | 64,600 |
| Roni Cohen-Pavon | 12/30/2021 | 17,000 | $3.99 | 67,830 |
| Roni Cohen-Pavon | 1/4/2022 | 17,000 | $4.05 | 68,850 |
| Roni Cohen-Pavon | 1/11/2022 | 17,000 | $3.18 | 54,060 |
| Roni Cohen-Pavon | 1/18/2022 | 17,000 | $3.08 | 52,360 |
| **Total** | | **256,000** | | **$1,074,600** |

| Name | Date | Number of CEL | $USD / CEL | $USD Total |
|---|---|---|---|---|
| Harumi Urata-Thompson | 4/10/2021 | 41,667 | $7.20 | $300,002 |
| Harumi Urata-Thompson | 4/10/2021 | 11,130 | $7.20 | 80,136 |
| Harumi Urata-Thompson | 4/10/2021 | 11,130 | $7.20 | 80,136 |
| Harumi Urata-Thompson | 9/3/2021 | 41,225 | $6.43 | 265,075 |
| Harumi Urata-Thompson | 9/3/2021 | 41,225 | $6.43 | 265,075 |

| | | | | |
|---|---|---|---|---|
| Harumi Urata-Thompson | 9/3/2021 | 10,993 | $6.43 | 70,687 |
| Harumi Urata-Thompson | 9/3/2021 | 10,993 | $6.43 | 70,687 |
| Harumi Urata-Thompson | 9/3/2021 | 10,993 | $6.43 | 70,687 |
| Harumi Urata-Thompson | 9/3/2021 | 10,993 | $6.43 | 70,687 |
| Harumi Urata-Thompson | 9/3/2021 | 10,993 | $6.43 | 70,687 |
| **Total** | | **201,343** | | **$1,343,859** |