# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

In re:

CELSIUS NETWORK LLC, *et al.*,[1]

                            Reorganized Debtors.

-------------------------------------------------------------------/

Mohsin Y. Meghji, as Representative for the Post-Effective Date Debtors,

                        Plaintiff,

                   v.

ALEXANDER MASHINSKY, SHLOMI DANIEL LEON, HANOCH GOLDSTEIN, RONI COHEN-PAVON, HARUMI URATA-THOMPSON, JEREMIE BEAUDRY, JOHANNES TREUTLER, KRISTINE MEEHAN MASHINSKY, ALIZA LANDES, AM VENTURES HOLDING, INC., KOALA1 LLC, KOALA2 LLC, KOALA3 LLC, ALCHEMY CAPITAL PARTNERS, LP, BITS OF SUNSHINE LLC, AND FOUR THIRTEEN LLC.

                        Defendants.

-------------------------------------------------------------------x

Chapter 11
(Subchapter V)
Case No. 22-10964
(Jointly Administered)

Adv. Proceeding No. 24-03667

**JURY TRIAL DEMANDED**

## ANSWER OF DEFENDANTS HANOCH "NUKE" GOLDSTEIN, BITS OF SUNSHINE LLC, AND FOUR THIRTEEN LLC TO PLAINTIFF MOSHIN Y. MEGHJI'S COMPLAINT

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Defendants Hanoch Goldstein ("Goldstein"), Bits of Sunshine LLC ("Bits of Sunshine"), and Four Thirteen LLC ("Four Thirteen" and collectively, the "Goldstein Defendants"), by and through their undersigned counsel, respectfully submit the following Answer to the Complaint dated filed on July 10, 2024 (the "Complaint") by Moshin Y. Meghji ("Plaintiff" or the "Litigation Administrator"), in his capacity as Litigation Administrator of the estates of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors," and together with their non-Debtor affiliates "Celsius" or the "Company") appointed pursuant to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Dkt. No. 4289] (the "Plan"). Except as otherwise expressly admitted below, Goldstein denies each and every allegation of the Complaint and specifically denies any liability. In responding to the allegations below, the Goldstein Defendants deny any averment in the headings and subheadings of the Complaint. Unless otherwise specified, any denial of any allegation in the Complaint expressly encompasses any and all implied allegations that could also be derived from the underlying allegation. The Goldstein Defendants respond to Plaintiff's allegations as follows:

## NATURE OF ACTION

1.    Celsius was founded on the idea that banks were broken. Celsius promised to provide financial freedom to its account holders by paying them 80% of the gross revenue it received from its investments. Celsius's co-founders, Alexander Mashinsky, Daniel Leon, and Hanoch "Nuke" Goldstein, repeatedly assured Celsius's account holders that Celsius safeguarded their assets and advertised that Celsius only invested in safe, market-neutral and well-collateralized investments with reputable counterparties. Unfortunately, none of this was true.

**RESPONSE**: The Goldstein Defendants deny the allegations contained in Paragraph 1.

2.    From the beginning, Celsius operated a fraudulent business. The company's initial capital raise occurred through an initial coin offering (or ICO) of its own cryptocurrency, the CEL token. In the summer of 2018, Mr. Mashinsky announced that Celsius had raised $50 million through a fully funded ICO. This was a lie.

**RESPONSE**: The Goldstein Defendants deny the allegations contained in Paragraph 2, except they admit an initial coin offering (ICO) of the CEL token raised capital for Celsius and

lack knowledge or information sufficient to form a belief as to the truth of the allegations in the

third and fourth sentences of Paragraph 2.

3.      The claim that the ICO was fully funded relied on Mr. Mashinsky's agreement to backstop $18 million of unsold CEL tokens. But when the time came to pay, Mr. Mashinsky refused. Instead, Mr. Leon extended the time by which Mr. Mashinsky had to purchase the tokens and reduced the purchase price. Mr. Mashinsky, Mr. Leon, Mr. Beaudry and Mr. Cohen-Pavon then orchestrated a series of deceptive corporate transactions and together with certain of the other Defendants, including Mr. Goldstein, colluded to hide the failure from the public. Ultimately, two years later, Mr. Leon let Mr. Mashinsky off the hook, and the CEL tokens Mr. Mashinsky promised to purchase were added back to Celsius's balance sheet.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 3, except they deny the allegations of

collusion with Goldstein.

4.      Through a combination of relentless promotion, rising public interest in cryptocurrency, and top-of-the-market interest rates, the number of account holders who transferred assets to Celsius and the total value of those assets grew rapidly. Mr. Mashinsky promoted Celsius's "success" each week on his live "Ask Mashinsky Anything" broadcasts ("**AMAs**") where he encouraged people to give Celsius their cryptocurrency, sit back, and earn weekly rewards. Mr. Mashinsky and other Defendants assured account holders that Celsius was responsibly investing in collateralized loans and other low risk investments.

**RESPONSE**: The Goldstein Defendants deny the allegations contained in Paragraph 4,

except admit that Mr. Mashinsky held "Ask Mashinsky Anything" ("AMA") broadcasts, and

respectfully refer to those broadcasts for their true contents.

5.      The truth was far different. On the inside, Celsius was a mess and far more broken than any bank. Celsius repeatedly failed to responsibly hold or invest the assets transferred to its platform by its account holders. In 2020, investment decisions were primarily made by Mr. Mashinsky, Roni Cohen-Pavon (Celsius's Chief Revenue Officer), and Harumi Urata-Thompson (Celsius's Chief Investment and Financial Officer). Those investment decisions were made in an ad hoc manner, with hundreds of millions of dollars' worth of cryptocurrency transmitted to counterparties with little to no diligence. Celsius had hundreds of millions of uncollateralized loans and recklessly gambled on the price of cryptocurrency.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 5.

6.     By the spring of 2021, account holders had transferred over $10 billion of cryptocurrency to Celsius. Celsius tasked two employees with overseeing risk and sorting through the ad hoc gambles placed by Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, and other Celsius employees. To the extent Celsius tracked its billions of dollars of investments and various positions across the firm, it did so using a spreadsheet.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 6.

7.     Celsius's lack of basic investment controls led to disastrous results. For example, in 2020, Mr. Mashinsky and Mr. Cohen-Pavon sent billions in assets to KeyFi, Inc. ("**KeyFi**")— an entity that was partially owned Mr. Mashinsky and Mr. Goldstein—to engage in staking and speculative investments. These assets were sent to KeyFi before an agreement was finalized. Celsius never created proper controls or oversight mechanisms to ensure KeyFi was using its assets as directed. KeyFi lost and absconded with more than $315 million.

**RESPONSE**: The Goldstein Defendants deny the allegations in Paragraph 7, except they

admit Goldstein had a small investment in KeyFi, Inc.

8.     Celsius also provided hundreds of millions of dollars of Bitcoin ("**BTC**") and Ethereum ("**ETH**") collateral to a separate entity, Equities First Holdings ("**EFH**"), without receiving basic financial information from EFH. EFH, ultimately, refused to return Celsius's cryptocurrency and now owes Celsius approximately $308 million and 3,765 BTC (with a current market value of over $231 million).

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 8.

9.     During this same period, Celsius used BTC transferred by customers to strategically purchase CEL tokens and artificially inflate the token's price. In late 2020 and early 2021, the Defendants realized that they had not accurately tracked Celsius's assets and liabilities and, because the Defendants were using BTC to purchase CEL tokens, Celsius had significantly more BTC obligations than it had assets to satisfy those obligations. As BTC prices skyrocketed and everyone in the crypto industry was making money, Celsius lost *over $250 million*—a fact that the Defendants did not realize until it was too late. After that incident, the Defendants knew that Celsius had to better track its assets and obligations—yet, the Defendants *again* failed to allocate proper resources to Celsius's financial operations. Instead, the Defendants turned to another ineffective, manually updated spreadsheet, which often misrepresented Celsius's position by hundreds of millions of dollars.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 9.

10.     The above-described losses were some of the many "poor asset deployment decisions" made by the Debtors in 2020 and 2021.[2] During that time, Celsius operated at a multiple hundred-million-dollar loss. The returns from its investments were not sufficient to meet the bloated operating expenses incurred by the Defendants, the staggering losses suffered due to the Defendants' reckless conduct, and the above-market interest rates the Defendants refused to reduce. ***In 2021 alone, the Defendants lost over $1.2 billion.***

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 10.

11.     As the losses mounted, Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler directed Celsius to continue spending ***hundreds of millions of dollars*** to buy CEL tokens on the open market to inflate the token's price. Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler coordinated the timing, price, and size of purchases, each specifically intended to inflate the price of the token. As the largest holders of CEL tokens, Mr. Mashinsky, Mr. Leon, Mr. Goldstein and the other Defendants profited from the rising price. All of the Defendants sold millions of dollars of CEL token directly back to the Company through its "over-the-counter" ("**OTC**") trading desk at prices that they knew were inflated. Mr. Mashinsky, Mr. Leon, and Mr. Goldstein also directly profited by secretly selling CEL tokens from their private wallets, often around the time when Celsius was purchasing CEL tokens. Between 2019 and 2022, Mr. Mashinsky sold more than $73.9 million of CEL tokens, Mr. Leon sold more than $21.6 million, and Mr. Goldstein sold more than $6 million. Certain of those sales were in direct violate on of Celsius's policy on trading CEL tokens. Certain of those sales were in direct violation of Celsius's policy on trading CEL tokens.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 11, except admit that the Goldstein

Defendants sold and transferred CEL tokens between 2019 and 2022 using the "over-the-counter"

("OTC") trading desk and through private wallets, but lack knowledge or information that any

such sales or transfers were done at inflated prices.

12.     Also in 2021, Celsius became concerned by Mr. Mashinsky's pattern of misrepresentation when promoting Celsius on his live AMAs and other engagements. Mr. Mashinsky's lies included statements about the risk of Celsius's investments, regulatory compliance, the strength of its financials, and the method by which Celsius set its rewards rates. Each lie was intended to convince more retail investors to transfer their assets to Celsius. Celsius's risk team raised concerns to Mr. Mashinsky about his repeated misrepresentations and informed him of the specific inaccuracies and misrepresentations. They asked him to not film live and instead record the AMAs so that the risk, compliance, and other teams could review the videos

---

[2] *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, In Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 23] ¶ 10.

and remove misstatements before the videos were released to the public. Mr. Mashinsky refused and continued to lie to the public. Each week, Celsius employees would watch Mr. Mashinsky's AMAs as they were broadcast live to thousands of account holders. Celsius would then post the video to the internet. The employees would then send a list of Mr. Mashinsky's and other employees' lies to the media team who would remove the statements, remove the version with the lies from the internet, and repost the edited video. Each Defendant was aware of the cover-up. Neither the Defendants nor Celsius ever retracted or corrected any of Mr. Mashinsky's misrepresentations. Mr. Mashinsky also lied on widely published news broadcasts and other live events, which could not be covered up by the Celsius team.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 12, except they deny any intent to engage in,

or knowledge that others engaged in, a "cover-up."

13.     It all came to a head in January 2022. The Defendants were operating a billion-dollar derivatives trading desk without tracking the positions they were holding. The desk was betting that markets would continue to go up. As the cryptocurrency market turned, and prices began to drop, the derivatives desk experienced significant losses. Mr. Mashinsky, Mr. Leon, and the other officers were informed of the issue after significant losses had been incurred, but they failed to take action for days. Finally, after days of additional losses, Mr. Mashinsky took matters into his own hands and recklessly bet the markets would continue to drop, ordering Celsius's traders to sell *hundreds of millions of dollars in cryptocurrency*. But Mr. Mashinsky was wrong again. The market turned positive while Celsius had a large short position and this caused Celsius to incur staggering losses.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 13.

14.     In May 2022, the Terra Luna crisis and resulting drain on Celsius's liquidity crippled Celsius. After Mr. Mashinsky and Mr. Leon became aware that Celsius would likely not survive, they and their relatives withdrew substantially all of their non-CEL token cryptocurrency from the Celsius platform. In total, the Defendants *withdrew nearly $20 million* between April 1, 2022 and July 13, 2022 (the "**Petition Date**").

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 14, except admit the collapse of Terra Luna

occurred in or about May 2022, and that Goldstein made withdrawals and deposits of non-CEL

token cryptocurrency between April 1, 2022 and July 13, 2022.

15.     Mr. Mashinsky would often preach that if account holders had questions about whether they should trust Celsius, they only had to look at him—the largest account holder and

CEL token holder—who was putting his money where his mouth was and standing alongside them. Like many other things Mr. Mashinsky said to entice customers to transfer their hard-earned assets to Celsius, those statements were not true. Mr. Mashinsky refused to invest at the beginning after telling customers the money was in the bank, skimmed millions off the top through his secret sales of CEL tokens, and was the first one to jump as the Celsius ship began to sink.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 15.

16.     From the outset, Mr. Mashinsky and the other Defendants placed themselves ahead of Celsius and its account holders. Their reckless and self-interested conduct has caused more than $3 billion of damage to the hundreds of thousands of account holders who believed the Defendants and trusted them to safeguard their cryptocurrency. This lawsuit seeks damages for, among other things, (1) breaches of the Defendants' fiduciary duties to Celsius and aiding and abetting those breaches, (2) fraudulent misrepresentation, conspiracy to fraudulently misrepresent, and violations of applicable state consumer fraud statutes, (3) avoidance of actual, preferential, and constructive transfers, and (4) equitable subordination and/or disallowance of Defendants' claims.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 16, except they deny the allegations contained

in the first and second sentences of Paragraph 16 to the extent they are directed at the Goldstein

Defendants.  The allegations contained in the third sentence of Paragraph 16 purport to describe

the nature of Plaintiff's claims and therefore require no response.  To the extent a response is

required, the Goldstein Defendants deny the allegations contained in the third sentence of

Paragraph 16.

### JURISDICTION

17.     This adversary proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

**RESPONSE**:  The Goldstein Defendants admit the allegations in Paragraph 17.

18.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Federal subject matter jurisdiction also exists under 28 U.S.C. § 1331 and under 28 U.S.C. § 1332(a), based on complete diversity of citizenship of the parties and because the amount in controversy, exclusive of interests and costs, exceeds $75,000.

**RESPONSE**:  The allegations in Paragraph 18 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph.

19.     This Court has personal jurisdiction over each of the Defendants pursuant to Bankruptcy Rule 7004. Each of the Defendants has maintained minimum contacts with the United States in connection with the claims asserted herein.

**RESPONSE**:  The allegations in Paragraph 19 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph.

20.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.

**RESPONSE**:  The allegations in Paragraph 19 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph.

21.     The Litigation Administrator consents to the entry of final orders or judgements by the Bankruptcy Court.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21.

## PARTIES

22.     Plaintiff is the Litigation Administrator appointed by the Debtors to pursue estate causes of action pursuant to the Plan, which became effective on January 31, 2024.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22.

23.     The Litigation Administrator brings this action on behalf of the Post-Effective Date Debtors' (the "**Debtors**") estates.[3] The Debtors are: Celsius Network LLC; Celsius KeyFi LLC; Celsius Lending LLC; Celsius Mining LLC; Celsius Network, Inc.; Celsius Network Limited; Celsius Networks Lending LLC; Celsius US Holding LLC; GK8 Ltd; GK8 UK Limited; and GK8 USA LLC. On July 13, 2022, the Debtors, other than GK8 Ltd, GK8 UK Limited, and GK8 USA LLC (collectively, the "**GK8 Debtors**"), filed voluntary petitions for relief in this Court under Chapter 11 of the Bankruptcy Code.[4] On December 7, 2022, the GK8 Debtors filed voluntary petitions in this Court under Chapter 11 of the Bankruptcy Code. The Plan became effective on January 31, 2024.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 23.

24.     Defendant Alexander Mashinsky is one of the founders of Celsius. Mr. Mashinsky was a director of Celsius Network Limited and Celsius Network, Inc. He served as the Chief Executive Officer ("**CEO**") of Celsius Network LLC and Celsius Network Limited on or around the time of their inceptions until September 27, 2022. Mr. Mashinsky also served as CEO of Celsius US Holding LLC, Celsius Lending LLC, Celsius Networks Lending LLC, and Celsius Network, Inc., in addition to serving as Executive Chairman of the Board for Celsius Mining LLC and Secretary of Celsius Network, Inc. Mr. Mashinsky was a director of Celsius KeyFi LLC, Celsius Mining LLC, Celsius Network LLC, Celsius Lending LLC, Celsius US Holding LLC, and Celsius Networks Lending LLC from their inception to September 27, 2022. Upon information and belief, Mr. Mashinsky served on Celsius's (1) New Business Committee from its inception until it was disbanded in July 2021,[5] (2) Executive Committee ("**ExCO**") from its inception until the end of his tenure at Celsius, (3) Assets and Liabilities Committee ("**ALCO**") from its inception in July 2021 until the end of his tenure at Celsius, (4) Risk Committee from its inception in December 20, 2020 until on or around August 2021, (5) Assets & Obligations Committee ("**A&O Committee**") from its inception on April 7, 2020, until it was disbanded, (6) Deployment Committee as its chair from its inception on April 7, 2020 until it was disbanded, and (7) Investment Committee in or around 2020. Mr. Mashinsky regularly attended, participated in, and received materials from the New Business Committee, ExCO, ALCO, Risk Committee, A&O Committee, Deployment Committee, and Investment Committee meetings during his time at Celsius, even if he was not a member of the applicable committee at the time. At all times relevant to this Complaint, Mr. Mashinsky controlled the Debtors through his 83.7% equity stake in Debtor Celsius Network Inc., a Delaware corporation, which is a majority owner of Celsius Network Limited, which wholly owns Celsius US Holding LLC, which is the sole owner of Celsius Network

---

[3] References to the "Debtors" with respect to conduct that occurred prior to the effective date of the Plan are to the pre-effective date Debtors. Reference to the "Debtors" with respect to conduct that occurred following the effective date of the Plan are to the post-effective date Debtors.

[4] The claims asserted herein also include certain creditors' claims which were assigned to the Debtors' estates under the Plan.

[5] The New Business Committee functioned as Celsius's investment and business development committee from around 2018 to July 2021. The New Business Committee replaced the Investment Committee in 2020.

LLC. Upon information and belief, Mr. Mashinsky maintains a residence and conducts or conducted business in or directed at New York for the time period relevant to this Complaint.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 24, except admit that Mashinsky was a

founder of Celsius and served as the CEO of Celsius Network LLC and Celsius Network Limited

since their inception.

25.      Defendant Shlomi Daniel Leon is one of the founders of Celsius. He was a director of Celsius Network, Inc. and Celsius Network Limited. He served as the Chief Strategy Officer ("**CSO**") of Celsius Network Limited and Celsius Network LLC on or around the time of each of their inception until September 27, 2022. He served as Chief Operating Officer ("**COO**") of Celsius Network Limited and Celsius Network LLC from, on, or around each of their inception until January 3, 2022. Mr. Leon was the CSO of Celsius Lending LLC, President of Celsius Mining LLC, and COO of Celsius Network, Inc. and of Celsius Networks Lending LLC. He was a director of Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network LLC, Celsius Networks Lending LLC, Celsius US Holding LLC, and GK8 USA LLC. Upon information and belief, Mr. Leon served on (1) the ExCO from its inception until the end of his tenure at Celsius, (2) the ALCO from its inception in July 2021 until the end of his tenure at Celsius, (3) the Risk Committee from December 20, 2020 until on or around December 2021, (4) the A&O Committee from its inception on April 7, 2020 until it was disbanded, the (5) the New Business Committee from its inception until it was disbanded in July 2021, and (6) the Investment Committee in or around 2020. Upon information and belief, Mr. Leon regularly attended, participated in, and received materials from the ExCO, ALCO, Investment Committee, Risk Committee, New Business Committee, and A&O Committee meetings during his time at Celsius, even if he was not a member of that committee at the time. Upon information and belief, Mr. Leon maintains a residence in New Hampshire and conducts or conducted business in or directed at New York.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 25, except admit the first three sentences of

Paragraph 25.

26.      Defendant Hanoch "Nuke" Goldstein is one of the founders of Celsius. Mr. Goldstein served as the Chief Technology Officer ("**CTO**") of Celsius Network LLC, Celsius Lending LLC, and Celsius Network Limited from on or around the time of their inceptions until March 21, 2022. Mr. Goldstein served as the President of Labs at Celsius Network LLC and Celsius Network Limited until he was terminated during the Chapter 11 Cases. Mr. Goldstein served on the ExCO from its inception until the end of his tenure at Celsius, and the Risk Committee from on or around September 2021 until March 2022. Upon information and belief, Mr. Goldstein regularly attended, participated in, and received materials from the ExCO and Risk Committee meetings during his time at Celsius, even if he was not a member of that committee at

the time. Mr. Goldstein maintains a residence in Florida and conducts or conducted business in or directed at New York.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 26, except admit the allegations contained in the second and third sentences of Paragraph 26 and that Goldstein maintains a residence in Florida.

27.     Defendant Roni Cohen-Pavon was initially outside counsel to Celsius. He later was hired as the Chief Revenue Officer ("**CRO**") of Celsius Network Limited, Celsius Network LLC, and Celsius Mining LLC from on or about September 16, 2020. As part of his duties, Mr. Cohen-Pavon was responsible for leading and overseeing Celsius's regulatory compliance. On September 13, 2023, Mr. Cohen-Pavon pled guilty to securities fraud, wire fraud, and market manipulation related to the conduct alleged in this Complaint. His employment with Celsius was terminated following his indictment in July 2023. Upon information and belief, Mr. Cohen-Pavon served on (1) the ExCO from the beginning of his employment until the termination of his employment, (2) the ALCO from its inception in July 2021 until the termination of his employment, (3) the Risk Committee from its inception on December 20, 2020 until the termination of his employment, (4) the A&O Committee from its inception on April 7, 2020 until such committee was disbanded,[6] and (5) the Regulatory Committee from its inception on April 7, 2020 until such committee was disbanded. Upon information and belief, Mr. Cohen-Pavon regularly attended, participated in, and received materials from the ExCO, ALCO, A&O Committee, Regulatory Committee, and Risk Committee meetings during his time at Celsius, even if he was not a member of that committee at the time. On information and belief, Mr. Cohen-Pavon maintains a residence in Tel Aviv, Israel and conducts and conducted business in or directed at New York, including regular business travel to New York.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27.

28.     Defendant Harumi Urata-Thompson served as the Chief Financial Officer ("**CFO**") of Celsius Network Limited and Celsius Network, Inc. from April 2020 to November 2021 and Chief Investments Officer ("**CIO**") of the same entities from February 2020 to September 2021. Upon information and belief, Ms. Urata-Thompson served on (1) the ALCO from its inception in July 2021 until the end of her tenure at Celsius, (2) the New Business Committee from the beginning of her employment with Celsius until it was disbanded in July 2021, (3) the Risk Committee from its inception on December 20, 2020 until the end of her tenure at Celsius, (4) the Deployment Committee as its chair from its inception on April 7, 2020 until it was disbanded, (5) the A&O Committee from its inception on April 7, 2020 until it was disbanded, (6) the Investment Committee in or around 2020, and (7) the ExCO from the beginning of her employment with Celsius until the end of her tenure at Celsius. Upon information and belief, Ms. Harumi Urata-Thompson regularly attended, participated in, and received materials from the ExCO, ALCO, New

---

[6] Mr. Cohen-Pavon was appointed to the Assets & Obligations Committee notwithstanding that he was not an employee or officer of Celsius at the time.

Business Committee, Investment Committee, Deployment Committee, A&O Committee, and Risk Committee meetings during her time at Celsius, even if she was not a member of the applicable committee at the time. Upon information and belief, Ms. Urata-Thompson maintains a residence and conducts or conducted business in or directed at New York.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 28.

29.     Defendant Jeremie Beaudry served as General Counsel, Chief Compliance Officer ("**CCO**"), Secretary to the Board, and head of the anti-money laundering compliance department of Celsius Network Limited from April 7, 2020 to September 2021. Mr. Beaudry was CCO of Celsius Lending LLC and Celsius Networks Lending LLC from its inception until September 2021. Upon information and belief, Mr. Beaudry served on the (1) Risk Committee from April 2021 to July 2021, (2) the A&O Committee as its chair from its inception on April 7, 2020 until it was disbanded, (3) the Regulatory Committee from its inception on April 7, 2020 until the end of his tenure at Celsius, and (4) the ExCO from the beginning of his employment with Celsius until February 2021. Upon information and belief, Mr. Beaudry regularly attended, participated in, and received materials from the A&O Committee, ExCO, Regulatory Committee, and Risk Committee meetings during his time at Celsius, even if he was not a member of that committee at the time. Upon information and belief, Mr. Beaudry maintains a residence in Georgia and conducts or conducted business in or directed at New York.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 29.

30.     Defendant Johannes Treutler was the Head of CeFi Trading of Celsius Network Limited from October 2019 to January 2022. During that time, among other things, Mr. Treutler directed the purchase of CEL tokens on public markets and exchanges and oversaw the execution of Celsius's exchange traded strategies. Upon information and belief, Mr. Treutler regularly attended, participated in, received materials from, and prepared information for the Investment Committee and ExCO during his time at Celsius, even if he was not a member of the applicable committee at the time. Upon information and belief, Mr. Treutler lives in Berlin, Germany and conducted business in or directed at New York.

**RESPONSE**: The Goldstein lack knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 30.

31.     Defendant Aliza Landes served as the Head of Business Development for EMEA at Celsius Network Limited from January 2018 to March 2019. Ms. Landes served as the Vice President of Lending at Celsius Network Limited, Celsius Lending LLC, and Celsius Network LLC from its inception until January 2022. Ms. Landes served on the Risk Committee from on or around September 2021 until November 2021. Upon information and belief, Ms. Landes regularly attended, participated in, and received materials from Risk Committee meetings during her time at Celsius, even if she was not a member of that committee at the time. Ms. Landes is the spouse

of Defendant Shlomi Daniel Leon. Upon information and belief, Ms. Landes maintains a residence in New Hampshire and conducts or conducted business in or directed at New York.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 31.

32.     Defendant Kristine Meehan Mashinsky is the spouse of Defendant Alexander Mashinsky. Upon information and belief, Mrs. Mashinsky maintains a residence and conducts or conducted business in or directed at New York.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 32.

33.     Defendant AM Ventures Holding, Inc. ("**AMV**") is a corporation incorporated under the laws of the State of Delaware. Upon information and belief, AMV is wholly owned by Defendant Alexander Mashinsky. AMV agreed to purchase CEL tokens in connection with the ICO of Celsius Network Limited.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 33.

34.     Defendant Koala1 LLC is a limited liability company incorporated under the laws of the State of Delaware. Upon information and belief, Koala1 LLC is owned and controlled by Defendant Alexander Mashinsky. Koala1 LLC maintained an account with Celsius.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 34.

35.     Defendant Koala2 LLC is a limited liability company incorporated under the laws of the State of Delaware. Upon information and belief, Koala2 LLC is controlled by Defendant Alexander Mashinsky.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 35.

36.     Defendant Koala3 LLC is a limited liability company incorporated under the laws of the State of Delaware. Upon information and belief, Koala3 LLC is controlled by Defendant Alexander Mashinsky.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 36.

37.     Defendant Alchemy Capital Partners, LP ("**Alchemy**") is a limited partnership incorporated under the laws of the State of Delaware. Upon information and belief, Alchemy is controlled by Defendant Shlomi Daniel Leon.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 37.

38.     Defendant Bits of Sunshine LLC is a limited liability company incorporated under the laws of the State of Delaware. Upon information and belief, Bits of Sunshine LLC is controlled by Defendant Hanoch Goldstein.

**RESPONSE**: The Goldstein Defendants admit the allegations in Paragraph 38.

39.     Defendant Four Thirteen LLC is a limited liability company incorporated under the laws of the State of Delaware. Upon information and belief, Four Thirteen LLC is controlled by Defendant Hanoch Goldstein.

**RESPONSE**: The Goldstein Defendants admit the allegations in Paragraph 39.

40.     Collectively, Defendants Alexander Mashinsky, Leon, Goldstein, Cohen-Pavon, Urata-Thompson, and Beaudry are referred to as the "**D&O Defendants**" throughout this Complaint.

**RESPONSE**: The allegations in Paragraph 40 reflect definitional allegations to which no

response is required.

## STATEMENT OF FACTS

### I.     The Launch of Celsius and Initial Coin Offering

41.     Celsius was started by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein in 2017. The business idea was described in a "Whitepaper," which Celsius used to solicit capital through the public initial coin offering of the CEL token (the "**ICO**").[7] The Whitepaper explained that the CEL token was necessary because Celsius's "lending and borrowing model requires a blockchain and open ledger," which would be key to transparency on the platform.

**RESPONSE**: The Goldstein Defendants deny that Goldstein "started" Celsius, and lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

---

[7] The CEL token uses the ERC-20 standard. The ERC-20 standard defines a common list of rules that ERC-20 tokens must adhere to, including how the tokens can be transferred, how transactions are approved, and the total supply of tokens. Transactions of ERC-20 tokens are processed and documented on the Ethereum blockchain.

Paragraph 41.  The Goldstein Defendants respectfully refer the Court to the whitepaper referenced

in Paragraph 41 for the true contents of any statements contained therein.

42.    Celsius planned to offer two primary products. First, customers could transfer their cryptocurrency assets to Celsius in exchange for weekly interest—the Earn program. Celsius said it would lend those cryptocurrency assets to hedge funds, family offices, and crypto funds to "make the most of their greed" and generate yield. Second, Celsius would "allow its members to use their crypto holdings as collateral in order to secure low interest loans in dollars"—the Borrow program.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 42.  To the

extent the allegations in Paragraph 42 purport to quote from the whitepaper referenced in

Paragraph 41, the Goldstein Defendants respectfully refer the Court to the whitepaper for the true

contents of any statements contained therein.

43.    Mr. Mashinsky, Mr. Leon, and Mr. Goldstein advertised that "Banking is Broken" and that Celsius's product would be for "[t]he 99% not the 1%." They decried that banks take depositors' money to make large profits for their shareholders while only paying a fraction of interest to their depositors. By contrast, Celsius promised to pay 80% of its gross revenue to customers in the form of rewards on their cryptocurrency deposits in the Earn program.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 43.  To the

extent the allegations in Paragraph 43 purport to quote from the whitepaper referenced in

Paragraph 41 or any marketing materials of Celsius, the Goldstein Defendants respectfully refer

the Court to those documents for the true contents of any statements contained therein.

44.    The late 2010s were known as the "ICO boom." Coins (and scams) were common, and a successful ICO was perceived as the key to a project's successful start. Celsius said it would mint 650,000,000 CEL tokens. It offered half of those tokens (325,000,000) to the public for sale at $0.20-0.30 per token. Celsius employees were scheduled to receive 123,500,000 CEL tokens (19%) and partners and advisors would receive 26,000,000 CEL tokens (4%). The balance of the tokens would be allocated to Celsius's treasury.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 44.

45.    If all 325,000,000 CEL tokens were sold, Celsius would raise approximately $50,000,000. The Whitepaper provided that any of the 325,000,000 CEL tokens offered that went unsold would be "burned" or destroyed. It explained how Celsius would use that $50,000,000 to

fund its operations, loan reserves, research and development, sales and marketing, and an insurance pool.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45. The Goldstein Defendants respectfully refer the Court to the whitepaper referenced in Paragraph 45 for the true contents of any statements contained therein.

46.     On March 28, 2018, Mr. Mashinsky executed a token sale agreement with Celsius Network Limited on behalf of his corporation AMV (the "**Token Sale Agreement**"). Mr. Leon signed the Token Sale Agreement on behalf of Celsius Network Limited. Under the Token Sale Agreement, Mr. Mashinsky agreed to purchase the CEL tokens not sold in the ICO, up to a maximum amount of 90,000,000, for $18 million. Mr. Mashinsky would receive a bonus of 30% more CEL tokens (*i.e.*, a total of 117,000,000 CEL tokens or 36% of the total amount of CEL tokens to be sold). The purchase was to be settled 90 days after March 28, 2018. The Token Sale Agreement provided that the purchase was "final, and there are no refunds or cancellations . . ."

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46.

47.     On April 30, 2018, Celsius filed a Notice of Exempt Offering of Securities (Form D) with the United States Securities and Exchange Commission, disclosing that it had sold $24,527,033 of the $50,000,000 of CEL tokens offered, including to 1,343 unaccredited investors. Celsius later filed an Amended Form D which indicated that the "Total Offering Amount," and "Total Remaining to be Sold" was "Indefinite" because Celsius was "[u]nable to determine [the] exchange rate." Celsius's records reflect that it ultimately sold only $32 million, or 203 million CEL tokens.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47. The Goldstein Defendants respectfully refer the Court to the Form D and Amended Form D referenced in Paragraph 45 for the true contents of any statements contained therein.

48.     Notwithstanding the fact that Celsius had failed to sell the entire amount of CEL tokens offered in the ICO, Mr. Mashinsky, aware that a successful ICO was a key barometer of success, told several media outlets that the ICO of the CEL token was fully funded. For instance, at the World Blockchain Forum held in New York from June 11-13, 2018, Mr. Mashinsky stated:

"Celsius completed a fifty two million dollar ICO two months ago."[8] During a July 25, 2018 Coin Central Interview, Mr. Mashinsky repeated this claim, stating, "[i]t's funny because our ICO raised over $50 million."[9] And on October 2, 2018 in Las Vegas, Mr. Mashinsky stated again that "[w]e did a $52 million ICO four months ago."[10]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the allegations in Paragraph 48.  The Goldstein Defendants respectfully refer the

Court to the videos referenced in Footnotes 8 and 10 and the article referenced in Footnote 9 for

the true contents of any statements made or contained therein.

49.     Each of these statements was false, as Mr. Mashinsky refused to purchase the 117,000,000 CEL tokens that he had promised to buy and Celsius's ICO only raised approximately $32 million. Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Mr. Goldstein, and Mr. Beaudry all knew that the ICO was underfunded, that all of the representations that Celsius made to the contrary were false, and that customers would react negatively if the truth were revealed. None of them corrected any of Mr. Mashinsky's many false statements. To the contrary, they actively conspired to hide the truth.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 49, except they deny the allegations contained

in the second and fourth sentences of Paragraph 49 to the extent they are directed at Goldstein.

50.     Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, and Mr. Beaudry hatched a series of convoluted corporate transactions that were designed to hide the fact that the ICO had not been fully funded. In early September 2018, Mr. Mashinsky instructed Mr. Leon to extend the Token Sale Agreement by 12 months and to change the price of the purchase obligation to the current market price ($0.06 vs. the $0.20 previously agreed sale price) to avoid a "tax hit."

**RESPONSES:** The Goldstein Defendants lack knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 50.

51.     More than a year later, Mr. Mashinsky continued to refuse to purchase the CEL tokens AMV was obligated to buy. To settle the unfulfilled obligations in the Token Sale Agreement, AMV entered into a loan agreement, in which Celsius Network Limited "lent" AMV

---

[8] Events, Alex Mashinsky – Crossing the Chasm – The Next 100 Million Crypto Users, Youtube (Hun. 24, 2018), at [1:41], https://www.youtube.com/watch?v=m5W7vNUfguM.

[9] Steven Buchko, Celsius Network CEO Alex Mashinsky Is Moving from VoIP to MoIP, Coin Central (Jul. 17, 2022), https://coincentral.com/alex-mashinsky-voip-to-moip-2/.

[10] BlockShow, Alex Mashinsky. Power vs. People: The War of Decentralization. BlockShow Americas 2018, Youtube (Oct. 2, 2018), at [16:19], https://www.youtube.com/watch?v=HTENY4D1Iqc.

$7,020,000 collateralized with the 117,000,000 CEL tokens (which AMV had not purchased) and common shares of Celsius (the "**AMV Loan**"). Mr. Mashinsky signed for AMV and Mr. Leon signed for Celsius. Celsius employees, including Celsius's then CFO, struggled to understand how Mr. Mashinsky could take a loan collateralized by assets he did not own. Celsius even paid Mr. Mashinsky's personal legal bill for the AMV loan. It is unclear whether any fiat currency changed hands under the AMV Loan.

**RESPONSES:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51.

52.    At Celsius's April 7, 2020 board meeting, the board discussed issues regarding AMV's agreement to buy CEL tokens and noted that Celsius Network Limited and AMV had terminated the Token Sale Agreement at some point before the meeting. The board resolved to keep the 117,000,000 CEL tokens that Mr. Mashinsky refused to purchase in a segregated account. The board resolution was approved by Mr. Leon and Patrick Martin (whose company had been appointed to the board that day), both large holders of CEL tokens. Despite Celsius's promise in the Whitepaper to burn any of the 325,000,000 CEL tokens that were not sold, the 117,000,000 CEL tokens were not burned. Instead, those CEL tokens were deposited in a segregated wallet at the direction of Mr. Leon and Mr. Martin to obscure their return from the public.

**RESPONSES:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52.

53.    The board eventually resolved to move the 117,000,000 CEL tokens to Celsius's treasury. In June 2020, Celsius employees, including Ms. Urata-Thompson and Mr. Goldstein, discussed whether Celsius's customers would react negatively to the return of the 117,000,000 CEL tokens to Celsius's treasury more than two years after the ICO. Ms. Urata-Thompson determined that they would need to "find a good story" and "well-crafted information" to explain why the 117,000,000 CEL tokens were not purchased. Defendant Johannes Treutler, who was in charge of the Company's purchases of CEL tokens, informed Ms. Urata-Thompson that he had told Mr. Leon about similar concerns. Other employees warned that "not burning the tokens would be a concern" as the Whitepaper promised that all CEL tokens that were designated to be sold in the ICO, but were not ultimately sold, would be destroyed. But Mr. Leon and Mr. Mashinsky ordered the 117,000,000 CEL tokens to be sent to Celsius's treasury.

**RESPONSES:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53, except they deny the allegations contained in the second sentence of Paragraph 53 to the extent they are directed at Goldstein.

54.    The 117,000,000 CEL tokens were classified on the Celsius website as loan collateral. Mr. Beaudry acknowledged this classification was misleading and worked with Ms. Urata-Thompson on how to categorize the tokens on the Celsius website in a way that would not raise suspicion. Mr. Cohen-Pavon assisted in drafting statements to justify Celsius's appropriation

of these tokens, explaining that the company acted in the best interests of its clients by contributing the tokens to its balance sheet and thereby strengthening its financial position. Additionally, he prepared a response to Coin Market's inquiries about the 117,000,000 CEL tokens, asserting that the tokens were held by the company as collateral for a loan and were considered part of the total circulating supply of CEL tokens.

**RESPONSES:** The Goldstein Defendants lack knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 54.

55.     The Company continued to misrepresent how it handled the tokens that were not purchased in the ICO until its bankruptcy filing. In an April 1, 2022 AMA, Mr. Goldstein again told the public that "initially after the ICO we burned a few tokens that were not sold like we promised in the Whitepaper . . . we just followed exactly to the "T" of what we wrote in the Whitepaper, it was our commitment and building the trust."[11] Mr. Goldstein did not mention the 117,000,000 CEL token that were not sold in the ICO and not burned in accordance with the Whitepaper, as had been promised.

**RESPONSES:** The Goldstein Defendants lack knowledge or information sufficient to

form a belief as to the allegations in Paragraph 55.  The Goldstein Defendants respectfully refer

the Court to the video referenced in Footnote 11 for its true contents.

## II.     The CEL Token

56.     Mr. Mashinsky described the CEL token as the "backbone of Celsius" and often equated the market price of the CEL token with the strength of Celsius business.[12] Celsius account holders could elect to receive weekly rewards payments (or interest) in CEL tokens. Interest in CEL tokens was most often paid at a higher rate than if the account holder elected to receive interest in-kind (i.e., interest paid in the deposited cryptocurrency).

**RESPONSES:** The Goldstein Defendants lack knowledge or information sufficient to

form a belief as to the allegations in Paragraph 56.  The Goldstein Defendants respectfully refer

the Court to the videos referenced in Footnote 12 for their true contents.

---

[11]   Celsius Network, Celsius AMA April 1st 2022, Youtube (Apr. 1, 2022), at [32:53], https://www.youtube.com/watch?v=ELjw52R6BzY.

[12] Celsius Network, Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon – Friday, July 17, 2020, Youtube (July 17, 2020), at [5:27], https://www.youtube.com/watch?v=csFrn4XtwL0; Celsius Network, Celsius Network Team AMA – Thursday, July 2, 2020, Youtube (July 2, 2020), at [38:35], https://www.youtube.com/watch?v=Ym1EjbThjVk; Ozi_Crypto, Celsius Network Twitter Spaces AMA 1-12-2021, Youtube (Jan. 12, 2021), at [1:43:33], https://www.youtube.com/watch?v=1v9zDkWbZJc&list=PL91_dMxDmGklKGDKCX_YFDLeRk0ag2Koj&index=28.

57.    As set forth in the table below, Mr. Mashinsky and other Celsius insiders were among the largest holders of CEL tokens.

| CEL Tokens Owned by Defendants | 7/12/2022 |
| --- | --- |
| Alexander Mashinsky | 57,180,878 |
| Shlomi Daniel Leon | 15,934,635 |
| Hanoch "Nuke" Goldstein | 9,705,806 |
| Kristine Meehan Mashinsky | 2,117,023 |
| Johannes Treutler | 535,928 |
| Jeremie Beaudry | 274,249 |
| Roni Cohen-Pavon | 85,678 |
| Harumi Urata-Thompson | 315,487 |
| **Total Defendants CEL Balance** | **86,149,684** |
| **Treasury CEL Balance** | **284,568,835** |
| **Available CEL Supply** | **692,753,441** |

On the Petition Date, the eight Defendants listed above, their affiliated entities, and Celsius's treasury owned approximately 54% of all CEL tokens.

**RESPONSE:** The Goldstein Defendants deny the allegations regarding his personal CEL Token holdings, and lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 57.

58.    Celsius used a flywheel diagram to demonstrate the benefits the CEL token was purported to provide to token holders and Celsius.



The flywheel evolved over time, but the point was that customers would deposit digital assets onto the Celsius platform. Celsius would lend those digital assets to third parties to earn yield. Celsius would use the return from its investments to buy CEL tokens on the market. Celsius would pay interest in CEL token to electing holders, whose balances would increase. Celsius would earn yield on the increased balances and pay its users more interest in CEL tokens.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the allegations in Paragraph 58, except they admit that the concept of a flywheel was

disclosed to customers to explain part of Celsius's business.

### 1.    *CEL Token Utility*

59.    The CEL token had limited utility.[13] Celsius provided that users could use CEL tokens to pay interest on their retail loans at a lower interest rate than if interest was paid in dollars or stablecoins.[14] Celsius also created membership tiers, where users who held more CEL tokens would receive early access to future Celsius products. CEL tokens were also provided to employees as part of their compensation.

---

[13] The CEL token was easily gamed by certain Celsius customers. Certain account holders who elected to earn interest in CEL tokens would immediately sell the tokens (or swap it on Celsius) for BTC, ETH, or stablecoins. The Company frequently bought those CEL tokens on the open market as part of its buybacks using BTC, ETH, and stablecoins. In essence, the Company was paying the increased interest rate with in-kind assets (or stablecoins, which it borrowed at an additional cost to the Company). The Defendants were aware that Celsius's customers were taking advantage of the Company and the resulting losses to the Company, but did not take any action to stop the bleeding. Rather, they encouraged it by reducing the amount of CEL tokens account holders had to hold to swap CEL tokens for BTC, ETH, and stablecoins.

[14] Stablecoin is a term used to describe a cryptocurrency, such as USDC or USDT, whose value is tied or pegged to fiat currency through an algorithm or reserves.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the allegations in Paragraph 59 (including Footnotes 13 and 14), except they admit

that a stablecoin is a cryptocurrency whose value is tied or pegged to a fiat currency and that

Celsius provided certain benefits to individuals who held CEL tokens, and provided employees

CEL tokens as part of their compensation.

60.     The Defendants hoped that Celsius could use CEL tokens as collateral to borrow
other currency and generate yield from third parties. That never happened. In fact, Celsius was
virtually the only entity that would accept CEL tokens as collateral. Celsius offered fiat and
stablecoin margin loans to employees and certain retail customers collateralized by their CEL
tokens.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 60, except they deny the allegations contained

in the first sentence of Paragraph 60 to the extent they are directed at the Goldstein Defendants.

61.     Mr. Leon and Mr. Goldstein both monetized their CEL token holdings by taking
multi-million-dollar loans from Celsius collateralized by CEL tokens. Specifically, Mr. Goldstein
received a $4.2 million loan from Celsius on April 1, 2021. Alchemy Capital Partners, LP (which,
upon information and belief, is wholly owned and controlled by Mr. Leon) received a $4 million
loan on April 13, 2022. The interest rates on Mr. Leon's and Mr. Goldstein's loans were 0.1% and
1%, respectively. Mr. Leon and Mr. Goldstein did not execute loan agreements in connection with
their multi-million-dollar loans from Celsius. Celsius asserts that the loans are governed by the
relevant Terms of Use that were in place at the time the loans were issued.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the allegations in Paragraph 61, except Goldstein admits he was approved for and

obtained a $4.2 million loan from Celsius on or about April 1, 2021.

62.     Mr. Goldstein's loan matured on April 1, 2024. The Litigation Administrator called
Mr. Leon's loan on May 7, 2024. That loan matured on June 7, 2024. As Celsius's Global Treasury
Director put it, the loans allowed the insiders to "us[e] the company" as a "piggybank." As of the
date of this Complaint, neither Mr. Goldstein nor Alchemy have repaid the amounts owed to
Celsius.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 62, except

Goldstein admits that he has not repaid the "loan" provided to him.

### 2. *Defendants Caused Celsius to Spend Hundreds of Millions of Dollars to Inflate the Price of the CEL Token*

63.     From 2018 through June 2022, Celsius used BTC, ETH, and stablecoins worth hundreds of millions of dollars to purchase CEL tokens on public markets through third-party exchanges (such as FTX and Liquid Exchange) or its OTC trading desk. Together Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, Mr. Treutler, and other Defendants orchestrated a scheme to manipulate the price of CEL token by causing Celsius to purchase massive amounts of CEL token to artificially inflate the price of the token. At the direction of Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler, Celsius strategically sized and timed its purchases of CEL tokens to prop-up the market price of the CEL token.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 63, except they deny the allegations contained

in the second sentence of Paragraph 63 to the extent they are directed at Goldstein.

64.     Celsius advertised that it would purchase the amount of CEL token it owed customers who elected to "Earn in CEL," rather than using CEL token in its treasury.[15] Beginning in the summer of June 2020, Mr. Mashinsky committed that Celsius would "stop using the treasury to pay interest to our community" and would start "buying almost everything . . . almost 100 percent from the markets."[16]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the allegations in Paragraph 64.  The Goldstein Defendants respectfully refer the

Court to the videos referenced in Footnotes 15 and 16 for their true contents.

65.     The amount of CEL tokens purchased was determined in an ad hoc manner by Mr. Mashinsky, Ms. Urata-Thompson, Mr. Cohen-Pavon, and Mr. Treutler, who provided specific price targets to support (including resting buy orders at set prices) and amounts to be purchased. On certain occasions, Ms. Urata-Thompson and Mr. Treutler directed CEL tokens to be purchased during Mr. Mashinsky's live AMAs to encourage retail investors to purchase CEL tokens.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 65.

66.     Celsius frequently purchased CEL tokens in amounts that were significantly greater than the amount needed to meet reward obligations. For example, on November 10, 2020, Mr.

---

[15] Celsius Network, Celsius Network Team AMA – Friday, December 31, 2021, YouTube (Dec. 31, 2021), at [3:70], https://www.youtube.com/watch?v=miXgxNqwFag.

[16] Celsius Network, Ask Mashinsky Anything – Friday, June 19, 2020, YouTube (June 19, 2020), at [00:11:41], https://www.youtube.com/watch?v=YrGcsAID3cM.

Treutler proposed and directed the purchase of 100,000 CEL tokens per day for that week, even though Celsius only needed 65,000 CEL tokens per day to satisfy its reward obligations. On November 26, 2020, Mr. Mashinsky assured the public that Celsius's purchases were transparent and calculated based on those who elected to receive interest (or "Earn in") CEL token: "[Celsius] just published our total assets, do the math how much $CEL we will need to buy next week all time record users, deposits and Celsius earning in CEL." Similarly, in late December 2020, Celsius's trading desk bought a total of $3.8 million in CEL tokens despite needing only $1.5 million to cover its reward obligations. From July 2020 to the end of 2020, Celsius purchased more than 17 million CEL tokens more than it paid its customers. Those purchases artificially increased the price of CEL token from approximately $0.40 in late July 2020 to approximately $5.50 by the end of 2020.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66.

67.     On occasion, Celsius also bought CEL tokens to improve its position in business deals. In one case, Mr. Treutler noted that "[w]e bought a lot [of CEL] . . . to support price for this deal" and contended that the purchases resulted in Celsius securing a better deal in the transaction than it otherwise would have secured.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67.

68.     As described in further detail below, Ms. Urata-Thompson and Mr. Treutler also monitored large CEL token sales by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein on centralized and decentralized exchanges and directed Celsius to purchase CEL tokens to support the falling price due to the increase in supply resulting from the directors' and officers' sales. While Ms. Urata-Thompson and Mr. Treutler complained to one another about Mr. Mashinsky's large sales of his CEL tokens at times when Celsius was purchasing CEL tokens, both continued to facilitate the purchases, spending company assets to inflate the price of the CEL token after such sales.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68, except they admit that Goldstein sold CEL tokens on centralized and decentralized exchanges.

69.     In July 2020, Celsius implemented a policy that restricted sales of CEL tokens by executive officers and directors of Celsius. The policy specifically prohibited officers and directors from buying and selling CEL tokens if they knew material non-public information, as well as any sale or purchases in an amount more than $20,000 per day or $50,000 per week. Mr. Beaudry was in charge of enforcing the CEL token trading policy. Mr. Beaudry was repeatedly informed that executives, including Mr. Mashinsky and Mr. Leon, were breaching the policy, but did not take actions to enforce the policy or stop the executives from selling amounts in excess of the policy.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69.

70.     Between December 25, 2020 and January 8, 2021, the CEL token increased in value from $3.80 to $5.50. Mr. Mashinsky, Mr. Leon, and Mr. Goldstein each sold significant amounts of CEL tokens on each day during that period through third party exchanges. In total, during that period, Mr. Mashinsky sold 1,231,486 CEL tokens (with a market value of $6,161,533.53), Mr. Leon sold 529,013 CEL tokens (with a market value of $2,540,508), and Mr. Goldstein sold 200,000 CEL tokens (with a market value of $1,053,253). Each sale violated Celsius's trading policy. Many of the CEL tokens sold by the Defendants were purchased by Celsius through resting buy orders that Mr. Treutler had placed at specific price targets.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to truth of the allegations in Paragraph 70, except Goldstein admits that he withdrew approximately 200,000 CEL tokens in or about late 2020.

71.     Ms. Urata-Thompson and Mr. Treutler were aware of the Defendants' sales and their downward effect on the price of the CEL token. Ms. Urata-Thompson specifically acknowledged that Mr. Mashinsky's sales violated Celsius's newly enacted policy on CEL token trading, but, nevertheless, she directed Mr. Treutler to "breach it back" and "support the market" by purchasing more CEL tokens. Each of the D&O Defendants was aware that insiders were selling CEL tokens in violation of the CEL token trading policy.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71, except they deny the allegations contained in the last sentence of Paragraph 71 to the extent they are directed at Goldstein.

72.     During this period Celsius paid its officers and employees bonuses when the market price of CEL token reached $1.50 and $5.00. These bonuses were calculated as a total amount of CEL tokens. However, a portion of each employee's CEL token bonus was paid in CEL tokens that would vest over time and the remaining portion of each employee's CEL token bonus allocation was paid in cash. The cash portions of the Defendants' bonuses were significant, with some more than $1 million. These bonuses were paid as a result of the Defendants' manipulation of the price of CEL token.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72, except they admit that Celsius paid bonuses in CEL tokens, and deny that the Goldstein Defendants were involved in, engaged in, or knew of any manipulation of the price of CEL token.

73.     At the beginning of 2021, the price of CEL had increased to over $6.00 per token. The rising price required Celsius to spend more dollars each week if it was to do as it promised and purchase the amount of CEL token required to pay the rewards it owed its customers. To avoid that cash burn, Mr. Mashinsky instructed Mr. Treutler to stop purchasing CEL token in the market until the price dropped. In March 2021, Mr. Mashinsky and the Defendants found a "hole" in Celsius's balance sheet, which was created in part through its purchase of CEL tokens using BTC and ETH that had been transferred by customers. On March 21, 2021, Mr. Mashinsky directed Ms. Urata-Thompson to change course and only purchase half of the CEL tokens required to pay interest to account holders who elected to receive interest in CEL token on the public market and take half from treasury. Ms. Urata-Thompson relayed the message to Mr. Treutler and asked him to make sure "to keep a low profile for now."

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73, except they admit the price of CEL increased to over $6.00 per token at the beginning of 2021, and deny the allegations contained in the fourth sentence of Paragraph 73 to the extent they are directed at the Goldstein Defendants.

74.     Throughout this time, Mr. Mashinsky continued to represent that the amount of CEL token purchased by the Company was determined by the number of users who elected to Earn in CEL. For instance, in an AMA released on March 19, 2021, Mr. Mashinsky told the public: "We obviously want CEL token to go higher in price, but we don't control it. It's not like we are the invisible hand that control the pricing here or anything like that."[17] In that AMA Mr. Mashinsky further stated that: "56.5% of [account holders] are earning in CEL. Those are the drivers. That's what's driving adoption and demand—creates demand for the CEL token. Those are the biggest drivers compared to buyers and sellers."[18]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74. The Goldstein Defendants respectfully refer the Court to the video referenced in Footnotes 17 and 18 in its entirety for a complete and accurate recitation of its contents.

75.     In April 2021, Celsius resumed purchasing more CEL token than it needed to pay rewards in CEL token to artificially inflate the price of the token. In total for 2021, Celsius purchased approximately $243 million more of CEL tokens than it paid to its customers as rewards.

---

[17] Celsius Network, Celsius March Madness – Business Development AMA (March 19, 2021), YouTube (Mar. 19, 2021), at [1:04:41], https://www.youtube.com/watch?v=JlELwjvdYcc.

[18] Celsius Network, Celsius March Madness – Business Development AMA (March 19, 2021), YouTube (Mar. 19, 2021), at [1:07:25], https://www.youtube.com/watch?v=JlELwjvdYcc.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 75.

76.     The Defendants were aware that Celsius was artificially inflating the CEL token's market price. On October 30, 2021, in a WhatsApp discussion, Mr. Cohen-Pavon told Mr. Mashinsky that:

> We're not just sitting and watching the price. We're on it all week and even now [another Celsius executive] and I are live with the market maker. The issue is that people are selling and no one is buying except for us. The main problem was that the value was fake and was based on us spending millions (~8M a week and even more until February 2020) just to keep it where it is. This week we spent 'only' $4M (on top of the rewards) and the price is still going down.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 76, except they deny the allegations contained

in the first sentence of Paragraph 76 to the extent they are directed at the Goldstein Defendants.

77.     On December 11, 2021, Mr. Cohen-Pavon told Mr. Mashinsky "[a]s of now, no one is buying in the market except for us. We spent $20M in the last 36 hours (16M to buy out [a known large CEL token holder] and 4M to support in the market). And this is after we're going up and the entire market is going down, people are still selling."

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 77.

78.     In December 2021, Mr. Cohen-Pavon provided Mr. Mashinsky with a chart of CEL token purchased in 2021 and stated that "we bought 23 [million] extra tokens." Even when accounting for the activities of Celsius's OTC desk, Celsius had been a net purchaser of 47.8 million CEL tokens that year, according to Mr. Cohen-Pavon's chart.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 78.

79.     Mr. Mashinsky, however, continued to misrepresent the amount of CEL tokens Celsius purchased. On January 7, 2022, Mashinsky again told the public that "[t]he piece of how much we buy CEL has nothing to do with Celsius – Celsius doesn't decide how many CEL tokens

to buy and then how many of them to burn . . . the more you earn in CEL the more you can direct how much we buy and how much we burn."[19]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 79.  The Goldstein Defendants respectfully

refer the Court to the video referenced in Footnote 19 for its true contents.

80.    Celsius has accepted and acknowledged as true that its executives manipulated the price of the CEL token, stating in a sworn stipulation with the Department of Justice that:

> Mashinsky touted the CEL token and the rise in CEL token's price as an indicator of Celsius's own financial health, and encouraged the public to purchase and hold CEL token. These claims were false and misleading. The rise in the value of the CEL token was not the product of market forces but was instead attributable to the fact that Celsius executives, including Mashinsky, had orchestrated a scheme to manipulate the CEL token by taking steps to artificially support the price of CEL. For example, although Mashinsky publicly disclosed that Celsius was purchasing CEL as part of a weekly "buyback" program to pay customer rewards, Celsius did not disclose that, in many weeks, Celsius was secretly purchasing far more CEL token than was necessary to pay those rewards. Those excess CEL purchases were not made for the purpose of paying customer rewards or for carrying out any legitimate business activity. Rather, their acknowledged purpose was to artificially support the price of CEL token.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 80.  The Goldstein Defendants respectfully

refer the Court to the sworn stipulation referenced in Paragraph 80 for its true contents.

81.    Likewise, on September 13, 2023, Mr. Cohen-Pavon pled guilty to four counts of (1) engaging in a scheme to defraud investors in CEL token by artificially manipulating the market for CEL token and by making false and misleading statements about Mr. Mashinksy's own sales of CEL token, (2) conspiring to manipulate the price of CEL token, (3) market manipulation of the CEL token, and (4) wire fraud in connection with the manipulation of the CEL token. As part of that plea, Mr. Cohen-Pavon testified under oath that:

> Beginning in 2019, [Celsius] told [CEL token] market participants that . . . the company was purchasing [the] amount of [CEL tokens]

---

[19]    Celsius Network, Celsius AMA January 7th 2022, YouTube (Jan. 7, 2022), at [42:11], https://www.youtube.com/watch?v=6631ORa2v4M.

in the market to fund the interest payments that is owed to [Celsius] clients. From October 2021 through December 31, 2021, I oversaw and at time directly ordered a pattern of [CEL token] purchases in excess of what the company needed to buy to meet its interest obligation. I knew and understood that the purpose of these excess purchases was at least in part to increase the price of [CEL token], prevent the price of [CEL token] from dropping and all to create [an] appearance of a more liquid market in [CEL token] trading all of which were intended to at least in part to induce additional [CEL token] purchases by the public, at prices that likely did not reflect the true market price.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81, except they admit that Mr. Cohen-Pavon pled guilty to certain criminal charges brought against him by the U.S. Attorney for the Southern District of New York on September 13, 2023. The Goldstein Defendants respectfully refer the Court to Mr. Cohen-Pavon's testimony for its true contents.

82.    From its inception to the Petition Date, Celsius spent hundreds of millions of dollars to purchase CEL tokens on the open market to inflate the price of the token at the direction of Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82.

83.    In May 2022, hoping to halt the enormous expense of supporting the CEL token, concerned Celsius employees attempted to calculate the cost to the Company. They estimated that Celsius had already spent more than $50 million that year purchasing CEL tokens. The total amount of CEL tokens purchased by Celsius at the direction of Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, Mr. Treutler and others from 2019 to 2022 exceeds $500 million.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83.

84.    Celsius took assets from its general omnibus wallets (where all customer funds were accepted and commingled) to fund its purchases of CEL tokens. Celsius operated at a multiple hundred-million-dollar loss in each of 2020, 2021, and 2022. Even if Celsius's intent was to use its profits to purchase CEL tokens, it simply did not have the profits to do so. Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler caused Celsius to use digital assets (such as BTC, ETH, and stablecoin) deposited by account holders to purchase CEL tokens. Those purchases directly benefited Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, the other

Defendants, and other Celsius employees who held the majority of the CEL token at the expense of Celsius's account holders.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84.

85.    Between 2019 to 2022, Mr. Mashinsky, Mr. Leon, and Mr. Goldstein sold the following net amounts of CEL tokens through centralized and decentralized exchanges:[20]

| Year | Net Sales From Known Mashinsky Wallets | | Net Sales From Known Leon Wallets | | Net Sales From Known Goldstein Wallets | |
|---|---|---|---|---|---|---|
| | Total USD Value | Number of CEL Tokens | Total USD Value | Number of CEL Tokens | Total USD Value | Number of CEL Tokens |
| 2019 | 204,760 | 2,631,204.69 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2020 | 10,770,301 | 10,710,169 | 2,532,404 | 746,541 | 1,393,858 | 2,272,926 |
| 2021 | 58,966,480 | 9,836,528 | 7,221,691 | 1,278,987 | 686,479 | 104,076 |
| 2022 | 3,492,360 | 1,495,627 | 395,719.00 | 140,924 | 632,689 | 233,530 |
| **TOTAL** | **73,433,901** | **24,673,529** | **10,149,814** | **2,166,452** | **2,713,026** | **2,610,531** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85 (including Footnote 20), except they admit that Goldstein sold CEL tokens through centralized and decentralized exchanges between 2019 and 2022.

86.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, Mr. Beaudry, Mr. Treutler, and Ms. Landes also sold their personal CEL token holdings back to Celsius via the Company's OTC desk. They did so knowing that the price of CEL token was artificially inflated because of their actions and that their CEL token was worth significantly less than the cash value they were receiving for it. Between 2019 to 2022, the Defendants also sold the following net amounts of CEL tokens through the OTC desk:

| Defendant | Number of CEL Token Sold To Celsius Through the OTC Desk | USD Value Received From OTC Sales |
|---|---|---|
| Daniel Leon | 2,345,790 | $11,521,250.00 |

---

[20] The amounts in the table above are based on public blockchain data from cryptocurrency wallets which have been identified as being owned by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein. The report by the Examiner appointed in the Debtors' Chapter 11 cases also identified sales of CEL tokens from private wallets associated with Mr. Mashinsky, Mr. Leon, and Mr. Goldstein. While the amounts identified by the Examiner and the Committee are slightly different, the Committee and the Examiner have come to the same conclusion; Mr. Mashinsky, Mr. Leon, and Mr. Goldstein each sold millions of dollars' worth of CEL tokens from 2019 through 2022.

| | | |
|---|---|---|
| Johannes Treutler | 1,553,278 | $8,872,941.07 |
| Jeremie Beaudry | 620,103 | $3,965,348.00 |
| Hanoch Goldstein | 700,000 | $2,362,500.00 |
| Four Thirteen LLC | 325,000 | $1,775,000.00 |
| Aliza Landes | 340,000 | $1,767,000.00 |
| Harumi Urata-Thompson | 201,343 | $1,343,859.27 |
| Roni Cohen-Pavon | 256,000 | $1,074,600.00 |
| Alexander Mashinsky | 416,667 | $500,000.00 |
| **TOTAL** | **6,758,181** | **$33,182,498.30** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86, except they admit Goldstein sold and transferred CEL tokens between 2019 and 2022 using the OTC trading desk.

87.    The sales through the OTC desk were done to hide the fact that Celsius executives were selling millions of dollars of CEL token from the public.[21]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87 (including Footnote 21), except they deny the allegations contained in the first sentence of Paragraph 87 to the extent they are directed at the Goldstein Defendants or refer to any sales or transfers of CEL token the Goldstein Defendants may have made using the OTC trading desk.

## III.    Ask Mashinsky Anything

88.    From the beginning, Mr. Mashinsky was the face of Celsius. Celsius relied heavily on social media to market its platform, with Mr. Mashinsky at the forefront of weekly "Ask Mashinsky Anything" ("**AMA**") videos. Mr. Mashinsky recorded many AMAs from his apartment in New York and the Company's New Jersey offices. During the videos, Mr. Mashinsky answered questions submitted directly by the public. The AMAs frequently featured guests, including many

---

[21] Mr. Mashinsky repeatedly and falsely claimed in AMAs and on Twitter that he was not a seller of CEL token. For example, in a November 5, 2021 AMA, Mr. Mashinsky addressed "rumors" that he had sold CEL tokens in recent weeks, stating that he had actually bought "something like 30,000 CEL token last few days. If you think I'm selling, I'm not selling, I'm buying" but that it did not matter as "you have to make your own decisions." In the month before that AMA, Mr. Mashinsky had sold a significant amount of CEL tokens. He continued to sell CEL tokens after that AMA as well. Examiners Report at 322 (citing Celsius, Celsius AMA November 5th 2021, YouTube (Nov. 5, 2021) https://www.youtube.com/watch?v=t-4DzujwruI.). On December 9, 2021, Mr. Mashinsky posted to Twitter, "All @CelsiusNetwork founders have made purchases of #CEL and are not sellers of the token." Id. (citing @Mashinsky, Twitter (Dec. 9, 2021)).

of the Defendants. Mr. Mashinsky recorded 179 AMAs in total, which were broadcast live to the public every Friday and live-streamed on social media.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 88, except they admit that Mr. Mashinsky

held AMA broadcasts.  The Goldstein Defendants respectfully refer the Court to those broadcasts

for the true contents of any statements made during those AMAs

89.    The AMAs were among Celsius's most important marketing tools and were regularly viewed by tens of thousands of people. To entice consumers to deposit coins, Mr. Mashinsky promised account holders some of the highest returns in the market. Mr. Mashinsky regularly assured customers that Celsius funded its above-market rates through low-risk, market-neutral investment strategies.[22] He repeatedly stressed the strength of Celsius's balance sheet as compared to those of Celsius's competitors. Mr. Mashinsky cast traditional banks as villains and championed that, unlike banks, Celsius's priority was making money for its account holders.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 89 (including Footnote 22).

1.    **Mr. Mashinsky and other Defendants Repeatedly Made False and Misleading Public Statements**

90.    Throughout the AMAs, Mr. Mashinsky and the other Defendants who participated in the broadcasts failed to disclose material facts and Celsius's massive losses. They repeatedly lied to account holders and the public about the legal status of their deposits, the risk of Celsius's investments, and Celsius's financial condition. For example, on June 24, 2020, Mr. Mashinsky, accompanied by Mr. Cohen-Pavon, told the public that "when you give us Bitcoin it is not like it is ours, right, it is yours. Legally it is still your Bitcoin, the only thing we do is when you lend us your Bitcoin, we lend them to people who pay us interest, when they return them it goes back to the wallet and it is still yours from that wallet."[23] The Company took the opposite position in its Chapter 11 Cases.

---

[22] market-neutral investment strategy uses hedges and other investments to avoid exposure to the wider financial market. One way to accomplish market neutrality it to balance long positions and short positions. A long position is the purchase of an asset with an expectation that it will increase in value. A short position is the sale of an asset with the expectation to repurchase it later at a lower price. A properly executed market-neutral strategy will result in a positive return if the market value of an asset or index increases or decreases.

[23] Celsius Network, AMA July 24, 2020 with Mashinsky and Cohen Pavon, YouTube (July 24, 2020), at [1:16:38], https://www.youtube.com/watch?app=desktop&v=kC-89USzxaM.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90, except they deny the allegations contained in the first and second sentences of Paragraph 90 to the extent they are directed at the Goldstein Defendants. The Goldstein Defendants respectfully refer the Court to the video referenced in Footnote 23 for its true contents.

**a.    Celsius Never Calculated the Interest It Paid to Account Holders Based on its Revenue**

91.    Mr. Mashinsky used the AMAs and other public interviews to repeat Celsius's motto that it would pay 80% of its gross revenue to customers. Mr. Mashinsky made this promise as early as March 7, 2019, in a New York-based interview with NASDAQ, stating that "Celsius network enables you to deposit your coins, enables you to lend them to someone else, and you get to keep 80%."[24] Mr. Mashinsky made the same promise in AMAs on, among other occasions,

---

[24] Celsius Network, Alex Mashinsky, Celsius CEO, interview at NASDAQ, YouTube (Mar. 7, 2019), at [3:26], https://www.youtube.com/watch?v=8cIdPpA-pyk.

December 19, 2019,[25] March 20, 2020,[26] April 10, 2020,[27] May 15, 2020,[28] December 6, 2020,[29] December 18, 2020,[30] March 7, 2021,[31] and February 10, 2022.[32]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 91.  The Goldstein Defendants respectfully

---

[25] AMA: "So what Celsius has done is really put this whole model on its head by returning eighty or ninety percent to our depositors. No one has ever done that before. No one has ever done that in seven hundred years of banking giving so much back to the depositors right . . . Celsius gives you eighty to ninety percent [of] the revenues we collect. Revenue, not net profit." (Mr. Mashinsky, New York); Celsius Network, AMA with Celsius Network CEO Alex Mashinsky, YouTube (Dec. 19, 2019), at [49:52, 53:12], https://www.youtube.com/watch?v=el62VDzt_ww&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=50.

[26] "[W]e [are] finding more and more ways to earn more and more yield for customers, and again, no one can compete with this model. No one who pays less than 80% to their community can compete with the Celsius model. If you want to beat us, you're going to have to pay more than 80 percent." Celsius Network, Fireside Finance with Alex Mashinsky, YouTube (Mar. 20, 2020), at [31:18], https://www.youtube.com/watch?v=4_a9QWuXMF0&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=47.

[27] "And again 80%, we're the only guys that take 80% of what we earn and give it to the community as Bitcoin, Ethereum, or CEL tokens." Celsius Network, AMA with Celsius Network and Saga!, YouTube (Apr. 10, 2020), at [46:25], https://www.youtube.com/watch?v=HAuolsYA9EQ.

[28] "We have to earn the money, give you 80%, and use the 20% to deliver everything you're asking from us every day." Celsius Network, Ask Mashinsky Anything – Friday, May 15, YouTube (May 15, 2020), at [30:48], https://www.youtube.com/watch?v=am5CXWgj-Vk.

[29] "We are structured almost like a hedge fund, even though we're not. But we are like a 80-20 LP-GP relationship, meaning our users are LP's. They lend us their coins. We deploy the coins. We earn yield, and we give 80% of it back to the depositors." Celsius Network: Regulations & Yield on Crypto Assets, RealVision (Dec. 7, 2020), at [19:57], https://www.realvision.com/shows/cryptoverse/videos/celsius-network-regulations-yield-on-crypto-assets-2QXo?tab=details.

[30] "Right, so if you continue to earn interest, then Celsius would be basically a scam or something. We couldn't sit there and explain how we make money. Celsius makes money, we don't charge you any fees, we pay your withdrawal fees, and we are doing everything because we do make money when you take a loan. How do we make money? We've got your collateral effectively for free, you've got the loan. We've got the collateral and we make income off that collateral. So we can't make income and pay you at the same time, right? So that's why it's one or the other. We basically don't make any money when you just deposit with us and we pay you that 80%, right? Because the cost of running Celsius is more than 20% of our income, all of the revenues, right? So the rest of the money comes from us using your collateral and re-hypothecating the collateral." Celsius Network, Celsius AMA December 18th, YouTube (Dec. 18, 2020), at [47:53] https://www.youtube.com/watch?v=8s3_X3VOq4k.

[31] "Celsius lends funds to institutions and returns up to 80% of earnings to users." Alex Mashinsky, How Celsius creates prosperity for retail and institutional investors alike, Medium (Mar. 7, 2021), https://medium.datadriveninvestor.com/how-celsius-creates-prosperity-for-retail-and-institutionalinvestors-alike-cc086084c6bd.

[32] Just Get Started with Brian Ondrako, Alex Mashinsky on Why People Should be Unbanking Themselves, iHeart Radio (Feb. 10, 2022), https://www.iheart.com/podcast/269-just-get-started-podcast-61217509/episode/211-alex-mashinsky-on-why-people-92736422/ (last visited Apr. 26, 2023) (Mr. Mashinsky highlighted that the Celsius wallets "charge no fees yet pay 80% of interest income revenues back to the depositors and the underserved global population.").

refers the Court to the media referenced in Footnotes 24–32 in their entirety for a complete and accurate recitation of their contents.

92.    Other Defendants promised investors that Celsius returned 80% of its revenues to customers as well. Mr. Leon made this promise in a February 10, 2021 Twitter video, claiming that unlike other companies, Celsius spent its money on its customers, and telling viewers "that's why we share up to 80% of our revenues with you."[33] Mr. Goldstein made this promise in the December 10, 2019 AMA, stating that "at the end of the day the interest that you see is 80% of our revenue, right . . . this is not something Alex [Mashinsky] just makes up this is on the spot every week we have an ExCo we see the numbers and we make sure that were 80% of revenue, not profit, is going back to you guys."[34]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92, except they deny the allegations contained in the first sentence of Paragraph 92 to the extent they are directed at the Goldstein Defendants. The Goldstein Defendants respectfully refer the Court to the videos referenced in Footnotes 33 and 34 for their true contents.

93.    On August 19, 2020, Ms. Urata-Thompson made this promise in a Medium blog post, in which she stated that "Celsius returns up to 80% of what we earn (and that's before we deduct any expenses), and that enables us to offer a very high reward rate on the assets we support."[35] Ms. Urata-Thompson reiterated this promise in a since-deleted January 22, 2021 blog post, in which she stated that "we make money by deploying the coins transferred to Celsius and return up to 80% of our revenue to the community before we take out any for expenses."[36]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93.  The Goldstein Defendants respectfully refer the Court to the articles referenced in Footnotes 35 and 36 for their true contents.

---

[33] @sdanielleon, Twitter (Feb. 10, 2021, 2:35 PM), https://x.com/sdanielleon/status/1359601845770059778.

[34] Celsius Network, Celsius Network AMA with CTO Nuke Goldstein, YouTube (Dec. 10, 2019), at [29:20], https://www.youtube.com/watch?v=gxf2XgPKdzI&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=50.

[35] Celsius Network, What We Do & How We Do It, Medium (Aug. 19, 2020), https://blog.celsius.network/what-we-do-howwe-do-it-9a82124f7159.

[36] Celsius Network, What are stablecoins? How to earn more on your dollars with Celsius, Medium (Jan. 18, 2021), https://web.archive.org/web/20201118043446/https://celsiusnetwork.medium.com/what-are-stablecoins-how-to-earn-more-on-your-dollars-with-celsius-42b4d9c9630a.

94.    All of these statements were false. Celsius never calculated its rewards based on revenue—a fact it admitted when arguing to state, federal, and foreign regulators that the Earn program was not a security. For instance, on July 2, 2021, Celsius told the Financial Conduct Authority of the United Kingdom (the "**FCA**") that rewards paid to customers "do not represent a share in the income or capital appreciation derived from Celsius's[s] use of such cryptoassets," and are rather paid weekly according to a fixed reward schedule.[37] The letter went on to explain how rewards were calculated, emphasized that rewards were in no way linked to Celsius's revenue and confirmed that customers did not receive 80% of revenue as rewards.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94 (including Footnote 37), except they deny the allegations contained in Footnote 37 to the extent they are directed at Goldstein.

95.    For the majority of the time Celsius operated, Celsius did not even perform a calculation when setting its rewards rates or know what 80% of its revenue was. Instead, Celsius's rates were primarily based on marketing concerns and that the Company would lose customers if it offered lower rates. In reality, Celsius paid out far more in rewards than it even earned in revenue. By portraying its top of the market rates as a percentage of its revenue, and moving those rates to create the appearance of adjusting for profitability, Celsius was able to project the appearance of a profitable business when the truth was that Celsius was incurring unsustainable losses.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95.

96.    The Defendants were all aware that Celsius was not profitable when repeating their mantra, but they nevertheless persisted in telling the public otherwise.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 96.

### b.    Celsius Issued Billions of Unsecured Loans

97.    Mr. Mashinsky also repeatedly told investors on AMAs that Celsius only issued collateralized loans to well-capitalized institutions. Those statements were never true. For example, on July 17, 2020, Mr. Mashinsky, accompanied by Mr. Leon, stated that "Celsius does not do non-collateralized loans" because "that would be taking too much risk on [customers'] behalf."[38] Mr. Leon did not correct Mr. Mashinsky.[39] Mr. Mashinsky reiterated this promise

---

[37] Defendants Mashinsky, Leon, Goldstein, Beaudry, and Cohen-Pavon were all aware of the FCA's June 18, 2021 letter to CNL. Defendants Mashinsky, Beaudry, and Cohen-Pavon were aware of CNL's July 2, 2021 response.

[38] Celsius Network, Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon, YouTube (July 17, 2020), at [53:21], https://www.youtube.com/watch?v=csFrn4XtwL0.

[39] Celsius Network, Revealing the NEW WORLD of Crypto Lending, YouTube (Apr. 14, 2020), at [14:53], https://www.youtube.com/watch?v=QqWl9Qbh5to.

multiple times, including, on April 14, 2020, April 17, 2020,[40] May 15, 2020,[41] May 18, 2020,[42] May 19, 2020,[43] July 17, 2020,[44] September 11, 2020,[45] November 6, 2020,[46] November 9, 2020,[47]

---

[40] Celsius Network, Ask Mashinsky Anything - Friday, April 17 2020, YouTube (Apr. 17, 2020), at [21:35], https://www.youtube.com/watch?v=zC1jIOwdhK0. ("[W]e only do asset backed lending. I know some of our competitors lend coins with no collateral, we don't do that.").

[41] Celsius Network, Ask Mashinsky Anything - Friday, May 15, YouTube (May 15, 2020), at [14:08], https://www.youtube.com/watch?v=am5CXWgj-Vk ("I can tell you that our competitors are lending coins unsecured, meaning they not take any collateral. Right, we don't do anything like that we always require collateral we always have something that we hold to make sure that the institution on the other side we don't mean are just relying on their goodwill. We have an asset that they want to come back and claim. So we get our coins back -- or your coins back, actually.").

[42] Celsius Network, Coronavirus and Market Crash won't stop DeFi Interview with Alex Mashinsky, YouTube (May 19, 2020), at [12:44], https://www.youtube.com/watch?v=6kWqRsRXAt8. ("Celsius basically has zero leverage at any time. We don't use leverage at all, right. We collect coins and assets from 80,000 retail users and we only lend them to institutions, and we always have collateral from the institutions, there's no leverage in the system. So, we expand the net-work this way, meaning we don't create any leverage in the system, you don't want to create leverage and copy what Wall Street does.").

[43] Celsius Network, Crypto for the Masses Celsius Network w The Godfather of VOIP Alex Mashinsky – Crypto Arnie, YouTube (May 19, 2020), at [18:39], https://www.youtube.com/watch?v=vmqMPL51v_4 ("Crypto for the Masses, Celsius Network with the Godfather of VOIP Alex Mashinsky – Crypto Arnie" Video: "So we are only doing asset backed lending unlike the banks, and the credit card companies, and all the other guys who lend you money.").

[44] Celsius Network, Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon, YouTube (July 17, 2020), at [53:18], https://www.youtube.com/watch?v=csFrn4XtwL0 ("Celsius does not do non-collateralized loans" because "that would be taking too much risk on [customers'] behalf.").

[45] Celsius Network, CHAINLINK Keynote & AMA Alex Mashinsky (Smart Contract Summit 2020), YouTube (Sept. 11, 2020), at [42:11], https://www.youtube.com/watch?v=DWd2AE-g694 ("We don't believe in fractional reserve or taking loans with fractional collaterals. All of our loans are effectively over-collateralized or they are given to institutions that have billion dollar balance sheets.").

[46] Celsius Network, Celsius AMA - Ask Mashinsky Anything - Friday, November 6, YouTube (Nov. 6, 2020), at [32:25], https://www.youtube.com/watch?v=apWkwq8uscU ("We do not do all kinds of unsecured lending like a lot of people are talking about or saying Celsius does unsecured. We do not do unsecured lending.").

[47] Celsius Network, Why Celsius makes all loans collateralized, YouTube (Nov. 9, 2020), at [1:20], https://www.youtube.com/watch?v=NgA5t2RUcWI. ("I'm asking you right now, anyone who received an uncollateralized loan from Celsius go on twitter, give us the loan number that you got, and I will give you a thousand dollars just to prove that Celsius does not do non collateralized loans.").

May 14, 2021,[48] January 7, 2022,[49] March 11, 2022,[50] and April 13, 2022.[51] Other Defendants also falsely represented that Celsius only made collateralized loans; for example, in the December 10, 2019 AMA, Mr. Goldstein said "We don't leverage. We don't do all these manipulations banks do. We are fully collateralized with whatever we do."[52]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 97, except they deny the allegations contained

in the first clause of the last sentence of Paragraph 97 to the extent they are directed at the Goldstein

Defendants.    The Goldstein Defendants respectfully refer the Court to the videos referenced in

Footnotes 38–52 for their true contents.

98.    These statements were false. In December 2019, 72% of Celsius's aggregate institutional loans outstanding were unsecured. A significant portion of Celsius's loans outstanding in 2020 were unsecured. As of July 30, 2021, Celsius had uncollateralized and undercollateralized loans outstanding with numerous non-traditional financial institutions, including Genesis Global Capital, LLC, Alameda Research Ltd., and Three Arrows Capital Ltd., each of which has now undergone a chapter 11 or liquidation proceeding. The amount of unsecured loans was documented in Risk Committee meeting materials that were presented to Mr. Mashinsky and Mr. Goldstein on or about the time of those statements.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 98, except they deny the allegations contained

---

[48] Celsius Network, Crypto Volatility and Elon Musk - Celsius AMA May 14th 2021, YouTube (May 14, 2021), https://www.youtube.com/watch?v=4r4jnEgeWl8 (The loans Celsius makes to "vetted financial institutions . . . are collateralized" as the institutions "give Celsius assets or dollars to hold on to[.]"). This statement was removed from the AMA during the censorship process, which is described in Section III herein.

[49] Real Vision Finance, Everything You Need to Know About Yield in Crypto, YouTube (Jan. 7, 2022), at [18:50], https://www.youtube.com/watch?v=-paNUHyLWlk. ("So, Celsius, is, uh, lending, uh, basically most of our loans are fully collateralized. Some of them are partially collateralized. It really depends on the size of the counterparty . . . And we have, uh, tier 1 institutions with billions of dollars on their balance sheet borrowing from us.").

[50] Celsius Network, Celsius AMA March 11th 2022, YouTube (Mar. 11, 2022), https://www.youtube.com/watch?v=JCMuY2FbKJQ. This statement was removed from the AMA during the censorship process, which is described in Section III hereof. ("So we are squeezing the lots of the largest guys on Wall Street.").

[51] CNBC International TV, Celsius CEO on best practices for retail investing in cryptocurrencies, YouTube (Apr. 13, 2022), at [1:43], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=7s ("[W]e do not offer any noncollateralized loans.").

[52] Celsius Network, Celsius Network AMA with CTO Nuke Goldstein, YouTube (Dec. 10, 2019), at [14:11] https://www.youtube.com/watch?v=gxf2XgPKdzI&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=50.

in the first and fifth sentences of Paragraph 98 to the extent are directed at Goldstein or any statements Goldstein purportedly made.

99.    In an August 19, 2021 letter to the New Jersey Office of the Attorney General, Celsius admitted that 30% of Celsius's institutional lending book, or the equivalent of $747,948,734, was uncollateralized.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99.

100.    But Mr. Mashinsky never changed his tune, even when directly warned by Celsius employees. For instance, in November 2021 an article quoted Mr. Mashinsky as reiterating his promise that borrowers were always required to "put up more than 100 percent of the value of their loan in collateral in another asset." An executive had that statement removed and again informed Mr. Mashinsky, "this is not true, and we cannot say that." Mr. Mashinsky did not stop. For instance, on April 13, 2022, a CNBC reporter asked Mr. Mashinsky if Celsius offered uncollateralized loans. Mr. Mashinsky explicitly stated that Celsius's institutional lending business had "undercollateralized [loans], but we do not offer any non-collateralized loans."[53] On or about that time, Celsius had more than $1.3 billion in outstanding uncollateralized loans.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100.  The Goldstein Defendants respectfully refer the Court to the video referenced in Footnote 53 for its true contents.

### c.    Celsius Placed Risky Directional Bets on Cryptocurrency

101.    Mr. Mashinsky also repeatedly advertised that Celsius only undertook low risk, delta neutral investing strategies and did not "bet the market." For instance, on September 29, 2020, Mr. Mashinsky tweeted that "Celsius does not trade or take long or short positions with customer coins."

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100.

102.    An internal Celsius presentation from February 2022 noted that "[d]irectional trading was a widespread practice before September 2021 and was known and accepted by senior management, including risk. It was presented and discussed in ExCo, ALCO, and [the Risk Committee] and there is extensive supporting evidence." Mr. Mashinsky also directed Celsius to take large directional bets. As described in more detail in Section VII, *infra*, in January 2022, the

---

[53] CNBC International TV, Celsius CEO on best practices for retail investing in cryptocurrencies, YouTube (Apr. 13, 2022), at [1:43], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=7s.

price of BTC significantly dropped. At the bottom of the market, Mr. Mashinsky directed traders to sell **hundreds of millions of dollars of BTC**, betting the price would continue to plummet. It did not, and Celsius incurred massive losses as a result.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102.

103.    That did not stop Mr. Mashinsky's misrepresentations and in an April 13, 2022 CNBC interview, in response to allegations that Celsius pursued risky trading strategies, Mr. Mashinsky again told the public that "Celsius is a delta neutral strategy [and] doesn't bet on the market going up and down."[54]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103. The Goldstein Defendants respectfully refer the Court to the video referenced in Footnote 54 for its true contents.

104.    Mr. Mashinsky has also subsequently admitted that Celsius operated a swing trading strategy, including in his sworn testimony to this Court.[55] Swing trading is not market neutral, as it attempts to profit by predicting market movement.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104. The Goldstein Defendants respectfully refer the Court to the declaration referenced in Footnote 55 for its true contents.

### d.    Celsius Had Many Defaulted Loans

105.    On November 12, 2021, Mr. Mashinsky boasted that, "[i]n four years we have not had a single institution default, either not pay the interest or not return the collateral, or the [] coins that we lend to them."[56] That statement was false. By July of 2021, EFH had informed Celsius that it could not return over $500 million worth of BTC and ETH collateral that had been posted by Celsius. In an August 19, 2021 letter to the New Jersey Office of the Attorney General Celsius admitted that two counterparties to uncollateralized loans "failed to pay it back" and that Celsius "accounts for the disputed amounts on its books as 'bad debt.'"

---

[54] CNBC International TV, Celsius CEO on best practices for retail investing in cryptocurrencies, YouTube (Apr. 13, 2022), at [2:50], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=148s.

[55] *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, In Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 23] ¶ 81.

[56] Celsius Network, Celsius AMA November 12th, 2021, YouTube (Nov. 12, 2021), https://www.youtube.com/watch?v=bTrByn1DAFo.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105. The Goldstein Defendants respectfully refer the Court to the video referenced in Footnote 56 for its true contents.

### e.    The Defendants Misrepresented Celsius's Regulatory Compliance

106.    Throughout the life of the Company, Mr. Mashinsky repeatedly misrepresented Celsius's regulatory issues to the public. During a December 19, 2019 AMA, Mr. Mashinsky stated: "we are fully compliant, everything we do is compliant . . . we will not do anything that is not 100% compliant."[57] In July of 2020, Mr. Mashinsky told customers: "[t]here's no way we're doing this bypassing all the rules like FinCEN and the SEC."[58] And on July 21, 2021, notwithstanding his knowledge of multiple investigations by federal and state regulatory agencies, Mr. Mashinsky appeared on CNBC's show "The Exchange" and stated that "we also work closely with regulators all over the world . . . we are fully compliant. We do everything that we need to do to stay compliant in all the jurisdictions we operate."[59] Mr. Mashinsky made similar misrepresentations on November 26, 2021,[60] December 3, 2021,[61] March 11, 2022,[62] and April 13, 2022.[63] These statements were all false as many regulatory agencies were investigating Celsius at that time. Mr. Mashinsky and the other Defendants were aware of those investigations when those statements were made.

---

[57] Celsius Network, AMA with Celsius Network CEO Alex Mashinsky, YouTube (Dec. 19, 2019), at [58:36; 1:01:02], https://www.youtube.com/watch?v=el62VDzt_ww.

[58] On the Chain LIVE, Celsius Network with Alex Mashinsky – On the Chain, YouTube (July 19, 2020), at [8:04], https://www.youtube.com/watch?v=h5yzyx9Z6uk.

[59] "The Exchange" (@CNBCTheExchange), Twitter (July 21, 2021, 1:59 PM), at [2:02], https://twitter.com/CNBCTheExchange/status/1417907168678920192.

[60] White Crypto, Celsius network (CEL) $26B TVL Interview with CEO Alex Mashinsky WebSummit. Bitcoin, YouTube (Nov. 26, 2021), at [12:30], https://www.youtube.com/watch?v=LkZ8XJ-2n1c. (During this public interview broadcast from Lisbon, Portugal, Mr. Mashinsky stated, "[w]e have followed regulations since day one. We did KYC AML FinCen SEC everything. We followed all the rules as needed and we will continue to do that.").

[61] Kitco NEWS, This is when Bitcoin will hit $140k according to Alex Mashinsky, CEO of Celsius, YouTube (Dec. 3, 2021), at [7:10], https://www.youtube.com/watch?v=DJPogJVkQUE. (During this interview with KITCO News in Florida, Mr. Mashinsky represented that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything . . .").

[62] Celsius Network, *Celsius AMA March 11th 2022*, YouTube (Mar. 11, 2022), at [16:35], https://www.youtube.com/watch?v=JCMuY2FbKJQ. (During this AMA broadcast from Texas, Mr. Mashinsky stated that Celsius had not been "do[ing] the things that get you in trouble" and had been complying with regulations "since day one.").

[63] CNBC International TV, Celsius CEO on best practices for retail investing in cryptocurrencies, YouTube (Apr. 13, 2022), at [6:41], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=7s. (During this CNBC interview in Paris, when asked about regulatory compliance, Mr. Mashinsky stated: "We are following all the rules A to Z. Seven days a week."). He doubled down on this statement in an April 15, 2022 AMA, during which he said: "There's not—no legal issues at least with the services that Celsius provides." This statement was removed from the AMA during the censorship process, which is described in Section III hereof.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106, except they deny the allegations contained in the last sentence of Paragraph 106 to the extent they are directed at the Goldstein Defendants.  The Goldstein Defendants respectfully refers the Court to the videos referenced in Footnotes 59–63 for their true contents.

### f.    The Defendants Sold Millions of Dollars of CEL Tokens

107.    Finally, Mr. Mashinsky repeatedly and falsely claimed in AMAs and on Twitter that he and the other directors and officers were not selling CEL tokens. For example, in a November 5, 2021 AMA, Mr. Mashinsky addressed "rumors" that he had sold CEL tokens in recent weeks, stating that he had actually bought "something like 30,000 CEL token last few days. If you think I'm selling, I'm not selling, I'm buying."[64] On December 9, 2021, Mr. Mashinsky posted to Twitter, "All @CelsiusNetwork founders have made purchases of #CEL and are not sellers of the token." As noted in Section II, above, this was false, and he and the other Defendants were selling their personal CEL tokens in large quantities on or about the time of those statements.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107, except they deny the allegations contained in the last sentence of Paragraph 107 to the extent they are directed at the Goldstein Defendants.  The Goldstein Defendants respectfully refer the Court to the video referenced in Footnote 64 and the December 9, 2021 tweet referenced in Paragraph 107 for the true contents of any statements made or contained therein.

### 2.    Defendants Hid the Misrepresentations After They Were Made

108.    Mr. Mashinsky and the other Defendants' misrepresentations and lies were well-known within the company.[65] On May 1, 2021, Celsius's Chief Risk Officer, Rodney Sunada-Wong, noted inaccuracies in the April 20, 2021 AMA regarding the risk of the Company's investments. Mr. Sunada-Wong recommended that AMAs be taped rather than proceeding live so that false or misleading statements could be removed before the AMA was broadcast to the public "[t]o protect Celsius." Mr. Mashinsky resisted and directed the Celsius team to broadcast the videos to the public "ASAP and then make the changes necessary."

---

[64] Celsius AMA November 5th 2021 (November 5, 2021) https://www. youtube.com/watch?v=t-4DzujwruI.

[65] Prior to the Petition Date, Celsius hired a third-party risk management and investigation firm to review Mr. Mashinsky's media statements and assess the damage that had been caused.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 (including Footnote 65), except they deny the allegations contained in the first sentence of Paragraph 108 to the extent they are directed at the Goldstein Defendants.

109.    From that time forward, Celsius executives from its risk, regulatory, compliance, and legal teams watched the AMAs live, along with thousands of current and prospective customers, and documented inaccurate or materially misleading statements made by Mr. Mashinsky, co-hosts, and guests. The video would be immediately posted to YouTube. The executives would then send a list of false or misleading statements to the marketing department, which edited the videos, removed the live recording from YouTube, and then reposted the scrubbed version.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109.

110.    The statements by Mr. Mashinsky that were deleted from the AMAs ranged from distasteful comments and exaggerations to material misstatements about Celsius's balance sheet and the risk undertaken by the Company. For example, Mr. Sunada-Wong called it "crucial" to delete a statement from the May 14, 2021 AMA that said,

> When you transfer your assets to your Celsius wallet you've instantly start[ed] generating rewards that are paid out every Monday. These rewards compound causing your returns to stack and snowball over time. Celsius is able to achieve this by lending out the community's assets to vetted financial institutions. These loans are collateralized. This means the institutions give Celsius assets or dollars to hold onto before we give out the digital assets. This protects the community and keeps them whole.

This statement was misleading, given that many of Celsius's institutional loans were uncollateralized, and was removed after it was seen by thousands of customers and potential customers. As of the filing of this Complaint, the statement is not present in the version of the May 14, 2021 AMA posted on YouTube.[66]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 110.

---

[66] Crypto Volatility and Elon Musk – Celsius AMA May 14th 2021, YouTube (May 14, 2021), https://www.youtube.com/watch?v=4r4jnEgeWl8.

111.     The YouTube editing process occurred every week from May 2021 until around June 12, 2022, when Celsius paused all withdrawals from the platform. Mr. Mashinsky, Mr. Goldstein, Mr. Leon, Mr. Cohen-Pavon, and Mr. Beaudry were each included on the emails noting the inaccuracies and were aware that Celsius was editing and removing false and misleading statements from the AMA videos. Instead of correcting the misrepresentations to the public, the Defendants and other Celsius employees covered them up. At no time did Mr. Mashinsky or the Defendants involved in the editing of AMAs retract or correct any of these misrepresentations.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111.

## IV.    Celsius's Inability to Accurately Track its Assets and Liabilities Resulted in Massive Losses

112.     Since its inception, Mr. Mashinsky and Celsius focused on growing the number of Celsius customers and amount of assets those customers transferred to Celsius above all else. To that end, Mr. Mashinsky and Celsius aggressively promoted Celsius's above-market interest rates. The D&O Defendants, including Mr. Goldstein, the Chief Technology Officer, also directed that Celsius devote almost all of its technological and development resources to its customer-facing application with the goal of attracting more users and assets. But Celsius's revenue could not support its rewards rates. Celsius also did not appropriately invest in its financial technology or operations, or in developing the necessary processes and procedures to invest the billions of dollars of assets entrusted to it by its account holders in a remotely responsible manner.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112, except they deny the allegations contained in the third sentence of Paragraph 112 to the extent they are directed at Goldstein.

113.     During most of 2020, Mr. Mashinsky and Ms. Urata-Thompson made the ultimate decisions regarding Celsius's investment, growth, and deployment strategies. To the extent the Company tracked its investments, it was done in an ad hoc manner using spreadsheets that were manually updated. There were no clear or documented investment policies or decision-making processes or procedures. In February 2020, a single employee was hired as a consultant to evaluate risk. That consultant developed a rudimentary database to track Celsius's loan positions and set basic credit limits. But those limits were not followed. As of December 2020, Celsius's exposure exceeded its credit limits for a number of Celsius's significant institutional loans, including with Alameda Research (twice its credit limit), Tether (twice its credit limit), and Three Arrows Capital (three times its credit limit).

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 113.

114.    Celsius's official Risk Committee was not created until December 2020, and only then, primarily because the FCA required Celsius to do so. The Risk Committee lacked any real rigor. Up until the spring of 2021, Celsius's risk team was composed of *two employees* who were tasked with attempting to oversee the Company's efforts to deploy *over $10 billion* of digital assets.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 114.

115.    Sometime around the end of 2020, Celsius realized that the Company was not accurately tracking its positions and that Celsius had significantly more BTC obligations than BTC assets, and thus had a short position on the rapidly appreciating asset. A substantial factor contributing to Celsius's short position was the Defendants' use of BTC transferred by account holders to purchase CEL tokens to inflate the price of the token. When Celsius finally realized it was short BTC, it was too late. While others in the cryptocurrency industry were making money hand-over-fist as BTC rose from approximately $10,000 to $60,000, *Celsius lost approximately $250 million*.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 115, except they deny the allegations

contained in the second sentence of Paragraph 115 to the extent they are directed at the Goldstein

Defendants.

116.    In response to that loss, Mr. Mashinsky and other Celsius executives instructed several of Celsius's employees to "turn over the couch cushions" and locate all of its assets to assess the damage done. Those employees found millions of dollars of investments largely unknown to anyone at Celsius. To remedy these issues, Celsius began using a Google sheet it called the "Freeze Report" to track its billions of dollars in assets and investments. Unsurprisingly, another manual spreadsheet did not fix the problem.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 116, except they deny the allegations

contained in the first and second sentences of Paragraph 116 to the extent they are directed at

Goldstein.

117.    The Google sheet was updated periodically with apparently no set schedule. Many different Celsius employees across different departments had to check their positions and often manually input them into the Google sheet. That meant that many employees had access to, and could alter, the Google sheet at any given time.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117.

118.    The Google sheet was not closely monitored and was often incorrect by hundreds of millions of dollars on any given day. As a result, Celsius's officers and financial team had difficulties tracking the Company's exposure and implementing coherent investment strategies. One coin deployment specialist noted that "Celsius [had] lost money selling coins that management believes to be long, only to buy them back shortly afterward when it realized Celsius needed to cover its short exposure." According to Celsius's Head of Model Risk and Quantitative Analytics, the Google sheet was "one analyst's lonely guess of the firm's position," and it was a result of leadership not diverting the "proper resources and care" to its accounting procedures.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118.

119.    Celsius's leadership, including many of the D&O Defendants, were acutely aware of the Company's inability to track its positions and inadequate technological infrastructure. An internal report that was issued in 2022—over a year after Celsius had experienced the quarter of a billion dollar loss due to its unexpected short position—noted that Celsius lacked fundamental technology and controls with respect to its financial positions. The internal report was circulated to the D&O Defendants. The report explained that Celsius had no order management systems, portfolio management system, pre-trade mandate or compliance controls, institutional grade trading systems, risk systems, or systems to generate profit and loss statements.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119, except they deny the allegations contained in the first sentence of Paragraph 119 to the extent they are directed at Goldstein.

120.    Ms. Aslihan Denizkurdu, who joined Celsius in 2022 after over 10 years at Citibank, noted that the technology "we [i.e., Celsius] have is worse than what we had in 1993." Mr. Rod Bolger, who was formerly the CFO of the Royal Bank of Canada, noted that when he joined as the CFO in the spring of 2022, Celsius's leadership was using an incomplete profit and loss statement to assess its positions.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 120.

## V.    2020 - 2021 – Explosive User Growth and Exorbitant Losses

121.    Between 2019 and 2021, Celsius experienced rapid growth in both its registered users and assets under management. By December 2021, Celsius claimed that it had over one

million registered users. Only a portion of those users had transferred assets to the Celsius platform.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121.

122.    At all times relevant to this Complaint, Celsius operated at a loss and was insolvent. The D&O Defendants were aware of those facts. But they continued to pay out astronomical rewards rates and pursue a "growth at all costs" strategy chosen by the D&O Defendants. Mr. Mashinsky, Ms. Urata-Thompson, Mr. Cohen-Pavon, and other officers and directors took on riskier investments in their attempts to support their unsustainable business strategy.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122, except they deny the allegations in Paragraph 122 to the extent they are directed at Goldstein.

### 1.    *The Self-Interested and Reckless KeyFi Transaction*

123.    Mr. Mashinsky and Mr. Goldstein were partial owners of an entity called KeyFi. In the summer of 2020, Mr. Mashinsky, Mr. Goldstein, and Mr. Cohen-Pavon wanted Celsius to begin investing in staking and decentralized finance ("**DeFi**") protocols. Mr. Mashinsky, Mr. Goldstein, and Mr. Cohen-Pavon chose to work with KeyFi, who would deploy Celsius's assets.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123, except they admit that Goldstein had a small investment in KeyFi and deny the allegations contained in the last sentence of Paragraph 123 to the extent they are directed at Goldstein.

124.    On August 19, 2020, Mr. Mashinsky and Mr. Cohen-Pavon reached an "agreement in principal" with KeyFi and its principal, Jason Stone, whereby KeyFi would deploy assets transferred by Celsius account holders. Upon information and belief, before a written agreement was signed, and over the objection of other Celsius employees, Mr. Mashinsky and Mr. Cohen-Pavon directed the transfer of cryptocurrency from Celsius to KeyFi. Notwithstanding his equity interest in KeyFi, Mr. Mashinsky executed on Celsius's behalf the final Asset Purchase Agreement between Celsius Network Limited and KeyFi on January 11, 2021. Mr. Goldstein was the primary person at Celsius in charge of closing the KeyFi deal.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124, except they deny the allegations contained in the last sentence of Paragraph 124.

125.    In February 2021, KeyFi held $1.4 billion of digital assets that had been transferred to it by Celsius. Upon information and belief, Celsius's decision to invest in KeyFi was never approved by an independent decision-maker. Instead, Mr. Mashinsky and Mr. Cohen-Pavon directed that Celsius send more than $1 billion in assets to an entity in which Mr. Mashinsky and Mr. Goldstein owned equity, before a contract was signed, and without the ability to police those assets. Other Defendants, including Harumi Urata-Thompson and Jeremie Beaudry, were aware that KeyFi was in financial distress and believed that entering into a deal with them was unwise, but did not do anything to stop the transaction. As a result of Mr. Mashinsky's and Mr. Goldstein's conflicted and reckless conduct, Celsius lost more than $315 million.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125, except they admit that Goldstein had a small investment in KeyFi and deny the allegations contained in the fourth and fifth sentences of Paragraph 125 to the extent they are directed at the Goldstein Defendants.

## 2.    *Mr. Mashinsky Dictated Unsustainable Interest Rates to Attract More Customers*

126.    Until July 2021, Celsius did not have a formal method or policy to determine the interest rates it offered and paid to its customers. Rates were chosen on an ad hoc basis, largely based on Mr. Mashinsky's and other executives' fears that Celsius would lose customers if its rates were lower than those set by Celsius's competitors. Celsius employees expressed that "[t]here is no evidence that has ever supported the rates we pay." Mr. Mashinsky consistently resisted efforts to reduce the rewards rates that Celsius offered on BTC. For instance, in January 2022, the ALCO was informed that even if Celsius was able to maximize BTC deployment across every available investment strategy, it would still lose money at its current rewards rates. Nevertheless, Mr. Mashinsky vetoed any suggestion to lower interest rates on BTC at that time.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126.

127.    In February 2022, Celsius's Treasury department prepared an analysis for the Company's new CFO showing $100 million in potential cost savings to Celsius by reducing interest rates paid out on BTC and ETH deposits. The presentation also pointed out that at that time, Celsius's liabilities exceeded its assets by $1 billion and that Celsius was incurring financing costs of approximately $100 million per year. The presentation recommended that Celsius "should begin to shift its strategic direction to profitability rather than being a 'loss leader' for the sake of

customer acquisition." Those suggestions were again refused by Mr. Mashinsky and Celsius's other executives.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 127.

### 3.    *Celsius Incurs Staggering (and Unsustainable) Losses*

128.    In a presentation that was given to the Board of Directors in May 2022, Celsius reported an $811 million pre-tax loss on its management profit and loss statement for the year ending 2021. Following the Petition Date, the Debtors informed the Official Committee of Unsecured Creditors that the figure was much higher and identified approximately $1.2 billion of losses in 2021. Mr. Mashinsky has admitted that Celsius's staggering losses were the result of "poor asset deployment decisions."[67] Those large losses, which were never disclosed to Celsius's account holders until the Company's Chapter 11 cases, include:

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 128.  The Goldstein Defendants respectfully

refer the Court to the declaration referenced in Footnote 67 for its true contents.

129.    **Equities First Holdings ($308 million and 3,765 BTC defaulted unsecured obligation (current market value of approximately $230 million))**: In 2019, Mr. Mashinsky decided to enter into the first of a series of loan agreements with EFH under which EFH would loan Celsius U.S. dollars collateralized by BTC and ETH, which would be held by EFH. When Ms. Urata-Thompson joined the Company, she was in charge of Celsius's relationship with EFH, including subsequent multi-million dollar loans. Celsius did not require (and EFH did not provide Celsius with) financial statements in connection with entering into any of the loans.[68] Upon information and belief, Celsius did not conduct a public records search before it executed the first loan agreement. If it had, it would have known that at that time, EFH had been sued at least four times in the United States for failing to return borrowers' collateral.[69] Celsius's risk officer was not told about the loan until months after it had been executed. That risk officer immediately identified that Celsius was over-exposed to EFH.

---

[67] *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, In Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 23] ¶ 10.

[68] EFH has never provided Celsius with financial statements.

[69] *See HNA Sweden Hospitality Management AB et al v. Equities First Holdings, LLC et al.*, No. 1:19-cv-02452-JRS-MPB (S.D. Ind. June 17, 2019); *Roossien et al v. Equities First Holdings LLC*, No. 3:12-cv-02649 (N.D. Tex. July 10, 2012); *Morris et al v. Equities First Holdings LLC et al.*, No. 3:08-cv-05126 (W.D. Wash. Mar. 3, 2008); *Segovia v. Equities First Holdings, LLC*, No. 06C-09-149-JRS, 2008 Del. Super. LEXIS 197 (Del. Super. Ct. May 30, 2008).

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 129 (including Footnotes 68 and 69).

130.    During the course of the EFH loan, Celsius's collateral appreciated significantly in value. But because Celsius had not negotiated for a reverse margin feature common in similar loans, Celsius had no recourse to recoup its collateral. When certain of Celsius's loans with EFH came due in July 2021, EFH informed Celsius that it would be unable to return Celsius's BTC and ETH collateral which was then valued to be worth approximately $509 million. It was only after EFH refused to return Celsius's collateral that the Risk Committee did background checks on EFH and its principals. Prior to the Petition Date, Celsius agreed to a long dated unsecured payment plan with EFH. EFH defaulted and stopped making any payments to Celsius on or around June 13, 2023. It currently owes Celsius approximately $308 million and 3,765 BTC which have a market value of approximately $230 million.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 130.

131.    **Grayscale BTC Trust (~$120 million loss)**: In 2021, Celsius contributed BTC to the Grayscale BTC Trust in exchange for shares in the Trust, which were trading at a premium to the Trust's Net Asset Value at the time. Celsius was required to hold the shares for six months before they could be sold. Once the lock-up period expired, the shares were trading at a discount to the BTC that Celsius had contributed. Mr. Mashinsky elected to hold the shares over the advice of other Celsius employees, betting that the share price would rebound and trade at a premium again. Instead, the discount increased, resulting in an approximately $120 million loss when the shares were sold.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 131.

132.    **Stakehound Loss (~$110 million loss)**: Stakehound is an ETH staking service provider that was utilized by Celsius. In 2021, Stakehound announced that both it and its custody provider had deleted the private key for the wallet that held 35,000 ETH that had been transferred by Celsius. Celsius did not disclose that loss to its customers until June 2022 and only after various news outlets published stories on the loss.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 132.

133.    **BadgerDAO Hack (~$49 million loss)**: On December 2, 2021, a phishing incident occurred on BadgerDAO, a DeFi protocol where Celsius had stored 906 BTC. BadgerDAO issued a recovery token, remBadger, which guaranteed a full pay-out over two years if the tokens remained deposited at BadgerDAO. BadgerDAO made clear that the condition for receiving the restitution pay-out was keeping the remBadger token deposited and that the holder of the

remBadger token could not re-deposit the token after its withdrawal. A Celsius employee withdrew the tokens, forfeiting the payment. The mistake could have easily been avoided had Celsius implemented proper corporate controls, including a multi-signature approval protocol.

**RESPONSE:** The Goldstein lack knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 133.

134.    **Defaults on Under-Collateralized and Uncollateralized Loans (~$35 million loss)**:Between 2020 and the end of 2021, Celsius began to increase its exposure to under-collateralized and wholly uncollateralized loans which provided a higher interest rate, but also significantly more risk. By June 2021, it was routine for one-third or more of Celsius's institutional loan portfolio to consist of unsecured loans. In 2021, two counterparties defaulted on significant uncollateralized and under-collateralized loans resulting in approximately $35 million losses.[70]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 134 (including Footnote 70).

135.    **Acquisition of GK8 and Subsequent Sale (~$71 million loss)**: In October 2021, Celsius Network Limited purchased the GK8 Debtors, a digital asset custody business, for $115 million. After the acquisition of GK8, Celsius made limited effort, and was never able, to integrate the GK8 Debtors' technology in the broader Celsius business. On top of that, Mr. Mashinsky repeatedly promised consumers that GK8 had a "$750 million insurance policy" which would offer "$750 million insurance per client." Neither Celsius nor GK8 had ever owned such an insurance policy. On December 13, 2022, the Bankruptcy Court approved the Debtors' sale of the GK8 Debtors for approximately $44 million—a realized loss of approximately $71 million.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 135.

136.    ***In all, Celsius suffered realized losses that exceeded $1.2 billion due to the reckless conduct and actions taken in 2021 by the D&O Defendants. The Company also spent over $388 million buying back CEL token in 2021.***

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 136, except they deny the allegations

contained in the first sentence of Paragraph 136 to the extent they are directed at Goldstein.

---

[70] The Reliz LTD loan was under-collateralized. The Iterative OTC LLC loan was uncollateralized.

## VI.    **Increased Regulatory Pressure**

137.    At the same time that Celsius was experiencing billions of dollars in losses, the Company faced increasing regulatory pressure from authorities in the United Kingdom and the United States. In July 2021, the Debtors determined to "migrate" their retail business from Celsius Network Limited (a U.K. entity) to Celsius Network LLC (a Delaware entity) in an effort to avoid the FCA prosecuting Celsius for running an unlicensed investment scheme. Celsius moved all of its customer obligations to Celsius Network LLC, but did not move many, if any, crypto assets as part of the migration. Celsius also did not tell its customers that Celsius had been accused of offering unlicensed investments or that Celsius was moving their obligations to a massively insolvent entity. Rather, Mr. Mashinsky told Celsius's account holders that Celsius was moving because it liked the U.S. markets.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 137.

138.    Around that time, U.S. state regulators also began cracking down on Celsius. On May 14, 2021, the Texas State Securities Board notified Celsius that it may have offered securities in Texas in violation of securities law. Shortly thereafter, several state regulatory agencies, including those in New Jersey, Vermont, California, Alabama, Kentucky, and New York, took action against Celsius.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 138.

139.    Celsius's Chief Compliance Officer and General Counsel, Jeremie Beaudry, left Celsius around that time, in the summer and early fall of 2021. Mr. Cohen-Pavon, who was already in charge of regulatory matters, handled all regulatory issues for Celsius thereafter.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 139.

140.    On September 17, 2021, the New Jersey Bureau of Securities found that Celsius was offering unregistered securities in violation of New Jersey law. New Jersey ordered that Celsius cease and desist from offering its Earn investment account to unaccredited investors in the United States (the "New Jersey Order").

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 140.

## VII.    **January 2022 – The Jig Is Up**

141.    In December 2021, certain affiliates of the WestCap Group ("**Westcap**") and Caisse de dépôt et placement du Québec ("**CDPQ**") converted certain convertible promissory notes to Series B preferred shares of Celsius Network Limited (the "**Series B Preferred Shares**"). Celsius received approximately $536 million from the Series B raise. Mr. Mashinsky cited the Series B equity raise to customers as legitimizing Celsius. But the investment did not solve Celsius's problems, or even make it solvent. The capital raised in the Series B offering was more than offset by Celsius's staggering losses.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141.

142.    Celsius's derivatives (or CeFi) desk was led by Mr. Treutler and composed of approximately six traders who were dispersed between New York, Berlin, and Australia. Celsius told the Oklahoma Department of Securities that in October 2021 the total USD value in accounts used to support its trading strategies was approximately $1.3 billion. Celsius did not establish risk limits for its traders until sometime on or about December 2021. When those risk limits were finally imposed, they were not monitored or enforced. Indeed, the only information the investment and risk teams received on the status of Celsius's CeFi deployments was a weekly email that contained a basic profit and loss statement that was manually generated. Celsius's risk and finance teams had no way to tell the positions of each strategy or whether the traders were within their limits.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142.

143.    After the New Year, members of Celsius's risk and finance teams raised concerns regarding substantial losses incurred by the CeFi trading desk. A subsequent investigation found that the traders were intentionally placing only one side of the transaction and not properly hedging their trades by placing a second derivative. Mr. Treutler was informed that the desk was over its limits on January 9, 2022. Because Celsius and the D&O Defendants had not instituted proper oversight procedures for the trading desk, the issue was not identified until Celsius had already realized significant losses.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 143, except they deny the allegations contained in the last sentence of Paragraph 143 to the extent they are directed at Goldstein.

144.    On January 11, 2022, the limit breach was not remedied and was raised in an Executive Committee meeting that Mr. Mashinsky, Mr. Goldstein, Mr. Cohen-Pavon, and Mr. Leon attended. On January 11, 2022, Celsius's Chief Investment Officer ("**CIO**") directed the traders to get under the risk limit within 48 hours. The traders did not listen and, upon information and belief, other than asking nicely, neither the CIO nor the D&O Defendants took any actions to bring the traders within their limits. The limits were still breached when the price of BTC

plummeted on January 20, 2022—**nine days after the CIO instructed the traders to get back within their limits**. Between January 20 to January 23, the price of BTC dropped precipitously from approximately $42,500 to $33,500.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 144, except they deny the allegations

contained in the third sentence of Paragraph 144 to the extent they are directed at Goldstein.

145.    On January 21, 2022, the CEO of Celsius Mining, Amir Ayalon, also informed the risk department that he had been relying on January 1, 2022 Bitcoin prices and Celsius's future Bitcoin production was unhedged. Mr. Mashinsky was aware of the growing imbalance in the Company's BTC position, but told the finance department to not bring the position level and instead wait for Bitcoin prices to rebound. The price continued to go down.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 145.

146.    On the evening of Sunday, January 24, 2022, Mr. Mashinsky held a chaotic call with Celsius's finance, risk, and trading teams in which he instructed traders to sell 2,785 BTC with a market value of approximately $100 million. Celsius now had a large short position with respect to BTC. Upon information and belief, the next day Mr. Mashinsky again instructed the traders to sell BTC and other coins worth more than $100 million. The market turned against Celsius and began to rebound. Certain Celsius executives pleaded with Mr. Mashinsky to bring the position even. Mr. Mashinsky eventually relented and agreed to purchase half of the position back. As BTC prices continued to rise, he purchased the second half of the position on January 26, 2022. Upon information and belief, Celsius ultimately lost more than $60 million as a result of Mr. Mashinsky's, Mr. Treutler's, and the other executives' and traders' reckless conduct.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 146.

147.    Both the risk and audit departments conducted "post-mortem" analyses of the events. Their reports included other recent, similar reckless and irresponsible events, including delays implementing hedging strategies, (2) issues at Celsius Mining concerning a lack of communication and project plan, which led to rushed decisions on large rig purchases and power agreements, and (3) special situation investments made at the direction of Mr. Mashinsky that were unknown to the rest of the finance team or could not be hedged. The post-mortem noted:

- The failure of existing controls (e.g., trading limits) or a lack of controls;
- The failure of multiple communications channels to enable decision making; and
- The lack of governance and unclear roles and responsibilities.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 147.

148.    In March 2022, Celsius was reeling and acknowledged in a presentation to the ALCO that it was not producing enough revenue to cover liabilities or additional operating expenses. Subsequent presentations show that Celsius had net capital of approximately negative $60 million at this time (that negative figure included the CEL tokens held in treasury which Celsius valued at more than $700 million). If the value of Celsius's CEL token treasury is removed, Celsius was insolvent by nearly $800 million.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 148.

149.    On April 4, 2022, Celsius did not have enough liquid assets (i.e., assets that Celsius could retrieve within seven days or less) to meet its expected obligations.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 149.

150.    On April 10, 2022, Mrs. Mashinsky withdrew approximately 1 million CEL tokens with a market value of $2,946,336.[71] On April 13, Mr. Leon withdrew $2,200,000 of USDC.[72] Mr. Leon also transferred 8,000,000 CEL tokens to an account owned by Alchemy, a limited partnership that he controlled. That same day, Alchemy posted 7,373,272 CEL tokens as collateral and received a $4 million loan.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 150 (including Footnotes 71 and 72), except

they admit that USDC is a stablecoin whose value is intended to be pegged to the U.S. dollar.

151.    On April 15, 2022, Celsius only had liquid assets sufficient to meet 54.5% of its total liabilities. Also on April 15, 2022, the New Jersey Order became effective, and Celsius was forced to close its Earn program to unaccredited investors. In an attempt to keep customers on the platform, Celsius launched its "Custody" product for customers in certain U.S. states. Funds that were already held in Celsius's Earn accounts were grandfathered into the Earn program regardless of accreditation status. But unaccredited users could not invest more digital assets into the Earn program. A major source of assets and liquidity—incoming deposits from U.S. unaccredited customers—was closed.

---

[71] Mrs. Mashinsky then sold those tokens in a series of smaller, regular transactions that appear designed to conceal the sales and minimize their effect on the price of the CEL token.

[72] USDC is a stablecoin whose value is intended to be pegged to the U.S. dollar.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 151.

152.    On April 26, 2022, Rod Bolger, Celsius's new CFO, informed Mr. Mashinsky that Celsius was "hemorrhaging $7.5mm pre-tax losses each week" and if they did not correct their deployments, Celsius ran "a real risk of not returning to profitability quickly enough."

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 152.

153.    On May 2 and 3, 2022, Celsius Network Limited held a two-day board meeting to discuss the Company's future. The presentation to the board stated that, notwithstanding the Series B investment, Celsius's capital sat near zero. It disclosed that Celsius had already lost approximately $159 million in 2022.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 153.

154.    On May 7, 2022, the cryptocurrency token, TerraUSD ("**UST**"), suffered a significant loss of value that sent shockwaves through the entire cryptocurrency market. The UST token was a stablecoin whose value was pegged to USD through an algorithm and use of another cryptocurrency called Luna. The UST coin value "de-pegged" and plummeted. Celsius had approximately $940 million deployed on the Terra Chain. It realized an approximately $30 million loss on its assets deployed on the Terra Chain. Celsius also had lent $41 million to Three Arrows Capital, which entered liquidation as a result of the collapse of Terraform Labs.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 154.

155.    Rumors swirled around Celsius and its stability. Users withdrew over $1.4 billion worth of digital assets from the Celsius platform the week after the collapse of Terraform Labs. Mr. Mashinsky and Celsius desperately tried to hold the line. In response to a May 11, 2022 inquiry from a CoinTelegraph reporter, Mr. Mashinsky responded that "we have ample liquidity and continue to issue loans . . . [we] have had no significant issues as we were ready for this downturn since end of 2021." Mr. Mashinsky reiterated that comment to the public on May 11 when he tweeted "[a]ll funds are safe and we have robust risk management." ***That same day***, in response to the dramatic drop in liquidity, instead of restricting deployments, as was required by its liquidity risk policy, Celsius dramatically decreased its liquidity thresholds. If it had not, it would have failed its liquidity test. On May 12, 2022, Mr. Mashinsky lied to Celsius employees, assuring them in an internal email that "our liquidity position remains very strong and all client funds remain secure." On May 13, 2022, Mr. Mashinsky told AMA viewers that "Celsius is stronger than ever, we have billions of dollars in liquidity . . . and we continue to do what Celsius does best – serve the community, protect the community, make sure your assets are there when you need them." On

May 27, 2022, Mr. Mashinsky told AMA viewers that it was "business as usual" at Celsius. The next day, Mr. Goldstein tweeted that "the Celsius community, company, and staff are strong as always . . ."

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 155.  The Goldstein Defendants respectfully

refer the Court to the May 13, 2022 AMA video, the May 27, 2022 AMA video, and the May 28,

2022 Twitter thread referenced in Paragraph 155 in their entirety for a complete and accurate

recitation of their contents.

156.    Celsius faced a liquidity crisis. It had billions of dollars invested in illiquid investments, including approximately $800 million[73] in staked ETH (which was locked until an uncertain date in the future) and approximately $600 million invested in its fledgling and ill-planned BTC mining operation, but insufficient assets to address customer withdrawal requests. Celsius experienced an issue that has been faced by banks with on demand deposits for centuries, but the D&O Defendants had not taken any meaningful (let alone sufficient) steps to protect against the liquidity crisis it was facing. Instead, Celsius had more than $1 billion in loans that were collateralized by cryptocurrency that was dramatically decreasing in value and required additional collateral to avoid margin calls.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 156 (including Footnote 73), except they

deny the allegations contained in the second sentence of Paragraph 156 to the extent they are

directed at Goldstein

157.    On May 9, 2022, the price of the CEL token dropped precipitously. On May 12, 2022, with the price of CEL token crossing $1.00 and Celsius desperately trying to preserve liquidity, Mr. Mashinsky ordered the purchase of $5 million of CEL tokens to inflate the value of the CEL token. Only a portion was purchased. On May 13, 2022, Mr. Mashinsky also instructed Tal Bentov, the head of loans, to stop issuing CEL token-backed loans. He further instructed Ms. Bentov not to announce the change as he "did not want negative press."

---

[73] On the Petition Date, Celsius had 410,516 ETH staked with the Lido Finance DeFi protocol and 371,149 ETH staked directly on the Beacon Chain. The Beacon Chain is the original proof-of-stake blockchain that was launched in 2020. The Beacon Chain introduced proof-of-stake to Ethereum and formalized proof-of-stake as Ethereum's consensus mechanism with The Merge upgrade on September 15, 2022.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 157.

158.    On May 14, 2022, members of the risk team described the liquidity crisis facing Celsius as "existential" and the measures they were taking to increase liquidity as "only buying [Celsius] time."

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 158.

159.    On May 15, 2022, Mr. Mashinsky withdrew BTC, ETH, and USDC worth $1,089,137.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 159.

160.    On May 16, 2022, Celsius's liquidity had dropped by 40% due to customer withdrawals and steep price declines in BTC and ETH. That day, Ms. Denizkurdu asked Mr. Bolger, "why aren't we talking about the elephant in the room. Survival? Liquidity. How many days we have left. at what price do we go bust . . ." Also on that day, Mr. Mashinsky withdrew $1,792,255 in stablecoins.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 160.

161.    On May 19, 2022, Mr. Bolger sent a presentation to Mr. Mashinsky which included projections that were dramatically different than the projections presented to the board of directors 17 days earlier. Mr. Bolger now projected that Celsius's capital position sat at approximately negative $800 million and Celsius would be approximately $1.1 billion in the red by the end of the year. Mr. Bolger concluded that "[t]he current business model is not financially sustainable" and that "[n]o business unit or coin is currently profitable at the current level of rewards rates and OpEx." Mr. Bolger warned Mr. Mashinsky that "profitability is not achieved even at 2x growth." Mr. Mashinsky responded that he understood "the current business model is not sustainable and that our capital position is making things worse."

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 161.

162.    On May 27, 2022, Celsius triggered the reduced liquidity stress test introduced weeks before. On that same day, Mr. Mashinsky instructed a Celsius employee to withdraw substantially all of the non-CEL token cryptocurrency held by Koala1 LLC—worth $5,120,317.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 162.

163.    On May 29, 2022, Mr. Leon withdrew $2,370,634 of stablecoins.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 163.

164.    On May 31, 2022, Mrs. Mashinsky withdrew CEL tokens with a purported value of $2,027,339. The same day, Mr. Leon withdrew BTC with a value of $423,376 and Ms. Landes, who was the Vice President of Lending at Celsius and is the wife of Mr. Leon, withdrew $333,548 of stablecoins.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 164.

165.    In a June 1, 2022 interview, Mr. Mashinsky was asked whether account holders' funds were safe at Celsius. Mr. Mashinsky responded, "not just that they are safe but we provided anyone who wanted to withdraw partially or fully, there were no problems . . . I know people are concerned about the whole market . . . about the TerraLuna situation. That's the service, you can withdraw at any time . . . We have billions of dollars of liquidity."[74] On June 3, 2022, Mr. Mashinsky urged consumers to leave their assets on the platform and "HODL," meaning "hold on for dear life." He promised that Celsius had "figured out how to make money for all of us while you HODL."[75]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 165, except they admit that the acronym "HODL" means "hold on for dear life."  The Goldstein Defendants respectfully refer the Court to the videos referenced in Footnotes 74 and 75 in their entirety for a complete and accurate recitation of their contents.

166.    On June 7, 2022, at the direction of Mr. Leon, Celsius published a blog titled "Damn the Torpedoes, Full Speed Ahead."[76] Celsius sought to reassure the community, stating that it was

---

[74] *Id.* (citing Crypto Archives, InvestAnswers interviews Alex Mashinsky, CEO of Celsius Live streamed June 1, 2022 (Dec. 13, 2022), https://m.youtube.com/watch?v=lPXHwWyJhTo.)

[75] Celsius Network, Celsius AMA June 3, 2022, YouTube (Jun. 3, 2022), at [48:13], https://www.youtube.com/watch?v=9zAVFmiyDhE.

[76] Celsius, Damn the Torpedoes, Full Speed Ahead, (June 7, 2022), https://celsiusnetwork.medium.com/damn-the-torpedoes-full-speed-ahead-4123847832af. This blog post has since been deleted.

prepared for the crypto downturn, that it will "continue to process withdrawal[] without delay," and that "Celsius has the reserves (and more than enough ETH) to meet obligations" under its "comprehensive liquidity risk management framework."[77] These statements were false, but Mr. Leon and Mr. Goldstein retweeted the June 7, 2022 blog post from their personal Twitter accounts.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 166. The Goldstein Defendants respectfully refer the Court to the blog post referenced in Footnotes 76 and 77 and the quote tweet referenced in Paragraph 166 for their true contents.

167. On June 10, 2022, Mr. Mashinsky stated that "Celsius has billions in liquidity" and "anyone who wants to withdraw has no problem."[78]

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 167. The Goldstein Defendants respectfully refer the Court to the video referenced in Footnote 78 for its true contents.

## VIII.   **The Pause**

168. On June 12, 2022, Celsius paused all withdrawals from the platform to prevent further erosion of liquidity and value (the "**Pause**").

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 168, except they admit that Celsius paused all withdrawals from the Celsius platform on June 12, 2022.

169. On June 13, 2022, Tether applied BTC that it was holding as collateral for a loan to Celsius. Tether purported to apply the collateral for a total amount of $816,822,948.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 169.

---

[77] *Id.*

[78] Celsius Network, Celsius AMA June 10, 2022, YouTube (Jun. 10, 2022), at [9:06; 45:48], https://www.youtube.com/watch?v=GyRO_W-utXs.

170.    Thereafter, certain of the D&O Defendants instructed Celsius employees to continue liquidating retail loans as cryptocurrency prices dropped to avoid making Celsius's asset to liability gap larger.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 170, except they deny the allegations in

Paragraph 170 to the extent they are directed at Goldstein.

## IX.    **Chapter 11 Bankruptcy and Government Actions**

171.    On July 13, 2022, the Debtors other than the GK8 Debtors filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. On December 7, 2022, the GK8 Debtors filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

**RESPONSE:** The Goldstein Defendants admit the allegations in Paragraph 171.

172.    On July 13, 2023, the U.S. Attorney for the Southern District of New York indicted Mr. Mashinsky on counts of securities fraud, commodities fraud, wire fraud relating to his false statements inducing customers to invest their assets in Celsius, conspiracy to manipulate the price of CEL token, fraudulent scheme to manipulate the price of CEL token, market manipulation, and wire fraud related to CEL token manipulation. The Southern District of New York also indicted Mr. Cohen-Pavon for securities fraud, wire fraud, and market manipulation related to the CEL token manipulation scheme. On September 13, 2023, Mr. Cohen-Pavon pled guilty to the charges against him, admitting under oath that the Company manipulated the price of CEL token.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 172, except they admit that Mr. Mashinsky

and Mr. Cohen-Pavon were indicted by the U.S. Attorney for the Southern District of New York,

and that Mr. Cohen-Pavon pled guilty to the charges brought against him on September 13, 2023.

The Goldstein Defendants respectfully refer the Court to Mr. Cohen-Pavon's plea allocution for

its true contents.

173.    Also on July 13, 2023, the Securities and Exchange Commission filed a complaint against Mr. Mashinsky alleging securities fraud; the Federal Trade Commission filed a complaint against Mr. Mashinsky, Mr. Leon, and Mr. Goldstein alleging deceptive business practices; and the Commodity Futures Trading Commission filed a complaint against Mr. Mashinsky alleging fraud under the Commodity Exchange Act.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 173, except admit that the Federal Trade Commission filed a complaint against Mr. Mashinsky, Mr. Leon, and Goldstein.

## COUNT I

**(Breach of Fiduciary Duty — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Harumi Urata-Thompson, and Jeremie Beaudry)**

174.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeats and realleges each and every response to Plaintiff's allegations as if fully set forth herein.

175.    At all times relevant to this Complaint, Celsius was insolvent. Celsius's debts and liabilities exceeded the value of its assets, especially when the artificially inflated value of its CEL token treasury was taken into account. Because a substantial portion of the Company's assets were illiquid, Celsius did not have the ability to meet its on demand and other obligations.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 175.

176.    The Defendants were directors and officers of Celsius Network, Inc., Celsius Network Limited, Celsius Network LLC, and certain other of their affiliates. While not explicitly named as directors of these entities, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were officers that made major decisions for these entities that would normally be carried out by directors. Additionally, each of the D&O Defendants were senior level employees enjoying significant trust and independence within these entities.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 176, except they admit that Goldstein served as Celsius's CTO for a period of time, deny that Goldstein was a director of Celsius or any Celsius affiliate, and deny the allegations contained in the second sentence of Paragraph 176 to the extent they are directed at Goldstein.

177.    The D&O Defendants therefore owed Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors a fiduciary duty to exercise the care, skill, and diligence that an ordinarily careful and prudent person would use when carrying out the

functions exercised by the directors and officers in relation to the companies they serve. This duty included, among other things, the obligations to acquire and maintain sufficient knowledge to enable them to discharge their duties as directors and officers, and to act on an informed basis after considering relevant and reasonably available information.

**RESPONSE:** The allegations in Paragraph 177 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

178.    The D&O Defendants breached their fiduciary duty to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors, as well as their creditors, by acting in bad faith, without exercising the care, skill, and diligence that an ordinarily careful and prudent person would exercise in similar circumstances; by not acquiring and maintaining sufficient knowledge and considering relevant and reasonably available material information; by disregarding knowledge they did possess; and by acting with negligence, gross negligence, and reckless and irrational indifference to the interests of Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors.

**RESPONSE:** The allegations in Paragraph 178 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

179.    The Defendants' conduct was arbitrary and unreasonable, frustrating the overarching purpose of Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors' governing documents, and breaching the implied contractual covenant of good faith and fair dealing.

**RESPONSE:** The allegations in Paragraph 179 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack

knowledge or information sufficient to form a belief as to the truth of the allegations of the

Paragraph with respect to any other entity or individual.

180.   Celsius was a financial services company that catered to retail investors. Mr. Mashinsky marketed Celsius through online "Ask Mashinsky Anything" videos that were broadcast to the public. During those videos, Mr. Mashinsky repeatedly and persistently made fraudulent, false, and misleading statements to the public. Mr. Mashinsky was aware his statements were false when he made them. Mr. Mashinsky intentionally made those false and misleading statements to encourage more individuals to transfer cryptocurrency to Celsius. The other D&O Defendants, including Mr. Goldstein, Mr. Leon, and Ms. Urata-Thompson, made similar misrepresentations to the public.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 180, except they admit that Mr. Mashinsky

held AMA broadcasts and deny the allegations contained in the last sentence of Paragraph 180 to

the extent they are directed at Goldstein.  The Goldstein Defendants respectfully refer the Court to

the Mr. Mashinsky's AMA broadcasts for their true contents.

181.   The D&O Defendants and other employees of Celsius collectively and knowingly engaged in a scheme to cover up Mr. Mashinsky's and other employees' misrepresentations and false statements. Members of the risk, legal, compliance, regulatory, and media teams would flag problematic and false statements to be deleted from the AMAs after such videos had been broadcast live and many had already been posted to YouTube. Mr. Mashinsky and the other D&O Defendants were warned about the fraudulent, false, and misleading statements Mr. Mashinsky and certain of the other D&O Defendants were making and the claims and liability that the Company would incur as a result of those statements. Despite that knowledge, Mr. Mashinsky and the D&O Defendants continued to intentionally publish false and misleading statements to the public to entice individuals to transfer cryptocurrency to Celsius.

**RESPONSE:** The allegations in Paragraph 181 state a legal conclusion to which no

response is required.   To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

181, except they deny the allegations in Paragraph 181 to the extent they are directed at Goldstein

or any statements Goldstein purportedly made.

182.   Celsius received billions of dollars of assets from retail investors and had a fiduciary duty to handle and invest those assets in a responsible manner. Celsius and the D&O Defendants stressed the safety of its investments and systems repeatedly in public communications

targeted at current and prospective account holders, specifically retail investors. The D&O Defendants engaged in directional investments and uncollateralized loans that were significantly riskier than the investment strategies Celsius told its customers it was pursuing.

**RESPONSE:** The allegation that Celsius "had a fiduciary duty to handle and invest . . . assets in a responsible manner" states a legal conclusion to which no response is required." To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 182, except they deny the allegations contained in the second and third sentences of Paragraph 182 to the extent they are directed at Goldstein.

183.    The D&O Defendants also failed to establish adequate controls, systems, technology, infrastructure, and decision-making processes to responsibly invest or protect the assets that they were trusted to invest.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 183, except they deny the allegations in Paragraph 183 to the extent they are directed at Goldstein.

184.    Celsius managed its assets and investments on spreadsheets in which positions were required to be manually inputted and updated. Those spreadsheets were not accurate and did not adequately track Celsius's relative positions in certain cryptocurrencies. This and other failures, directed by the D&O Defendants, caused Celsius to incur over $250 million of losses in late 2020 and early 2021, when, unbeknownst to the Company, its BTC and other coin obligations greatly exceeded its BTC assets as the market price of BTC (and cryptocurrency prices generally) increased rapidly. Celsius's losses could have been avoided or mitigated if proper systems were in place.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 184, except they deny the allegations contained in the third sentence of Paragraph 184 to the extent they are directed at Goldstein

185.    In response to that exorbitant loss, the D&O Defendants again failed to implement a system that could accurately track Celsius's assets and liabilities. Rather, they relied on another Google spreadsheet. The sheet required many different employees to manually input investments and positions. The updates were done in an unorganized, ad hoc manner. As a result, the Google sheet regularly misreported the Company's positions by hundreds of millions of dollars. The D&O Defendants were repeatedly informed of the inadequacy of the Company's systems, but failed to

take adequate measures to remedy the situation. Instead, the D&O Defendants directed that more technological resources be invested in new products and the customer facing side of the business, to attract more assets from retail investors, rather than investing in the necessary systems to protect the Company and its customers' assets.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 185, except they deny the allegations in

Paragraph 185 to the extent they are directed at Goldstein.

186.    The D&O Defendants also failed to implement proper risk management procedures. Up until spring of 2021, Celsius employed two risk management professionals. In March of 2021, those two risk management professionals were overseeing more than $10 billion of assets and investments. Many of the investments that led to the large losses described in Section V, supra, were incurred while those two individuals oversaw Celsius's risk exposure. Such investment decisions included posting collateral with EFH without conducting proper diligence or receiving financial statements and transferring money to KeyFi, an entity in which Mr. Mashinsky and Mr. Goldstein owned equity, before executing a written contract or ensuring proper oversight mechanisms were in place.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 186, except they deny the allegations

contained in the first sentence of Paragraph 186 to the extent they are directed at Goldstein and

admit Goldstein had a small investment in KeyFi.

187.    Even after the Company brought in additional risk management professionals, the problems continued. For instance, the D&O Defendants did not implement any risk limits for its $1.3 billion CeFi trading desk until the end of 2021. The D&O Defendants also did not establish any mechanism, policy, or procedure to monitor and oversee the traders' positions and ensure that such traders were following Celsius's investment policy and properly hedging their positions. The D&O Defendants also did not utilize any method to effectively police the risk limits.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 187, except they deny the allegations

contained in Paragraph 187 to the extent they are directed at Goldstein.

188.    The lack of effective risk limits and risk monitoring led to significant losses in January 2022, when traders refused to reduce positions that were outside of their delta neutral mandates and risk limits for more than 15 days while the cryptocurrency market plummeted. Mr. Mashinsky then took a reckless gamble on BTC continuing to drop, betting over $200 million on the volatile cryptocurrency. The Company lacked appropriate controls or the delegation of

responsibility to stop that reckless decision. The other D&O Defendants failed to take appropriate action to stop Mr. Mashinsky's reckless gamble.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 188, except they deny the allegations contained in the last sentence of Paragraph 188 to the extent they are directed at Goldstein

189.    The D&O Defendants also failed to take appropriate actions to manage their business. From at least as early as 2021 through 2022, the D&O Defendants were repeatedly informed that Celsius had a negative net interest margin and was not making enough money from its investments to fund the rewards rates it promised to pay to account holders. Members of the Finance and Treasury departments made multiple proposals to reduce the rewards rates. With full knowledge of Celsius's financial condition, including an extreme shortfall in assets compared to liabilities, the D&O Defendants refused to lower rewards rates and continued to offer rates that were regularly higher than their competitors. The failure to reduce rewards rates caused Celsius to incur hundreds of millions in operating losses in 2021 and 2022.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 189, except they deny the allegations in Paragraph 189 to the extent they are directed at Goldstein.

190.    The D&O Defendants' breach of their fiduciary duties caused substantial damage to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, the other Debtors, and their account holders and other creditors in an amount to be proven at trial. But for such breaches of fiduciary duty, Celsius and its creditors would not have suffered such damage.

**RESPONSE:** The allegations in Paragraph 190 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

## COUNT II

**(Breach of Fiduciary Duty of Loyalty — Purchase and Manipulation of CEL token — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Jeremie Beaudry, Harumi Urata-Thompson, and Johannes Treutler)**

191.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every

response to Plaintiff's allegations as if fully set forth herein.

192.    At all times relevant to this Complaint, Celsius was insolvent. Celsius's debts and liabilities exceeded the value of its assets, especially when the artificially inflated value of its CEL token treasury was taken into account. Because a substantial portion of the Company's assets were illiquid, Celsius did not have the ability to meet its on demand and other obligations.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 192.

193.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Mr. Beaudry, Ms. Urata-Thompson, and Mr. Treutler, as well as their family, friends, and affiliated entities, all owned large quantities of CEL tokens.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 193, except they admit that the Goldstein

Defendants owned CEL tokens.

194.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Mr. Beaudry, and Ms. Urata-Thompson were directors and officers of Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and certain other of their affiliates. While not explicitly named as directors, Mr. Goldstein, Mr. Cohen-Pavon, Mr. Beaudry, and Ms. Urata-Thompson were officers that made high-level decisions for these entities that would normally be carried out by directors. Additionally, Mr. Goldstein, Mr. Cohen-Pavon, Mr. Beaudry, and Ms. Urata-Thompson were senior level employees enjoying significant trust and independence within these entities.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 194, except they admit Goldstein served as

Celsius's CTO for a period of time, deny that Goldstein was a director of Celsius or any Celsius

affiliate, and deny the allegations contained in the second sentence of Paragraph 194 to the extent

they are directed at Goldstein.

195.     Mr. Treutler was the Head of the CeFi trading desk and in charge of implementing and directing Celsius's purchase of CEL tokens from public markets in late 2019 through the fall of 2021. Although not a director or officer of Celsius Network Inc., Celsius Network Limited, or Celsius Network LLC, Mr. Treutler was a key, senior employee within these entities, who made material decisions with respect to these entities' strategy, operations, and the use of significant assets of the Company. Mr. Treutler ran the CeFi division of the Company, participated in financial decisions of the Company, had input into and knowledge of the financial welfare of the Company, and advised Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Mr. Beaudry, and Ms. Urata-Thompson, who were Celsius Network Inc., Celsius Network Limited, and Celsius Network LLC's Directors, CEO, COO, CTO, CRO, CCO, and CFO at all times relevant to this Count II. Together with Mr. Mashinsky, Mr. Cohen-Pavon, and Ms. Urata-Thompson, Mr. Treutler would establish price targets for Celsius's purchase of CEL tokens. Mr. Treutler would determine the specific quantities of CEL tokens purchased, the prices to purchase CEL tokens, and when the purchases would occur to inflate the price of the CEL token. As a key managerial employee, Mr. Treutler owed Celsius Network Limited the same fiduciary duties as its officers and directors. Additionally, Mr. Treutler owed an implied fiduciary duty to Celsius Network Limited because Mr. Treutler and Celsius Network Limited had a relationship of trust on which Celsius Network Limited relied, Mr. Treutler and Celsius Network Limited's interests were aligned, and Mr. Treutler exercised control and dominion over a substantial amount of Celsius Network Limited's property, instructing the purchase of hundreds of millions of dollars of CEL tokens, and oversaw and directing Celsius Network Limited's CeFi trading activities, which at times exceeded $1 billion.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 195, except they that Goldstein served as

Celsius's CTO for a period of time.

196.     Each of the D&O Defendants and Mr. Treutler therefore owed Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors a fiduciary duty of loyalty, including the duty to act in good faith and in the best interest of Celsius, promote the success of the Company, and, at all times, to subordinate their personal interests to the interests of Celsius.

**RESPONSE:** The allegations in Paragraph 196 state legal conclusions to which no

response is required.  To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or

information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect

to any other entity or individual.

197.     The D&O Defendants and Mr. Treutler breached their fiduciary duty of loyalty to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors by

acting in bad faith, failing to act in the best interest of the Company as a whole, failing to act in a way that promoted the success of the Company, and failing to subordinate their personal interests to the interests of the Company. The D&O Defendants' and Mr. Treutler's conduct was arbitrary, unreasonable, and done in bad faith, which frustrated the overarching purpose of Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors' governing documents and breached the implied contractual covenant of good faith and fair dealing.

**RESPONSE:** The allegations in Paragraph 196 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

198. Mr. Mashinsky, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler repeatedly directed Celsius to purchase CEL tokens on the open market in a manner designed to artificially increase the price of the token, including directing the timing, amount, and price of such purchases and setting resting purchase orders to purchase CEL token at set prices to absorb demand from larger sellers. Contrary to Mr. Mashinsky's and Celsius's public statements, the amount of these purchases was determined in an ad hoc manner and often exceeded the amount of weekly rewards in CEL tokens to be paid to account holders.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 198.

199. On certain occasions, the Defendants directed CEL tokens to be purchased during Mr. Mashinsky's public AMA segments to encourage retail investors to purchase CEL tokens.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 199, except they deny the allegations in Paragraph 199 to the extent they are directed at the Goldstein Defendants.

200. Celsius's strategic purchases were designed and intended to artificially increase the price of the CEL token above a fair market price. The manipulation of the price of the CEL token benefited insiders, including, but not limited to, the D&O Defendants, Mr. Treutler, their families, and affiliates, who held substantial amounts of CEL tokens, at the expense of the Company and its account holders and other creditors. The manipulation of the CEL token also resulted in the Company paying the Defendants and employees millions of dollars in bonuses when CEL token reached $1.50 and $5.00.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 200, except they deny the allegations in Paragraph 200 to the extent they imply Goldstein and/or the Goldstein Defendants were aware of any purported manipulation of the price of CEL token.

201.    Mr. Mashinsky, Mr. Leon, and Mr. Goldstein all sold large amounts of CEL tokens on public exchanges on or around the time Celsius was buying CEL tokens.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 201, except they admit Goldstein made sales of CEL tokens on public exchanges.

202.    Certain of those sales violated Celsius's corporate policy regarding the sale of CEL tokens by insiders and employees. Ms. Urata-Thompson, Mr. Cohen-Pavon, Mr. Beaudry, and Mr. Treutler were aware of those sales and that such sales violated Celsius policies. Nevertheless, Ms. Urata-Thompson, Mr. Cohen-Pavon, and Mr. Treutler specifically directed the purchase of CEL tokens to support its price around the times of certain of the large sales by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein to avoid those sales depressing the price of CEL token.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 202.

203.    Mr. Beaudry was the primary individual responsible for managing the Company's CEL token trading policy. He was aware of certain of the large sales of CEL tokens by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein, which were reported to him. He took no measures to stop these breaches, and instead amended the policy to authorize larger sales.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 203, except they admit Goldstein made sales of CEL tokens.

204.    The D&O Defendants and Mr. Treutler used wallets with commingled customer deposits and other undeployed assets to make the above-mentioned CEL token purchases.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 204, except they deny the allegations in Paragraph 204 to the extent they are directed at Goldstein.

205.    At the direction of Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler, Celsius spent hundreds of millions of dollars purchasing CEL tokens on public markets to manipulate and support the token's price. These purchases were not conducted at a fair market value, and the strategic timing and pricing of the transactions caused Celsius to overpay for the CEL tokens it purchased. Celsius did not keep track of the amount of these purchases, and to this day the Company does not know the total amount it spent to purchase CEL tokens. The total amount Celsius spent buying CEL tokens on the open market from 2019 to 2022 exceeds $500 million.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 205.

206.    Additionally, Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Ms. Urata-Thompson, Mr. Beaudry, Ms. Landes, Mr. Treutler, and certain of their affiliates sold their personal CEL token holdings back to the Company via its OTC desk, receiving tens of millions of dollars in return. They did so knowing that the price of CEL token was artificially inflated because of their actions, that their CEL token was worth significantly less than the value they were receiving for it, and that they were profiting through the Company's payment of cash and other cryptocurrency for the artificially inflated CEL token.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 206, except they admit Goldstein made sales

and transfers of CEL token using the OTC trading desk, and deny the allegations contained in the

second sentence of Paragraph 206 to the extent they are directed at Goldstein.

207.    Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler spent hundreds of millions of dollars' worth of assets of Celsius Network Limited and Celsius Network LLC that had been deposited by account holders to inflate the value of CEL token, and to enrich themselves, their friends, families, and affiliated entities. The D&O Defendants' and Mr. Treutler's conduct with respect to the CEL token breached the Defendants' fiduciary duty of loyalty to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors because the Defendants acted in bad faith, failed to act in the best interest of Celsius as a whole, failed to act in a way that promoted the success of Celsius, and failed to subordinate their personal interests to the interests of Celsius. The D&O Defendants' and Mr. Treutler's conduct also put Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors at substantial risk of insolvency and additional claims to the detriment of Celsius, its account holders, and creditors.

**RESPONSE:** The allegations contained in the second sentence of Paragraph 207 states a

legal conclusion to which no response is required.  To the extent a response is required, the

Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of

the allegations in Paragraph 207, except they deny the allegations contained in the last sentence of Paragraph 207 to the extent they are directed at Goldstein.

208.    The Defendants' breach of the fiduciary duty of loyalty caused substantial damage to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, their affiliates, and their creditors in an amount to be proven at trial. But for such breaches of fiduciary duty, Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, their affiliates, and their creditors would not have suffered such damage.

**RESPONSE:** The allegations in Paragraph 208 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

## COUNT III

**(Aiding and Abetting Breach of Fiduciary Duty of Loyalty — Purchase and Manipulation of CEL token — Defendant Johannes Treutler)**

209.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

210.    As set forth in detail above, at all times relevant, Mr. Treutler was Head of CeFi Trading at Celsius and responsible for directing Celsius's purchase of CEL tokens from public markets. Mr. Treutler was a senior managerial employee within Celsius whose contributions to Company strategy were essential to operations and the use of the Company's assets.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 210.

211.    Mr. Treutler wielded significant influence over Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors' officers and directors and understood his role in the Company and the effects that his actions could have on the Company and its creditors. Mr. Treutler also understood the roles and duties of the Company's officers and directors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 211.

212.    As also set forth in detail in this Complaint, Defendants Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Treutler each participated in the scheme to artificially inflate the price of CEL token by directing the Company to buy back large quantities of CEL token in public markets and on certain occasions timing these purchases to avoid decreases in the token price that otherwise would have occurred due to large sales by Mr. Mashinsky, Mr. Goldstein, and Mr. Leon.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 212, except they deny the allegations in

Paragraph 212 to the extent they are directed at Goldstein.

213.    Celsius represented that it only purchased the amount of CEL token needed to pay interest owed to Celsius account holders who elected to Earn in CEL token. However, the purchases directed and made by Mr. Treutler often exceeded the amount of CEL tokens that were required to be purchased to pay the interest owed to Celsius account holders who elected to Earn in CEL token.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 213.

214.    Mr. Treutler knew that his conduct and that of the other Defendants constituted breaches of the fiduciary duties they owed to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and their affiliates.

**RESPONSE:** The allegations in Paragraph 214 state legal conclusions to which no

response is required.  To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack

knowledge or information sufficient to form a belief as to the truth of the allegations of the

Paragraph with respect to any other entity or individual.

215.    To the extent this Court determines that Mr. Treutler does not owe any fiduciary duties of his own, Mr. Treutler is liable for aiding and abetting other Defendants' breaches of fiduciary duty.

**RESPONSE:** The allegations in Paragraph 215 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

216. Mr. Treutler substantially assisted and supported the other Defendants in these breaches of fiduciary duty by encouraging and implementing the Defendants' strategy to artificially inflate the price of CEL token.

**RESPONSE:** The allegations in Paragraph 216 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

217. Mr. Treutler understood that Mr. Mashinsky's and other Defendants' sales of their personal CEL tokens were enriching Defendants while diminishing CEL token's value, but continued to covertly conspire to deceive the public and benefit insiders by artificially inflating the price of CEL token.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 217, except they admit the Goldstein Defendants made sales of CEL token and deny that the Goldstein Defendants were involved in, engaged in, or knew of any purported conspiracy to deceive the public and benefit insiders by artificially inflating the price of CEL token.

218. As a result of Mr. Treutler's aiding and abetting other Defendants' breaches of fiduciary duty, Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, their affiliates, and their creditors suffered significant damages in an amount to be determined at trial. But for such breaches of fiduciary duty, Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, their affiliates, and their creditors would not have suffered such damage.

**RESPONSE:** The allegations in Paragraph 218 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

## COUNT IV

### (Breach of Fiduciary Duty of Loyalty — KeyFi Purchase and Asset Deployment — Defendants Alexander Mashinsky and Hanoch Goldstein)

219.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

220.    At all times relevant to this Complaint, Celsius was insolvent. Celsius's debts and liabilities exceeded the value of its assets, especially when the artificially inflated value of its CEL token treasury was taken into account. Because a substantial portion of the Company's assets were illiquid, Celsius did not have the ability to meet its on demand and other obligations.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 220.

221.    Mr. Mashinsky was a co-founder, director and officer of Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and certain of their affiliates. Mr. Goldstein was a co-founder and officer that made decisions for Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors that would normally be carried out by a director. Mr. Goldstein was a senior-level officer enjoying significant trust and independence within Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 221, except they admit that Goldstein served as Celsius's CTO, deny that Goldstein was a co-founder of Celsius, and deny that Goldstein made decisions that would normally be carried out by a director.

222.    Mr. Mashinsky and Mr. Goldstein therefore owed Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors a fiduciary duty of loyalty, including the duty to act in good faith and in the best interest of Celsius, promote the success of the Company, and, at all times, to subordinate their personal interests to the interests of Celsius.

**RESPONSE:** The allegations in Paragraph 222 states a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

223.    Mr. Mashinsky and Mr. Goldstein breached their fiduciary duty of loyalty to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors by acting in bad faith, failing to act in the best interest of the Company as a whole, failing to act in a way that promotes the success of the Company, and failing to subordinate their personal interests to the interests of the Company.

**RESPONSE:** The allegations in Paragraph 223 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

224.    Mr. Mashinsky and Mr. Goldstein owned equity in KeyFi.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 224, except they admit Goldstein had a small investment in KeyFi.

225.    Mr. Mashinsky and Mr. Goldstein, together with Mr. Cohen-Pavon, caused Celsius to transfer hundreds of millions of dollars' worth of customer assets to KeyFi.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 225, except they deny the allegations in Paragraph 225 to the extent they are directed at Goldstein.

226.    Mr. Mashinsky and Mr. Goldstein would profit from Celsius's assets that were transferred to KeyFi if it was successful in investing those funds due to their equity interests.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 226.

227.    Mr. Mashinsky and Mr. Cohen-Pavon directed certain of these transfers to be made before a formal agreement between KeyFi and Celsius was executed so that Mr. Mashinsky and Mr. Goldstein could begin to profit from KeyFi's deployment of Celsius assets through their equity ownership of KeyFi.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 227, except they admit that Goldstein had a

small investment in KeyFi and deny that any purported transfers were done for the purpose of

enabling Goldstein to profit from his interest in KeyFi.

228.    Mr. Goldstein was one of the primary people at Celsius in charge of closing the KeyFi deal.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 228.

229.    When the contract was ultimately signed, the terms were extremely favorable to KeyFi.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 229.

230.    Mr. Mashinksy and Mr. Goldstein were aware of the risks of the KeyFi investment but directed it nonetheless in bad faith, for the benefit of Mr. Mashinsky and Mr. Goldstein, and failed to subordinate their personal interests to the interests of the Company. As a result, Celsius lost more than $315 million.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 230, except they deny the allegations

contained in the first sentence of Paragraph 230 to the extent they are directed at Goldstein.

231.    Mr. Mashinsky and Mr. Goldstein, by such aforementioned actions, breached their fiduciary duties of loyalty and acted to favor their own interests over the interests of the Company. They did not act to maximize the value or the long-term wealth-creating capacity of the Company.

**RESPONSE:** The allegations in Paragraph 231 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

232.    Mr. Mashinsky and Mr. Goldstein's breach of the fiduciary duty of loyalty caused substantial damage to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, the other Debtors, and their creditors in an amount to be proven at trial. But for such breaches of fiduciary duty, the Company and its creditors would not have suffered such damage.

**RESPONSE:** The allegations in Paragraph 232 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

## COUNT V

**(Breach of Fiduciary Duty of Loyalty — Execution of AMV Loan — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Jeremie Beaudry, Harumi Urata-Thompson, and Roni Cohen-Pavon)**

233.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

234.    At all times relevant to this Complaint, Celsius was insolvent. Celsius's debts and liabilities exceeded the value of its assets, especially when the artificially inflated value of its CEL token treasury was taken into account. Because a substantial portion of the Company's assets were illiquid, Celsius did not have the ability to meet its on demand and other obligations.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 234.

235.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were directors and officers of Celsius Network, Inc., Celsius Network Limited, Celsius Network LLC, and certain other of their affiliates. While not explicitly named as directors, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were officers that made high-level decisions for Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors that would normally be carried out by directors. Additionally, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were senior-level employees enjoying significant trust and independence within Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 235, except they admit that Goldstein served as Celsius's CTO, deny that Goldstein was a director of Celsius or any Celsius affiliate, and deny the allegations contained in the second sentence of Paragraph 235 to the extent they are directed at Goldstein.

236.    Each of the Defendants therefore owed Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors a fiduciary duty of loyalty, including the duty to act in good faith and in the best interest of Celsius, promote the success of the Company, and, at all times, to subordinate their personal interests to the interests of Celsius.

**RESPONSE:** The allegations in Paragraph 236 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

237.    The Defendants breached their fiduciary duty of loyalty to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, and the other Debtors by acting in bad faith, failing to act in the best interest of the Company as a whole, failing to act in a way that promoted the success of the Company, and failing to subordinate their personal interests to the interests of the Company. The Defendants' conduct was arbitrary and unreasonable, which frustrated the overarching purpose of Celsius's governing documents and breached the implied contractual covenant of good faith and fair dealing.

**RESPONSE:** The allegations in Paragraph 237 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack

knowledge or information sufficient to form a belief as to the truth of the allegations of the

Paragraph with respect to any other entity or individual.

238.    Mr. Mashinsky and Mr. Leon, who both signed the Token Sale Agreement, did not abide by the agreement that obligated Mr. Mashinsky to purchase the 117,000,000 CEL tokens not sold in the ICO. Instead, they extended the agreement and ultimately cancelled the Token Sale Agreement to the detriment of Celsius and the benefit of Mr. Mashinsky.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 238.

239.    Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Mr. Goldstein, and Mr. Beaudry worked together to hide the fact that the CEL token ICO was not fully funded and that 117,000,000 CEL tokens were not sold. Mr. Mashinsky, despite knowing otherwise, continued to make public statements that the ICO was fully funded.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 239, except they deny the allegations

contained in the first sentence of Paragraph 239 to the extent they are directed at Goldstein.

240.    Mr. Mashinsky and Mr. Leon entered into the AMV Loan to cover up the fact that the CEL tokens which should have been purchased by Mr. Mashinsky were not actually purchased. Mr. Beaudry facilitated the AMV loan by drafting the agreement. Mr. Leon approved Celsius entering into the AMV Loan and depositing the CEL tokens into a segregated wallet to obscure their return from the public.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 240.

241.    Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Mr. Goldstein, and Mr. Beaudry were aware that Celsius had represented in its Whitepaper that all CEL tokens not offered to be sold, but not sold in the ICO would be burned. Nevertheless, Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Mr. Goldstein, and Mr. Beaudry covered up the fact that the CEL tokens were not destroyed or paid off by Mr. Mashinsky, and both directed and enabled Celsius to retain the ICO CEL tokens in its treasury. Mr. Goldstein made false statements to the public that all CEL tokens not sold had been burned.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 241, except they deny the allegations

contained in the first and second sentences of Paragraph 241 to the extent they are directed at

Goldstein and deny the allegations contained in the last sentence of Paragraph 241.

242.    The decision to enter into the AMV Loan and retain the ICO CEL tokens in Celsius's treasury primarily benefited Mr. Mashinsky, allowing him to eschew his obligation to purchase the leftover ICO CEL tokens at the expense of the Company and its account holders and other creditors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 242.

243.    Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, Mr. Goldstein, Ms. Urata-Thompson, and Mr. Beaudry all owned a substantial amount of CEL token and were entitled to receive more CEL token in the future and, thus, benefited from obscuring the return of the unsold CEL tokens to the treasury.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 243, except they admit that Goldstein owned

CEL token and deny the allegations in Paragraph 243 to the extent they imply Goldstein obscured

or was aware of others obscuring the purported return of unsold CEL tokens to the treasury.

244.    The Defendants' breach of the fiduciary duty of loyalty caused substantial damage to Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, their affiliates, and their creditors in an amount to be proven at trial. But for such breaches of fiduciary duty, Celsius Network Inc., Celsius Network Limited, Celsius Network LLC, their affiliates, and their creditors would not have suffered such damage.

**RESPONSE:** The allegations in Paragraph 244 state legal conclusions to which no

response is required.  To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack

knowledge or information sufficient to form a belief as to the truth of the allegations of the

Paragraph with respect to any other entity or individual.

## COUNT VI

**(Breach of Director's Duties — Duty to Exercise Independent Judgment (English Law) — Defendants Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Harumi Urata-Thompson, and Jeremie Beaudry)**

245.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

246.    Mr. Leon was a director and officer of Celsius Network Limited, and Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were officers of Celsius Network Limited. While not explicitly named as directors, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were all officers who made high-level decisions for Celsius Network Limited that would normally be carried out by directors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 246, except they admit Goldstein served as Celsius's CTO and deny the allegations contained in the second sentence of Paragraph 246 to the extent they are directed at Goldstein.

247.    Each of the D&O Defendants owed a duty to exercise independent judgment, to take responsibility for all decisions reached, consider issues for themselves, and regard themselves as the ultimate decision-maker.

**RESPONSE:** The allegations in Paragraph 247 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

248.    Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry breached their duty to exercise independent judgment by failing to consider issues for themselves and take responsibility for all decisions reached.

**RESPONSE:** The allegations in Paragraph 248 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

249. Specifically, among other failures to exercise independent judgment, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry repeatedly deferred to Mr. Mashinsky on numerous consequential management decisions notwithstanding their own roles within Celsius and despite relevant and reasonably available information indicating such decisions were not in the best interests of the Company.

**RESPONSE:** The allegations in Paragraph 249 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

250. For example, despite being warned about the fraudulent, false, and misleading statements Mr. Mashinsky was making in his AMA videos and the liability that the Company would incur as a result, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry failed to exercise independent judgment and stop these fraudulent statements. Instead, they participated in a scheme to cover up Mr. Mashinsky's misrepresentations. The Defendants were aware of the scheme to edit the AMAs after they were recorded live to remove the live misrepresentations that Mr. Mashinsky had made, and to not explicitly correct those misstatements. The Defendants actively participated in the editing process. None of the Defendants ever corrected or retracted any of Mr. Mashinsky's statements.

**RESPONSE:** The allegations in Paragraph 250 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

251.    Mr. Leon and Mr. Beaudry failed to exercise independent judgment with respect to the Token Sale Agreement between AMV and Celsius Network Limited. Mr. Leon extended the deadline and reduced the price for AMV's purchase in 2018 at Mr. Mashinsky's direction, so that Mr. Mashinsky could avoid tax consequences. Ultimately, rather than holding Mr. Mashinsky to his agreement to purchase 117,000,000 CEL tokens under the Token Sale Agreement, Mr. Leon agreed to release Mr. Mashinsky from his purchase obligation in exchange for no consideration. Mr. Leon subsequently authorized and approved the AMV Loan arrangement in an attempt to cover up the issue. Mr. Beaudry facilitated the cover-up by drafting the AMV Loan agreement. Ultimately, Mr. Leon authorized the termination of each agreement and the return of the 117,000,000 CEL tokens to Celsius's treasury instead of being burned as the Whitepaper promised. Mr. Leon's and Mr. Beaudry's decisions and actions demonstrated that they were being influenced by Mr. Mashinsky rather than exercising independent judgment to make decisions in the best interest of Celsius.

**RESPONSE:** The allegations in Paragraph 251 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 251.

252.    Ms. Urata-Thompson and Mr. Cohen-Pavon were key members of various Celsius committees, including the Executive Committee, the Risk Committee, the Assets and Liabilities Committee, the New Business Committee, and the Investment Committee, and had significant input into Celsius's investment decisions. Ms. Urata-Thompson and Mr. Cohen-Pavon failed to exercise independent judgment with respect to many significant investment decisions, including, but not limited to: (1) posting significant cryptocurrency collateral with EFH without conducting proper diligence, (2) failing to sell shares in the Grayscale Bitcoin Trust when Celsius was able to do so, (3) transferring significant assets to KeyFi before an agreement had been executed, making unsecured loans to risky counterparties that exceeded the Company's risk limits, and not reducing the unsustainable interest rate that Celsius paid to its customers. These poor investment decisions were influenced by Mr. Mashinsky, and had Ms. Urata-Thompson and Mr. Cohen-Pavon exercised independent judgment and considered all relevant issues for themselves, they would not have made these decisions.

**RESPONSE:** The allegations in Paragraph 252 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 252.

253.    Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, and Ms. Urata-Thompson failed to prioritize, develop, and authorize proper systems to track and monitor Celsius's assets, obligations, and trading positions. The Defendants' initial failure led to an approximate $250 million loss that

was discovered in late 2020 and early 2021. In response, the Defendants attempted to implement a system to better track Celsius's assets and obligations. However, the ultimate system Google sheet that the Defendants created or oversaw creating to remedy the issue was obviously and woefully inadequate to track the billions of dollars of assets that had been entrusted to Celsius by retail investors and the investments that Celsius made for the benefit of the Company and its account holders. The Defendants never implemented a system to track Celsius's trading positions.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 253, except they deny the allegations in

Paragraph 253 to the extent they are directed at the Goldstein Defendants.

254.    The Defendants also failed to take appropriate actions to manage their business. From at least as early as 2021, through 2022, the Defendants were repeatedly informed that Celsius had a negative net interest margin and was not making enough money from its investments to fund the rewards rates it promised to pay to account holders. Members of the Finance and Treasury departments made multiple proposals to reduce the rewards rates. With full knowledge of Celsius's financial condition, including an extreme shortfall in assets compared to liabilities, the Defendants buckled to Mr. Mashinsky's insistence that rewards rates remain competitive, refused to lower rewards rates, and continued to offer rates that were regularly higher than their competitors'. The failure to reduce rewards rates caused Celsius to incur hundreds of millions in operating losses in 2021 and 2022.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 254, except they deny the allegations in

Paragraph 254 to the extent they are directed at the Goldstein Defendants.

255.    The Defendants failed to take immediate action in January 2022 to block Mr. Mashinsky from betting that the cryptocurrency market would drop further during a period of extreme market volatility and selling hundreds of millions of dollars' worth of BTC and other cryptocurrency assets. Following that incident, Defendants failed to remove Mr. Mashinsky's ability to make similar decisions.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 255, except they deny the allegations in

Paragraph 255 to the extent they are directed at the Goldstein Defendants.

256.    In breaching their duty to exercise independent judgment, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry caused substantial damage to Celsius Network Limited and its creditors in an amount to be proven at trial. But for such breaches of duty, Celsius Network Limited and its creditors would not have suffered such damage.

**RESPONSE:** The allegations in Paragraph 256 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

## COUNT VII

**(Breach of Fiduciary Duty — Duty to Avoid Conflicts of Interest (English Law) — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Jeremie Beaudry, Harumi Urata-Thompson, and Johannes Treutler)**

257.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

258.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Mr. Beaudry, and Ms. Urata-Thompson were all directors and officers of various Celsius entities from 2018 to present, including Celsius Network Limited. While not explicitly named as directors of Celsius Network Limited, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, and Mr. Beaudry were officers that made high-level decisions for Celsius Network Limited that would normally be carried out by directors. Additionally, the Defendants were senior level officers enjoying significant trust and independence within Celsius Network Limited.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 258, except they admit that Goldstein served as Celsius's CTO, deny that Goldstein was a director of Celsius or any Celsius affiliate, and deny the allegations contained in the second sentence of Paragraph 258 to the extent they are directed at Goldstein.

259.    Mr. Treutler was the Head of the CeFi trading desk and in charge of implementing and directing Celsius's purchases of CEL tokens from public markets. Although not a director or officer of Celsius Network Limited, Mr. Treutler was a key senior employee within Celsius Network Limited, who made material decisions with respect to Celsius Network Limited's strategy, operations, and the use of significant assets of Celsius Network Limited. Mr. Treutler ran the CeFi division of Celsius, participated in financial decisions of the Company, had input into and

knowledge of the financial welfare of the Company, and advised Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon, and Ms. Urata-Thompson, who were the Company's Directors, CEO, COO, CRO, and CFO at times relevant to this Count VII. Together with Mr. Mashinsky, Mr. Cohen-Pavon, and Ms. Urata-Thompson, Mr. Treutler would establish price targets for Celsius's purchases of CEL tokens and set resting purchase orders at specific prices. Mr. Treutler would determine the specific quantities of CEL tokens to be purchased, the prices at which to purchase the CEL tokens, and when the purchases would occur, to inflate the price of the CEL token.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 259.

260.    Accordingly, each of the aforementioned Defendants owed a duty to avoid conflicts of interest, or situations in which they have, or can have, a direct or indirect interest that conflicts, or possibly may conflict, with the interests of Celsius Network Limited.

**RESPONSE:** The allegations in Paragraph 260 state legal conclusions to which no

response is required.  To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to the Goldstein Goldstein, and lack knowledge

or information sufficient to form a belief as to the truth of the allegations of the Paragraph with

respect to any other entity or individual.

261.    Mr. Mashinsky and Mr. Goldstein owned equity interests in KeyFi when, on behalf of Celsius, they transferred coins to KeyFi prior to entering into a written agreement with KeyFi and ultimately agreed to purchase KeyFi for more than fair-market value.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 261, except they admit that Goldstein had a

small investment in KeyFi, and otherwise deny the allegations in Paragraph 261 to the extent they

are directed at Goldstein.

262.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Ms. Urata-Thompson, Mr. Treutler, and their family, friends, and related entities each owned significant amounts of CEL tokens. They directed and engaged in strategic purchases of CEL tokens on public markets using Celsius assets to manipulate and support the price of CEL token. Mr. Mashinsky, Mr. Leon, and Mr. Goldstein sold substantial amounts of CEL tokens when they knew Celsius was purchasing CEL tokens on the open market.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 193, except they admit that Goldstein owned

CEL tokens, admit that Goldstein made sales of CEL token, and deny the allegations contained in

the last sentence of Paragraph 262 to the extent they imply that Goldstein knew or was aware that

Celsius was purportedly purchasing CEL tokens on the open market.

263.    As set forth *infra*, each of the aforementioned Defendants withdrew their assets
from the Celsius platform or sold CEL token to Celsius through the OTC desk with the actual
intent to hinder, delay, and defraud Celsius and its creditors.

**RESPONSE:** The allegations in Paragraph 264 state a legal conclusion to which no

response is required.  To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack

knowledge or information sufficient to form a belief as to the truth of the allegations of the

Paragraph with respect to any other entity or individual.

264.    The Defendants breached their duty to avoid conflicts of interest by engaging in
fraudulent actions with respect to the CEL token for their own personal benefit and withdrawing
their assets from the Celsius platform at a time when the Company was suffering financial distress,
harming the Company and its creditors to the benefit of themselves.

**RESPONSE:** The allegations in Paragraph 264 state a legal conclusion to which no

response is required.  To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack

knowledge or information sufficient to form a belief as to the truth of the allegations of the

Paragraph with respect to any other entity or individual.

265.    The Defendants possessed and were able to obtain non-public information
regarding Celsius's financial condition due to their positions within Celsius, deliberately concealed
this information from the public and account holders, misrepresented Celsius's financial condition
and the risks that it was taking with its investments, and/or were aware of public misrepresentations
of Celsius and its financial condition, and used this information for their own personal advantage.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 265, except they deny the allegations in Paragraph 265 to the extent they are directed at the Goldstein Defendants.

266.    In breaching their duty to avoid conflicts of interest, the Defendants caused substantial damage to Celsius Network Limited and its creditors, in an amount to be proven at trial. But for such breaches of duty, Celsius Network Limited and its creditors would not have suffered such damage.

**RESPONSE:** The allegations in Paragraph 265 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

## COUNT VIII

### (Fraudulent Misrepresentation – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, and Harumi Urata-Thompson)

267.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

268.    On the date the Plan became effective, customers' claims for fraudulent misrepresentation described herein were irrevocably contributed to the post-effective date Debtor for the Litigation Administrator to prosecute pursuant to Article IV.U of the Plan.

**RESPONSE:** The allegations in Paragraph 268 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 268.

269.    Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson made false statements concerning several matters, including (1) the funding of Celsius's ICO; (2) the

percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius's loans to third parties; (5) Celsius' trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius. These false statements are described with particularity *supra* in Section III.

**RESPONSE:** The allegation that the matters referenced in Paragraph 269 were "described with particularity *supra* in Section III" of the Complaint states a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 269, except they deny the allegations contained in the first sentence of Paragraph 269 to the extent they are directed at Goldstein or any statements Goldstein purportedly made, and deny that the matters referenced in Paragraph 269 were described with particularity in the Complaint.

270. The specific misrepresentations and omissions made by Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson in this Complaint:

a. Were factually incorrect;

b. Were made by Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson in their official capacities through, among others, media, interviews, AMA broadcasts, tweets, blog posts on the Celsius website and podcast interviews;

c. Were known to be false by Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson at the time such statements were made;

d. Were never retracted or corrected by Defendants Mashinsky, Leon, Goldstein, or Urata-Thompson;

e. Created a materially false impression with respect to Celsius's financial health, leverage, risk strategy, regulatory compliance, and business model;

f. Presented the kind of information that customers regularly research, investigate, diligence and rely upon when making investment decisions;

g. Were intended to and did induce customers to transfer digital assets to and/or not withdraw digital assets from the Celsius platform;

h. Were likely to mislead a reasonable consumer acting reasonably under the circumstances; and

      **i.**    Were reasonably and justifiably relied on by the customers in deciding whether to transfer assets to and/or withdraw assets from the Celsius platform.

**RESPONSE:** The allegations in Paragraph 270 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein and/or any statements Goldstein purportedly made, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

271.    Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson knew or should have known that customers would rely on the misrepresentations and/or omissions they made because they insisted that customers rely on them for accurate information.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 271, except they deny the allegations in Paragraph 271 to the extent they are directed at Goldstein.

272.    The customers' reliance on Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson's representations about, among other things, (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius's loans to third parties; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above, was both reasonable and justifiable because:

      **a.**    The customers, taken as a whole, are retail investors;

      **b.**    Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson are sophisticated parties in the cryptocurrency industry relative to the customers, taken as a whole;

      **c.**    The misrepresentations and omissions were made by sophisticated parties with personal and specific knowledge about the subject matter relating thereto;

      **d.**    The communications were primarily advertisements. Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson intended for customers to rely on their statements and send digital assets to Celsius or keep digital assets on Celsius' platform;

    **e.**    Celsius established and carried out a systematic censorship process (see Section III infra), which Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson were aware of, in that process they were informed of their misrepresentation. Celsius, at the direction of the Defendants, removed any evidence of such misrepresentations and omissions from the public record after the fact and did not take any action to retract or correct the misrepresentations and omissions;

    **f.**    The customers watched AMAs and interviews with Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson, read blog posts on the Celsius website authored by Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson, and read tweets by Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson to learn information about Celsius; and

    **g.**    The customers had no reason to doubt the truthfulness of Defendants Mashinsky, Leon, Goldstein, or Urata-Thompson's representations made in their official capacities.

**RESPONSE:** The allegation that the matters referenced in Paragraph 272 were "detailed with particularity in Section III" of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 272, except they deny the allegations in Paragraph 272 to the extent they are directed at Goldstein or any statements Goldstein purportedly made, and deny that the matters referenced in Paragraph 272 were detailed with particularity in the Complaint.

273.    Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson willfully, knowingly and recklessly engaged in the conduct alleged herein, including a coordinated effort to remove misstatements from Celsius's marketing materials and public statements.

**RESPONSE:** The Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

274.    Had customers known the truth about (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans to third parties; (5) Celsius's risky trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III

above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform, and therefore would not have sustained such damages but for Defendants Mashinsky, Leon, Goldstein, or Urata-Thompson's fraudulent conduct.

**RESPONSE:** The allegations in Paragraph 274 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 274, except they deny the allegation that the matters referenced in Paragraph 274 are detailed with particularity in the Complaint.

275.   As a direct and proximate result of relying on Defendants Mashinsky, Leon, Goldstein, or Urata-Thompson's intentional misrepresentations and/or omissions, which induced customers to transfer digital assets to and/or not withdraw digital assets from the Celsius platform, customers have suffered the loss of the digital assets they transferred to the Celsius platform in an amount to be determined at trial.

**RESPONSE:** The allegations in Paragraph 275 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

276.   In addition to state laws including, but not limited to, the laws of New York, New Jersey, and Delaware, the facts asserted in this Count VIII also constitute common law fraudulent misrepresentation under English law, which is rooted in the tort of deceit and requires:

    **a.**   Defendants making a false representation to Celsius's customers;

    **b.**   Defendants' knowledge that the representation is false, or recklessness as to whether it is true or false;

    **c.**   Defendants' intention that customers act in reliance on the representation; and

    **d.**   The Class members acting in reliance on the representation and suffering loss as a result.

**RESPONSE:** The allegations in Paragraph 276 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

277. As set out above, the specific misrepresentations and omissions made by Defendants to customers as to: (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius's loans to third parties; (5) Celsius's trading strategies; regulatory issues that Celsius was facing and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above were, among other things:

    **a.** Factually incorrect;

    **b.** Known to be false by Defendants at the time such statements were made;

    **c.** Intended to and did induce customers to transfer digital assets to and/or not withdraw digital assets from the Celsius platform; and

    **d.** Reasonably and justifiably relied upon by customers, causing them to suffer the loss of the digital assets they transferred to the Celsius platform in an amount to be determined at trial.

**RESPONSE:** The allegations in Paragraph 277 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 277, except they deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants and/or any statements purportedly made by the Goldstein Defendants, and deny that the matters referenced in Paragraph 277 are detailed with particularity in the Complaint.

## COUNT IX

### (Conspiracy to Fraudulently Misrepresent – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Harumi Urata-Thompson, Jeremie Beaudry, Roni Cohen-Pavon, Johannes Treutler)

278.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every

response to Plaintiff's allegations as if fully set forth herein.

279.    Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, Beaudry, Cohen-Pavon, and Treutler knew of the other Defendants' misrepresentations regarding (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius's loans to third parties; (5) the different collateralization requirements for retail borrowers and institutional borrowers; (6) Celsius's trading strategies; (7) regulatory issues that Celsius was facing, and (8) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above (the "**Fraudulent Misrepresentations**").

**RESPONSE:** The allegation that the matters referenced in Paragraph 279 were "detailed

with particularity in Section III" of the Complaint states a legal conclusion to which no response

is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or

information sufficient to form a belief as to the truth of the allegations in Paragraph 279, except

they deny the allegations in in Paragraph 279 to the extent they are directed at the Goldstein

Defendants, and deny that the matters referenced in Paragraph 279 were detailed with particularity

in the Complaint.

280.    Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, Beaudry, Cohen-Pavon, and Treutler did not correct the statements and engaged in a scheme to cover up the misstatements by erasing the content from the internet.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 280, except they deny the allegations in

Paragraph 280 to the extent they are directed at Goldstein.

281.    Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, Beaudry, Cohen-Pavon, and Treutler also willfully, knowingly and recklessly engaged in a coordinated effort to (1) remove misstatements from Celsius's marketing materials and public statements, but without correcting these misstatements publicly, because they knew these constituted fraudulent misrepresentations, ¶¶ 108-111; (2) obscure the fact that the ICO had not been fully funded, by segregating the CEL tokens that Mr. Mashinsky refused to purchase and moving the tokens to Celsius's treasury, ¶¶ 50-55; and (3) support (i.e., inflate) the market by purchasing CEL tokens in a manner that was contrary to what Celsius told the public. ¶¶ 63-87.

**RESPONSE:** The allegations in Paragraph 281 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

282.    Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, Beaudry, Cohen-Pavon, and Treutler's conduct described herein was intentional, as demonstrated by their communications, including communications described in the aforementioned paragraphs.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 282, except they deny the allegations in Paragraph 282 to the extent they are directed at Goldstein.

283.    Had customers known the truth about the Fraudulent Misrepresentations, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform, and therefore would not have sustained damages but for Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, Beaudry, Cohen-Pavon, and Treutler's failure to correct the Fraudulent Misrepresentations and coordinated efforts to obscure the Fraudulent Misrepresentations.

**RESPONSE:** The allegations in Paragraph 283 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

284.    As a direct and proximate result of relying on the Fraudulent Misrepresentations, which Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, Beaudry, Cohen-Pavon, and Treutler willfully, knowingly and recklessly failed to correct and attempted to obscure, customers transferred digital assets to and/or failed to withdraw digital assets from the Celsius platform, thus suffering losses in an amount to be determined at trial.

**RESPONSE:** The allegations in Paragraph 284 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

## COUNT X

**(Violation of New York Deceptive Practices Act (N.Y. Gen. Bus. Law § 349(a) – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Jeremie Beaudry, and Harumi Urata-Thompson)**

285.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

286.    New York General Business Law ("**GBL**") § 349 prohibits any business or person from engaging in deceptive business practices in the conduct of any business, trade or commerce, or in the furnishing of any service, in New York state. GBL § 349(a).

**RESPONSE**:  The allegations in Paragraph 286 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 286.

287.    As consumers of Celsius's services as described herein, account holders who contributed their claims to the Litigation Administrator are "person[s]" within the meaning of GBL § 349.

**RESPONSE**:  The allegations in Paragraph 287 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 287.

288.    These account holders, and, by assignment, the Litigation Administrator, are authorized to bring a private action for the conduct described herein under GBL § 349(h).

**RESPONSE**:  The allegations in Paragraph 288 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 288.

289.    At all times relevant herein, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson conducted business in the State of New York or directed their business at the State of New York and are therefore subject to New York law for the incidents described in this Count.

**RESPONSE**:  The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 289.

290.    Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry and Urata-Thompson's actions alleged herein constitute unlawful, unfair, deceptive and fraudulent business practices in the State of New York.

**RESPONSE**:  The allegations in Paragraph 290 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

291.    Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson's conduct constitutes acts, uses and/or employment by these Defendants of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations and/or the knowing concealment, suppression and/or omission of material facts with the intent that others rely upon such concealment, suppression or omission, in connection

with the sale or advertisement of services, and with the subsequent performance of services and transactions, in violation of GBL § 349.

**RESPONSE**:    The allegations in Paragraph 291 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

292.    At all times relevant herein, Celsius offered and sold its services to a robust consumer base and did not tailor such offer or sale to a specific buyer.

**RESPONSE**:  The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 292.

293.    Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson made repeated, specific misrepresentations and omissions to Celsius customers in public broadcasts and interviews as to: (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above:

    **a.**    Were factually incorrect;

    **b.**    Were made by Defendants in their official capacities through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website and podcast interviews;

    **c.**    Were known to be false by Defendants at the time such misrepresentations or omissions were made;

    **d.**    Were never retracted or corrected by Defendants;

    **e.**    Presented the kind of information that investors regularly research, investigate, diligence and rely upon when making investment decisions;

    **f.**    Were intended to and did induce customers to transfer digital assets to and/or not withdraw digital assets from the Celsius platform;

    **g.**    Were likely to mislead a reasonable consumer acting reasonably under the circumstances; and

h.   Constituted materially misleading and, therefore, deceptive conduct in violation of GBL § 349.

**RESPONSE:** The allegations in Paragraph 293 state legal conclusions to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 293, except they deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and deny that the matters referenced in Paragraph 293 were detailed with particularity in the Complaint.

294.   In addition to making specific misrepresentations and omissions, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson conspired to conceal these misrepresentations from Celsius customers by editing the misrepresentations out of AMA videos after they had been broadcast live, but before they were posted on YouTube. Defendants made these changes surreptitiously and did not inform customers that the information they had heard on the live AMA broadcasts was incorrect. This practice is described with particularity in Section III above.

**RESPONSE:** The allegation that the matters referenced in Paragraph 294 were "described with particularity in Section III" of the Complaint states a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 294, except they deny the allegations in Paragraph 294 to the extent they are directed at the Goldstein Defendants, and deny that the matters referenced in Paragraph 294 were described with particularity in the Complaint.

295.   Defendants systematically engaged in these deceptive, misleading and unlawful acts and practices to the detriment of customers.

**RESPONSE:** The allegations in Paragraph 295 state legal conclusions to which no response is required.   To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack

knowledge or information sufficient to form a belief as to the truth of the allegations of the

Paragraph with respect to any other entity or individual.

296.    Had customers known the truth about (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform.

**RESPONSE:** The allegations in Paragraph 296 state a legal conclusion to which no

response is required.    To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

296, except they deny that the matters referenced in Paragraph 296 were detailed with particularity

in the Complaint.

297.    Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson knowingly and/or recklessly engaged in the conduct alleged herein, including the coordinated effort to remove misstatements from Celsius's marketing materials and public statements.

**RESPONSE:** The allegations in Paragraph 297 state a legal conclusion to which no

response is required.    To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or

information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect

to any other entity or individual.

298.    Customers relied on Defendants' misrepresentations when they transferred their assets to Celsius, and customers have been harmed by Defendants' deceptive conduct in that they have suffered the loss of the digital assets they transferred to the Celsius platform. As a result of Defendants' violation of GBL § 349, customers have suffered a loss in an amount to be determined at trial.

**RESPONSE:** The allegations in Paragraph 298 state a legal conclusion to which no

response is required.    To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack

knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

299.    Plaintiff, on behalf of account holders, seeks all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

**RESPONSE:** The allegations in Paragraph 299 state the relief Plaintiff seeks and therefore requires no response.  To the extent a response is deemed to be required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 299, except they deny that Plaintiff or account holders are entitled to any of the relief sought.

## COUNT XI

**(Violation of New York False Advertising Law (N.Y. Gen. Bus. Law § 350 – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Jeremie Beaudry, and Harumi Urata-Thompson)**

300.    Plaintiff repeats and realleges each and every allegation and factual statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

301.    GBL § 350-a(1) prohibits false advertising in the conduct of any business, trade or commerce, or in the furnishing of any service, in New York state.

**RESPONSE**:  The allegations in Paragraph 301 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 301.

302.    GBL § 350-A defines the term "false advertising" as advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.

**RESPONSE**:  The allegations in Paragraph 302 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 302.

303.    At all times relevant herein, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson conducted business in the State of New York or directed their business at the State of New York and are therefore subject to New York law for the incidents described in this Count.

**RESPONSE**:  The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 303.

304.    As alleged herein, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson have engaged in material deceptive, misleading or false advertising that was directed at and affected consumers who transferred digital assets to and/or did not withdraw digital assets from Celsius platform as a result of such deceptive, misleading or false advertising, in violation of GBL §§ 350 and 350-a.

**RESPONSE**:  The allegations in Paragraph 304 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

305.    At all times relevant herein, Celsius offered and sold its services to a robust consumer base and did not tailor such offer or sale to a specific buyer.

**RESPONSE**:  The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 305.

306.    Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson made repeated, specific misrepresentations and omissions to Celsius customers in public broadcasts and interviews as to: (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above:

    **a.**    Were factually incorrect;

    **b.**    Were made by Defendants in their official capacities, through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website, podcast interviews;

    **c.**    Were known to be false by Defendants at the time such misrepresentations or omissions were made;

    **d.**    Were never retracted or corrected by Defendants;

    **e.**    Presented the kind of information that consumers regularly research, investigate, diligence and rely upon when determining whether to purchase or use a product or service;

    **f.**    Were intended to and did induce customers to transfer digital assets to and/or not withdraw digital assets from the Celsius platform;

    **g.**    Were likely to mislead a reasonable consumer acting reasonably under the circumstances; and

    **h.**    Constituted affirmative misrepresentation and omissions in connection with the marking, advertising, promotion and sale of the products and services offered by Celsius in violation of GBL § 350 and 350-a.

**RESPONSE:** The allegations in Paragraph 306 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 306, except they deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and deny that the matters referenced in Paragraph 306 were detailed with particularity in the Complaint.

307.    In addition to making specific misrepresentations and omissions, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson conspired to conceal these misrepresentations from Celsius customers by editing the misrepresentations out of AMA videos after they had been broadcast live, but before they were posted on YouTube. Defendants made these changes surreptitiously and did not inform customers that the information they had heard on the live AMA broadcasts was incorrect. This practice is described with particularity in Section III above.

**RESPONSE:** The allegation that the matters referenced in Paragraph 307 were "described with particularity in Section III" of the Complaint states a legal conclusion to which no response

is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 307, except they deny the allegations in Paragraph 307 to the extent they are directed at the Goldstein Defendants, and deny that the matters referenced in Paragraph 307 were described with particularity in the Complaint.

308.    Had customers known the truth about (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Section III above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform.

**RESPONSE:** The allegations in Paragraph 308 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 308, except they deny that the matters referenced in Paragraph 308 were detailed with particularity in the Complaint.

309.    Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson willfully, knowingly and/or recklessly engaged in the conduct alleged herein, including the coordinated effort to remove misstatements from Celsius's marketing materials and public statements.

**RESPONSE:** The allegations in Paragraph 309 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

310.    Customers have been harmed by Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson's deceptive conduct in that they have suffered the loss of the digital assets they transferred to the Celsius platform. As a result of Defendants' violation of GBL §§ 350 and 350-a, customers have suffered a loss in an amount to be determined at trial.

**RESPONSE:** The allegations in Paragraph 310 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

311. Plaintiff, on behalf of account holders, accordingly seeks all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

**RESPONSE:** The allegations in Paragraph 311 state the relief Plaintiff seeks and therefore requires no response. To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 311.

## COUNT XII

**(Violation of New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1, et seq.) – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Jeremie Beaudry, and Harumi Urata-Thompson)**

312. Plaintiff repeats and realleges each and every allegation and factual statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

313. The New Jersey Consumer Fraud Act (the "**NJCFA**") prohibits unconscionable practices, misrepresentations and omissions, including:

> the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

N.J. Stat. Ann. 56:8-2.

**RESPONSE**: The allegations in Paragraph 313 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 313.

314. At all times relevant herein, Celsius had an office or offices in the State of New Jersey.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 314.

315. At all times relevant herein, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson conducted business in the State of New Jersey or directed its business at the State of New Jersey and are therefore subject to New Jersey law for the incidents described in this Count.

**RESPONSE**: The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 315.

316. Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, and Urata-Thompson have engaged in unconscionable commercial practices under the NJCFA.

**RESPONSE:** The allegations in Paragraph 316 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

317. Defendants Mashinsky, Leon, Goldstein, and Urata-Thompson made repeated, specific misrepresentations and omissions to Celsius customers in public broadcasts and interviews as to: (1) the funding of Celsius's ICO; (2) the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets they transferred to Celsius, each as detailed with particularity in Sections III above:

    a. Were factually incorrect;

    **b.**    Were made in connection with the sale or advertisement of merchandise, being the Celsius services;

    **c.**    Were made by Defendants in their official capacities, through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website, podcast interviews;

    **d.**    Were known to be false by Defendants at the time such misrepresentations or omissions were made;

    **e.**    Were never retracted or corrected by Defendants;

    **f.**    Were intended to and did induce customers to use the Celsius service by transferring digital assets to and/or not withdrawing digital assets from the Celsius platform; and

    **g.**    Constituted, in the aggregate, an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation and/or the knowing, concealment, suppression and/or omission of material facts in connection with the sale and advertisement of the Celsius services, in violation of N.J. Stat. Ann. § 56:8-2.

**RESPONSE:** The allegations in Paragraph 317 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 317, except they deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and deny that the matters referenced in Paragraph 317 were detailed with particularity in the Complaint.

318.   In addition to making specific misrepresentations and omissions, Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-Thompson conspired to conceal these misrepresentations from Celsius customers by editing the misrepresentations out of AMA videos after they had been broadcast live, but before they were posted on YouTube. Defendants made these changes surreptitiously and did not inform customers that the information they had heard on the live AMA broadcasts was incorrect. This practice is described with particularity in Section III above.

**RESPONSE:** The allegation that the matters referenced in Paragraph 318 were "described with particularity in Section III" of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or

information sufficient to form a belief as to the truth of the allegations in Paragraph 318, except

they deny the allegations in Paragraph 318 to the extent they are directed at the Goldstein

Defendants, and deny that the matters referenced in Paragraph 318 were described with

particularity in the Complaint.

319.    Had customers known the truth about (1) the funding of Celsius's ICO; (2) the
percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL
tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies;
(6) regulatory issues that Celsius was facing, and (7) their legal rights with respect to the assets
they transferred to Celsius, each as detailed with particularity in Section III above, they would not
have transferred digital assets to or declined to withdraw digital assets from the Celsius platform.

**RESPONSE:** The allegations in Paragraph 319 state legal conclusions to which no

response is required.   To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

319, except they deny that the matters referenced in Paragraph 319 were detailed with particularity

in the Complaint.

320.    Defendants Mashinsky, Leon, Goldstein, Cohen-Pavon, Beaudry, and Urata-
Thompson willfully, knowingly and/or recklessly engaged in the conduct alleged herein, including
the coordinated effort to remove misstatements from Celsius's marketing materials and public
statements.

**RESPONSE:** The allegations in Paragraph 320 state a legal conclusion to which no

response is required.   To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or

information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect

to any other entity or individual.

321.    Customers have been harmed by Defendants Mashinsky, Leon, Goldstein, Cohen-
Pavon, and Urata-Thompson's deceptive conduct in that they have suffered the quantifiable and
measurable loss of the digital assets they transferred to the Celsius platform. As a result of
Defendants' violations of N.J. Stat. Ann. § 56:8-2, customers have suffered a loss in an amount to
be determined at trial.

**RESPONSE:** The allegations in Paragraph 321 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

322.    Plaintiff, on behalf of account holders, accordingly seeks all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

**RESPONSE:** The allegations in Paragraph 322 state the relief Plaintiff seeks and therefore requires no response. To the extent a response is deemed to be required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 322, except they deny that Plaintiff or account holders are entitled to any of the relief sought.

## COUNT XIII

**(Avoidance and Recovery of Preferential Transfers — 11 U.S.C §§ 547(b); 550 — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Jeremie Beaudry, Roni Cohen-Pavon, Harumi Urata-Thompson, Aliza Landes, Kristine Meehan Mashinsky, AM Ventures Holding LLC, Koala1 LLC, Bits of Sunshine LLC, and Four Thirteen LLC)**

323.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

324.    Prior to the Pause, the Defendants withdrew cryptocurrency from the Celsius platform, and each withdrawal constituted a transfer of an interest of the Debtors in the property.

**RESPONSE:** The allegation contained in the last clause of Paragraph 324 states a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 324, except they admit the Goldstein Defendants made withdrawals and deposits of cryptocurrency from and to their accounts on the Celsius platform prior to the Pause, and deny that any withdrawals or deposits of cryptocurrency that the Goldstein Defendants may have made from or to their accounts on the Celsius platform constituted transfers of an interest of the Debtors in the property.

325.    A complete list of the Defendants' withdrawals is included as **Exhibit A** to this Complaint (the "**Preferential Transfers**").[79]

**RESPONSE:** The allegations contained in the second and third sentences of Footnote 79 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 325 (including Footnote 79 and Exhibit A), except they admit the Goldstein Defendants made withdrawals and deposits of cryptocurrency from and to their accounts on the Celsius platform.

326.    The Defendants were creditors of Celsius at the time of the Preferential Transfers.

**RESPONSE:** The allegations in Paragraph 326 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants admit that they are creditors of Celsius, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

327.    The Preferential Transfers were to, or for the benefit of, the Defendants within the meaning of section 547(b)(1) of the Bankruptcy Code.

---

[79] As part of this due diligence evaluation, Plaintiff reviewed the Debtors' books and records and identified that Defendants potentially deposited assets on the Celsius platform during the applicable period that would qualify as new value under section 547(c)(4) of the Bankruptcy Code. However, the subsequent new value defense is an affirmative defense, for which Defendants bear the burden of proof under section 547(g) of the Bankruptcy Code. Factors such as the appropriate valuation date of such new value may affect the ultimate net of new value amount, if any. Accordingly, Defendants bear the burden of proof to establish they are entitled to this new value.

**RESPONSE:** The allegations in Paragraph 327 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

328. The Preferential Transfers were made for, or on account of, an antecedent debt or debts owed by the Debtors to each of the Defendants before such transfers were made.

**RESPONSE:** The allegations in Paragraph 328 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

329. The Preferential Transfers each occurred within one year of the Petition Date.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 329.

330. The Preferential Transfers were made while the Debtors were insolvent.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 330.

331. Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Beaudry, Mr. Cohen-Pavon, Ms. Urata-Thompson, Ms. Landes, and Mrs. Mashinsky qualify as statutory insiders under section 101(31) of the Bankruptcy Code as the Defendants were all directors, officers, or persons in control of the Debtors, or relatives of directors, officers, or persons in control of the Debtors. These Defendants are also non-statutory insiders because they shared close relationships with the Debtors, had material non-public information regarding the Debtors, and had positions of significant authority and decision-making with the Debtors leading up to the Preferential Transfers.

**RESPONSE:** The allegations in Paragraph 331 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

332.    AMV, Koala1 LLC, Bits of Sunshine LLC, and Four Thirteen LLC are non-statutory insiders because they shared close relationships with the Debtors, are owned and controlled by the Defendants, and negotiated at less than arm's length with the Debtors leading up to the Preferential Transfers. Specifically, AMV and Koala1 LLC are entities that, upon information and belief, are wholly owned by Mr. Mashinsky, the founder, director, and former CEO of Celsius. Bits of Sunshine LLC and Four Thirteen LLC are entities that, upon information and belief, are wholly owned by Mr. Goldstein.

**RESPONSE:** The allegations contained in the first sentence of Paragraph 332 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 332, except they admit Goldstein has interests in Bits of Sunshine and Four Thirteen.

333.    As a result of the Preferential Transfers, each of the Defendants received more than they would be entitled to receive (i) under a hypothetical Chapter 7 case; (ii) if the transfers had not been made; and (iii) if such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 333 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

334.    As of the date hereof, the Defendants have not repaid all or a part of the value of the Preferential Transfers or returned the Preferential Transfers.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 334.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein,

and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

335.    The Preferential Transfers are avoidable under section 547(b) of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 335 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to any transfers purportedly made by the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any transfers purportedly made by any other entity or individual.

336.    Under Section 550 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred and avoided under section 547 of the Bankruptcy Code from any immediate or mediate transferee of the initial transferee of such property.

**RESPONSE:** The allegations in Paragraph 336 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 336.

337.    The Defendants are the recipients of the Preferential Transfers and are liable as initial transferees. In the alternative, the Defendants are liable as subsequent or mediate transferees.

**RESPONSE:** The allegations in Paragraph 337 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

338.    Therefore, the Preferential Transfers or the value of the property transferred in Preferential Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 338 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to any transfers purportedly made by the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any transfers purportedly made by any other entity or individual.

## COUNT XIV

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b);
548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform
Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware)
— Defendant Alexander Mashinsky)**

339.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

340.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 340 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response. To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 340.

341.    Between May 14, 2022 and the Petition Date, Mr. Mashinsky transferred the following amounts from the Celsius platform to his personal cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Alexander Mashinsky Transfers**"):

*Alex Mashinsky*

| Date | Asset | USD Amount |
|---|---|---|
| May 14, 2022 | SOL | $121,935 |
| May 14, 2022 | MATIC | 30,178 |
| May 14, 2022 | BTC | 334,407 |

| May 14, 2022 | LINK | 35,663 |
| May 14, 2022 | CEL | 10,000 |
| May 15, 2022 | ETH | 204,472 |
| May 15, 2022 | ETH | 803,764 |
| May 15, 2022 | USDC | 1,299,827 |
| **Total** | | **$2,840,246** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 341.

341.    The Alexander Mashinsky Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 342 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 342.

343.    Mr. Mashinsky caused the Alexander Mashinsky Transfers to be made by the Debtors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 343.

344.    Mr. Mashinsky caused Debtors to make the Alexander Mashinsky Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Mr. Mashinsky.

**RESPONSE:** The allegations in Paragraph 344 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 344.

345.    Mr. Mashinsky's actual intent to hinder, delay, or defraud creditors is established by, among other things, the following badges of fraud:

      a.    The close relationship between the Debtors and Mr. Mashinsky, who was a director and the CEO of the Debtors at the time of the transfers;

b.   Mr. Mashinsky's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn;

c.   The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

d.   Contemporaneous communications that establish Mr. Mashinsky knew Celsius was insolvent and in dire financial condition;

e.   The fact that Mr. Mashinsky withdrew substantially all of his BTC, ETH, and stablecoins on deposit with Celsius;

f.   Mr. Mashinsky had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

g.   That Mr. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

h.   That notwithstanding the Alexander Mashinsky Transfers, Mr. Mashinsky continued to represent publicly that he was fully invested in Celsius and was not withdrawing his assets in order to persuade others to keep their digital assets on the platform;

i.   The Alexander Mashinsky Transfers were to an insider; and

j.   Mr. Mashinsky, through initiating the Alexander Mashinsky Transfers and other transfers described herein, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors.

**RESPONSE:** The allegations in Paragraph 345 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 345.

346.   The Alexander Mashinsky Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. To the extent the Alexander Mashinsky Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

**RESPONSE:** The allegations in Paragraph 346 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 346.

347.    Plaintiff is entitled to avoid the Alexander Mashinsky Transfers.

**RESPONSE:** The allegations in Paragraph 347 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 347.

348.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 348 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 348.

349.    Mr. Mashinsky is the initial transferee for whose benefit the Alexander Mashinsky Transfers were made. Upon information and belief, Mr. Mashinsky may have transferred the funds comprising the Alexander Mashinsky Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 349 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 349.

350.    Therefore, the Alexander Mashinsky Transfers, or the value of the property transferred in the Alexander Mashinsky Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 350 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 350.

## COUNT XV

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Shlomi Daniel Leon)**

351.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

352.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 352 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response. To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 352.

353.    Between July 15, 2021 and the Petition Date, Mr. Leon transferred the following amounts from the Celsius platform to his personal cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Leon Transfers**"):

### Shlomi Daniel Leon

| Date | Asset | USD Amount |
|------|-------|-----------|
| July 15, 2021 | BTC | $31,447 |
| July 18, 2021 | ETH | 1,916 |
| July 18, 2021 | CEL | 11 |
| July 19, 2021 | ETH | 69,320 |
| August 8, 2021 | CEL | 636,462 |
| September 14, 2021 | CEL | 5 |
| September 14, 2021 | CEL | 104,200 |
| September 21, 2021 | CEL | 102,616 |

| September 22, 2021 | BTC | 1,355,123 |
| September 27, 2021 | CEL | 177,575 |
| October 6, 2021 | CEL | 113,800 |
| October 21, 2021 | CEL | 184,800 |
| December 2, 2021 | CEL | 206,208 |
| March 29, 2022 | CEL | 64,030 |
| April 4, 2022 | CEL | 69,280 |
| April 11, 2022 | CEL | 265,576 |
| April 13, 2022 | USDC | 2 |
| April 13, 2022 | USDC | 50 |
| April 14, 2022 | USDC | 2,200,000 |
| April 20, 2022 | CEL | 100 |
| April 26, 2022 | CEL | 81,000 |
| May 29, 2022 | USDC | 2,370,634 |
| May 31, 2022 | BTC | 420,805 |
| May 31, 2022 | ETH | 110,179 |
| May 31, 2022 | DOT | 52,575 |
| May 31, 2022 | ADA | 30,978 |
| May 31, 2022 | SNX | 35,975 |
| May 31, 2022 | USDC | 3,127 |
| **Total** | | **$8,687,793** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 353.

354.    The Leon Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 354 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 354.

355.    Mr. Leon caused the Leon Transfers to be made by the Debtors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 355.

356.    Mr. Leon caused Debtors to make the Leon Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Mr. Leon.

**RESPONSE:** The allegations in Paragraph 356 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 356.

357. Mr. Leon's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

a.  The close relationship between the Debtors and Mr. Leon, who was a director, the COO, or the CSO of the Debtors at the time of the transfers;

b.  Mr. Leon's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Leon Transfers;

c.  The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

d.  Contemporaneous communications that establish Mr. Leon knew Celsius was insolvent and in dire financial condition;

e.  The fact that Mr. Leon withdrew all of his BTC, ETH, and a majority of his stablecoins on deposit with Celsius;

f.  The fact that Mr. Leon moved nearly all of his CEL tokens between associated entities;

g.  Mr. Leon had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

h.  Mr. Leon, through initiating the Leon Transfers, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors;

i.  That Mr. Leon's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

j.  The Leon Transfers were to an insider; and

k.  The Debtors were insolvent or became insolvent shortly after the Leon Transfers were made.

**RESPONSE:** The allegations in Paragraph 357 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 357.

358.    By virtue of the foregoing, the Leon Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Leon Transfers.

**RESPONSE:** The allegations in Paragraph 358 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in  Paragraph 358.

359.    To the extent the Leon Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

**RESPONSE:** The allegations in Paragraph 359 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 359.

360.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 360 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 360.

361.    Mr. Leon is the initial transferee for whose benefit the Leon Transfers were made. Upon information and belief, Mr. Leon may have transferred the funds comprising the Leon

Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 361 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 361.

362.    Therefore, the Leon Transfers, or the value of the property transferred in the Leon Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 362 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 362.

## COUNT XVI

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Hanoch Goldstein)**

363.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

364.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 352 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response.  To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 364.

365.    Between August 12, 2021 and the Petition Date, Mr. Goldstein transferred the following amounts from the Celsius platform to his personal cryptocurrency wallet (collectively, the "**Goldstein Transfers**"):

### Hanoch Goldstein

| Date | Asset | USD Amount |
|------|-------|-----------:|
| August 12, 2021 | ETH | $4,269 |
| October 27, 2021 | USDC | 100,000 |
| October 28, 2021 | USDT ERC20 | 2,828 |
| December 4, 2021 | USDC | 250,000 |
| March 4, 2022 | CEL | 152,000 |
| March 4, 2022 | ETH | 682,381 |
| April 17, 2022 | CEL | 44,259 |
| May 6, 2022 | ETH | 540,921 |
| May 11, 2022 | ETH | 694,989 |
| May 27, 2022 | CEL | 72,146 |
| **Total** | | **$2,543,793** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 365.

366.    The Goldstein Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 366 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 366, except they deny that any purported transfers Goldstein may have made constitute transfers of interest in the Debtors' property.

367.    Mr. Goldstein caused the Goldstein Transfers to be made by the Debtors.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 367.

368.    Mr. Goldstein caused Debtors to make the Goldstein Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Mr. Goldstein.

**RESPONSE:** The allegations in Paragraph 368 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 368.

369.   Mr. Goldstein's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

a.   The close relationship between the Debtors and Mr. Goldstein, who was the CTO or President of Labs of the Debtors at the time of the transfers;

b.   Mr. Goldstein's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Goldstein Transfers;

c.   The timing of the transactions as Celsius was experiencing financial distress;

d.   Contemporaneous communications that establish Mr. Goldstein knew Celsius was insolvent and in dire financial condition;

e.   That Mr. Goldstein's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

f.   The Goldstein Transfers were to an insider;

g.   The Debtors were insolvent or became insolvent shortly after the Goldstein Transfers were made;

h.   Mr. Goldstein, through initiating the Goldstein Transfers, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors; and

i.   The fact that Mr. Goldstein moved nearly all of his CEL tokens and a substantial majority of stablecoins between associated entities.

**RESPONSE:** The allegations in Paragraph 369 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 369.

370.   By virtue of the foregoing, the Goldstein Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states

of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Goldstein Transfers.

**RESPONSE:** The allegations in Paragraph 370 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 370.

371.    To the extent the Goldstein Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

**RESPONSE:** The allegations in Paragraph 371 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 371.

372.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 372 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 372.

373.    Mr. Goldstein is the initial transferee for whose benefit the Goldstein Transfers were made. Upon information and belief, Mr. Goldstein may have transferred the funds comprising the Goldstein Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 373 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 373.

374.    Therefore, the Goldstein Transfers, or the value of the property transferred in the Goldstein Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 374 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 374.

## COUNT XVII

**(Avoidance and Recovery of Constructive Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(B); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Hanoch Goldstein)**

375.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

376.    Plaintiff brings this claim under sections 544(b), 548(a)(1)(B), and 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 376 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response.  To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 376.

377.    On April 1, 2021, Mr. Goldstein received a loan of $4,200,000 collateralized by 9,628,852 CEL tokens, which constitutes a transfer of interest in the Debtors' property and was made to and for the benefit of Mr. Goldstein (the "**Goldstein Loan**").

**RESPONSE:** The allegations in Paragraph 377 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 377, except they admit Goldstein was approved for a $4,200,000 loan on April 1, 2021, admit that this loan was collateralized by CEL tokens, and deny that this loan constitutes a transfer of interest in the Debtors' property.

378.    The Goldstein Loan was made within two years prior to the Petition Date.

**RESPONSE:** The Goldstein Defendants admit the allegations in Paragraph 378.

379.    The Debtors received less than reasonably equivalent value or did not receive fair consideration in exchange for the Goldstein Loan. At the time of the transfer, the 9,628,852 CEL tokens received as collateral were worth significantly less than the $4,200,000 received by Mr. Goldstein, particularly when the manipulation of the CEL token's value is considered.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 379.

380.    The interest rate on the Goldstein Loan is 1%. Upon information and belief, Mr. Goldstein did not execute a loan agreement in connection with the Goldstein Loan.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 380, except they admit the interest rate on the Goldstein Loan was 1%.

381.    The Debtors were insolvent on the date of the Goldstein Loan; were left with unreasonably small capital on the date of the Goldstein Loan or as a result of the Goldstein Loan; or intended to incur or believed they would incur debts beyond its ability to pay as such debts matured.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 381.

382.    Moreover, the Debtors made the Goldstein Loan to, or for the benefit of, an insider, or incurred such obligation to or for the benefit of an insider and not in the ordinary course of business.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 382.

383.    By virtue of the foregoing, the Goldstein Loan was a constructive fraudulent transfer avoidable under sections 544(b) and 548(a)(1)(B) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Goldstein Loan.

**RESPONSE:** The allegations in Paragraph 372 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 383.

384.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the

property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 384 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 384.

385.   Mr. Goldstein is the initial transferee for whose benefit the Goldstein Loan was made. Upon information and belief, Mr. Goldstein may have transferred the funds comprising the Goldstein Loan to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 385 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 385.

386.   Therefore, the Goldstein Loan, or the value of the property transferred in the Goldstein Loan, is recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 374 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 386.

## COUNT XVIII

### (Breach of Contract — Failure to Repay Loan — Defendant Hanoch Goldstein)

387.   Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

388.   As set out in Count XVII, Mr. Goldstein entered into the Goldstein Loan, which constituted a valid and binding agreement between Mr. Goldstein and Celsius.

**RESPONSE:** The allegations in Paragraph 388 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 388, except admit that Goldstein was approved for a loan.

389. The Goldstein Loan was subject to the Celsius Loan Terms and Conditions, which stated that a failure to make timely payments would constitute a default.

**RESPONSE:** The allegations in Paragraph 389 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 389.

390. Mr. Goldstein defaulted on the Goldstein Loan by failing to repay it by the maturity date of April 1, 2024.

**RESPONSE:** The allegations in Paragraph 390 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 390.

391. The total amount currently owed by Mr. Goldstein to Celsius is $4,280,778, which includes the principal amount of $4,200,000 plus accrued and unpaid interest of $76,521 and late fees of $4,257, plus additional interest and fees accruing daily.

**RESPONSE:** The allegations in Paragraph 391 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 391.

392. Mr. Goldstein was sent a notice on behalf of Celsius on May 8, 2024 informing him of his default on the Goldstein Loan and requesting full repayment. Mr. Goldstein did not repay his loan in response to this notice.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 392, except they admit Goldstein received correspondence from Celsius dated May 8, 2024. The Goldstein Defendants respectfully refer the Court to the correspondence for its true contents.

393.    As a result of this breach of contract, Celsius and its creditors suffered damage.

**RESPONSE:** The allegations in Paragraph 393 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 393.

## COUNT XIX

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Jeremie Beaudry)**

394.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

395.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 395 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response.  To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 395.

396.    Between July 16, 2021 and the Petition Date, Mr. Beaudry transferred the following amounts of cryptocurrency from the Celsius platform to his personal cryptocurrency wallet (collectively, the "**Beaudry Transfers**"):

*Jeremie Beaudry*

| Date | Asset | USD Amount |
|------|-------|-----------|
| July 16, 2021 | BTC | $100 |
| July 16, 2021 | BTC | 147,929 |
| July 19, 2021 | USDC | 15,000 |
| August 4, 2021 | USDC | 850,000 |
| August 9, 2021 | USDC | 35,000 |
| August 13, 2021 | USDC | 41,000 |
| August 20, 2021 | USDC | 400,000 |
| October 16, 2021 | ETH | 453,879 |

| | | |
|---|---|---|
| November 17, 2021 | USDC | 30,000 |
| December 1, 2021 | USDC | 42,000 |
| December 1, 2021 | BAT | 61 |
| December 2, 2021 | BCH | 16,615 |
| December 2, 2021 | BTC | 37,702 |
| December 2, 2021 | DASH | 8 |
| December 2, 2021 | UNI | 9,352 |
| December 2, 2021 | USDC | 100,000 |
| December 3, 2021 | USDT ERC20 | 28 |
| December 3, 2021 | BTC | 13,987 |
| December 3, 2021 | USDC | 6,000 |
| December 3, 2021 | USDC | 21,000 |
| December 4, 2021 | USDC | 40,000 |
| December 4, 2021 | USDC | 400,000 |
| December 5, 2021 | USDC | 30,000 |
| December 6, 2021 | BTC | 31 |
| December 6, 2021 | BCH | 10 |
| December 6, 2021 | USDC | 37,000 |
| December 9, 2021 | UNI | 3 |
| December 9, 2021 | USDC | 40,000 |
| December 10, 2021 | USDC | 50,000 |
| December 12, 2021 | USDC | 50,000 |
| December 13, 2021 | USDC | 20,000 |
| December 15, 2021 | USDC | 42,000 |
| December 17, 2021 | USDC | 25,050 |
| December 20, 2021 | USDC | 50,000 |
| December 20, 2021 | USDC | 10,000 |
| December 22, 2021 | USDC | 30,000 |
| December 23, 2021 | USDC | 13,000 |
| December 28, 2021 | USDC | 20,000 |
| December 29, 2021 | USDC | 25,000 |
| January 1, 2022 | CEL | 150,289 |
| January 1, 2022 | ETH | 500 |
| January 2, 2022 | USDC | 16,607 |
| January 3, 2022 | USDC | 76 |
| January 5, 2022 | CEL | 149,838 |
| January 5, 2022 | CEL | 140,059 |
| January 6, 2022 | USDC | 245,000 |
| January 7, 2022 | CEL | 149,236 |
| January 7, 2022 | ETH | 321,528 |
| January 7, 2022 | ETH | 480,847 |
| January 7, 2022 | USDC | 866 |
| January 10, 2022 | USDC | 79 |
| January 10, 2022 | ETH | 87 |
| January 17, 2022 | BTC | 49 |
| March 2, 2022 | USDC | 100,000 |

| | | |
|---|---|---|
| March 4, 2022 | USDC | 50,000 |
| March 5, 2022 | USDC | 50,001 |
| May 11, 2022 | USDC | 25 |
| **Total** | | **4,956,843** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 396.

397.    The Beaudry Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 397 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 397.

398.    Mr. Beaudry caused the Beaudry Transfers to be made by the Debtors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 398.

399.    Mr. Beaudry caused Debtors to make the Beaudry Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Mr. Beaudry.

**RESPONSE:** The allegations in Paragraph 399 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 399.

400.    Mr. Beaudry's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

      **a.**    The close relationship between the Debtors and Mr. Beaudry, who was the Debtors' current or former General Counsel and Chief Compliance Officer at the time of the transfers;

**b.**    Mr. Beaudry's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Beaudry Transfers;

**c.**    The Debtors' financial condition before and after each of the Beaudry Transfers;

**d.**    The Beaudry Transfers occurred on or about the time that significant regulatory action was taken against Celsius that had a material negative effect on its business. As the Chief Compliance Officer, Mr. Beaudry was uniquely positioned to know the negative effect those regulatory actions would have on Celsius's ability to continue to operate as a going concern;

**e.**    Mr. Beaudry, through initiating the Beaudry Transfers, engaged in a pattern, or series of transactions, or course of conduct after the significant regulatory actions were taken against the Debtors and the Debtors suffered significant losses;

**f.**    The fact that Mr. Beaudry withdrew the majority of his CEL tokens, all of his BTC, all of his ETH, and substantially all of his stablecoins, on deposit with Celsius;

**g.**    The general chronology of the events and the Beaudry Transfers;

**h.**    The Beaudry Transfers were questionable and not in the usual course of business;

**i.**    The Beaudry Transfers were made to an insider;

**j.**    The secrecy, haste, or unusualness of the Beaudry Transfers; and

**k.**    In early 2022, Mr. Beaudry engaged in a series of large CEL token withdrawals and then immediately swapped the withdrawn CEL tokens in exchange for ETH and stablecoins.

**RESPONSE:** The allegations in Paragraph 400 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 400.

401.    By virtue of the foregoing, the Beaudry Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Beaudry Transfers.

**RESPONSE:** The allegations in Paragraph 401 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 401.

402.    To the extent the Beaudry Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

**RESPONSE:** The allegations in Paragraph 402 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 402.

403.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 403 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 403.

404.    Mr. Beaudry is the initial transferee for whose benefit the Beaudry Transfers were made. Upon information and belief, Mr. Beaudry may have transferred the funds comprising the Beaudry Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 404 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 404.

405.    Therefore, the Beaudry Transfers, or the value of the property transferred in the Beaudry Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 405 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 405.

## COUNT XX

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Roni Cohen-Pavon)**

406.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

407.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 407 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response. To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 407.

408.    Between July 18, 2021 and the Petition Date, Mr. Cohen-Pavon transferred the following amounts of cryptocurrency from the Celsius platform to his personal cryptocurrency wallet (collectively, the "**Cohen-Pavon Transfers**"):

*Roni Cohen-Pavon*

| Date | Asset | USD Amount |
|---|---|---|
| July 18, 2021 | CEL | $137,850 |
| July 22, 2021 | CEL | 105,588 |
| July 26, 2021 | USDT ERC20 | 150,000 |
| August 6, 2021 | USDT ERC20 | 140,000 |
| September 1, 2021 | ETH | 147,975 |
| September 1, 2021 | ETH | 148,383 |
| September 1, 2021 | ETH | 110,387 |
| September 7, 2021 | USDT ERC20 | 148,000 |

| | | |
|---|---|---|
| September 7, 2021 | USDT ERC20 | 62,020 |
| September 20, 2021 | CEL | 144,194 |
| May 31, 2022 | USDC | 9,500 |
| May 31, 2022 | ETH | 501 |
| **Total** | | **$1,304,398** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 408.

409.    The Cohen-Pavon Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 409 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 409.

410.    Mr. Cohen-Pavon caused the Cohen-Pavon Transfers to be made by the Debtors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 410.

411.    Mr. Cohen-Pavon caused Debtors to make the Cohen-Pavon Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Mr. Cohen-Pavon.

**RESPONSE:** The allegations in Paragraph 411 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 411.

412.    Mr. Cohen-Pavon's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

      a.    The close relationship between the Debtors and Mr. Cohen-Pavon, who was the Debtors' current or former Chief Revenue Officer at the time of the transfers;

    **b.**    Mr. Cohen-Pavon's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Cohen-Pavon Transfers;

    **c.**    The Debtors' financial condition before and after each of the Cohen-Pavon Transfers;

    **d.**    The Cohen-Pavon Transfers occurred on or about the time that significant regulatory action was taken against Celsius that had a material negative effect on its business. As one of the primary individuals responsible for Celsius's legal affairs, Mr. Cohen-Pavon was uniquely positioned to know the negative effect those regulatory actions would have on Celsius's ability to continue to operate as a going concern;

    **e.**    Mr. Cohen-Pavon, through initiating the Cohen-Pavon Transfers, engaged in a pattern, or series of transactions, or course of conduct after the significant regulatory actions were taken against the Debtors and the Debtors suffered significant losses;

    **f.**    The fact that Mr. Cohen-Pavon withdrew the majority of his CEL tokens, all of his BTC, all of his ETH, and substantially all of his stablecoins, on deposit with Celsius;

    **g.**    The general chronology of the events and the Cohen-Pavon Transfers;

    **h.**    The Cohen-Pavon Transfers were questionable and not in the usual course of business;

    **i.**    The Cohen-Pavon Transfers were made to an insider; and

    **j.**    The secrecy, haste, or unusualness of the Cohen-Pavon Transfers.

**RESPONSE:** The allegations in Paragraph 412 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 412.

413.    By virtue of the foregoing, the Cohen-Pavon Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Cohen-Pavon Transfers.

**RESPONSE:** The allegations in Paragraph 413 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

413.

414.    To the extent the Cohen-Pavon Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

**RESPONSE:** The allegations in Paragraph 414 state a legal conclusion to which no

response is required.   To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

414.

415.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 415 state a legal conclusion to which no

response is required.   To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

415.

416.    Mr. Cohen-Pavon is the initial transferee for whose benefit the Cohen-Pavon Transfers were made. Upon information and belief, Mr. Cohen-Pavon may have transferred the funds comprising the Cohen-Pavon Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 416 state a legal conclusion to which no

response is required.   To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

416.

417.    Therefore, the Cohen-Pavon Transfers, or the value of the property transferred in the Cohen-Pavon Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 417 state a legal conclusion to which no

response is required.   To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

417.

## COUNT XXI

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Harumi Urata-Thompson)**

418.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every

response to Plaintiff's allegations as if fully set forth herein.

419.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 419 purport to describe the statutory provisions

under which Plaintiff brings its claims and therefore requires no response.  To the extent a response

is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 419.

420.    Between May 12, 2022 and the Petition Date, Ms. Urata-Thompson transferred the following cryptocurrency from the Celsius platform to her personal cryptocurrency wallet (collectively, the "**Urata-Thompson Transfers**"):

*Harumi Urata-Thompson*

| Date | Asset | USD Amount |
|---|---|---|
| May 11, 2022 | CEL | $50 |
| June 11, 2022 | CEL | 7,819 |
| June 12, 2022 | CEL | 9,780 |
| **Total** | | **$17,650** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 420.

421.    The Urata-Thompson Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 421 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 421.

422.    Ms. Urata-Thompson caused the Urata-Thompson Transfers to be made by the Debtors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 422.

423.    Ms. Urata-Thompson caused Debtors to make the Urata-Thompson Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Ms. Urata-Thompson.

**RESPONSE:** The allegations in Paragraph 423 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 423.

424.    Ms. Urata-Thompson's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.**    The close relationship between the Debtors and Ms. Urata-Thompson, who was the Debtors' former CFO and CIO at the time of the transfers;

    **b.**    Ms. Urata-Thompson's knowledge of Celsius's financial condition;

    **c.**    Ms. Urata-Thompson's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Urata-Thompson Transfers;

    **d.**    The general chronology of the events and the Urata-Thompson Transfers;

    **e.**    The Urata-Thompson Transfers were questionable and not in the usual course of business;

    **f.**    The secrecy, haste, or unusualness of the Urata-Thompson Transfers; and

    **g.**    The Urata-Thompson Transfers were made to an insider.

**RESPONSE:** The allegations in Paragraph 424 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations Paragraph 424.

425. By virtue of the foregoing, the Urata-Thompson Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Urata-Thompson Transfers.

**RESPONSE:** The allegations in Paragraph 425 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 425.

426. To the extent the Urata-Thompson Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

**RESPONSE:** The allegations in Paragraph 426 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 426.

427. Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

428. Ms. Urata-Thompson is the initial transferee for whose benefit the Urata-Thompson Transfers were made.

**RESPONSE:** The allegations in Paragraph 428 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

428.

429.    Therefore, the Urata-Thompson Transfers, or the value of the property transferred in the Urata-Thompson Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 429 state a legal conclusion to which no

response is required.   To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

429.

## COUNT XXII

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Aliza Landes)**

430.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every

response to Plaintiff's allegations as if fully set forth herein.

431.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 431 purport to describe the statutory provisions

under which Plaintiff brings its claims and therefore requires no response.  To the extent a response

is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 431.

432.    Between August 17, 2021 and the Petition Date, Ms. Landes transferred the following cryptocurrency from the Celsius platform to her personal cryptocurrency wallet (collectively, the "**Landes Transfers**"):

*Aliza Landes*

| Date | Asset | USD Amount |
|------|-------|------------|

| Date | | Amount |
|---|---|---|
| August 17, 2021 | USDC | $50 |
| August 17, 2021 | USDC | 100 |
| August 23, 2021 | USDC | 100 |
| August 31, 2021 | USDC | 690,000 |
| October 20, 2021 | USDC | 370,000 |
| January 24, 2022 | USDC | 20 |
| January 24, 2022 | USDC | 400,000 |
| February 15, 2022 | USDC | 125,600 |
| May 31, 2022 | USDC | 333,548 |
| **Total** | | **$1,919,418** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 432.

433.    The Landes Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 433 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 433.

434.    Ms. Landes caused the Landes Transfers to be made by the Debtors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 434.

435.    Ms. Landes caused Debtors to make the Landes Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Ms. Landes.

**RESPONSE:** The allegations in Paragraph 435 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 435.

436.    Ms. Landes' actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.**    Ms. Landes' spousal relationship with Mr. Leon;

    **b.**    The close relationship between the Debtors, Ms. Landes, who was the current or former VP of Lending of the Debtors at the time of the transfers, and Mr. Leon, who was a director, the COO or the CSO of the Debtors at the time of the transfers;

    **c.**    Ms. Landes' continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Landes Transfers;

    **d.**    The timing of the transactions shortly before the Pause when the Debtors were experiencing extreme financial distress;

    **e.**    That Ms. Landes' transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

    **f.**    The Landes Transfers were to an insider;

    **g.**    The Debtors were insolvent or became insolvent shortly after the Landes Transfers were made;

    **h.**    Contemporaneous communications that establish that Ms. Landes' spouse, Mr. Leon, knew Celsius was insolvent and in dire financial condition;

    **i.**    Ms. Landes withdrew substantially all of her stablecoins on deposit with Celsius;

    **j.**    Ms. Landes had not previously conducted a large-scale withdrawal of substantially all of her stablecoins on the Celsius platform; and

    **k.**    The Landes Transfers were questionable and not in the usual course of business.

**RESPONSE:** The allegations in Paragraph 436 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 436.

437. By virtue of the foregoing, the Landes Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Landes Transfers.

**RESPONSE:** The allegations in Paragraph 437 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 437.

438. To the extent the Landes Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

**RESPONSE:** The allegations in Paragraph 438 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 438.

439. Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 439 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 439.

440. Ms. Landes is the initial transferee for whose benefit the Landes Transfers were made. Upon information and belief, Ms. Landes may have transferred the funds comprising the Landes Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 440 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 440.

441. Therefore, the Landes Transfers, or the value of the property transferred in the Landes Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 441 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 441.

### COUNT XXIII

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Kristine Meehan Mashinsky)**

442.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

443.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 443 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response. To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 443.

444.    Between April 6, 2022 and the Petition Date, Mrs. Mashinsky transferred the following cryptocurrency from the Celsius platform to her personal cryptocurrency wallet (collectively, the "**Kristine Mashinsky Transfers**"):

**Kristine M Meehan**

| Date | Asset | USD Amount |
|------|-------|-----------|
| April 6, 2022 | CEL | $20 |
| April 10, 2022 | CEL | 2,946,336 |
| May 31, 2022 | CEL | 8 |
| May 31, 2022 | CEL | 2,027,331 |
| **Total** | | **$4,973,695** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 444.

445.   The Kristine Mashinsky Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 445 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 445.

446.   Mrs. Mashinsky caused the Kristine Mashinsky Transfers to be made by the Debtors.

**RESPONSE:** The Goldstein lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 446.

447.   Mrs. Mashinsky caused Debtors to make the Kristine Mashinsky Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Mrs. Mashinsky.

**RESPONSE:** The allegations in Paragraph 447 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 447.

448.   Mrs. Mashinsky's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.**   The close relationship between the Debtors and Mrs. Mashinsky, who is the spouse of Alexander Mashinsky, a director and the CEO of the Debtors at the time of the transfers;

    **b.**   Mrs. Mashinsky's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Kristine Mashinsky Transfers;

> **c.** The financial condition of the Debtors before and after each of the Kristine Mashinsky Transfers and Mrs. Mashinsky's knowledge of the Debtors' financial condition;
>
> **d.** Contemporaneous communications that establish that Mrs. Mashinsky's spouse, Alexander Mashinsky, knew Celsius was insolvent and in dire financial condition;
>
> **e.** Mrs. Mashinsky, through initiating the Kristine Mashinsky Transfers, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors;
>
> **f.** The general chronology of the events and the Kristine Mashinsky Transfers;
>
> **g.** The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;
>
> **h.** The Kristine Mashinsky Transfers were questionable and not in the usual course of business;
>
> **i.** The secrecy, haste, and unusualness of the Kristine Mashinsky Transfers;
>
> **j.** Mrs. Mashinsky had not previously conducted large-scale withdrawal of her CEL token holdings on the Celsius platform;
>
> **k.** The Kristine Mashinsky Transfers were made to an insider; and
>
> **l.** Mrs. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11.

**RESPONSE:** The allegations in Paragraph 448 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 448.

449. Following each large withdrawal of CEL token, Mrs. Mashinsky sold CEL tokens in small batches regularly for the month after the withdrawal. The sales appear coordinated to not draw scrutiny or affect the price of the CEL token.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 449.

450.    By virtue of the foregoing, the Kristine Mashinsky Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Kristine Mashinsky Transfers.

**RESPONSE:** The allegations in Paragraph 450 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 450.

451.    To the extent the Kristine Mashinsky Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

**RESPONSE:** The allegations in Paragraph 451 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 451.

452.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 452 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 452.

453.    Mrs. Mashinsky is the initial transferee for whose benefit the Kristine Mashinsky Transfers were made. Upon information and belief, Mrs. Mashinsky may have transferred the funds comprising the Kristine Mashinsky Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 453 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

453.

454.    Therefore, the Kristine Mashinsky Transfers, or the value of the property transferred in the Kristine Mashinsky Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 454 state a legal conclusion to which no

response is required.   To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

454.

## COUNT XXIV

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant AM Ventures Holding Inc.)**

455.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every

response to Plaintiff's allegations as if fully set forth herein.

456.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 456 purport to describe the statutory provisions

under which Plaintiff brings its claims and therefore requires no response.  To the extent a response

is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 456.

457.    Between July 28, 2021 to the Petition Date, AMV transferred the following cryptocurrency from the Celsius platform to its cryptocurrency wallet (collectively, the "**AMV Transfers**"):

*AM Ventures Holding Inc.*

| Date | Asset | USD Amount |
|------|-------|------------|

| July 28, 2021 | CEL | $584 |
|---|---|---|
| July 28, 2021 | CEL | 6,592,283 |
| October 7, 2021 | CEL | 5,591,165 |
| **Total** | | **$12,184,031** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 457.

458.   The AMV Transfers constitute transfers of interest in the Debtors' property and
were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 458 state a legal conclusion to which no

response is required.   To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

458.

459.   AMV caused the AMV Transfers to be made by the Debtors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 459.

460.   AMV caused Debtors to make the AMV Transfers with the actual intent to hinder,
delay, or defraud creditors. Such transfers were made with the intention, among other things, to
impede or obstruct creditors' enforcement and collection of claims against AMV.

**RESPONSE:** The allegations in Paragraph 460 state a legal conclusion to which no

response is required.   To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

460.

461.   AMV's actual intent to hinder, delay, or defraud creditors is further established by,
among other things, the following badges of fraud:

   a.   Mr. Mashinsky's ownership and control of AMV;

   b.   The close relationship between the Debtors and Mr. Mashinsky, who was
        a director and the CEO of the Debtors at the time of the transfers;

**c.**    Mr. Mashinsky's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the AMV Transfers;

**d.**    The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

**e.**    Contemporaneous communications that establish Mr. Mashinsky knew Celsius was insolvent and in dire financial condition;

**f.**    The fact that Mr. Mashinsky withdrew substantially all non-CEL token cryptocurrency in accounts held by himself or his affiliated entities on deposit with Celsius;

**g.**    Neither Mr. Mashinsky nor his affiliated entities had previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

**h.**    That AMV and Mr. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

**i.**    The AMV Transfers were to an insider;

**j.**    The Debtors were insolvent or became insolvent shortly after the AMV Transfers were made;

**k.**    Alexander Mashinsky knowingly caused the withdrawals of cryptocurrencies in the AMV Transfers; and

**l.**    The AMV Transfers were questionable and not in the usual course of business.

**RESPONSE:** The allegations in Paragraph 461 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 461.

462.    Following each large withdrawal of CEL token, Mr. Mashinsky sold CEL tokens in small consistent batches regularly after the withdrawal. The sales appear coordinated to not draw scrutiny or affect the price of the CEL token.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 462.

463.   By virtue of the foregoing, the AMV Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the AMV Transfers.

**RESPONSE:** The allegations in Paragraph 463 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 463.

464.   To the extent the AMV Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

**RESPONSE:** The allegations in Paragraph 464 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 464.

465.   Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 465 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 465.

466.   AMV is the initial transferee for whose benefit the AMV Transfers were made. Upon information and belief, AMV may have transferred the funds comprising the AMV Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 466 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

466.

467.    Therefore, the AMV Transfers, or the value of the property transferred in the AMV Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 467 state a legal conclusion to which no

response is required.  To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

467.

## COUNT XXV

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Koala1 LLC)**

468.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every

response to Plaintiff's allegations as if fully set forth herein.

469.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 469 purport to describe the statutory provisions

under which Plaintiff brings its claims and therefore requires no response.  To the extent a response

is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 469.

470.    Upon information and belief, Koala1 LLC is owned and controlled by Mr. Mashinsky.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 470.

471.    On May 27, 2022, Koala1 LLC transferred the following cryptocurrency from the Celsius platform to its cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Koala Transfers**"):

### KOALA 1 LLC

| Date | Asset | USD Amount |
|------|-------|-----------|
| May 27, 2022 | USDC | $1,638,303 |
| May 27, 2022 | ETH | 1,174,716 |
| May 27, 2022 | BTC | 1,589,025 |
| **Total** | | **$4,402,044** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 471.

472.    The Koala Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 472 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 472.

473.    Koala1 LLC caused the Koala Transfers to be made by the Debtors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 473.

474.    Koala1 LLC caused Debtors to make the Koala Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Koala1 LLC.

**RESPONSE:** The allegations in Paragraph 474 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 474.

475.    Koala1 LLC's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

a.    Mr. Mashinsky's ownership and control of Koala1 LLC;

b.    The close relationship between the Debtors and Mr. Mashinsky, who was a director and the CEO of the Debtors at the time of the transfers;

c.    Mr. Mashinsky's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Koala Transfers;

d.    The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

e.    Contemporaneous communications that establish Mr. Mashinsky knew Celsius was insolvent and in dire financial condition;

f.    The fact that Mr. Mashinsky withdrew substantially all non-CEL token cryptocurrency in accounts held by himself or his affiliated entities on deposit with Celsius;

g.    Mr. Mashinsky had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

h.    That Koala1 LLC and Mr. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

i.    The Koala Transfers were to an insider;

j.    The Debtors were insolvent or became insolvent shortly after the Koala Transfers were made;

k.    Mr. Mashinsky knowingly caused the Koala Transfers;

l.    The fact that all or substantially all of Koala1 LLC's stablecoin holdings on deposit with Celsius were withdrawn;

m.    The fact that Koala1 LLC had not previously conducted a largescale withdrawal of its stablecoin holdings on the Celsius platform; and

n.    The Koala Transfers were questionable and not in the usual course of business.

**RESPONSE:** The allegations in Paragraph 475 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 475.

476.    By virtue of the foregoing, the Koala Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Koala Transfers.

**RESPONSE:** The allegations in Paragraph 476 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 476.

477.    To the extent the Koala Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

**RESPONSE:** The allegations in Paragraph 477 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 477.

478.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 478 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 478.

479.    Koala1 LLC is the initial transferee for whose benefit the Koala Transfers were made. Upon information and belief, Koala1 LLC may have transferred the funds comprising the Koala Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 479 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

479.

480.    Therefore, the Koala Transfers, or the value of the property transferred in the Koala Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 480 state a legal conclusion to which no

response is required.    To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

480.

## COUNT XXVI

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Alchemy Capital Partners, LP)**

481.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every

response to Plaintiff's allegations as if fully set forth herein.

482.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 482 purport to describe the statutory provisions

under which Plaintiff brings its claims and therefore requires no response.  To the extent a response

is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 482.

483.    On April 13, 2022, Mr. Leon transferred 8,000,002 CEL tokens to Alchemy. That same day, Alchemy entered into a loan agreement with the Debtors and, on April 14, 2022, received $4,000,000 in exchange for posting 7,373,272 CEL tokens as collateral. On May 27, 2022, Mr. Leon transferred 7,023,636 CEL tokens to Alchemy. That same day, Alchemy posted additional collateral of 7,654,644 CEL tokens. In total, Alchemy posted 15,027,916 CEL tokens as collateral in exchange for the $4 million USD loan from the Debtors (the "**Alchemy Loan**").

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 483.

484.    The Alchemy Loan constitutes a transfer of interest in the Debtors' property and was made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 484 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 484.

485.    Alchemy caused the Alchemy Loan to be made by the Debtors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 485.

486.    The interest rate on the Alchemy Loan is 0.1%. Upon information and belief, Alchemy did not execute a loan agreement in connection with the Alchemy Loan.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 486.

487.    Alchemy caused Debtors to make the Alchemy Loan with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Alchemy.

**RESPONSE:** The allegations in Paragraph 487 state a legal conclusion to which no response is required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 487.

488.    Alchemy's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

  **a.**    Mr. Leon's ownership and control of Alchemy;

  **b.**    The close relationship between the Debtors and Mr. Leon, who was a director, the COO or the CSO of the Debtors at the time of the transfers;

**c.**   Mr. Leon's continued retention of possession, benefit, or use of the money received from the Alchemy Loan;

**d.**   The timing of the transactions shortly before the effective date of the New Jersey Order and as Celsius was experiencing financial distress;

**e.**   Contemporaneous communications that establish Mr. Leon knew Celsius was insolvent and in dire financial condition;

**f.**   Mr. Leon had not previously entered into a loan collateralized by CEL tokens;

**g.**   The Alchemy Loan was conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

**h.**   Alchemy, and by extension, Mr. Leon, was able to receive USD value for the CEL token collateral, which was worth significantly less than the USD value received. Therefore, reasonably equivalent value was not received;

**i.**   Alchemy, and by extension, Mr. Leon, was able to receive USD value for the CEL token collateral without having to sell his CEL token positions, guaranteeing a USD value in exchange for the CEL tokens as Debtors faced the consequences of the New Jersey Order and insolvency;

**j.**   The Alchemy Loan was to an insider;

**k.**   The Alchemy Loan was unusual and not in the regular course of business; and

**l.**   The Debtors were insolvent or became insolvent shortly after the Alchemy Loan was made.

**RESPONSE:** The allegations in Paragraph 488 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 488.

489.   By virtue of the foregoing, the Alchemy Loan was a fraudulent transfer avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Alchemy Loan.

**RESPONSE:** The allegations in Paragraph 489 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 489.

490. Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 490 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 490.

491. Alchemy is the initial transferee for whose benefit the Alchemy Loan was made. Upon information and belief, Alchemy may have transferred the funds comprising the Alchemy Loan to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 491 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 491.

492. Therefore, the Alchemy Loan, or the value of the property transferred in the Alchemy Loan, is recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 492 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 492.

## COUNT XXVII

**(Avoidance and Recovery of Constructive Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(B); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Alchemy Capital Partners, LP)**

493.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

494.    Plaintiff brings this claim under sections 544(b), 548(a)(1)(B), and 550 of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware

**RESPONSE:** The allegations in Paragraph 494 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response.  To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 494.

495.    As set out in Count XXVI, Alchemy caused the Alchemy Loan to be made by the Debtors, which constitutes a transfer of interest in the Debtors' property made to and for the benefit of Alchemy.

**RESPONSE:** The allegations in Paragraph 495 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 495.

496.    The Alchemy Loan was made within two years prior to the Petition Date.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 496.

497.    The Debtors received less than reasonably equivalent value or did not receive fair consideration in exchange for the Alchemy Loan. At the time of the transfer, the 15,027,916 CEL tokens posted by Alchemy as collateral were worth significantly less than the $4,000,000 received by Alchemy, particularly when the manipulation of the CEL token's value is considered.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 497.

498.    The interest rate on the Alchemy Loan is 0.1%. Upon information and belief, Alchemy did not execute a loan agreement in connection with the Alchemy Loan.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 498.

499.    The Debtors were insolvent on the date of the Alchemy Loan; were left with unreasonably small capital on the date of the Alchemy Loan; or intended to incur or believed it would incur debts beyond its ability to pay as such debts matured.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 499.

500.    Moreover, the Debtors made the Alchemy Loan to, or for the benefit of, an insider, or incurred such obligation to or for the benefit of an insider and not in the ordinary course of business.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 500.

501.    By virtue of the foregoing, the Alchemy Loan was a constructive fraudulent transfer avoidable under sections 544(b) and 548(a)(1)(B) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Alchemy Loan.

**RESPONSE:** The allegations in Paragraph 501 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 501.

502.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 502 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 502.

503. Alchemy is the initial transferee for whose benefit the Alchemy Loan was made. Upon information and belief, Alchemy may have transferred the funds comprising the Alchemy Loan to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 503 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 503.

504. Therefore, the Alchemy Transfers, or the value of the property transferred in the Alchemy Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 504 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 504.

## COUNT XXVIII

### (Breach of Contract — Failure to Repay Loan — Defendants Daniel Leon and Alchemy Capital Partners, LP)

505. Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

506. As set out in Count XXVI, Alchemy entered into the Alchemy Loan, which constituted a valid and binding agreement between Alchemy and Celsius. On April 14, 2022 and

May 27, 2022 Mr. Leon transferred 8,000,002 and 7,023,636 CEL tokens respectively to Alchemy, which Alchemy then used as collateral for the Alchemy Loan with Celsius.

**RESPONSE:** The allegations in Paragraph 506 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 506.

507.    Mr. Leon also took out three loans from Celsius in the principal amounts of $1,000, $2,000, and $2,000 respectively (the "**Leon Loans**"), each of which constituted a valid and binding agreement.

**RESPONSE:** The allegations in Paragraph 507 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 507.

508.    Mr. Leon and Alchemy were sent a notice on behalf of Celsius on May 8, 2024 informing them that Mr. Leon and Alchemy were in default (and if not, Celsius thereby terminated the loans). The notice also informed them that the Alchemy Loan and the Leon Loans were due and payable; such loans were required to be repaid; the accrued and unpaid interest on the Alchemy Loan currently amounted to $7,288; and the combined accrued and unpaid interest on the Leon Loans amounted to $90. Neither Mr. Leon nor Alchemy paid back any of their outstanding loan balances in response to the notice.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 508.

509.    The Alchemy Loan and Leon Loans were subject to the Celsius Loan Terms and Conditions, which stated that a failure "to pay any amount whatsoever (principal, interest or other) to Celsius in respect of the loan" constituted a default.

**RESPONSE:** The allegations in Paragraph 509 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

508.   The Goldstein Defendants respectfully refer the Court to the Celsius Loan Terms and Conditions referenced in Paragraph 509 for their true contents.

510.   The Celsius Loan Terms and Conditions also state that a failure to respond to Celsius's communications constitutes a default.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 510.  The Goldstein Defendants respectfully refer the Court to the Celsius Loan Terms and Conditions referenced in Paragraph 510 for their true contents.

511.   Mr. Leon and Alchemy failed to repay the accrued and unpaid interest on the loans. Mr. Leon and Alchemy also failed to respond to Celsius's default notice sent on May 8, 2024. Therefore, Mr. Leon and Alchemy have defaulted on the Alchemy Loan and Leon Loans and breached the terms of the Celsius Loan Terms and Conditions.

**RESPONSE:** The allegations in Paragraph 511 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 511.

512.   As a result of these breaches of contract, the Company suffered damages.

**RESPONSE:** The allegations in Paragraph 512 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 512.

## COUNT XXIX

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Bits of Sunshine LLC)**

513.   Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

514.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 514 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response.  To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 514.

515.    Bits of Sunshine LLC is owned and controlled by Mr. Goldstein.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 515, except they admit Goldstein controls Bits of Sunshine.

516.    Between February 7, 2022 and the Petition Date, Bits of Sunshine LLC transferred the following cryptocurrency from the Celsius platform to its cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Bits of Sunshine Transfers**"):

### Bits of Sunshine LLC

| Date | Asset | USD Amount |
|------|-------|-----------|
| February 7, 2022 | CEL | $150,000 |
| February 23, 2022 | CEL | 154,500 |
| April 27, 2022 | CEL | 105,703 |
| May 9, 2022 | CEL | 162,000 |
| **Total** | | **$572,203** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 516.

517.    The Bits of Sunshine Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 517 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

517, except deny that any transfers Bits of Sunshine may have made constitute transfer of interest in the Debtors' property.

518.    Bits of Sunshine LLC caused the Bits of Sunshine Transfers to be made by the Debtors.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 518.

519.    Bits of Sunshine LLC caused Debtors to make the Bits of Sunshine Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Bits of Sunshine LLC.

**RESPONSE:** The allegations in Paragraph 519 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 519.

520.    Bits of Sunshine LLC's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.**   Mr. Goldstein's ownership and control of Bits of Sunshine LLC;

    **b.**   The close relationship between the Debtors and Mr. Goldstein, who was Chief Technology Officer of the Debtors at the time of the transfers;

    **c.**   Mr. Goldstein's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Bits of Sunshine Transfers;

    **d.**   The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

    **e.**   Contemporaneous communications that establish Mr. Goldstein knew Celsius was insolvent and in dire financial condition;

    **f.**   The fact that Mr. Goldstein withdrew substantially all non-CEL token cryptocurrency in accounts held by himself or his affiliated entities on deposit with Celsius;

    **g.**   Mr. Goldstein had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

    **h.**   That Bits of Sunshine LLC and Mr. Goldstein's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

    **i.**    The Bits of Sunshine Transfers were to an insider;

    **j.**    The Debtors were insolvent or became insolvent shortly after the Bits of Sunshine Transfers were made;

    **k.**    Mr. Goldstein knowingly caused the withdrawals of cryptocurrencies in the Bits of Sunshine Transfers;

    **l.**    The fact that all or substantially all of Bits of Sunshine LLC's stablecoin holdings on deposit with Celsius were withdrawn;

    **m.**    The fact that Bits of Sunshine LLC had not previously conducted a largescale withdrawal of its stablecoin holdings on the Celsius platform; and

    **n.**    The Bits of Sunshine Transfers were questionable and not in the usual course of business.

**RESPONSE:** The allegations in Paragraph 520 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 520.

521.    By virtue of the foregoing, the Bits of Sunshine Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Bits of Sunshine Transfers.

**RESPONSE:** The allegations in Paragraph 521 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 521.

522.    To the extent the Bits of Sunshine Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

**RESPONSE:** The allegations in Paragraph 522 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 522.

523.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the

property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 523 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 523.

524.    Bits of Sunshine LLC is the initial transferee for whose benefit the Bits of Sunshine Transfers were made. Upon information and belief, Bits of Sunshine LLC may have transferred the funds comprising the Bits of Sunshine Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 524 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 524.

525.    Therefore, the Bits of Sunshine Transfers, or the value of the property transferred in the Bits of Sunshine Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 525 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 525.

## COUNT XXX

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Four Thirteen LLC)**

526.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

527.     Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 527 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response.  To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 527.

528.     Four Thirteen LLC is owned and controlled by Mr. Goldstein.

**RESPONSE:** The Goldstein Defendants admit the allegations in Paragraph 528.

529.     Between May 30, 2022 and the Petition Date, Four Thirteen LLC transferred the following cryptocurrency from the Celsius platform to its cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Four Thirteen Transfers**"):

### Four Thirteen LLC

| Date | Asset | USD Amount |
|------|-------|-----------|
| May 30, 2022 | CEL | $11,039 |
| June 1, 2022 | USDT ERC20 | $821 |
| **Total** | | **$11,860** |

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 529.

530.     The Four Thirteen Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 530 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 530, except they deny that any transfers Four Thirteen may have made constitute transfers of interest in the Debtors' property.

531.     Four Thirteen LLC caused the Four Thirteen Transfers to be made by the Debtors.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 531.

532.    Four Thirteen LLC caused Debtors to make the Four Thirteen Transfers with the actual intent to hinder, delay, or defraud creditors. Such transfers were made with the intention, among other things, to impede or obstruct creditors' enforcement and collection of claims against Four Thirteen LLC.

**RESPONSE:** The allegations in Paragraph 532 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 532.

533.    Four Thirteen LLC's actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.**    Mr. Goldstein's ownership and control of Four Thirteen LLC;

    **b.**    The close relationship between the Debtors and Mr. Goldstein, who was Chief Technology Officer of the Debtors at the time of the transfers;

    **c.**    Mr. Goldstein's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Four Thirteen Transfers;

    **d.**    The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

    **e.**    Contemporaneous communications that establish Mr. Goldstein knew Celsius was insolvent and in dire financial condition;

    **f.**    The fact that Mr. Goldstein withdrew substantially all non-CEL token cryptocurrency in accounts held by himself or his affiliated entities on deposit with Celsius;

    **g.**    Mr. Goldstein had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

    **h.**    That Four Thirteen LLC and Mr. Goldstein's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

    **i.**    The Four Thirteen Transfers were to an insider;

    **j.**    The Debtors were insolvent or became insolvent shortly after the Four Thirteen Transfers were made;

    **k.**    Mr. Goldstein knowingly caused the withdrawals of cryptocurrencies in the Four Thirteen Transfers;

l.   The fact that all or substantially all of Four Thirteen LLC's stablecoin holdings on deposit with Celsius were withdrawn;

m.   The fact that Four Thirteen LLC had not previously conducted a largescale withdrawal of its stablecoin holdings on the Celsius platform; and

n.   The Four Thirteen Transfers were questionable and not in the usual course of business.

**RESPONSE:** The allegations in Paragraph 533 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 533.

534.   By virtue of the foregoing, the Four Thirteen Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Four Thirteen Transfers.

**RESPONSE:** The allegations in Paragraph 534 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 534.

535.   To the extent the Four Thirteen Transfers are included in Count XIII as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

**RESPONSE:** The allegations in Paragraph 535 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 535.

536.   Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 536 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 536.

537.     Four Thirteen LLC is the initial transferee for whose benefit the Bits of Sunshine Transfers were made. Upon information and belief, Four Thirteen LLC may have transferred the funds comprising the Four Thirteen Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 537 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 537.

538.     Therefore, the Four Thirteen Transfers, or the value of the property transferred in the Bits of Sunshine Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 538 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations in Paragraph 538.

## COUNT XXXI

**(Avoidance and Recovery of Actual Fraudulent Transfers — OTC Sales — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Aliza Landes, Johannes Treutler, Harumi Urata-Thompson, Jeremie Beaudry, Roni Cohen-Pavon, and Four Thirteen LLC)**

539.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

540.     Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 540 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response. To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 540.

541.    Between October 18, 2020 and the Petition Date, Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC sold CEL tokens to the company via the OTC desk (collectively, the "**OTC Sales**"). A list of the OTC Sales is attached as **Exhibit B** to this Complaint.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 541 (including Exhibit B), except they admit Goldstein and Four Thirteen made sales and transfers of CEL tokens using the OTC trading desk.

542.    Defendants received cash, stablecoins, or other more valuable cryptocurrency such as BTC and ETH in exchange for these sales.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 542.

543.    The OTC Sales constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 543 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 543, except they deny that any purported sales Goldstein and/or Four Thirteen may have made through the OTC trading desk constitute transfers of interest in the Debtors' property.

544.    Defendants directed and caused Celsius to make the OTC Sales and Celsius entered into the OTC Sales with the actual intent to hinder, delay, or defraud Celsius and its creditors by obscuring the sales from the market to avoid the negative affect they would have on the price of CEL token. The Defendants profited from the CEL token's artificially inflated value at the company's and customers' expense through the OTC Sales.

**RESPONSE:** The allegation that the Defendants acted "with the actual intent to hinder, delay, or defraud Celsius and its creditors" states a legal conclusion to which no response is

required.   To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 544, except they deny the allegations contained in the first sentence of Paragraph 544 to the extent they are directed at the Goldstein Defendants.

545.   The OTC Sales were an integral part of Defendants' fraudulent scheme to artificially inflate the price of CEL token. At the direction of Defendants, Celsius promoted employees' use of the OTC desk to sell back their CEL token to the Company rather than using third-party cryptocurrency exchanges for these sales. The Defendants directed Celsius to do so to conceal the fact that employees were selling CEL token and prevent large sales by employees from negatively impacting the market price of CEL token. By keeping the CEL token's price artificially high through the use of the OTC desk and strategically purchasing CEL token in manners that were contrary to what Celsius and the Defendants told the public, Defendants were able to profit.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 545, except they deny the allegations in Paragraph 545 to the extent they are directed at the Goldstein Defendants.

546.   Celsius' actual intent to hinder, delay, or defraud creditors is further established by, among other things, the following badges of fraud:

    **a.**   The close relationship between the Debtors and Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC, who were insiders at the time of the OTC Sales;

    **b.**   The timing of the OTC Sales as Celsius was experiencing financial distress;

    **c.**   Contemporaneous communications that establish Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon and Beaudry knew Celsius was insolvent and in dire financial condition at the time of the OTC Sales;

    **d.**   The Debtors were insolvent or became insolvent shortly after the OTC Sales were made;

    **e.**   The Debtors received less than reasonably equivalent value in exchange for the cash, stablecoins, and other cryptocurrencies they transferred to Defendants through the OTC sales;

     **f.**    Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC made the OTC sales knowing that the CEL token was subject to significant manipulation and its value was artificially inflated; and

     **g.**    Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC, through initiating the OTC Sales, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors.

**RESPONSE:** The allegations in Paragraph 546 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

547. By virtue of the foregoing, the OTC Sales were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 547 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to any purported sales that Goldstein and/or Four Thirteen may have made through the OTC trading desk, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

548. Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 548 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 550.

549.    Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC are initial transferees for whose benefit the OTC Sales were made.

**RESPONSE:** The allegations in Paragraph 549 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein and Four Thirteen, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

550.    Therefore, the OTC Sales, or the value of the property transferred in the OTC Sales, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 550 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to any purported sales that Goldstein and/or Four Thirteen may have made through the OTC trading desk, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

## COUNT XXXII

**(Avoidance and Recovery of Constructive Fraudulent Transfers — OTC Sales — 11 U.S.C. §§ 544(b); 548(a)(1)(B); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Aliza Landes, Johannes Treutler, Harumi Urata-Thompson, Jeremie Beaudry, Roni Cohen-Pavon, and Four Thirteen LLC)**

551.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

552.    Plaintiff brings this claim under sections 544(b), 548(a)(1)(B), and 550 of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 552 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response.  To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 552.

553.    Between October 18, 2020 and the Petition Date, Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC sold CEL token to the company via the OTC desk (the OTC Sales, attached hereto as **Exhibit B**), which constitute transfers of interest in the Debtors' property made within two years prior to the Petition Date, and made to and for the benefit of Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC.

**RESPONSE:** The allegations in Paragraph 553 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 553 (including Exhibit B), except they admit Goldstein and Four Thirteen made sales and transfers of CEL tokens using the OTC trading desk, and deny that any purported sales that Goldstein and/or Four Thirteen may have made through the OTC trading desk constitute transfers of interest in the Debtors' property.

554.    The Debtors received less than reasonably equivalent value or did not receive fair consideration in exchange for the cash, stablecoins, or more valuable cryptocurrency such as BTC and ETH that Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC received through the OTC Sales. At the time of the transfers, the CEL tokens received by the Debtors were worth significantly less than the cash, stablecoins, or more valuable cryptocurrency such as BTC and ETH received by Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC, particularly considering the manipulation of the CEL token, which rendered its value nearly non-existent, and the company being insolvent at the time of the sales.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 554, except they deny the allegations in Paragraph 554 to the extent they are directed at Goldstein, Four Thirteen, and/or any sales or purchases Goldstein or Four Thirteen may have made through the OTC trading desk.

555.   The Debtors were insolvent on the dates of the OTC Sales; were engaged or about to engage in a business or transaction for which the remaining assets of the Debtors were unreasonably small on the date of the OTC Sales or as a result of the OTC Sales; or intended to incur, believed, or reasonably should have believed they would incur debts beyond their ability to pay as such debts came due.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 555.

556.   Moreover, the Debtors participated in the OTC Sales for the benefit of insiders, not in the ordinary course of business.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 556.

557.   By virtue of the foregoing, the OTC Sales were constructive fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(B) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the OTC Sales.

**RESPONSE:** The allegations in Paragraph 557 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to any purported sales that Goldstein and/or Four Thirteen may have made using the OTC trading desk, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

558.   Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 558 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 558.

559. Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC are the initial transferees for whose benefit the OTC Sales were made. Upon information and belief, Defendants Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Cohen-Pavon, Beaudry, and Four Thirteen LLC may have transferred the funds received through the OTC Sales to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 559 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein and Four Thirteen, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

560. Therefore, the OTC Sales, or the value of the property transferred in the OTC Sales, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 560 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to any purported sales that Goldstein and/or Four Thirteen may have made using the OTC trading desk, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

## COUNT XXXIII

**(Avoidance and Recovery of Actual Fraudulent Transfers — CEL Token Bonus Cash Payments — 11 U.S.C. §§ 544(b); 548(a)(1)(A); 550; and Applicable Law, including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware — Defendants Alexander Mashinsky, Shlomi Daniel Leon,**

**Hanoch Goldstein, Jeremie Beaudry, Harumi Urata-Thompson, Roni Cohen-Pavon, Aliza Landes, and Johannes Treutler)**

561.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

562.    Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section 548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 562 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response.  To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 562.

563.    Celsius paid its officers and employees bonuses when the market price of CEL token reached $1.50 and $5.00 (the "**$1.50 CEL Token Bonus**" and "**$5.00 CEL Token Bonus**", respectively, and together, the "**CEL Token Bonuses**"). The CEL Token Bonuses consisted of allocations of a total quantity of CEL token. A portion of each employee's CEL Token Bonus allocation was paid in CEL tokens that would vest over time. The remaining portion of each employee's CEL token bonus allocation was paid in cash.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 563, except they admit that certain Celsius officers and employees received bonuses when CEL token hit certain market prices.

564.    On or about November 17, 2020, Defendant Mashinsky received a cash payment in the amount of $1,081,193.16 as a portion of his $1.50 CEL Token Bonus.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 564.

565.    On or about February 16, 2021, Defendant Mashinsky received a cash payment in the amount of $1,302,353.26 as a portion of his $5.00 CEL Token Bonus.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 565.

566.    On or about November 17, 2020, Defendant Leon received a cash payment in the amount of $915,452.20 as a portion of his $1.50 CEL Token Bonus.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 566.

567.    On or about November 17, 2020, Defendant Goldstein received a cash payment in the amount of $1,080,410.84 as a portion of his $1.50 CEL Token Bonus.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 567.

568.    On or about February 16, 2021, Defendant Goldstein received a cash payment in the amount of $1,302,353.26 as a portion of his $5.00 CEL Token Bonus.

**RESPONSE:** The Goldstein Defendants deny the allegations in Paragraph 568.

569.    On or about November 17, 2020, Defendant Beaudry received a cash payment in the amount of $386,078.79 as a portion of his $1.50 CEL Token Bonus.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 569.

570.    On or about February 16, 2021, Defendant Beaudry received a cash payment in the amount of $703.362.71 as a portion of his $5.00 CEL Token Bonus.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 570.

571.    On or about November 17, 2020, Defendant Urata-Thompson received a cash payment in the amount of $298,142.80 as a portion of her $1.50 CEL Token Bonus.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 571.

572.    On or about February 16, 2021, Defendant Urata-Thompson received a cash payment in the amount of $485,546.91 as a portion of her $5.00 CEL Token Bonus.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 572.

573.    On or about November 17, 2020, Defendant Cohen-Pavon received a cash payment in the amount of $36,003.27 as a portion of his $1.50 CEL Token Bonus.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 573.

574.    On or about November 17, 2020, Defendant Landes received a cash payment in the amount of $167,311.77 as a portion of her $1.50 CEL Token Bonus.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 574.

575.    On or about November 17, 2020, Defendant Treutler received a cash payment in the amount of $58,770.48 as a portion of his $1.50 CEL Token Bonus (together with the cash payments referenced in paragraphs 564 through 574 above, the "**CEL Token Bonus Cash Transfers**").

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 575.

576.    The CEL Token Bonus Cash Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

**RESPONSE:** The allegations in Paragraph 576 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to any purported bonus Goldstein may have received, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

577.    CEL Token Bonuses were paid out as part of the CEL token manipulation scheme directed by Defendants. The payment of CEL Token Bonuses furthered Defendants' manipulation scheme by reinforcing artificially inflated CEL token prices through the payment of cash bonuses at amounts in excess of the true value of CEL token. CEL token would not have reached the $1.50 and $5.00 price thresholds if its market price had not been artificially inflated by Defendants' manipulation scheme, discussed *supra* in paragraphs 63 through 87. Celsius, directed by Defendants, paid the CEL Token Bonuses in order to allow its insiders to profit as a result of the CEL token manipulation scheme at the expense of creditors.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 577, except they deny the allegations in Paragraph 577 to the extent they are directed at the Goldstein Defendants.

578.    The CEL Token Bonus Cash Transfers were intended to be the cash equivalent of a portion of Defendants' CEL token allocation provided for by the CEL Token Bonuses. However, due to CEL token's artificially inflated price resulting from Defendants' manipulation, the CEL tokens intended to be represented by the CEL Token Bonus Cash Transfers and kept by the Debtors as consideration for the CEL Token Bonus Cash Transfers were actually worth far less than the dollar amounts Defendants received.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form

a belief to the truth of the allegations in Paragraph 578, except they deny the allegations in

Paragraph 578 to the extent they imply the Goldstein Defendants were involved in, engaged in, or

knew of any purported manipulation of or inflation in the price of CEL token.

579.    Celsius's actual intent to hinder, delay, or defraud creditors is established by, among other things, the following badges of fraud:

    a.    The close relationship between the Debtors and Defendants Mashinsky, Leon, Goldstein, Beaudry, Urata-Thompson, Cohen-Pavon, Landes, and Treutler, who were insiders at the time of the CEL Token Bonus Cash Transfers;

    b.    The timing of the CEL Token Bonus Cash Transfers as Celsius was experiencing financial distress;

    c.    Contemporaneous communications that establish Defendants Mashinsky, Leon, Goldstein, Beaudry, Urata-Thompson, Cohen-Pavon, Landes, and Treutler knew Celsius was insolvent and in declining financial condition at the time of the CEL Token Bonus Cash Transfers,

    d.    The Debtors were insolvent or became insolvent shortly after the CEL Token Bonus Cash Transfers made;

    e.    The Debtors received less than reasonably equivalent value in exchange for the CEL Token Bonus Cash Transfers;

    f.    Defendants Mashinsky, Leon, Goldstein, Beaudry, Urata-Thompson, Cohen-Pavon, Landes, and Treutler directed the Debtors to make the CEL Token Bonus Cash Transfers knowing that the CEL token was subject to significant manipulation and its value was artificially inflated; and

    g.    The CEL Token Bonus Cash Transfers were a part of the scheme to allow insiders and employees to monetize the artificially inflated CEL token.

**RESPONSE:** The allegations in Paragraph 579 state legal conclusions to which no

response is required.  To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

580.    The CEL Token Bonus Cash Transfers were fraudulent transfers avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 580 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to any purported bonus Goldstein may have received, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

581.    Plaintiff is entitled to avoid the CEL Token Bonus Cash Transfers.

**RESPONSE:** The allegations in Paragraph 581 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to any purported bonus Goldstein ma have received, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

582.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 582 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 582.

583.    Defendants Mashinsky, Leon, Goldstein, Beaudry, Urata-Thompson, Cohen-Pavon, Landes, and Treutler are the initial transferees for whose benefit the CEL Token Bonus Cash Transfers were made. Upon information and belief, Defendants may have transferred the funds comprising the CEL Token Bonus Cash Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 583 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

584.    Therefore, the CEL Token Bonus Cash Transfers, or the value of the property transferred in the CEL Token Bonus Cash Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 584 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to any purported bonus Goldstein may have received, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

## COUNT XXXIV

**(Avoidance and Recovery of Constructive Fraudulent Transfers — CEL Token Bonus Cash Payments — 11 U.S.C. §§ 544(b)(1); 548(a)(1)(B); 550; and Applicable Law including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Jeremie Beaudry, Harumi Urata-Thompson, Roni Cohen-Pavon, Aliza Landes, and Johannes Treutler)**

585.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

586.    Plaintiff brings this claim under sections 544(b)(1), 548(a)(1)(B), and 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 586 purport to describe the statutory provisions under which Plaintiff brings its claims and therefore requires no response.  To the extent a response is deemed to be required, the Goldstein Defendants deny the allegations in Paragraph 586.

587.    Defendants received the CEL Token Bonus Cash Transfers described in Count XXXIII above.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 587.

588.    The CEL Token Bonus Cash Transfers were intended to be the cash equivalent of a portion of Defendants' CEL token allocation provided for by the CEL Token Bonuses. However, due to CEL token's artificially inflated price resulting from the manipulation directed by Defendants, the CEL tokens intended to be represented by the CEL Token Bonus Cash Transfers and kept by the Debtors as consideration for the CEL Token Bonus Cash Transfers were actually worth far less than the dollar amounts Defendants received.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief to the truth of the allegations in Paragraph 588.

589.    The Debtors received less than reasonably equivalent value or did not receive fair consideration as part of these CEL Token Bonus Cash Transfers.

**RESPONSE:** The Goldstein Defendants deny the allegations set forth in Paragraph 589 as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

590.    The Debtors were insolvent at all times relevant to this Complaint, and when each of the CEL Token Bonus Cash Transfers was completed. The Debtors also had unreasonably small capital on the date of each CEL Token Bonus Cash Transfer or intended to incur or believed they would incur debts beyond their ability to pay as such debts matured.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 590.

591.    The Debtors, directed by Defendants, conducted the CEL Token Bonus Cash Transfers or incurred such obligation to, or for the benefit, of insiders like Defendants, and not in the ordinary course of business.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 591, except they deny the allegations in Paragraph 591 to the extent they are directed at the Goldstein Defendants.

592.    By virtue of the foregoing, the CEL Token Bonus Cash Transfers were constructive fraudulent transfers avoidable under sections 544(b)(1) and 548(a)(1)(B) of the Bankruptcy Code, and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

**RESPONSE:** The allegations in Paragraph 592 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to any purported bonus Goldstein may have received, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

593.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 or 548 of the Bankruptcy Code, the Litigation Administrator may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

**RESPONSE:** The allegations in Paragraph 593 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 593.

594.    Defendants Mashinsky, Leon, Goldstein, Beaudry, Urata-Thompson, Cohen-Pavon, Landes, and Treutler are the initial transferees for whose benefit the CEL Token Bonus Cash Transfers were made. Upon information and belief, Defendants may have transferred the funds comprising the CEL Token Bonus Cash Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown.

**RESPONSE:** The allegations in Paragraph 594 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

595.    Therefore, the CEL Token Bonus Cash Transfers, or the value of the property transferred in the CEL Token Bonus Cash Transfers, is recoverable by the Litigation Administrator under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 595 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to any purported bonus Goldstein may have received, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

## COUNT XXXV

**(Equitable Subordination – 11 U.S.C. § 510 – Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Harumi Urata-Thompson, Jeremie Beaudry, Johannes Treutler, Kristine Meehan Mashinsky, Aliza Landes, AM Ventures Holding, Inc., Koala1 LLC, Koala2 LLC, Koala3 LLC, Bits of Sunshine LLC, Four Thirteen LLC, and Alchemy Capital Partners, LP)**

596.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every response to Plaintiff's allegations as if fully set forth herein.

597.    Defendants used their power as statutory and/or non-statutory insiders to their own advantage and to the other creditors' detriment.

**RESPONSE:** To the extent the allegations in Paragraph 597 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

598.    All named Defendants engaged in wrongful and inequitable conduct by orchestrating the fraudulent transactions referred to in Counts XIV through XXX herein, at a time when Celsius was experiencing financial distress, and with the actual intent to hinder, delay, or defraud creditors and Celsius. Prior to the Pause, within one year of the Petition Date and while the Debtors were insolvent, all Defendants withdrew cryptocurrency from the Celsius platform. Each withdrawal constituted a fraudulent transaction and an illegal preferential transfer of the Debtors' interest in the property.

**RESPONSE:** The allegations in Paragraph 598 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 598, except they admit the Goldstein Defendants made withdrawals and deposits of cryptocurrency from and to their accounts on the Celsius platform, and deny the allegations contained in the first and last sentences of Paragraph 598 to the extent they are directed at the Goldstein Defendants and/or any withdrawals or deposits of cryptocurrency from or to their accounts on the Celsius platform.

599.    Defendants A. Mashinsky, Leon, Goldstein, Landes, Treutler, Urata-Thompson, Beaudry, Cohen-Pavon, and Four Thirteen LLC also orchestrated the fraudulent transactions referred to in Counts XXXI through XXXIV herein, whereby they engaged in sales of their personal CEL token holdings back to the Company via the OTC desk at prices which were artificially inflated as a result of Defendants' CEL token manipulation scheme, and directed Celsius to pay them cash bonuses when CEL token reached particular (artificially inflated) market prices.

**RESPONSE:** The Goldstein Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 599, except they deny the allegations in Paragraph 599 to the extent they are directed at the Goldstein Defendants or imply the Goldstein Defendants were involved in, engaged in, or knew of any purported manipulation of or inflation in the price of CEL token.

600.    Moreover, Defendants A. Mashinsky, Leon, Goldstein, Cohen-Pavon, Urata-Thompson, and Treutler also used their power as insiders to control Celsius to the detriment of the other creditors, breaching their fiduciary duties of care and loyalty to the Company. As discussed in detail in Counts I through VII herein, these breaches of duty included approving and overseeing risky investments that resulted in enormous losses of customer assets; failing to implement proper

controls or adequate means of tracking the Company's assets; approving self-interested transactions such as the AMV loan; participating in a scheme to edit fraudulent statements out of AMAs after they had already been broadcast live; and manipulating the price of the CEL token to benefit themselves, their families, and their affiliates at the expense of the Company and its creditors.

**RESPONSE:** The allegations in Paragraph 600 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to Goldstein, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

601.    Additionally, as described in Counts VIII and IX herein, Defendants fraudulently misrepresented and conspired to fraudulently misrepresent (1) the funding of Celsius's ICO; the percentage of gross revenues distributed to customers; (3) directors' and officers' sales of CEL tokens; (4) the collateralization (or lack thereof) of Celsius loans; (5) Celsius's trading strategies; (6) regulatory issues that Celsius was facing, and (7) the legal nature of deposits in Celsius. These fraudulent misrepresentations were reasonably relied upon by Celsius customers, inducing them to invest their cryptocurrency assets in Celsius and ultimately suffer massive losses.

**RESPONSE:** The allegations in Paragraph 601 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

602.    These fraudulent misrepresentations, along with the scheme defendants engaged in to cover them up by editing AMA videos after they had been broadcast live, also constitute deceptive business practices, false advertising, and consumer fraud in violation of applicable state statutes as described in Counts X through XII.

**RESPONSE:** The allegations in Paragraph 602 state legal conclusions to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack

knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

603.    Defendants' conduct as alleged above, including but not limited to the fraudulent transfers, preferential transfers, breaches of fiduciary duty, fraudulent misrepresentation, deceptive business practices, false advertising, and consumer fraud, constitutes inequitable conduct.

**RESPONSE:** The allegations in Paragraph 603 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

604.    By reason of this inequitable conduct, Defendants received an unfair advantage in the form of excess value that otherwise would have been available to all of the Celsius stakeholders. Celsius's unsecured creditors were injured because their credit exposure was increased and their potential for recovery was reduced due to Defendants' actions.

**RESPONSE:** The allegations in Paragraph 604 state legal conclusions to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

605.    Allowing Defendants to receive payment on their claims would be unfair and inequitable.

**RESPONSE:** The allegations in Paragraph 605 state a legal conclusion to which no response is required.  To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

606.    Equitable subordination of the Defendants' claims is consistent with the Bankruptcy Code and with the Code's overarching purpose to protect creditors and guarantee similar treatment for all similarly situated claims.

**RESPONSE:** The allegations in Paragraph 606 state legal conclusions to which no

response is required.  To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to the Goldstein Defendants' claims, and lack

knowledge or information sufficient to form a belief as to the truth of the allegations of the

Paragraph with respect to any other entity or individual.

607.    Because of the transactions and actions described herein, Defendants' claims, including any and all current and future claims they have for indemnification against the Company, should be equitably subordinated to all general unsecured claims pursuant to 11 U.S.C. § 510.

**RESPONSE:** The allegations in Paragraph 607 state legal conclusions to which no

response is required.  To the extent a response is required, the Goldstein Defendants deny the

allegations set forth in this Paragraph as they relate to the Goldstein Defendants' claims, and lack

knowledge or information sufficient to form a belief as to the truth of the allegations of the

Paragraph with respect to any other entity or individual.

## COUNT XXXVI

**(Disallowance of Defendants' Claims — 11 U.S.C. § 502(d) — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Roni Cohen-Pavon, Harumi Urata-Thompson, Jeremie Beaudry, Johannes Treutler, Kristine Meehan Mashinsky, Aliza Landes, AM Ventures Holding, Inc., Koala1 LLC, Koala2 LLC, Koala3 LLC, Bits of Sunshine LLC, Four Thirteen LLC, and Alchemy Capital Partners, LP)**

608.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

**RESPONSE:** The Goldstein Defendants respectfully repeat and reallege each and every

response to Plaintiff's allegations as if fully set forth herein.

609.    The Defendants are all persons or entities from which property is recoverable under section 550 of the Bankruptcy Code or is a transferee of transfers avoidable under sections 544, 547, and 548 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 609 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

610. The Defendants have not paid the amount or turned over any property transferred for which the Defendants are liable under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 610 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

611. Any filed or scheduled claims held by the Defendants are disallowed until the Defendants pay in full or return the property for which they are liable under section 550 of the Bankruptcy Code.

**RESPONSE:** The allegations in Paragraph 611 state a legal conclusion to which no response is required. To the extent a response is required, the Goldstein Defendants deny the allegations set forth in this Paragraph as they relate to the Goldstein Defendants' claims, and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the Paragraph with respect to any other entity or individual.

## <u>ANSWER TO PRAYER FOR RELIEF</u>

The Prayer for Relief states the relief Plaintiff seeks and therefore requires no response. To the extent a response is deemed to be required, the Goldstein Defendants deny that Plaintiff and/or any creditors are entitled to any of the relief sought.

## **AFFIRMATIVE DEFENSES**

The Goldstein Defendants set forth the following affirmative defenses and/or other defenses. To the extent that a defense asserted herein as an "Affirmative Defense" is an ordinary defense, the Goldstein Defendants do not intend to, and do not, assume any burden of proof, production, or persuasion that would not apply if such defense were not asserted herein. The Goldstein Defendants expressly and specifically reserve the right to raise any additional defenses not asserted herein, of which they may become aware through discovery or other investigation, and will amend or modify their answer accordingly. The Goldstein Defendants further reserve the right to withdraw defenses that they determine are not applicable during the course of other proceedings in this action. The Goldstein Defendants further adopt and incorporate by reference any and all other defenses asserted, or to be asserted, by any other Defendant in this action to the extent the Goldstein Defendants may share in such defense.

### **First Affirmative Defense**

The relief sought in the Complaint should be denied because the Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

### **Second Affirmative Defense**

The relief sought in the Complaint should be denied because all or some of the alleged transfers did not involve any property of the Debtor.

### **Third Affirmative Defense**

The relief sought in the Complaint should be denied because the Debtor was not insolvent at the time of all or some of the alleged transfers.

### **Fourth Affirmative Defense**

The relief sought in the Complaint should be denied because all or some of the alleged transfers were not made to or for the benefit of a creditor.

### Fifth Affirmative Defense

The relief sought in the Complaint should be denied because the Goldstein Defendants received any alleged fraudulent transfers for value and in good faith, pursuant to 11 U.S.C. § 548(c).

### Sixth Affirmative Defense

The relief sought in the Complain should be denied because all or some of the alleged transfers to the Goldstein Defendants reflected a contemporaneous exchange for new value under 11 U.S.C. § 547(c)(1).

### Seventh Affirmative Defense

The relief sought in the Complaint should be denied because all or some of the alleged transfers to the Goldstein Defendants were made in the ordinary course of business under 11 U.S.C. § 547(c)(2).

### Eighth Affirmative Defense

The relief sought in the Complaint should be denied because all or some of the alleged transfers to the Goldstein Defendants reflected an exchange for subsequent new value under 11 U.S.C. § 547(c)(4).

### Ninth Affirmative Defense

The relief sought in the Complaint should be denied under the doctrines of acquiescence, ratification, and estoppel.

### Tenth Affirmative Defense

The relief sought in the Complaint should be denied under the doctrine of laches.

### Eleventh Affirmative Defense

The relief sought in the Complaint should be denied under principles of waiver and/or release.

### Twelfth Affirmative Defense

The relief sought in the Complaint should be denied to the extent permitted by the doctrine of accord and satisfaction.

### Thirteenth Affirmative Defense

The relief sought in the Complaint should be denied to the extent permitted by the equitable doctrines of *in pari delicto*, "unclean hands," and/or unjust enrichment.

### Fourteenth Affirmative Defense

The relief sought in the Complaint should be denied to the extent permitted by the doctrines of setoff and/or recoupment.

### Fifteenth Affirmative Defense

The relief sought in the Complaint should be denied because any debts, obligations or guarantees allegedly owed by the Goldstein Defendants have been satisfied and/or extinguished.

### Sixteenth Affirmative Defense

The equitable relief sought in the Complaint should be denied because monetary damages are an available remedy.

### Seventeenth Affirmative Defense

The relief sought in the Complaint should be denied because the Goldstein Defendants did not cause any purported losses or damages.

### Eighteenth Affirmative Defense

The relief sought in the Complaint should be denied because Plaintiff lacks standing to bring all or some of its alleged claims.

### Nineteenth Affirmative Defense

The relief sought in the Complaint should be denied because any alleged misstatements or misleading omissions were not known to be false.

### Twentieth Affirmative Defense

The relief sought in the Complaint should be denied because any alleged misstatements or misleading omissions were not material.

### Twenty-First Affirmative Defense

The relief sought in the Complaint should be denied because the Goldstein Defendants did not act at any time with scienter or intent to deceive, manipulate, or defraud.

### Twenty-Second Affirmative Defense

The relief sought in the Complaint should be denied because the Goldstein Defendants did act at any time with the intent to induce reliance on any alleged misstatements or omissions.

### Twenty-Third Affirmative Defense

The relief sought in the Complaint should be denied because account holders did not rely on any alleged misstatements or omissions made by the Goldstein Defendants

### Twenty-Fourth Affirmative Defense

The relief sought in the Complaint should be denied because the Goldstein Defendants did not owe any fiduciary duties under any law.

### Twenty-Fifth Affirmative Defense

The relief sought in the Complaint should be denied because the Goldstein Defendants' actions are protected under the business judgment and proper purposes rules.

### Twenty-Sixth Affirmative Defense

The relief sought in the Complaint should be denied because the Goldstein Defendants reasonably relied on the advice and guidance of professional advisors for all or some of the conduct alleged in the Complaint.

### Twenty-Seventh Affirmative Defense

The relief sought in the Complaint should be denied because all or some of Plaintiff's claims are barred by the limitations on avoiding powers under 11 U.S.C. § 546(e).

### Twenty-Eighth Affirmative Defense

The relief sought in the Complaint should be denied because English law is inapplicable.

### Twenty-Ninth Affirmative Defense

The relief sought in the Complaint should be denied because all or some of the alleged transfers were not made on account of an antecedent debt.

### Thirtieth Affirmative Defense

The relief sought in the Complaint should be denied because Plaintiff fails to identify a factual or legal basis for his claim for attorneys' fees.

### Thirty-First Affirmative Defense

The relief sought in the Complaint should be denied because Plaintiff is barred from recovering in excess of any statutory caps on punitive damages that may apply in this action.

### Thirty-Second Affirmative Defense

The relief sought in the Complaint should be denied because all or some of Plaintiff's claims are barred by the "safe harbor" provision in 11 U.S.C. § 546(e).

### Thirty-Third Affirmative Defense

The relief sought in the Complaint should be denied because Plaintiff does not plead all or some of its claims with the requisite particularity.

### Thirty-Fourth Affirmative Defense

The relief sought in the Complaint should be denied because Debtors received reasonably equivalent value in exchange for any allegedly fraudulent transfers made to the Goldstein Defendants.

### Thirty-Fifth Affirmative Defense

The relief sought in the Complaint should be denied because all or some of the alleged transfers to the Goldstein Defendants were not made during the time period set forth in 11 U.S.C. § 547(b).

### Thirty-Sixth Affirmative Defense

The relief sought in the Complaint should be denied because at the time of all or some of the alleged transfers to the Goldstein Defendants, the Debtors were not insolvent and did not become insolvent as a result of such transfers, were not engaged in business or a transaction and were not about to engage in business or a transaction for which any property remaining with the Debtors was an unreasonably small capital, or did not intend to incur debts that would be beyond the Debtors' ability to pay as such debts matured.

### Thirty-Seventh Affirmative Defense

The relief sought in the Complaint should be denied all or some of the alleged damages were caused by the acts, including criminal acts, of others for whose conduct the Goldstein Defendants were not responsible.

### Thirty-Eighth Affirmative Defense

The relief sought in the Complaint should be denied all or some of Plaintiff's claims are barred by the applicable statutes of limitations.

### Thirty-Ninth Affirmative Defense

The relief sought in the Complaint should be denied for the reasons stated in any defenses asserted by any other Defendant to this action, which are incorporated herein by reference to the extent applicable.

## RESERVATION

The Goldstein Defendants expressly and specifically reserve the right to amend this Answer to add, remove, or modify defenses based on legal theories, facts, and circumstances that may or will be divulged through discovery and/or further legal analysis of Plaintiff's position in this litigation.

## STATEMENT OF JURISDICTION AND JURY DEMAND

The Goldstein Defendants do not consent to entry of final orders or judgment by the Bankruptcy Court. The Goldstein Defendants demand a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**WHEREFORE**, the Goldstein Defendants respectfully request that the Complaint be dismissed, with prejudice, and that the Court enter such other relief as it deems just and proper.

Dated:     February 18, 2025
               New York, New York

/s/ *Avi Weitzman*

**PAUL HASTINGS LLP**
Avi Weitzman
Zachary Melvin
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 752-3561
Email: aviweitzman@paulhastings.com
            zacharymelvin@paulhastings.com

*Counsel to Hanoch "Nuke" Goldstein, Bits of Sunshine LLC, and Four Thirteen LLC*