**WHITE & CASE**

March 13, 2026

VIA CM/ECF

The Honorable Chief Judge Martin Glenn
U.S. Bankruptcy Court for the Southern District of New York
One Bowling Green, Courtroom 523
New York, NY 10004-1408

White & Case LLP
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606-4302
**T** +1 312 881 5400

**whitecase.com**

**Re:**   *Meghji v. Mashinsky, et al.*, **Adv. Proc. No. 24-03667 (MG)**

Dear Chief Judge Glenn:

Under Rules 7026, 7033, 7034, and 7037 of the Federal Rules of Bankruptcy Procedure, the Litigation Administrator requests that the Court order Defendants Shlomi Daniel Leon ("Leon"), Aliza Landes ("Landes"), and Alchemy Capital Partners, LP ("Alchemy") (collectively, the "LLA Defendants") to immediately answer three outstanding interrogatories and produce information selectively withheld from Mr. Leon's government "clone" production.

First, the Litigation Administrator sent the LLA Defendants interrogatories regarding the use of proceeds from insider transactions, including the Alchemy Loan (defined below). The LLA Defendants have taken the position that this information is irrelevant under Rule 7026 and refused to answer either through written responses or document productions.

Second, Mr. Leon has refused to produce and sought to claw back certain documents related to his finances,[1] despite having provided this information to the government in connection with investigations into Celsius' business.

Counsel for the parties have met and conferred but have been unable to resolve these issues. The Litigation Administrator now submits this letter brief accordingly.

## I. Background

Mr. Leon was the co-founder, board member, Chief Operating Officer and Chief Strategy Officer of Celsius.  Ms. Landes is Mr. Leon's spouse and the former Vice President of Lending of Celsius. Alchemy is an entity controlled by Mr. Leon.  The Complaint alleges that, among other things, the LLA Defendants participated and profited from a scheme to manipulate the price of the CEL token. It also alleges that the LLA Defendants were the beneficiaries of constructive fraudulent, actual fraudulent, and preferential transfers, including significant transfers in the days before the "pause."[2]

In April 2021, contemporaneously with the effectiveness of the State of New Jersey Cease and Desist Order and other similar impending determinations by regulators, Alchemy received a $4 million loan from Celsius collateralized by approximately 8,000,000 CEL tokens, at an *0.1%* pre-default interest rate (the "Alchemy Loan").  *See* Statement of Financial Affairs (Bankr. D.I.

---

[1] The Litigation Administrator disagrees with the basis for the claw-back but as a professional courtesy has agreed to not review the subject material until the Court rules on the matter.

[2] On June 12, 2022, Celsius paused all withdrawals of cryptocurrency from the Celsius platform. Celsius filed for bankruptcy approximately one month later, on July 13, 2022 (the "Petition Date").

WHITE & CASE

973) at 48, 53; Compl. (D.I. 1) at ¶ 61. At that same time, Mr. Leon also transferred cryptocurrency worth $2,200,000 from Celsius to himself. Statement of Financial Affairs (Bankr. D.I. 973) at 52. The Litigation Administrator has brought an actual fraudulent transfer claim (Count XXVI) against Alchemy, asserting the Alchemy Loan was made with actual intent to hinder, delay, or defraud creditors and is therefore avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code. *See* Compl.(D.I. 1) at ¶¶ 481-492. The Complaint also asserts a constructive fraudulent transfer claim (Count XXVII), alleging Celsius received less than reasonably equivalent value on account of the loan transfer while Celsius was insolvent. Compl. (D.I. 1) at ¶ 497. The Complaint also asserts other related claims against the LLA Defendants, including for breach of fiduciary duties.

On August 18, 2025, the Litigation Administrator served interrogatories on the LLA Defendants seeking, among other things: (1) a description of what the Alchemy Loan proceeds were used for or where they were directly or indirectly transferred; (2) the identity of all cryptocurrency wallets owned by the LLA Defendants or their affiliated entities; and (3) the identity of all trusts in which the LLA Defendants, their affiliates, or relatives are settlors, trustees, or beneficiaries and the dates those trusts were formed. The LLA Defendants have refused to answer these interrogatories.[3]

The Litigation Administrator also served document requests on the LLA Defendants on August 18, 2025, seeking, among other things, all documents and communications regarding investigations or inquiries into Celsius' business by any government or other regulatory entity. Mr. Leon agreed to produce the documents in response to this request, including a government "clone" production. However, in making that production, Mr. Leon first selectively withheld certain documents and then also sought to claw back one additional document, as allegedly irrelevant or non-responsive. The fact that these documents were produced to the government clearly makes them responsive, they are relevant under Bankruptcy Rule 7026, and there is no basis to claw back non-privileged documents based on a responsiveness or relevance objection—as opposed to a privilege assertion—under the Stipulated Protective Order (D.I. 184).

## II. Argument

Bankruptcy Rule 7026 provides that parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. In assessing proportionality, courts consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Bankr. P. 7026. The burden is on the party resisting discovery to establish that the requested materials are not relevant or that production would be disproportionate. *See* Fed. R. Bankr. P. 7026(b)(1); *In re Application of the Children's Inv. Fund Found.*, 363 F. Supp. 3d 361, 373 (S.D.N.Y. 2019).

### A. The Use of the Alchemy Loan Proceeds Is Relevant

Alchemy argues that what it did with the $4 million it received on account of the Alchemy Loan is irrelevant to any claim or defense in this action, including the actual fraudulent transfer claims,

---

[3] The LLA Defendants initially also refused to answer similar interrogatories asking what they did with cryptocurrency withdrawn from the Celsius platform in the year prior to the Petition Date on the same grounds, but following the Court's comments at the discovery conference on January 29, 2026, ultimately conceded and produced documents in response. The Litigation Administrator is still assessing the adequacy of their response and reserves all rights.

March 13, 2026

**WHITE & CASE**

because it is the Debtors' intent, and not the intent of the transferee, that matters.  That is incorrect.

Actual fraudulent transfer claims require a plaintiff to establish that a Debtor acted with an intent to hinder, delay, or defraud creditors.  *See* 11 U.S.C. § 548(a)(1)(A).  Because parties rarely admit they acted with a fraudulent intent, courts may infer fraudulent intent from the circumstances surrounding the transfer.  *See von Kahle v. Cargill, Inc.*, 2024 U.S. Dist. LEXIS 229901, at \*22 (S.D.N.Y. Dec. 19, 2024).  Courts apply a non-exhaustive list of "badges of fraud" to determine whether a transfer was made with fraudulent intent, including: (1) lack or inadequacy of consideration; (2) a family, friendship, or other close relationship between the transferor and transferee; (3) retention of possession, benefit, or use of the property; (4) the financial condition of the transferor before and after the transfer; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) the existence of a trust or trust relationship; (8) a pattern or series of transactions after the pendency or threat of suit; and (11) the general chronology of events.  *See United States v. Evseroff*, 270 Fed. Appx. 75, 77 (2d Cir. 2008).  The confluence of several badges creates a presumption of fraudulent intent, and once such a presumption arises, the burden shifts to the transferee to prove some legitimate supervening purpose for the transfers.  *In re Tronox Inc.*, 503 B.R. 239, 284 (Bankr. S.D.N.Y. 2013).

One important badge of fraud is retention of possession, benefit, or use of the transferred property. *In re Manshul Constr. Corp.*, 2000 U.S. Dist. LEXIS 12576, at \*136 (S.D.N.Y. Aug. 29, 2000). The Litigation Administrator has alleged that Mr. Leon, who both founded and served as a key executive at Celsius and also owned and controlled Alchemy, knew the extreme issues Celsius faced.  Yet he caused Celsius to issue a "loan" to his controlled entity at a 0.1% interest rate on the eve of the New Jersey Order taking effect and other regulatory issues confronting Celsius. Understanding where the Alchemy Loan proceeds went—and whether Leon or Landes, as insiders of the transferor, retained or put those proceeds into an asset protection vehicle such as an irrevocable trust—is clearly relevant to the badges of fraud, in addition to other issues, including concerning claims for breach of fiduciary duties.  The interrogatory asking the LLA Defendants to describe what the Alchemy Loan proceeds were used for, or where they were directly or indirectly transferred, goes to the heart of important issues in this case*.  See, e.g.*, *United States v. Zurn*, 2009 U.S. Dist. LEXIS 138445, at \*9 (C.D. Cal. Jan. 29, 2009) (finding retention of control of property following transfer to entities within the debtor's control).

The LLA Defendants' contention that the inquiry is limited to whether *Celsius* retained the loan proceeds is beside the point.  As courts in this district have recognized, the fraudulent transfer analysis focuses on the intent of the transferor at the time of the transfer—and intent is proven circumstantially through badges of fraud, which include what the transferee did with the proceeds and whether the transferor or its insiders continued to benefit from them.  *See Manshul*, 2000 U.S. Dist. LEXIS 12576, at \*86–87 (at trial, wife of debtor's president testified as to each entity she transferred funds to after receiving them from debtor, and trial exhibits demonstrated how transferred funds were used, including placement in offshore trust—information that established fraudulent intent).  Furthermore, the court in *Manshul* scrutinized not only whether the debtor itself retained the benefit, but also whether the insider making the transfer—the debtor's president— retained some benefit.  *Id.* \*76-78.

Besides its relevance to badges of fraud for the actual fraudulent transfer claim, Alchemy's use of the Alchemy Loan also relates to other allegations including that Mr. Leon breached his fiduciary

3

WHITE & CASE

duties, including as relating to the CEL Token purchase and manipulation. The Litigation Administrator has alleged that, with Celsius facing insurmountable regulatory and financial strain, Mr. Leon caused Alchemy to take out a loan backed by the Company's own heavily manipulated cryptocurrency at an artificially inflated value with unconscionably favorable terms. Alchemy's use of the proceeds could serve as additional evidence to demonstrate the extent Leon, who controls Alchemy, acted to benefit himself at the expense of Celsius and its creditors, thereby breaching his fiduciary duties. *See Richcourt Euro Strategies, Inc. v. Soundview Capital Mgmt.*, 594 B.R. 108, 128-129 (finding a fiduciary breach where fiduciaries appear on both sides of a transaction or "will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally.").

### B. Information on Cryptocurrency Wallets and Trusts Is Also Relevant

The interrogatories requesting the identification of all cryptocurrency wallets owned by the LLA Defendants or their affiliated entities and all trusts for which they or their relatives are settlors, trustees, or beneficiaries and the formation dates of those trusts, are also relevant to the claims against the LLA Defendants.

Whether a transfer is an actual fraudulent transfer turns on whether it was conducted with the intent to hinder, delay or defraud creditors. With corporate transferors, the relevant intent is the intent of its controlling insiders. *See In re National Audit Defense Network*, 367 B.R. 207, 221 (Bankr. Nev. 2007) ("A corporation, being an entity created by law, is incapable of formulating or acting with intent. Thus, for the purpose of recovering impermissibly transferred corporate assets and thereby facilitating creditor recovery, the intent of the officers and directors may be imputed to the corporation."). The Litigation Administrator has information related to the initial transfer of cryptocurrency off of the Celsius platform and, to the extent that cryptocurrency was transferred to a public wallet on the blockchain, can identify which wallet it was transferred to. But he does not know who owns that wallet. The Litigation Administrator also cannot glean from public information what happened to the cryptocurrency when transferred to a cryptocurrency exchange. The identification of wallets or accounts held by the LLA Defendants or their affiliates will reveal whether any of the relevant proceeds were transferred to or concealed within wallets under their control.[4]

Moreover, whether a transfer was directly or indirectly made to a trust is relevant to the intent behind the transfer and whether it was intended to shelter assets from creditors, which is a classic badge of fraud. *See In re Hypnotic Taxi, LLC*, 543 B.R. 365, 376 (Bankr. E.D.N.Y. 2016). To the extent the LLA Defendants have some concern about the scope of this request, as opposed to its general propriety, the Litigation Administrator has indicated he would be willing to narrow the request to make clear he is only seeking information with some connection to Celsius. But any wholesale refusal to respond is not appropriate.

### C. The LLA Defendants Cannot Selectively Withhold Information Provided to the Government

The LLA Defendants have omitted certain financial information and asked to claw-back information from within the government "clone" production on the grounds that such materials are

---

[4] The Litigation Administrator intends to retain an expert to examine the public blockchain ledger to analyze the extent of any concealment by the Defendants.

March 13, 2026

"non-responsive."  This is improper.

The "non-responsiveness" objection is particularly unavailing here because the LLA Defendants already produced these same financial documents to the SEC.  The fact that the LLA Defendants produced these materials to another party but refuse to produce them here in and of itself demonstrates that the objection is not principled.  *See, e.g.*, *United States v. Anthem, Inc.*, 2024 U.S. Dist. LEXIS 48281 at *8 (S.D.N.Y. Mar. 13, 2024) (ordering defendants to produce documents from prior litigation to "allow parties to benefit from work done in [prior litigation]"); *see also In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 181–82 (S.D.N.Y. 2004) (requiring defendants to produce documents previously produced to the SEC in connection with an investigation because failure to do so would prejudice plaintiffs and defendants would not be burdened by the production).  Similar logic applies here.  The LLA Defendants cannot selectively disclose information to regulators while simultaneously withholding it from the Litigation Administrator, especially without providing any explanation for this disparity.

### D. Rule 69 Does Not Limit the Scope of Rule 26

To the extent the LLA Defendants argue that any of the discovery requests are more appropriate for post-judgment collection proceedings under Federal Rule of Civil Procedure 69, that argument misses the mark.  Rule 26 governs discovery here and is not limited or superseded by Rule 69.  *See E-Corp v. Pacificspan LLC*, 2021 U.S. Dist. LEXIS 262096, at *6 (D. Ariz. Sept. 28. 2021) (noting that Rule 69 does not diminish the availability of discovery prior to judgment); *see also Al Thani v. Hanke,* 2021 U.S. Dist. LEXIS 44893, at *3 (S.D.N.Y. Mar. 10, 2021) (noting that Rule 26 allows for expansive discovery "that is relevant to any party's claim or defense and proportional to the needs of the case.").  Although Rule 69 provides an additional mechanism for discovery in aid of execution, it does not constrict the broad scope of discovery available under Rule 26 during the pendency of an action.  The Litigation Administrator's discovery requests are within the scope of Rule 26 and must be answered accordingly.

Various circumstances weigh in favor of compelling the requested discovery.  The Litigation Administrator has alleged that the LLA Defendants participated in a scheme to, among other things, defraud retail account holders, manipulate the price of the CEL token, breach their fiduciary duties, and abscond with millions of dollars.  The LLA Defendants have access to their cryptocurrency wallets and what they ultimately did with alleged ill-gotten gains—information that the Litigation Administrator may otherwise be unable to obtain.  The LLA Defendants' position risks prejudicing the Litigation Administrator's ability to marshal the evidence necessary to prosecute his claims and establish damages.  The burden of answering these interrogatories is minimal.  Finally, any concerns regarding the propriety of access to or use of the materials can be addressed by the protective order or through objections at trial, and does not constitute grounds for withholding the materials entirely.

The Court should order the LLA Defendants to immediately provide the outstanding information.[5]

Respectfully submitted,

 */s/ Erin Rosenberg*
Counsel to the Litigation Administrator

---

[5] To the extent the Court believes it would be appropriate, the Court may also first review any materials *in camera*.